UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                          :
BRETT STEININGER,                                         :
                                                          :
              -v-                                         :          19-CV-3644 (PAE)
                                                          :
TRIBUNE BROADCASTING COMPANY, LLC ET AL, :
                                                          :                  ORDER
              Defendants.                                 :
                                                          :
------------------------------------------------------------------ X

PAUL A. ENGELMAYER, District Judge:

        Attached to this Order are the following Court Exhibits:

- Exhibit 1: The draft jury charge dated September 22, 2021.

- Exhibit 2: The transcript of Stuart B Kleinman, M.D.'s *de bene esse* testimony, as redact for receipt in Court.

- Exhibit 3: The draft jury charge dated September 23, 2021.

- Exhibit 4: The verdict form discussed at the September 23, 2021 charge conference.

- Exhibit 5: The final jury charge read to the jury on September 24, 2021.

- Exhibit 6: The final verdict form.

- Exhibit 7: The exhibit list.

- Exhibit 8: The witness list.

        SO ORDERED.

                                                        PAUL A. ENGELMAYER
                                                        United States District Judge

Dated: September 29, 2021
       New York, New York

**EXHIBIT 1**

**COURT EXHIBIT 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
:
BRETT STEININGER,
:
:
                                    Plaintiff,     :          19 Civ. 3644 (PAE)
:
              v.                                   :
:
TRIBUNE BROADCASTING COMPANY, LLC :
ET AL.,                                            :
:
                                    Defendants.  :
:
:
------------------------------------------------------------ X

**Jury Charge**
**Draft for Counsel's Review: September 22, 2021**

**TABLE OF CONTENTS**

I.   GENERAL INSTRUCTIONS ...................................................................................... 1

  A.   Introductory Remarks ................................................................................... 1

  B.   Role of the Court .......................................................................................... 1

  C.   Role of the Jury ............................................................................................ 2

  D.   Role of Counsel / Objections and Sidebars ................................................. 2

  E.   Sympathy or Bias ......................................................................................... 3

  F.   Burden of Proof ............................................................................................ 3

  G.   What Is and Is Not Evidence ....................................................................... 5

  H.   Direct and Circumstantial Evidence ............................................................ 6

  I.   Witness Credibility ...................................................................................... 7

  J.   Interested Witnesses / Employee Witnesses ................................................ 9

  K.   Expert Witnesses ........................................................................................ 10

  L.   Preparation of Witnesses ........................................................................... 11

  M.   All Available Evidence Need Not Be Produced ........................................ 11

II.  SUBSTANTIVE CHARGES ................................................................................... 12

  A.   Overview of Plaintiff's Claims ................................................................. 12

  B.   Claims Under Title VII .............................................................................. 14

    1.   Elements of the Title VII Discriminatory Termination Claim ................ 14

      a.   Summary ................................................................................ 14

      b.   First Element: Member of a Protected Class ........................ 15

      c.   Second Element: Qualified for the Position ......................... 15

      d.   Third Element: Adverse Employment Action ...................... 16

      e.   Fourth Element: Religion or Race as Motivating Factor ..... 16

      f.   Defendants' Reasons for the Termination ............................ 17

    2.   Elements of the Title VII Hostile Work Environment Claim ................... 19

      a.   Summary ................................................................................ 19

      b.   First Element:  Member of a Protected Class ...................... 19

      c.   Second Element:  Unwelcome Harassment That Created a Hostile Work
Environment and Altered Work Conditions .................................................. 20

      d.   Third Element: Harassment Based on Religion or Race ....... 21

   e. Fourth Element: Responsibility of the Defendant ................................. 21

 C. Claims Under Section 1981 ....................................................................... 24

  1. Elements of a Section 1981 Discriminatory Termination Claim ................................. 24

  2. Elements of a Section 1981 Hostile Work Environment Claim .................................. 25

  3. Individual Defendant's Liability Under Section 1981 ................................................. 25

 D. Claims Under the New York State Human Rights Law ................................ 25

  1. Elements of the NYSHRL Discriminatory Termination Claim................................... 26

  2. Elements of the NYSHRL Hostile Work Environment Claim ................................... 26

  3. Individual Liability Under the NYSHRL ................................................................... 26

 E. Claims Under the New York City Human Rights Law ................................. 27

  1. Overview................................................................................................................... 27

  2. Elements of a NYCHRL Discriminatory Termination Claim ................................... 27

  3. Elements of a NYCHRL Hostile Work Environment Claim........................................ 28

  4. Affirmative Defenses ................................................................................................. 29

   a. Affirmative Defense to the Discriminatory Termination Claim........................... 29

   b. Affirmative Defense to the Hostile Work Environment Claim ............................. 29

 F. Damages..................................................................................................... 30

  1. Overview................................................................................................................... 30

  2. Categories of Damages ............................................................................................. 31

   a. Compensatory Damages .................................................................................... 31

    (i) Overview ...................................................................................................... 31

    (ii) Back Pay........................................................................................................ 31

    (iii) Front Pay ...................................................................................................... 32

   b. Plaintiff's Duty to Mitigate ................................................................................ 32

   c. Non-Economic Compensatory Damages ................................................................ 33

   d. Nominal Damages.............................................................................................. 34

   e. Punitive Damages ............................................................................................. 35

III. DELIBERATIONS OF THE JURY ................................................................... 40

 A. Right to See Exhibits and Hear Testimony................................................... 40

 B. Communication with the Court..................................................................... 40

 C. Notes ......................................................................................................... 41

D.   Duty to Deliberate; Unanimous Verdict ........................................................................ 41

E.   Verdict Form ............................................................................................................... 42

F.   Duties of Foreperson ................................................................................................... 42

G.   Return of Verdict ........................................................................................................ 42

IV.   CONCLUSION ........................................................................................................................ 43

I.    **GENERAL INSTRUCTIONS**

   A.    **Introductory Remarks**

Members of the jury, you have now heard all of the evidence in the case as well as the final arguments of the parties. You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in the case.

Now it is time for me to instruct you as to the law that governs the case. There are three parts to these instructions. First, I'm going to give you some general instructions about your role, and about how you are to decide the facts of the case. These instructions really would apply to just about any trial. Second, I'll give you some specific instructions about the legal rules applicable to this particular case. Third, I'll give you some final instructions about procedure.

Listening to these instructions may not be easy.  It is important, however, that you listen carefully and concentrate.  I ask you for patient cooperation and attention.  You'll notice that I'm reading these instructions from a prepared text.  It would be more lively, no doubt, if I just improvised.  But it's important that I not do that.  The law is made up of words, and those words are very carefully chosen.  So when I tell you the law, it's critical that I use exactly the right words.

You'll have copies of what I'm reading in the jury room to consult, so don't worry if you miss a word or two.  But for now, listen carefully and try to concentrate on what I'm saying.  I will be distributing to you a verdict in which to record your verdict.  It will list the questions that you must consider, in the order that you should consider them.

   B.    **Role of the Court**

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.  With respect to legal

1

matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.  You must not substitute your own notions or opinions of what the law is or ought to be.

### C.     Role of the Jury

As members of the jury, you are the sole and exclusive judges of the facts.  You pass upon the evidence.  You determine the credibility of the witnesses.  You resolve such conflicts as there may be in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Although you are encouraged to use all of your life experiences in analyzing testimony and reaching a fair verdict, you may not communicate any personal professional expertise you might have or other facts not in evidence to the other jurors during deliberations.  You must base your discussions and decisions solely on the evidence presented to you during the trial and that evidence alone.  You may not consider or speculate on matters not in evidence or matters outside the case.

### D.     Role of Counsel / Objections and Sidebars

It is the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible.  It is my job to rule on those objections.  Therefore, why an objection was made or why I ruled on it the way I did is not your concern.  You should draw no inference from the fact that an attorney objected to any evidence. Nor should you draw any inference from the fact that I might have sustained or overruled an objection.  Simply because I have permitted certain evidence to be introduced does not mean that I have decided on its significance.  That is for you to decide.

From time to time, the lawyers and I had conferences out of your hearing.  These conferences involved procedural and other matters, and none of the events relating to these conferences should enter into your deliberations at all.

Similarly, the personalities and the conduct of counsel in the courtroom are not in any way at issue.  If you formed reactions of any kind to any of the lawyers in the case, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, those reactions should not enter into your deliberations.

### E.      Sympathy or Bias

You are to evaluate the evidence calmly and objectively, without prejudice or sympathy. You are to be completely fair and impartial.  Your verdict must be based solely on the evidence developed at this trial, or the lack of evidence.  The parties in this case are entitled to a trial free from prejudice and bias.  Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

It would be improper for you to consider, in deciding the facts of the case, any personal feelings you may have about the race, national origin, sex or age of any party or any witness, or any other such irrelevant factor.  This case should be decided by you as an action between parties of equal standing in the community, and of equal worth.  Both parties are entitled to the same fair trial at your hands.  Both parties stand equal before the law, and are to be dealt with as equals in this Court.

### F.      Burden of Proof

The plaintiff, Brett Steininger, has the burden of proving all the elements of his claims by a preponderance of the evidence.

What does a "preponderance of the evidence" mean?  To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not the number of witnesses or documents.  In determining whether a claim has been proven by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.

If, after considering all of the testimony, you are satisfied that the plaintiff, the party with the burden of proof, has carried his burden on each essential point of a claim, then you must find in the plaintiff's favor.  If, after such consideration, you find that the evidence produced by the plaintiff is outweighed by the evidence against the plaintiff's position, or that the credible evidence on a given issue is evenly divided between the parties—that it is as equally probable that one side is right as it is that the other side is right—then you must decide that issue against the plaintiff.  That is because the plaintiff, because he bears the burden of proof, must prove more than simple equality of evidence—he must prove the element by a preponderance of the evidence.  On the other hand, the plaintiff need prove no more than a preponderance.  So long as you find that the scales tip, however slightly, in favor of the plaintiff—that what he claims is more likely true than not—then that element will have been proven by a preponderance of the evidence.

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof only in a *criminal* trial. That requirement does not apply to a civil case such as this, and you should put it out of your mind.

### G.      What Is and Is Not Evidence

I want to take a moment to describe to you what is and is not evidence in this case.  As I have said, you may rely only on the evidence in your deliberations.  The evidence in this case is the sworn testimony of the witnesses, and the exhibits received in evidence.  On the other hand, certain things are not evidence.

First, I will describe a list of examples of things that are not evidence:

1.      A question by a lawyer is not to be considered by you as evidence.  It is the witnesses' answers that are evidence, not the questions.  At times, a lawyer may have incorporated into a question a statement which assumed certain facts to be true, and asked the witness if the statement was true.  If the witness denied the truth of a statement, and if there is no direct evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

2.      Similarly, arguments by lawyers are not evidence, because the lawyers are not witnesses.  What they have said in their opening statements was intended, and what they will say to you in their closing statements will be intended, to help you understand the evidence and to reach your verdict.  However, if your recollection of the facts differs from the lawyers' statements, it is your recollection which controls.

3.      Statements that I may have made concerning the evidence do not constitute evidence.  Similarly, at times, I may have admonished a witness or directed a witness to be responsive to questions or to keep his or her voice up.  At times, I may have asked a question myself.  Any questions that I asked, or instructions that I gave, were intended only to clarify the presentation of evidence and to bring out something that I thought might be unclear.  You should draw no inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or any party in the case, by reason of any comment, question, or instruction of mine.  Nor should you infer that I have any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that is before you.  That is entirely your role.

4.      Testimony that has been stricken or excluded is not evidence, and it may not be considered by you in rendering your verdict.

5.      Anything you may have seen or heard outside the courtroom is not evidence.

Now, I will provide you with some things that you may consider as evidence. As I have said, evidence may come in several forms:

1. The sworn testimony of witnesses, regardless of who called them, is evidence. This is true of the witnesses' answers on both direct and cross examination. However, if certain testimony was received for a limited purpose, you must follow the limiting instructions I have given.

2. The exhibits that were admitted during the trial are evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials brought forth only to refresh a witness's recollection.

3. Prior testimony is evidence. Such testimony, known as depositions, is produced through a procedure where, prior to trial, the attorneys for one side may question a witness or an adversary under oath. This is part of what is called pretrial discovery, and each side is entitled to take depositions. To the extent I admitted excerpts of prior testimony at trial, you may consider the prior testimony of a witness according to the same standards you would use to evaluate the testimony of a witness given at trial.

4. Stipulated facts are evidence. The attorneys in this case entered into stipulations agreeing to certain facts. This means that there is no dispute as to these facts and these facts are established for the purposes of this case. You must consider the agreed facts along with the other evidence presented and give the agreed facts such weight as you find appropriate. **[IF APPLICABLE]**

**H.      Direct and Circumstantial Evidence**

Generally, as I told you in my initial instructions, there are two types of evidence that you may consider in reaching your verdict. One type of evidence is direct evidence. Direct evidence is testimony by a witness about something she knows by virtue of her own senses—something she has seen, felt, touched, or heard. For example, if a witness testified that when she left his house this morning, it was raining, that would be direct evidence about the weather.

Circumstantial evidence is evidence from which you may infer the existence of certain facts. To use the same example I gave you at the start of trial: Assume that when you came into the courthouse this morning, the sun was shining and it was a nice day. Assume that the

courtroom blinds were drawn and you could not look outside.  As you were sitting here, someone

walked in with an umbrella, which was dripping wet.  Then a few minutes later another person

entered with a wet raincoat.  Now, you cannot look outside of the courtroom and you cannot see

whether or not it is raining, and no one has testified that it is raining.  So you have no direct

evidence of that fact.  But on the combination of facts that I have asked you to assume, it would

be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence.  You infer on the basis of reason and

experience and common sense from one established fact the existence or non-existence of some

other fact.  Many facts, such as a person's state of mind or intentions, are rarely susceptible of proof

by direct evidence.  Usually, such facts are established by circumstantial evidence.  Where

circumstantial evidence is presented, it is of no less value than direct evidence, for it is a general rule

that the law makes no distinction between direct evidence and circumstantial evidence.

## I.       Witness Credibility

You have had the opportunity to observe the witnesses.  It is now your job to decide how

believable each witness was in his or her testimony.  You are the sole judge of the credibility of

each witness and of the importance of his or her testimony.

In making these judgments, you should carefully scrutinize the testimony of each witness,

the circumstances under which each witness testified, the impression the witness made when

testifying, and any other matter in evidence which may help you decide the truth and the

importance of each witness's testimony.

How do you determine where the truth lies?  You watched each witness testify.

Everything a witness said or did on the witness stand counts in your determination.  How did the

witness impress you?  Did he or she appear to be frank, forthright, and candid?  Or was the

witness evasive and edgy, as if hiding something?  How did the witness appear?  What was his

or her demeanor—that is, his or her carriage, behavior, bearing, manner and appearance while testifying?  Often it is not what a person says but how he or she says it that moves us.

You should use all the tests for truthfulness that you would use in determining matters of importance to you in your everyday life.  You should consider any bias or hostility the witness may have shown for or against any party as well as any interest the witness has in the outcome of the case.  You should consider the opportunity the witness had to see, hear, and know the things about which he or she testified, the accuracy of his or her memory, his or her candor or lack of candor, his or her intelligence, the reasonableness and probability of his or her testimony and its consistency or lack of consistency and its corroboration or lack of corroboration with other credible testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given, and all of the other evidence in the case. Always remember that you should use your common sense, your good judgment, and your everyday experiences in life to make your credibility determinations.

If you find that any witness has willfully testified falsely as to any material fact—that is, as to an important matter—the law permits you to disregard the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything.  However, you are not required to consider such a witness as totally "unbelievable."  You may accept so much of the witness's testimony as you deem true and disregard what you feel is false.  By the processes which I have just described, you, as the sole judges of the facts, decide which of the witnesses you will believe, what portion of each witness's testimony you accept, and what weight you will give to it.

8

On some occasions during this trial, witnesses were asked to explain an apparent inconsistency between testimony offered at this trial and previous statements made by the witness.  It is for you to determine whether a prior statement was inconsistent, and if so, how much (if any) weight to give to an inconsistent statement in assessing the witness's credibility at trial.

### J.      Interested Witnesses / Employee Witnesses

In deciding whether to believe a witness, you should take into account any evidence that shows that a witness may benefit in some way from the outcome of the case, such as a financial interest.  Likewise, you should specifically note any evidence of hostility or affection that the witness may have towards one of the parties.  You should also consider any other interest or motive that the witness may have in cooperating with a particular party.

In this case, the plaintiff, Brett Steininger, and a defendant, Christopher Tzianabos, testified before you.  As parties to this action, they are, by definition, interested witnesses.

It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony.  In short, if you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

An interested witness is not necessarily less believable than a disinterested witness.  The mere fact that a witness is interested in the outcome of the case does not mean he or she has not told the truth. It is for you to decide from your observations and applying your common sense and experience and all the other considerations mentioned, whether the possible interest of any witness, or of any party, has intentionally or otherwise colored or distorted his or her testimony. You are not required to believe an interested witness; you may accept as much of his or her testimony as you deem reliable and reject as much as you deem unworthy of acceptance.

Similarly, several witnesses who testified are presently or were previously employed by the corporate defendants, whom I am referring again for short as WPIX. In the order they have testified, they are Christian Wayland, Nancy Barbosa, Michael Schwartz, Debbie Presser, and Joseph Perrapato. You may consider whether the testimony of these witnesses was in any way influenced by the fact that they are now, or were previously, employed by WPIX.

**K.    Expert Witnesses**

You will recall that the witnesses Dr. N.G. Berrill, called by the plaintiff, and Dr. Stuart B. Kleinman, called by the defense, testified as experts in the field of forensic psychology and forensic psychiatry, respectively, and gave their opinions concerning Mr. Steininger's mental state. When a case involves a matter of science or art, or requires special knowledge or skill not ordinarily possessed by the average person, an expert is permitted to state his or her opinion for the information of the Court and jury. The opinions stated by each expert who testified before you were based on particular facts, as the expert obtained knowledge of them and testified to them before you, or as the attorney who questioned the expert asked him to assume. You may reject an expert's opinion if you find the facts to be different from those which formed the basis for the opinion. You may also reject the opinion if, after careful consideration of all the evidence in the case, expert and other, you disagree with the opinion. In other words, you are not required to accept an expert's opinion to the exclusion of the facts and circumstances disclosed by other testimony. Such an opinion is subject to the same rules concerning reliability as the testimony of any other witness. It is given to assist you in reaching a proper conclusion; it is entitled to such weight as you find the expert's qualifications in the field warrant and must be considered by you, but is not controlling upon your judgment.

### L.      Preparation of Witnesses

You have heard evidence during the trial that witnesses had discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.  Although you may consider that fact when you are evaluating a witness's credibility, I should tell you that there is nothing either unusual or improper about a witness meeting with lawyers before testifying, so that the witness can be made aware of the subjects that he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them.  In fact, it would be unusual for a lawyer to call a witness without such consultation.  Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

### M.      All Available Evidence Need Not Be Produced

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial.  Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in this case.

Each party has had an equal opportunity or lack of opportunity to call any witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what any uncalled witnesses would have testified to had they been called. The absence of any witnesses should not affect your judgment in any way.

## II.   SUBSTANTIVE CHARGES

I am now going to instruct you on the substantive law to be applied to Mr. Steininger's claims in this lawsuit.

### A.      Overview of Plaintiff's Claims

First, I want to give you an overview of the claims that Mr. Steininger brings in this case. He brings claims against five defendants.  One of them is Christopher Tzianobos, who was Mr. Steininger's supervisor at WPIX.  The other are WPIX and three affiliated corporations.  The parties and I agree that for the purposes of your work, you, the jury, are to treat the corporations as a single defendant, which I will refer to as WPIX.  You should not concern yourself with differences or distinctions among these corporations.  So, for your purposes, then, there are two defendants: Mr. Tzianobos and WPIX.

Mr. Steininger brings claims under four statutes.  Two of them are federal statutes: Title VII of the Civil Rights Act of 1964, which I will refer to as Title VII, and Section 1981 of Title 42 of the United States Code, which I will refer to as Section 1981.  The third is a state statute, the New York State Human Rights Law, sometimes called the "NYSHRL."  And the fourth is a local statute, the New York City Human Rights Law, sometimes called the "NYCHRL."

These statutes all prohibit discrimination in the terms and conditions of employment based on, among other things, a person's race and/or his religion.  There are similarities among these laws and I will point out to you where the requirements of certain laws are the same.  But there are also some differences, as I will draw to your attention.  And so Mr. Steininger's burden in proving some claims differs from his burden as to others.

I will go through the requirements of the four statutes in the order I have listed them. Under each statute, Mr. Steininger brings two claims. The first is for discriminatory termination.

He claims that he was terminated based on being Jewish.  I will refer to that as the discriminatory termination claim.  The second is for harassment, also known as hostile work environment.  He claims that he was subjected to a hostile work environment at WPIX, also based on his being Jewish.  I will refer to that as the hostile work environment claim.  For each statute, I will instruct you first as to the elements of the discriminatory termination claim and then as to the elements of the hostile work environment claim.

As to damages, Mr. Steininger, claims that, as a result of the violations of law that he claims, he was deprived of wages and that he suffered emotional distress.  Defendants deny Mr. Steininger's claims.  They assert that Mr. Steininger was not terminated on account of his religion.  And they deny that there was a hostile work environment for Mr. Steininger at WPIX based on his being Jewish.

I'm about to turn to the first of the claims.  I want to emphasize here that, although certain claims are related in ways that I will explain, you must consider each claim and each defendant separately.  With respect to each defendant and each claim, the critical issue is whether Mr. Steininger has proved the elements of the claim you are considering against the defendant you are considering by a preponderance of the evidence.  If you find a defendant liable to Mr. Steininger, you must then decide the amount of damages, if any, for which that defendant is responsible.

.

### B.      Claims Under Title VII

Let's start with Mr. Steininger's claims under Title VII.

Title VII provides, in pertinent part, that it shall be an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or religion." Under Title VII, Judaism is considered both a race and a religion.

A Title VII claim may only be brought against an employer and not against individuals. So, Mr. Steininger's claims under Title VII are brought only against WPIX.  However, you may consider the conduct of the other defendant, Mr. Tzianabos in determining whether Mr. Steininger has proven his claims under Title VII.

### 1.   Elements of the Title VII Discriminatory Termination Claim

#### a.   Summary

There are four elements that Mr. Steininger is required to prove by a preponderance of the evidence in order to prevail on his Title VII claim for a discriminatory termination based on religion or race.

*First*, that he is a member of a protected class.

*Second*, that he was qualified for the position he held.

*Third*, that he experienced an "adverse employment action," which I'll describe in a moment.

*Fourth*, that his race or religion—here, his being Jewish—was a motivating factor in WPIX's decision to take the adverse employment action.

### b.   First Element: Member of a Protected Class

The parties agree that Mr. Steininger, based on his being Jewish, has satisfied the first element.  I therefore instruct you that you must find this element satisfied.

### c.   Second Element: Qualified for the Position

The second element that Mr. Steininger must prove by a preponderance of the evidence is that he was qualified for the particular position from which he was terminated, that is, as a Sales Manager at WPIX.

Throughout this trial, you have seen and heard evidence concerning Mr. Steininger's performance in his sales role.  Of course, you are to keep that evidence in mind when you deliberate.  However, when I use the term "qualified" in this charge, that term has a particular meaning.

Specifically, with respect to the second element that Mr. Steininger must prove, an employee is qualified for a position only if he possesses the basic skills necessary for performance of the job.  This determination is made in reference to the criteria that the employer has specified for the position, assuming those criteria have not been established or applied in bad faith.  It does not refer to criteria that might seem reasonable to someone else, whether Mr. Steininger or to third parties.  However, being "qualified" should not be construed to require that the employer approved of how the employee performed in the job.  That issue arises, if at all, later in the Title VII analysis.

The parties dispute whether Mr. Steininger was qualified to maintain his position as a Sales Manager at WPIX.  It is for you to decide whether Mr. Steininger has demonstrated that he was qualified to serve in that role.

### d. Third Element: Adverse Employment Action

The third element that Mr. Steininger must prove by a preponderance of the evidence is that he suffered an adverse employment action, one that worked a materially adverse change in the terms or conditions of employment.  Here, Mr. Steininger claims he suffered one such action: being terminated.  As a matter of law, termination is a materially adverse employment action.  I therefore instruct you that you must find this element satisfied.

### e. Fourth Element: Religion or Race as Motivating Factor

Finally, Mr. Steininger must prove by a preponderance of the evidence that the adverse employment action at issue here, his termination, occurred because of discrimination based on his being Jewish.  When I say "because of," I mean that Mr. Steininger must prove by a preponderance of the evidence that his Jewish identity was a motivating factor at the time WPIX undertook the action.  Mr. Steininger need not, however, establish that his Jewish identity was the sole or principal reason for that decision.

Mr. Steininger may use direct evidence, or indirect or circumstantial evidence, or a combination of these, to meet his burden.  Again, direct evidence is evidence which, by its very nature, speaks to the issue sought to be proved.  An example of direct evidence would be a statement by a person that he or she intended to make an employment decision on the basis of a person's ethnicity or national origin.  Mr. Steininger is not required to prove his case by direct evidence, but he may do so.  You should consider any direct evidence along with all of the evidence in the case and determine whether it convinces you, by a preponderance of the evidence, that WPIX was motivated by a religious- or race-based discriminatory purpose.

Mr. Steininger may also prove that WPIX was motivated by discrimination based on Mr. Steininger's Jewish identity by presenting what is called indirect evidence to that effect.  Indirect

evidence is evidence which, though it does not speak directly to the issue sought to be proved, provides the basis for an inference with regard to that issue. Mr. Steininger may use such evidence in attempting to prove to you that WPIX was motivated by a religious- or race-based discriminatory purpose, and, if you believe the evidence establishes that fact, you may use it as the basis for your finding of intent.

Mr. Steininger may also prove that WPIX was motived by discrimination based on his being Jewish even absent evidence of bias on the part of the ultimate decision maker at WPIX, so long as an individual shown to have the impermissible bias played a meaningful role in the decision-making process. But just because an individual with an impermissible bias played a role in the decision-making process does not necessarily mean Mr. Steininger's termination was wrongful. Only if Mr. Steininger has proved that the ultimate decisionmaker *negligently* adopted the bias of another employee with discriminatory animus, and thereby afforded that employee an outsize role in the employment decision, can that biased motivation be imputed to the employer and used to support a claim under Title VII.

### f. Defendants' Reasons for the Termination

Defendants contend that WPIX had legitimate reasons for its conduct toward Mr. Steininger. Specifically, they contend that Mr. Steininger was not qualified for his position as Sales Manager and that, even if he was qualified, his termination was for reasons independent of bias, specifically, reasons relating to Mr. Steininger's performance in that position.

Mr. Steininger contends that WPIX's explanations for his termination are pretextual, that is, that they are unworthy of belief. Mr. Steininger further contends that even if those explanations were genuinely held, they were not the only bases on which WPIX made that

17

decision.  Mr. Steininger asserts that a motivating factor for his termination was his Jewish identity.

When you consider these competing claims, you are not to judge the wisdom of WPIX's actions, but instead, to decide whether the reasons it advances were the actual reasons for their actions.  An employer is entitled to make its decisions for good reasons, bad reasons, or for no reason at all, so long as the decision is not motivated by discrimination.

Similarly, absent evidence of bad faith, an employer is entitled to set its own expectations and requirements as to how to organize and staff its workplace and as to the qualifications for a given position.  You are not to judge WPIX's standards of expected performance or the qualifications it set in good faith.  Rather, you are to examine how it treated Mr. Steininger in light of its legitimate expectations of performance and the qualifications it desired.

If you believe that the reasons WPIX gave for Mr. Steininger's termination are false or incomplete, you may infer, but you are not required to infer, that WPIX acted as it did based on Mr. Steininger's Jewish identity.  Of course, if you find that WPIX's proffered reasons for its assignment decisions were false or incomplete, that does not necessarily mean that its true motives included the unlawful ones of ethnicity or national origin discrimination argued by Mr. Steininger.  You may infer discrimination from the falsity or incompleteness of the employer's explanation, but you are not required to do so.

Ultimately, however, it remains Mr. Steininger's burden to prove that he was a victim of discrimination—that is, that his Jewish identity was a motivating factor in his termination.  If he fails to meet this burden, then you must find in favor of WPIX.

In sum, if you find that Mr. Steininger has established each of the four elements of his employment discrimination claim by a preponderance of the evidence, then you must return a

verdict in his favor.  If, however, you find that he has failed to prove one or more of these elements by a preponderance of the evidence, then you must return a verdict for WPIX.

### 2. Elements of the Title VII Hostile Work Environment Claim

#### a. Summary

In addition to his discriminatory termination claim, Mr. Steininger has also brought a claim under Title VII for hostile work environment.  Title VII law prohibits harassment based on race or religion in the form of a hostile work environment.

There are four elements that Mr. Steininger is required to prove by a preponderance of the evidence to prevail on his claim under Title VII for a hostile work environment based on race or religion:

*First*, that he is a member of a protected class;

*Second*, that he was subject to harassment that had the purpose or effect of unreasonably interfering with Mr. Steininger's work performance and creating an intimidating, hostile, or offensive work environment;

*Third*, that the harassment was based on Mr. Steininger's being Jewish;

*Fourth*, that WPIX has responsibility for the acts of harassment in the workplace to which Mr. Steininger was subjected.

I shall now address each of these elements in greater detail.

#### b. First Element:  Member of a Protected Class

The first element of Mr. Steininger's claim is that he is a member of a protected class.  As discussed earlier, the parties do not dispute that Mr. Steininger has satisfied this element.

### c.   Second Element:  Unwelcome Harassment That Created a Hostile Work Environment and Altered Work Conditions

The second element that Mr. Steininger must prove by a preponderance of the evidence is that he was subjected to unwelcome harassment that had the purpose or effect of altering his work conditions so as to interfere unreasonably with his work performance and to create an intimidating, hostile, or offensive work environment.  Unwelcome conduct is conduct that Mr. Steininger indicated by his own conduct was unwanted.  Here, Mr. Steininger must prove that he was subjected to harassment that transcended coarse, rude, or boorish behavior.  He must prove more than the existence of isolated or trivial remarks.  A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of Mr. Steininger's employment.

Although Mr. Steininger need not prove that he suffered tangible psychological injury or the loss of a tangible job benefit, he must show that he perceived the work environment to be hostile or abusive, in the way I have described, and also that a reasonable person would have found his work environment to be hostile or abusive.  You must also find that a reasonable person of Mr. Steininger's background would also have found the working conditions to constitute a hostile work environment.  In other words, it is not enough for you to find that Mr. Steininger felt subjectively intimidated.  You must also find that a reasonable person in his position would have felt that his workplace was such an environment.  As a consequence, when considering this claim you may only consider evidence of conduct—either toward himself or others—of which Mr. Steininger was aware.

Mr. Steininger can show that his discriminatory work environment was hostile in two ways: he may show either that a single incident of harassment or intimidation was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the

conditions of his working environment. I remind you, however, that the offensive conduct must have been severe and pervasive and cannot have consisted of trivial or isolated remarks and incidents. In determining whether the conduct complained of was sufficiently severe and pervasive to have created a hostile work environment at Mr. Steininger's workplace, you should consider the totality of the circumstances. The circumstances may include the frequency of the discriminatory conduct, the severity of the conduct, whether it was physically threatening or humiliating, the effect on Mr. Steininger's psychological well-being, and whether it unreasonably interfered with Mr. Steininger's work performance. No single factor, however, is required.

### d.   Third Element: Harassment Based on Religion or Race

The third element that Mr. Steininger must prove by a preponderance of the evidence is that the harassment was based on his being Jewish. If an environment is equally abusive to all employees, or if the harassment was not directed toward Jewish individuals in a way that permits you to find that it was "based on religion or race," then this element has not been satisfied.

### e.   Fourth Element: Responsibility of the Defendant

The final element that Mr. Steininger must prove by a preponderance of the evidence is that WPIX had responsibility for the acts of harassment in the workplace to which Mr. Steininger was subjected. Under Title VII, an employer such as WPIX can be responsible for harassment committed by its employees; whether an employer is liable for such conduct depends on the status of the harasser. For purposes of this case, in which Mr. Steininger alleges harassing behavior by one person, Mr. Tzianabos, whom he asserts was his supervisor, the standards that govern harassment by supervisors are the ones that are relevant.

21

If a supervisor's harassment culminates in what is known as a "tangible employment action" for the plaintiff—a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits—then the employer is strictly liable.  Thus, you must first determine whether the harasser was Mr. Steininger's supervisor during the relevant time period. An employee qualifies as a supervisor if he or she is empowered by the employer to take tangible employment actions against the particular employee who is claiming to be the victim of harassment.

If you find that the harasser was Mr. Steininger's supervisor, you must then determine whether he or she engaged in harassment that culminated in a tangible employment action.  A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  If you find that there was harassment that culminated in a tangible employment action against Mr. Steininger, then WPIX would be strictly liable for any acts of religious or racial harassment committed by the harasser against Mr. Steininger.  You may consider whether the harasser played an outsized role in the termination, even if he himself was not the ultimate decisionmaker.  If you find, however, that the harasser was Mr. Steininger's supervisor, but that there was no tangible employment action, then WPIX might still be liable for such harassment.

Unlike the strict liability standard I discussed a moment ago, in this circumstance WPIX can avoid liability by proving a defense.  WPIX would not be liable if it proved, by a preponderance of the evidence, that (i) it exercised reasonable care to prevent and correct any

harassing behavior and (ii) Mr. Steininger unreasonably failed to take advantage of the preventive or corrective opportunities that it provided.

You may consider, as to the first prong of this defense, whether WPIX had promulgated an effective policy against harassment based on religion or race in the workplace; whether that policy was fully communicated to its employees; and whether that policy provided a reasonable avenue for Mr. Steininger to make a complaint to higher management.  You may also consider the level of the employer's demonstrated commitment to adhere to its policy. For example, an employer does not exercise reasonable care when its practice indicates tolerance toward harassment or discrimination, even if it has a policy that states otherwise.  As to the second prong, you may consider whether there was a procedure in place by which Mr. Steininger could have complained about harassment based on his ethnicity or national origin; whether Mr. Steininger made use of that procedure; and, if not, whether it was unreasonable for him not to have done so.

In sum, if you find that Mr. Steininger has established each of the four elements of a hostile work environment claim by a preponderance of the evidence, then you must return a verdict in his favor.  If, however, you find that he has failed to prove one or more of these elements by a preponderance of the evidence, then you must return a verdict for WPIX.

### C.    Claims Under Section 1981

Let's turn next to Mr. Steininger's claims under Section 1981.  Section 1981 guarantees each person, regardless of race, freedom from discrimination in the making and enforcing of contracts.  Under the statute, "mak[ing] and enforc[ing] contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  Under section 1981, Judaism is a race.  Unlike under Title VII, under Section 1981, individuals as well as employers can be liable.  And so, Mr. Steininger's claims under Section 1981, which are, again, for discriminatory termination and for a hostile work environment, are brought both against WPIX and against Mr. Tzianabos.

### 1.    Elements of a Section 1981 Discriminatory Termination Claim

Generally speaking, the four elements of a claim for discriminatory termination under Section 1981 are the same as the four elements of a claim under Title VII.  You may therefore use the same analysis that you used in analyzing Mr. Steininger's discriminatory termination under Title VII.

There is, however, an important difference between Mr. Steininger's Title VII and Section 1981 claims.  It relates to the fourth element.  Specifically, Section 1981 has a different standard for causation.  Under Title VII, you may find WPIX liable if—in addition to finding first three elements proven—Mr. Steininger's Jewish identity was a *motivating factor* in the decision to terminate him.  Under Section 1981, however, you must find that Mr. Steininger's Jewish identity was the *but-for cause* of the termination.  That means that you must find that, were it not for Mr. Steininger's Jewish identity, the defendants would have acted differently and would not have terminated him.

### 2. Elements of a Section 1981 Hostile Work Environment Claim

Mr. Steininger has also brought a claim for hostile work environment under Section 1981. Generally speaking, the elements of such a claim track those under Title VII, and you therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII hostile work environment claims.

### 3. Individual Defendant's Liability Under Section 1981

As I mentioned, unlike under Title VII, both corporations and individuals can be liable for violations of Section 1981. However, to find an individual defendant, here Mr. Tzianabos, liable for a violation of Section 1981 violation, Mr. Steininger must demonstrate an affirmative link that causally connects Mr. Tzianabos to the discriminatory conduct at issue—the discriminatory termination or the hostile work environment. In other words, an individual cannot be held liable under Section 1981 solely by virtue of his or her position as a supervisor. Rather, to find Mr. Tzianabos liable in his individual capacity under Section 1981, you must find that Mr. Tzianabos was personally involved in the discriminatory conduct. You may find that that Mr. Tzianabos was personally involved in the discriminatory action if you find one of the following: (i) he directly participated in the discriminatory act; (ii) he failed to remedy the wrong after learning of it; (iii) he created or maintained a policy under which unconstitutional acts occurred; (iv) he was grossly negligent in managing subordinates who committed the unconstitutional acts; or (v) he was deliberately indifferent by failing to act on information indicating that unconstitutional acts were occurring

### D. Claims Under the New York State Human Rights Law

Let's turn next to Mr. Steininger's claims under the New York State Human Rights Law, or NYSHRL. That law provides in relevant part that:

> It shall be an unlawfully discriminatory practice for an employer …
> because of an individual's … race [or] national origin … to
> discriminate against such individual in compensation or in terms,
> conditions, or privileges of employment.

Mr. Steininger brings claims under the NYSHRL against both WPIX and Mr. Tzianobos

### 1.    Elements of the NYSHRL Discriminatory Termination Claim

Generally speaking, the elements of a claim for discriminatory termination under the NYSHRL track the elements of a claim under Title VII, and you may therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII discriminatory termination claim.

### 2.    Elements of the NYSHRL Hostile Work Environment Claim

Generally speaking, the elements of a claim for hostile work environment under the NYHSRL track the elements under Title VII, and you therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII hostile work environment claim.

### 3.    Individual Liability Under the NYSHRL

Like Section 1981, the NYSHRL has more expansive liability than Title VII.  In addition to allowing an employer such as WPIX to be found liable for employment discrimination, there are circumstances in which an individual employee such as Mr. Tzianabos may be found liable. Specifically, if you find either that Mr. Tzianabos had an ownership interest in WPIX, or that he had had the power to do more than carry out personnel decisions made by others, and if you find that Mr. Steininger has proved the other elements of an NYSHRL claim (whether for discriminatory termination or hostile work environment) as to Mr. Tzianabos, then you are to find Mr. Tzianabos individually liable for that claim.

### E.  Claims Under the New York City Human Rights Law

#### 1.  Overview

Let's turn finally to Mr. Steininger's claims under the New York City Human Rights Law.  It provides that:

> It shall be an unlawful discriminatory practice . . . [f]or an employer or employee or agent thereof  … because of the actual or perceived … race [or] national origin … or alienage … of any person, to … discriminate against such person in compensation or in terms, conditions, or privileges of employment.

Mr. Steininger brings two claims under that law, which, again, claim, respectively, discriminatory termination and a hostile work environment, again, both based on his being Jewish.

A claim under the NYCHRL has different elements from the federal and state law claims that I have previously reviewed.  To prevail on an NYCHRL claim of either kind, Mr. Steininger must prove the following two elements, each by a preponderance of the evidence:

*First*, that he was subjected to differential treatment—*i.e.*, that he was treated less well than other employees—because of his Jewish identity; and

*Second*, that the defendant you are considering is responsible for that discriminatory conduct.

#### 2.  Elements of a NYCHRL Discriminatory Termination Claim

Generally speaking, the elements of a claim for discriminatory termination under the NYCHRL are the same as the elements of a claim under Title VII.  You may therefore use the same analysis that you used in analyzing Mr. Steininger's discriminatory termination under Title VII.  There is, however, one important difference, relating to the responsibility of the defendant you are considering.

With respect to the liability of an employer (like WPIX) for the discriminatory acts of its employees, the NYCHRL imposes liability where (i) the offending employee exercised managerial or supervisory responsibility; (ii) the employer knew of the offending employee's unlawful discriminatory conduct and either acquiesced or failed to take immediate and appropriate corrective action; or (iii) the employer should have known of the conduct yet failed to exercise reasonable diligence to prevent it.  If Mr. Steininger has proven one or more of these three situations by a preponderance of the evidence, then this element is established as to WPIX.

With respect to the individual Defendant, Mr. Tzianabos, this element is established if you find that he directly participated in the discriminatory conduct.

### 3.    Elements of a NYCHRL Hostile Work Environment Claim

Generally speaking, the elements of a claim for hostile work environment under the NYCHRL track the elements under Title VII, and you must therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII hostile work environment claim.  There are, however, two important differences you must consider.

First, Under Title VII, you must find that the harassment the plaintiff suffered was "severe and pervasive" in order to find for him on his hostile work environment claims.  Under the NYCHRL, however, Mr. Steininger need only prove that he was treated less well than other employees because of his Jewish identity.  The issue of the severity and pervasiveness of the harassment under this claim is relevant only for the calculation of damages, which I will discuss shortly.

Second, as for Mr. Steininger's claim for discriminatory termination under the NYCHRL, he must prove by a preponderance of the evidence that the defendant you are considering is responsible for that conduct.  The standards for establishing the responsibility of the defendant

28

you are considering for the hostile work environment claim under the NYCHRL are the same as the standards for the discriminatory termination claim under the NYCHRL.

### 4.    Affirmative Defenses

If you find that Mr. Steininger has not met his burden of showing such less favorable treatment attributable to his Jewish identity, or his burden of showing that the defendant you are considering was responsible for such treatment, then you must find against him on the NYCHRL claim at issue.  If, however, you find that Mr. Steininger has met this burden, you must then consider the affirmative defenses to each claim, which both defendants assert here.

### a.    Affirmative Defense to the Discriminatory Termination Claim

As to the discriminatory termination claim under the NYCHRL, you must determine whether the defendant you are considering has shown, by a preponderance of the evidence, that it or he had legitimate, non-discriminatory motives in terminating Mr. Steininger.  If you find that the defendant has made such a showing, then you must then consider whether Mr. Steininger has shown that the reasons offered for his termination are pretextual, which means that they are cover for the real discriminatory reasons, or that the defendant's stated reasons were not its or his sole basis for taking action.  If you find that the termination was based at least in part on discrimination, this defense does not apply, and you must return a verdict on this claim for Mr. Steininger.

### b.    Affirmative Defense to the Hostile Work Environment Claim

As to the hostile work environment claim under the NYCHRL, you must determine whether the defendant you are considering has shown, by a preponderance of the evidence, that the conduct at issue was nothing more than what a reasonable person would consider to be petty slights and trivial inconveniences.  That is because the NYCHRL is not a general civility code, and it does not apply in the case of such minor slights and inconveniences.  If the defendant you

are considering has shown that the unequal treatment experienced by Mr. Steininger on account

of his Jewish identity consisted of no more than minor slights and inconveniences, then that

defendant has established the affirmative defense to the first element, the first element has not

been proven, and that defendant is not liable for Mr. Steininger's claim under the NYCHRL.  To

be clear: on this affirmative defense, the defendant you are considering has the burden of proof.

**F.      Damages**

**1.      Overview**

If you conclude that Mr. Steininger has met his burden of proving liability under one or

more of the claims that he asserts, then you must determine the damages, if any, to which he is

entitled.  You should not infer that Mr. Steininger is entitled to recover damages merely because

I am instructing you on how to calculate damages.  It is exclusively your function to decide upon

liability, and I am instructing you on damages only so that you will have guidance should you

decide that they are warranted.

In awarding damages, if you decide to award them, you must be guided by dispassionate

common sense.  Computing damages may be difficult, but you must not let that difficulty lead

you to engage in arbitrary guesswork.  On the other hand, the law does not require a Mr.

Steininger to prove the amount of his or her losses with mathematical precision, but only with as

much definiteness and accuracy as the circumstances permit.  In all instances, you are to use

sound discretion in fixing an award of damages, drawing reasonable inferences where you deem

appropriate from the facts and circumstances in evidence.

The verdict form I will give you will assist you in recording the determinations, if any,

that you make as to damages.

### 2.    Categories of Damages

In this case, Mr. Steininger seeks to recover four types of damages: (i) back pay, (ii) front pay, (iii) damages for emotional distress, pain and suffering, humiliation, and mental anguish, and (iv) punitive damages.

### a.    Compensatory Damages

### (i)    Overview

The first three types of damages that Mr. Steininger seeks are known as "compensatory damages," and they are designed to put Mr. Steininger in the same position that he would have been in had there been no violation of his rights. You may award compensatory damages only for injuries that Mr. Steininger proves were caused by the discriminatory conduct that you have determined was committed by a defendant. You may not award damages based on speculation. The damages that you award must be fair compensation—no more and no less.

Please note that you may not award compensatory damages more than once to Mr. Steininger for the same injury. In other words, Mr. Steininger is entitled to be compensated only for injury that he actually suffered—he is entitled only to be made whole, not to recover more than he lost. Of course, if different injuries are attributed to separate claims, then you must compensate Mr. Steininger fully for all of the injuries.

### (ii)  Back Pay

If you find for Mr. Steininger on any one of his claims for discriminatory termination claims, then Mr. Steininger is entitled, as compensation, to the back pay that he would have earned if a defendant had not terminated him. This amount consists of the wages, including salary increases and employee benefits, that Mr. Steininger would have obtained from the date of the adverse employment action until the time of trial, and minus any earnings or benefits that Mr.

31

Steininger received from other employment during this time.  Back pay damages, however, are not available on Mr. Steininger's hostile work environment claims.

### (iii)    Front Pay

Additionally, if you find for Mr. Steininger on any of his claims for discriminatory termination, and if you find that Mr. Steininger will be unable to earn in the future what he would have earned at WPIX, then you may award him, as additional compensation, the amount he would have earned from the day of your verdict until either:  (i) the date you believe he would have worked at WPIX absent any discriminatory conduct or (ii) the date you can reasonably predict that he has a reasonable prospect of obtaining comparable employment.  This is called "front pay." You should keep in mind that the goal of back pay and front pay is to make Mr. Steininger "whole"—that is, to put Mr. Steininger in the position he or she would have been in if the defendants had not discriminated against him.

If you find that Mr. Steininger is entitled to an award of front pay, you should state the total dollar amount of that award and indicate the period over which such an award is intended to compensate Mr. Steininger.  In determining the length of time for which front pay will be awarded, if any, you should not unduly speculate as to future events, but are to be guided by the evidence presented at trial, including Mr. Steininger's age, work history, and likelihood of finding comparable employment.  You should not discount this award to its present value.

Again, like back-pay damages, front-pay damages are not available on Mr. Steininger's hostile work environment claims.

### b.    Plaintiff's Duty to Mitigate

A plaintiff has a duty to mitigate damages by using reasonable care and diligence in seeking suitable alternative employment.  The burden is on defendants to prove by a

preponderance of the evidence that Mr. Steininger has failed in his duty to mitigate.  Thus, if you find that Mr. Steininger failed to use reasonable care and diligence and that he could have obtained a job substantially equivalent to the one he left at WPIX, then you should reduce any award of back pay by the amount you find he could have earned from such employment. Similarly, if you find that in the future Mr. Steininger will be able to obtain such a job, using reasonable care and diligence, then you should reduce any award of front pay by the amount you find that he will earn through such other employment.

In assessing the reasonableness of Mr. Steininger's efforts to mitigate his damages, you may consider what you have learned about Mr. Steininger's qualifications for employment, the characteristics of the job market, and the quantity and quality of the efforts made by Mr. Steininger to find suitable work.  The question whether Mr. Steininger acted reasonably with respect to the mitigation of damages is one for you to decide, as sole judges of the facts.  In weighing the evidence, keep in mind that Mr. Steininger was under no obligation to enter another line of work, or to take a demotion or a demeaning job.

Mr. Steininger's failure to make a reasonable effort to minimize damages does not prevent all recovery, but does prevent recovery of such damages as might have been avoided.

### c.     Non-Economic Compensatory Damages

In addition to back pay and front pay, Mr. Steininger also seeks what I will refer to as "non-economic compensatory damages."  Unlike back pay and front pay, these damages are available for both Mr. Steininger's discriminatory termination claims and his hostile work environment claims.  If Mr. Steininger has proved the elements of one or more of his claims, then he is entitled, in addition to any back pay or front pay that you award, to compensatory

damages for any pain and suffering caused by defendants' unlawful conduct, as well as emotional distress, fear, personal humiliation, and indignation caused by that conduct.

As I noted, compensatory damages may not be based on speculation or sympathy. They must be based on those injuries that you find Mr. Steininger has proven by a preponderance of the evidence presented at trial, and only on that evidence. There is no requirement that evidence of the monetary value of such intangible things as pain and suffering be introduced into evidence. There is no exact standard for fixing the compensation to be awarded for these elements of damages. Any award you make should be fair in light of the evidence presented at the trial. In order to recover damages for mental and emotional distress, Mr. Steininger must present credible evidence with respect to the claimed distress. Psychiatric or other medical treatment is not a precondition to recovery.

That said, you may not simply award damages for *any* injury suffered by Mr. Steininger—you must award damages only for those injuries that were a proximate result of conduct by defendants that violated Mr. Steininger's rights.

### d.    Nominal Damages

If you find, after considering all the evidence presented, that one or more defendants discriminated against Mr. Steininger, but that Mr. Steininger suffered no injury as a result of this violation, you may award Mr. Steininger nominal damages. Nominal damages are a sum of money up to $1. They are awarded as recognition that Mr. Steininger's rights have been violated. You would award nominal damages if you conclude that the only injury that Mr. Steininger suffered was the deprivation of his rights, without any resulting physical, emotional, or financial damage.

You may also award nominal damages if, upon finding that some injury resulted from a given unlawful act, you find that you are unable to determine monetary damages except by engaging in pure speculation and guessing.

### e.    Punitive Damages

Finally, Mr. Steininger seeks punitive damages.  Under the New York State Human Rights Law, Mr. Steininger may not recover punitive damages.  If you find that Defendants intentionally discriminated against Mr. Steininger, each of Section 1981, Title VII, and the New York City Human Rights Law allows you, but does not require you, to award punitive damages under certain circumstances, although such damages are capped under Title VII at $300,000. You may make an award of punitive damages whether or not you award Mr. Steininger other forms of damages.

Punitive damages are awarded, in the discretion of the jury, to punish defendants for wrongful conduct or to deter them and others from similar misconduct in the future.  Punitive damages are intended to protect the community, and to be an expression of the jury's indignation at the misconduct.  Punitive damages may be awarded only after a thoughtful consideration of all of the evidence in the case.

I will instruct you now on the standards for determining whether punitive damages are warranted, and what you should consider in calculating the amount, should you decide punitive damages are warranted.

In order to award punitive damages, you must find that the individual Defendant, Mr. Tzianabos, acted with malice or reckless indifference to violate Mr. Steininger's right not to be discriminated against on the basis of his Jewish identity, and not merely that that the defendant's actions were unreasonable.  A defendant has acted with malice or reckless indifference if it has

been proved by a preponderance of the evidence that the defendant knew that his or her conduct was in violation of the laws prohibiting discrimination, or alternatively if it has been proved by a preponderance of the evidence that the defendant acted with reckless disregard of that law. Moreover, as an alternative to proving that a defendant knew he was acting in violation of federal law, evidence of egregious or outrageous acts may support an inference of the requisite motive.

If you decide that the conduct of Mr. Tzianabos justifies an award of punitive damages because it was done maliciously or with reckless indifference, you may so indicate on your verdict sheet. You must then decide whether that conduct should result in liability for WPIX. Liability may be imposed upon WPIX for the intentionally discriminatory conduct of an employee where (i) the employee served WPIX in a managerial capacity; (ii) the employee committed the intentional discrimination while acting within the scope of his or her employment; and (iii) the employer did not engage in good faith efforts to comply with the law.

If you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them. In making this decision, you should consider the underlying purpose of punitive damages. Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future. Thus, in deciding whether to award punitive damages, you should consider whether the defendant may be adequately punished by an award of actual damages only, or whether actual damages are inadequate to punish the wrongful conduct. You should also consider whether actual damages, standing alone, are likely to deter or prevent the defendant from similar wrongful conduct in the future, or whether punitive damages are necessary to provide deterrence. Finally, you should consider

whether punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those the defendant committed.

In considering a punitive damages award, if any, as to Mr. Tzianabos, you may consider Mr. Tzianabos' financial resources and the financial impact on him of paying any award. Moreover, punitive damages, if any, must bear a reasonable relationship to Mr. Steininger's actual injury. However, no single numerical equation has been made that easily links punitive to compensatory damages.  In determining a reasonable relationship to the actual injury, you must consider all relevant factors. These include:

1. The impact or severity of the defendant's conduct;

2. The amount of time the defendant conducted himself in this manner, and whether the defendant has a record of prior incidents of gender discrimination;

3. The effect of the damages award on the defendant's financial condition, as I noted a moment ago, and

4. Any punishment the defendant may receive from other sources.

Now I am going to turn to WPIX.

As to WPIX, under New York City anti-discrimination law, an employer is held liable for any award of punitive damages imposed on a managerial or supervisory employee found to have engaged in unlawful discrimination with the necessary state of mind.  In effect, the liability for the misconduct of the manager or supervisor is attributed to the employer.  Thus, if you assess punitive damages against Mr. Tzianabos,  WPIX would be obligated to pay the amount of such damages you impose.  That liability would be joint, meaning that the entire award could be

collected from either one or from both of these defendants in amounts adding up to the total punitive damages.

However, you may, in your discretion, reduce the amount of the punitive damages award imposed upon Mr. Tzianabos that is imputed to WPIX.  In doing so, you may consider whether WPIX established and complied with policies, programs, and procedures for the prevention and detection of unlawful discriminatory practices by employees, including, but not limited to:

1. A meaningful and responsive procedure for investigation of complaints of discriminatory practices by employees and for taking appropriate action against those persons who are found to have engaged in such practices;

2. A firm policy against such practices, which is effectively communicated to employees;

3. A program to educate employees about unlawful discriminatory practices under the local, state, and federal law; and

4. Procedures for the supervision of employees specifically directed at the prevention and detection of such practices.

You may also consider whether WPIX had a record of no or relatively few prior incidents of discriminatory conduct by Mr. Tzianabos.

You must consider whether WPIX has established any or all of the factors listed above, and, if so, the degree to which the award against WPIX should be reduced relative to the award against Mr. Tzianabos, if any.  Further, you may take into account WPIX's financial condition in deciding whether to reduce its responsibility for any punitive damages you may impose against Mr. Tzianabos.

If you do award punitive damages, you should fix the amount using calm discretion and sound reason. You must not be influenced by sympathy for or dislike of any party in this case.

### III.   DELIBERATIONS OF THE JURY

#### A.   Right to See Exhibits and Hear Testimony

Members of the jury, now that you have heard the closing arguments of the parties, you are about to go into the jury room to begin your deliberations. Before you do that, I will give you a few final instructions.

The exhibits received in evidence will be accessible to you on a monitor in the jury room. If during those deliberations you want to see a hard copy of any of the exhibits, you may request that they be brought into the jury room.  If you want any of the testimony read, you may also request that.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of the testimony.  And please be patient—with respect to requests for testimony, it can sometimes take counsel and the Court some time to identify the portions that are responsive to your request.  If you want any further explanation of the law as I have explained it to you, you may also request that.

To assist you in your deliberations, I am providing you with a list of witnesses, in the order in which they testified; a list of exhibits; a verdict form, which I will discuss in a moment; and a copy of these instructions.  There is one of each of these for each juror.

#### B.   Communication with the Court

Your requests for exhibits or testimony—in fact any communications with the Court—should be made to me in writing, signed by your foreperson, and given to one of the marshals.  In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

C.      **Notes**

Some of you have taken notes periodically throughout this trial.  I want to emphasize to you, as you are about to begin your deliberations, that notes are simply an aid to memory.  Notes that any of you may have made may not be given any greater weight or influence than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  All jurors' recollections are equal.  If you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

D.      **Duty to Deliberate; Unanimous Verdict**

You will now retire to decide the questions I have described to you.  For the plaintiff to prevail on the questions that you must answer, he must sustain his burden of proof as I have explained to you with respect to the questions you are considering.  Your verdict on each question must be unanimous.  Each juror is entitled to his or her opinion, but you are required to exchange views with your fellow jurors.  This is the very essence of jury deliberation.  It is your duty to discuss the evidence.  If you have a point of view and after reasoning with other jurors it appears that your own judgment is open to question, then of course you should not hesitate in yielding your original point of view if you are convinced that the opposite point of view is really one that satisfies your judgment and conscience.  You are not to give up a point of view, however, that you conscientiously believe in simply because you are outnumbered or outweighed.  You should vote with the others only if you are convinced on the evidence, the facts, and the law that it is the correct way to decide the case. You are not to discuss the case until all jurors are present.  Five or six jurors together is only a gathering of individuals. Only when nine jurors are present do you constitute a jury, and only then may you deliberate.

### E.     Verdict Form

I have prepared a verdict form for you to use in recording your decision.  Please use that form to report your verdict.

### F.     Duties of Foreperson

Finally, I referred a moment ago to a foreperson.  The first thing you should do when you retire to deliberate is take a vote to select one of you to sit as your foreperson, and then send out a note indicating whom you have chosen.

The foreperson doesn't have any more power or authority than any other juror, and his or her vote or opinion doesn't count for any more than any other juror's vote or opinion.  The foreperson is merely your spokesperson to the court.  He or she will send out any notes, and when the jury has reached a verdict, he or she will notify the marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

### G.     Return of Verdict

After you have reached a verdict, your foreperson will fill in and date the form that has been given to you.  All jurors must sign the form reflecting each juror's agreement with the verdict.  The foreperson should then advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you must be in agreement with the verdict which is announced in court.  Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

In conclusion, ladies and gentlemen, I am sure that if you listen to the views of your fellow jurors and if you apply your own common sense, you will reach a fair verdict here.

**IV.    CONCLUSION**

Members of the jury, that concludes my instructions to you.  I will ask you to remain seated while I confer with the attorneys to see if there are any additional instructions that they would like me to give to you or anything I may not have covered in my previous statement.

* * * * *

Members of the jury, you may now retire.  The marshal will be sworn before we retire.

(Marshal sworn)

**EXHIBIT 2**

**COURT EXHIBIT 2**

1
2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ------------------------x

4  BRETT STEININGER,

5       Plaintiff,
                            Case No.
6    -against-        1:19-cv-3644

7  TRIBUNE BROADCASTING COMPANY, LLC,
   WPIX, LLC, CHRISTOPHER S. TZIANABOS,
8  NEXSTAR MEDIA GROUP, INC.,
   and NEXSTAR BROADCASTING, INC.,
9
        Defendants.
10
   ------------------------x
11                 September 17, 2021
                   2:02 p.m.
12
13
14
15      Videotaped testimony, in connection to
16  trial, of STUART B. KLEINMAN, M.D., reported
17  remotely by Julia Liu, a Shorthand Reporter
18  and Notary Public of the State of New York.
19
20
21
22
23
24
25

**Page 2**

1
2  REMOTE APPEARANCES:

3
4  DEREK SMITH LAW GROUP, PLLC

5      Attorneys for plaintiff

6      One Penn Plaza, Suite 4905

7      New York, NY 10119

8  BY:  ALEXANDER G. CABECEIRAS

9
10 CERASIA & DEL REY-CONE LLP

11     Attorneys for defendants

12     150 Broadway, Suite 1517

13     New York, New York 10038

14 BY:  EDWARD CERASIA II

15     ALISON L. TOMASCO

16
17 PRESENT:
18 DAVID CHRONIGER, videographer
19
20
21
22
23
24
25

**Page 3**

1
2       THE VIDEOGRAPHER:  This is the
3  start of media labeled number 1 of the
4  video-recorded deposition of Dr. Stuart
5  Kleinman in the matter Brett Steininger
6  v. Tribune Broadcasting Company, LLC,
7  WPIX, LLC, Christopher Tzianabos,
8  Nexstar Media Group Inc., and Nexstar
9  Broadcasting, Inc., in the United
10 States District Court for the Southern
11 District of New York, case number
12 19-CV-3644.
13      This deposition is being held
14 remotely via Zoom on September 17th,
15 2021 at approximately 14:02.
16      My name is David Chroniger, I'm a
17 legal video specialist from Pirozzi
18 Hillman.  The court reporter is Julia
19 Liu in association with Pirozzi
20 Hillman.
21      Counsel, please introduce
22 yourselves.
23      MR. CERASIA:  This is Edward
24 Cerasia II from Cerasia & Del Ray-Cone
25 representing the defendants.

**Page 4**

1       Kleinman - Direct
2       MR. CABECEIRAS:  Alexander
3  Cabeceiras of the Derek Smith Law Group
4  representing the plaintiff.
5  STUART B. KLEINMAN, M.D.,
6  called as a witness, having been duly
7  sworn, testified as follows:
8       MR. CERASIA:  You all set?
9  DIRECT EXAMINATION
10 BY MR. CERASIA:
11      Q.   Good afternoon, Dr. Kleinman.
12 Could you please tell me your professional
13 qualifications?
14      A.   Sure.  I am a physician, a
15 medical doctor.  And then I practice in the
16 specialty area of psychiatry which, in
17 brief, requires four years of additional
18 training after four years of medical
19 school.  So a minimum of eight years post
20 college.
21      I practice in two subspecialties
22 of psychiatry; one is traumatic stress and
23 the other is forensic psychiatry.
24      So to become a board certified
25 forensic psychiatrist as I am, I first was

5

Kleinman - Direct

1  required, and in fact did, complete a
2  fellowship program, an advanced training
3  program in forensic psychiatry at New York
4  University School of Medicine, Bellevue
5  Hospital.  And I also, to gain greater
6  expertise in the field, completed advanced
7  training in psychiatry and the law at the
8  University of Pennsylvania in Philadelphia.
9            That, in summary, is my
10  professional qualifications.
11       Q.    And where did you go to medical
12  school?
13       A.    I attended what's called a
14  six-year accelerated bachelor of arts
15  medical degree program.  So that I attended
16  college for two years at Lehigh University
17  in Pennsylvania.  And after the completion
18  of two years, I went straight to medical
19  school and attended medical school at the
20  Medical College of Pennsylvania in
21  Philadelphia.
22       Q.    Can you tell us why you are
23  specifically qualified to assist in
24  understanding of the plaintiff Brett

6

Kleinman - Direct

1  Steininger's mental state in this matter?
2       A.    Well, my two subspecialties are
3  directly relevant to the ability to do a
4  reliable and accurate assessment.  So as
5  regard to the issue of traumatic stress,
6  which simply means understanding the ways
7  in which people respond to very difficult,
8  if not outright terribly traumatic events,
9  I have a great deal of experience in that.
10  I was the medical director, actually the
11  first medical director, of a not-for-profit
12  mental health center in Brooklyn whose sole
13  mission, whose only mission was to treat
14  people who suffered psychiatric
15  consequences of being the victim of a
16  crime, whether it was adults or children
17  who were in families in which they were
18  unfortunately abused.  So my job there was
19  to treat people, and really to train staff,
20  to make sure they were doing a good job.
21            I also, for many years, was an
22  independent consultant for the New York
23  State Crime Victims Compensation Board.
24  And, there, my only job was to evaluate

7

Kleinman - Direct

1  people who had been victims of crime, and
2  to determine what percentage of their
3  psychiatric problems were the result of
4  their criminal victimization.  Essentially,
5  New York State would pay for the treatment,
6  mental health treatment of people who had
7  suffered psychiatric problems from being
8  criminally victimized, and so that needed
9  to be determined.
10            I also of course have treated, in
11  the course of over 30 years, a very large
12  number of people who have suffered all
13  kinds of terrible traumatic events, because
14  patients were referred to me specifically
15  for that.
16            And then, professionally, I've
17  done research regarding the consequences of
18  trauma.  For example, I've written about
19  Vietnamese who fled Vietnam after the end
20  of the Vietnam War.  And many fled in boats
21  and were attacked, believe it or not, by
22  pirates -- there are still pirates in the
23  world -- who did terrible things to those
24  people.  And I was interested in not just

8

Kleinman - Direct

1  the problems that people suffered of
2  course, but how -- my focus of study was
3  how people coped, what were the things and
4  what are the things that allow people to
5  cope with traumatic or difficult events,
6  and not necessarily develop a mental
7  disorder or mental disorders.
8            And I also, professionally, was
9  one of the founders of the New York chapter
10  of the International Society of Traumatic
11  Stress Studies.
12            So helping, treating, evaluating,
13  researching regarding the psychological
14  consequences of trauma and other kinds of
15  bad life events has been central to my
16  practice in -- for over 30 years.
17            And the other hat I wear, as I
18  mentioned before, is as a board certified
19  forensic psychiatrist.  And forensic
20  psychiatrists work on the interface between
21  law and psychiatry or law and psychology.
22  So they use their expertise -- in my
23  instance, psychiatry and most commonly
24  traumatic stress -- to address legal

9

Kleinman - Direct

1  questions that involve mental state.
2  Because the way in which you do an
3  evaluation of individuals who are in either
4  the criminal justice system or civil
5  justice system is very different than the
6  way you would conduct an evaluation for the
7  purposes of treatment.  And part of my
8  expertise, which I teach about, is knowing
9  the proper methodology, so the proper
10  method of doing the assessment, so that you
11  can form a reliable conclusion.
12           So in terms of even being
13  specifically more relevant, I, for example,
14  founded the Committee on Trauma and Stress
15  of the American Academy of Psychiatry and
16  the Law, and I was a chairperson for a very
17  long time.
18           I currently serve as the co-chair
19  of the New York Psychiatric Society's
20  Forensic Committee, where we address a
21  range of forensic issues.  The most recent
22  one that we're addressing is actually the
23  involvement of mental health professionals
24  assisting law enforcement with the serious

10

Kleinman - Direct

1  mentally ill to try to decrease unfortunate
2  outcomes, to diminish violence, and to help
3  all parties involved.  So that's an
4  important part of what I do.  And of course
5  I do more.  But I think that's the general
6  outline.
7       Q.    And are you board certified in
8  forensic psychiatry?
9       A.    Yes.  I'm board certified in
10  general psychiatry.  And then I'm board
11  certified in forensic psychiatry, which
12  means that I've completed an accredited
13  forensic psychiatry training program.  And
14  then I have passed, actually every 10
15  years, a pretty tough examination in
16  forensic psychiatry.
17           And now, as is often the case,
18  first I was a student, and now I'm a
19  teacher.  And I teach individuals who are
20  psychiatrists already, who are in a
21  fellowship training, meaning advanced
22  training, to become forensic psychiatrists.
23  And my responsibility, every year I teach a
24  weekly course, and I've been doing it for

11

Kleinman - Direct

1  maybe close to 10 years now, on the
2  appropriate method of assessing emotional
3  distress claims or damages in court.
4       Q.    Now, with respect to your
5  forensic work, I think you mentioned you
6  are involved both on the criminal and civil
7  side of litigation?
8       A.    Yes.  You know, it varies.  But I
9  -- probably overall 40 to 50 percent of my
10  time is in criminal -- is involved in
11  criminal type of matters, and the rest of
12  the time in civil matters.
13       Q.    And in the civil matters, does
14  that include being involved in cases
15  alleging employment discrimination or
16  hostile work environment?
17       A.    Yes.  I've, because of my
18  background in traumatic stress, I started
19  to get retained to help in those kinds of
20  cases.  And then other kinds of civil
21  cases, for example, include what's called
22  negligent security, where unfortunately an
23  office building, a hotel, or some facility
24  didn't have adequate -- or allegedly didn't

12

Kleinman - Direct

1  have adequate security and somebody gets
2  attacked and assaulted.  And the question
3  is what were the psychological consequences
4  of that.  And then there are other kinds of
5  civil cases as well.
6       Q.    On the criminal side, have you
7  ever been appointed as an independent
8  evaluator by judges in the federal court
9  system?
10       A.    Yes.  I get retained by
11  prosecutors from the U.S. Attorney's
12  office, sometimes state attorneys.  I get
13  retained by criminal defense attorneys.
14  And in the federal system, I reasonably
15  often have been appointed as an independent
16  evaluator by judges.  So not by one side or
17  another, but really to assist both sides.
18       Q.    You mentioned some -- the
19  teaching experience that you have.  Where
20  is it that you teach, which institutions?
21       A.    Sure.  I've been on the faculty
22  of the Columbia University Medical School
23  for over 30 years, and I've been very
24  involved there.  I first, for many years,

13

Kleinman - Direct

taught medical students as part of their
experience learning how do you
appropriately diagnose an individual.  So I
would literally sit with students every
week for about two hours.  And we would,
together, conduct an interview over the
course of three, four, sometimes five
meetings.  And then we would discuss the
right way to both ask questions, the right
questions to ask, and how to put it all
together.

While I was teaching medical
students, I also set up an elective, which
means in your fourth year of medical
school, something that's optional, which
was to come to Brooklyn at the Crime
Victims Center where I worked to learn
about the justice system and about
psychological effects of trauma.

And for many years now, actually
since Columbia and Cornell, so Columbia and
Cornell got together, they formed a
forensic psychiatry fellowship training
program.  And since that program started,

14

Kleinman - Direct

I've been one of the teachers, and now one
of the, really, the core faculty members.
And my responsibility, as I mentioned, is
every year to help train the fellows, who
are psychiatrists, in the appropriate way
of conducting an assessment of emotional
distress damages.

And then also I've been a member
of the faculty of NYU, where I did my
fellowship training.  And every year I give
a number of lectures for all of the fellows
in all of the New York City and New Jersey
regions' training programs in forensic
psychiatry.  And I teach about employment
discrimination and how to assess emotional
distress damages.  And sometimes I
specifically teach about posttraumatic
stress disorder.  And I also, on the
criminal side, teach every year about white
collar crime.
    Q.    Are you aware of the organization
known as the American Psychiatric
Association?
    A.    Of course.

15

Kleinman - Direct

    Q.    Have you ever been recognized by
the American Psychiatric Association for
any awards related to teaching?
    A.    Yes.  I received an award from
the American Psychiatric Association, which
is given to doctors for their excellence in
training medical students which, as I
mentioned, I did for over 20 years.
    Q.    What's the difference between
psychiatry and psychology?
    A.    First, psychiatrists and
psychologists are both sophisticated in
terms of their ability to conduct mental
health assessments.  Obviously how good
somebody is depends on many different
things in doing their job.  But the
training in -- differs in certain ways and
important ways.

So as I mentioned, I'm a medical
doctor.  I went to medical school for four
years.  I did -- and a residency training
program after medical school.  And part of
that training program included rotating in
other fields besides psychiatry.  The main

16

Kleinman - Direct

field was neurology.  Actually, my board
certification, or the board certification
of all psychiatrists, is by the American
Board of Psychiatry and Neurology because
of course the brain is central to people's
mental states.

And in my particular interest, or
I should say the residence -- the residency
that I attended in Philadelphia, part of
our responsibilities actually was to be
responsible on call for neurosurgical
patients.  So that gave me particular
experience seeing people after they had
been operated on.  Usually it was people
who had surgery on their brain.  And I
would have the responsibility -- of course
there were more senior people -- but
helping take care of those people.

So psychiatrists, of course, are
going to be more attuned regarding the
biological contributions to someone's
mental state.  And of course, as
physicians, psychiatrists are able and
licensed to prescribe medication as part of

17

Kleinman - Direct

1  their treatment.  And of course in -- with
2  my own patients, I use medication as is
3  appropriate.
4
5          So psychiatrists are particularly
6  expert and different than psychologists in
7  that way.  But psychiatrists are also
8  trained in psychology.  And my training was
9  particularly in understanding what is
10  called psychodynamics, to understand
11  psychological motivations.
12          Psychologists -- and now I'm
13  talking about clinical psychologists,
14  because there are many different kinds --
15  they very much vary in the kind of things
16  they get with different emphasis.  But
17  psychologists are trained in psychology of
18  course and understand psychology well.  And
19  they have, generally speaking, more
20  training in psychological testing than do
21  psychiatrists.  The exception in a way is
22  that forensic psychiatrists use
23  psychological tests or work with
24  psychologists sometimes -- I certainly
25  have -- regarding psychological tests.  So

18

Kleinman - Direct

1
2  forensic psychiatrists specifically tend to
3  know more than most psychiatrists about
4  psychological testing.  But if -- there are
5  certain tests that psychiatrists don't give
6  or are typically not trained to give that
7  are specifically given by psychologists.
8          Q.     Have you written in the area of
9  testing with respect to subjects like
10  posttraumatic stress disorder?
11          A.     Yes.  I published an article with
12  a co-author specifically regarding the
13  psychological tests that are used to help
14  assess posttraumatic stress disorder.  And
15  the theme of the article was looking at the
16  utility, the usefulness of these tests when
17  used in forensic settings.  In other words,
18  how good are these tests at being able to
19  determine when people exaggerate or
20  purposely fake their mental state because
21  they're involved in a criminal matter where
22  it helps them, or a civil matter in which
23  it helps them.  So I've published about
24  that.
25          I've taught at the Annual Meeting

19

Kleinman - Direct

1  of the American Academy of Psychiatry and
2  the Law, with psychologists, about the
3  forensic use of testing.
4
5          And as part of the course seminar
6  that I teach every year, we discuss, as
7  part of the overall course, the appropriate
8  use of psychological testing.
9          Q.     Have you -- are you familiar with
10  the term malingering?
11          A.     Of course, yes.
12          Q.     What does malingering mean?
13          A.     Malingering is the intentional
14  and knowing either fabrication, meaning
15  make up out of whole cloth, a particular
16  physical or mental presentation, or
17  intentionally exaggerating the severity of
18  a problem that is, in fact, there for some
19  kind of rational, logical gain.  So the
20  classic example, or at least it used to be
21  the classic example, people faking or
22  exaggerating certain kinds of physical
23  problems to get out of serving in the
24  military.
25          Of course, in criminal cases,

20

Kleinman - Direct

1
2  where people are putting forth their mental
3  state as part of the defense, people may
4  exaggerate the presence of mental illness
5  or make it up.  And of course, in civil
6  cases, sometimes people exaggerate the
7  extent of their problems because it may
8  help them in terms of the outcome in their
9  civil case.
10          Q.     What methodology of assessment is
11  used by you in forensic psychiatry?
12          A.     Well, I use really what's
13  standard practice.  So I don't use a
14  technique or a method that's specific to
15  me.  It's part of what I was taught and
16  what I teach every year.  And that is it's
17  very important, first of all, to consider
18  whether malingering might be present.  It
19  doesn't mean it is present.  But if you're
20  doing a forensic evaluation, and someone is
21  involved in criminal or civil litigation,
22  and they're -- the issue or one of the
23  issues is their mental state, you have to
24  at least consider that maybe they're not
25  fully, accurately representing either the

21

Kleinman - Direct

nature of their problem or the cause of
their problem.

Second then, you have to use a
method that allows you to get a reliable
answer.  If you don't use a reliable
method, you can't get a reliable answer.

So just very briefly, the key
technique really is to make a vigorous
effort to at least do the best you can to
independently corroborate someone's reports
of the presence of problems or the causes
of their problems.  In other words, you
listen to someone, you take very seriously
what they say to you, and depending upon
what they say and how they say it will
determine how much effort is necessary to
determine if what they've said and how they
presented themselves is accurate.

And basically, you know, the ways
to do that generally are to, if you can,
get the observations, the reports that are
made of people who are not involved in a
lawsuit, who are reliable people, and see
what their observations are.  In other

22

Kleinman - Direct

words, not just what someone presents to
you in the setting of litigation, but how
they're presenting themselves, how they're
behaving, what they're saying outside of
litigation to another person or to others
who aren't involved in litigation.

And that could -- and relatedly,
also how somebody, some -- somebody
presents their mental state or what they
say about it in a setting which they think
is private and not involved in litigation.
For ex -- and also what someone has
presented about their mental state outside
before they started litigation.  So in
other words, if it's an emotional distress
damage claim, if before someone has begun
litigation -- especially if you find out
it's before they even were seriously
thinking about it, and they've gone to a
doctor or therapist, what they're saying
you can -- is probably less likely to be
potentially contaminated by their interest
in litigation, because there isn't any
litigation and they haven't thought about

23

Kleinman - Direct

the litigation.

And then finally, what you really
want to do is see if what somebody says is
actually the way they live.  In other
words, if someone says they're so exhausted
that they can barely get out of bed in the
morning, but you find out that they go
running five miles a day, they work
14-hour-a-day jobs or say they do double
shifts in some kind of job which requires a
lot of labor, it raises questions, do they
really have that level of fatigue they say.

So you ask yourself the question,
which is part of what I teach.  If someone
really has either the symptoms or the
severity of symptoms that they say they
have, how would you expect that to show up
in their everyday lives, or not.

Q.    Do you also evaluate the presence
and/or impact of either unrelated or
independent stressors in a person's life?

A.    Yes.  That's crucial.  And that
is one of the standard parts of a forensic
evaluation.  And that is if you -- if

24

Kleinman - Direct

someone really does have a mental disorder,
of course the question is why.  And
forensic psychiatrists or forensic mental
health evaluators really have an
obligation, if they're going to come up
with a reliable opinion, to really
investigate whether there are other
stressors which are entirely independent of
the events that they're litigating, or if
there have been new stressors or worsened
stressors since the event that are
independent.

So first you have to learn
whether they exist.  Sometimes people tell
you about them, sometimes they don't.  And
because they don't always tell you, that's
why you have to look.

And then you have to do an
investigation, a psychological
investigation to determine, well, how much,
if at all, are those factors responsible.
And, you know, people -- it's not just a
matter of whether people tell the truth.
People could tell the truth and still be

25

Kleinman - Direct

1  wrong.  In other words, people don't always
2  appreciate the cause of their problems.  So
3  when someone comes to a psychiatrist
4  office, the very first visit for treatment,
5  when they come to my office, they may tell
6  me why they think they have the problem
7  they have.  Maybe they're right, maybe
8  they're not fully right.  It's my job to
9  listen, but not to accept, as necessarily
10  true, what they say.  Even if they believe
11  it, I have to do my own assessment.
12           So that's one of the things,
13  looking at independent and intervening
14  stressors, and evaluating that reliably, is
15  part of what differentiates forensic
16  psychiatric evaluation, or a forensic
17  psychological evaluation, from an
18  evaluation that's done for the purpose of
19  treatment.
20  Q.     What is the evaluation
21  methodology that you used with respect to
22  Mr. Steininger?
23  A.     Well, I used exactly the
24  methodology that I just stated.  So before

26

Kleinman - Direct

1  I ever met Mr. Steininger, I attempted to
2  obtain as many records as possible that I
3  thought would reflect importantly about his
4  mental state.  And there are certain kinds
5  of records which I ask for in every
6  evaluation, and some kinds of records which
7  are specific to a particular individual.
8           And I try to read those -- get
9  those records before I ever meet somebody,
10  because the records help inform the
11  questions I ask.  If I don't know certain
12  information, then I don't know to ask the
13  right questions to get -- just be complete
14  in my evaluation.
15           So I reviewed a significant
16  amount of records and information before I
17  met Mr. Steininger.  And then of course I
18  conducted a forensic psychiatric
19  evaluation.  And I spent, in total,
20  approximately eight hours with him over the
21  course of a day, separate and apart from
22  breaks.
23           So, yes, it was a long day.  But
24  you learn a lot when you spend a day with

27

Kleinman - Direct

1  somebody.  You learn not only about what
2  somebody says, but you learn about how they
3  interact with you.  What's their level of
4  fatigue, what's their ability to pay
5  attention, to concentrate.  If they're
6  representing that they have certain kinds
7  of symptoms, are they showing those
8  symptoms, are they showing those symptoms
9  in the way that someone who really has them
10  would show those symptoms.
11           And as part of that evaluation, I
12  did what I mentioned a few moments ago.  I
13  looked at -- I listened very carefully and
14  asked him to tell me all the ways that he
15  feels that he was emotionally harmed or
16  negatively affected by the discrimination
17  that he claims.  And I open-endedly,
18  meaning I just gave him the opportunity to
19  tell me as much as he was able to about
20  that.  And then I, in part, tested what he
21  told me by looking at different aspects of
22  his life to see how he functioned in those
23  parts of his life to see if the symptoms
24  that he said he had were affecting that

28

Kleinman - Direct

1  part of his life, or if the severity of the
2  symptoms that he had were as severely
3  affecting parts of his life as you would
4  expect if someone really had those
5  symptoms.  And I did what I routinely do as
6  well, I asked about other stressors or
7  other potential stressors in his life.
8           So there are -- I have, because
9  human beings, all of us, there are things
10  that happen in our life and some things are
11  reasonably common.  I ask about the common
12  things routinely.  And then based upon what
13  someone says, from what I learn, maybe from
14  the records that I've read, I ask about
15  other stressors that I know about and try
16  to understand the impact or maybe no
17  impact.  Maybe just because there's a
18  stressor in your life doesn't mean that
19  stressor has caused you psychological
20  problems.  Maybe you've coped with it well.
21  So it's not just the fact of the stressor,
22  it's how you've coped with it.
23  Q.     So I know you have in front of
24  you, which is Defendants' Trial Exhibit VV,

29

Kleinman - Direct

1  as in Victor Victor, which is your report,
2  your forensic psychiatric report in this
3  case.
4      A.   Yes.
5      Q.   Do you have that in front of you?
6      A.   I do.
7      Q.   Okay.  And it's 30 pages.  Is
8  this the report that you prepared?
9      A.   It is, yes.
10     Q.   Okay.  And if you look at page 4.
11 It says Sources of Data.
12     A.   Yes.
13     Q.   Aside from number 1, which is the
14 eight hours approximately of the
15 examination with breaks, you then list, on
16 this page, numbers 2, 3, and 4, sources of
17 records that you reviewed?
18     A.   Yes, I did.
19     Q.   And did you personally yourself
20 review these documents before meeting with
21 Mr. Steininger?
22     A.   I did, yes.
23     Q.   Okay.  And then if you look on
24 page 29, which is an Appendix to the

30

Kleinman - Direct

1  Sources of Data.
2      A.   Yes.
3      Q.   And it goes to page 30.  There
4  are 16 items there.
5      A.   Yes.
6      Q.   Did you also review these
7  documents before you met with Mr.
8  Steininger?
9      A.   Yes.  I'm just going to check to
10 make sure there weren't any that I might
11 have received afterwards.
12          To the best of my recollection, I
13 reviewed all of these before I conducted my
14 examination.
15     Q.   And obviously before you wrote
16 the report if they're referenced in it,
17 right?
18     A.   Of course.
19     Q.   Were there any documents that you
20 recall requesting that you thought would
21 have aided or facilitated your opinion in
22 this case?
23     A.   Yes.
24     Q.   And what in particular do you

31

Kleinman - Direct

1  recall?
2      A.   Just so I don't -- well, I can
3  tell you what I recall.  And I can also, so
4  I don't forget some -- I can also look --
5  may I look at my report?
6      Q.   Yes, you can.
7      A.   Okay.  Well --
8          MR. CABECEIRAS:  And I'd like to
9  just put my objection on the record.
10 Request to who?  I mean when you say
11 request, I just want to make sure we're
12 clear on requesting to you, to the
13 Court, what kind of request are we
14 talking?
15          MR. CERASIA:  I'll ask.
16     Q.   Did you make a request to my law
17 firm?
18     A.   Yes.  All the requests that I
19 made for records were directly to your law
20 firm.
21          And so I did something, which I
22 commonly, not always, do -- it depends on
23 the case really -- so some cases yes, some
24 no.  But I asked if I could speak with Mr.

32

Kleinman - Direct

1  Steininger's wife, that's sometimes called
2  a collateral interview or a forensic
3  interview.  Not to conduct a psychiatric
4  examination of her, but obviously she lives
5  with Mr. Steininger and I wanted to learn
6  her observations.  And also because Mr.
7  Steininger, and the records I reviewed,
8  suggested that there might be some
9  independent problems or stressors unrelated
10 to the discrimination that he alleges, I
11 wanted to speak with her about those.
12          I also asked you if it were
13 possible to find and arrange an interview
14 with a social worker with whom Mr.
15 Steininger met many times after he had
16 brain surgery, because I've read her
17 records of the conversations she had with
18 him.  And during those conversations, he
19 was talking about things in his life that
20 were causing him stress.  But none of the
21 notes that this social worker wrote
22 referenced the alleged discrimination as a
23 -- one of those important sources of
24 stress.

33

Kleinman - Direct

1
2        And if I had an opportunity to
3   speak with her, I would have asked her,
4   even if you didn't -- I would've asked her,
5   even if you didn't put it in your notes,
6   was this an important topic of
7   conversation.  Just to make sure that the
8   fact that something isn't in the notes
9   didn't reflect -- didn't mean that
10  something wasn't talked about.  And that
11  social worker, I was informed, wasn't
12  available.
13       I asked for primary care doctors'
14  records going back further in time.  And
15  the reason for that is because primary care
16  doctors oftentimes not -- they recognize
17  depression or anxiety, because that can
18  affect someone's physical condition.  And
19  actually primary care doctors are --
20  prescribe antidepressant medicine more than
21  psychiatrists do.  So I always ask for
22  those.
23       I asked for Mr. Steininger's, all
24  of his social media postings that -- over a
25  certain period of time.  Because social

34

Kleinman - Direct

1
2   media postings sometimes reflect the
3   activities that somebody's doing.  And so,
4   for example, if someone says they have a
5   phobia and they can't go to certain places,
6   but you see a picture of them smiling
7   holding a cup somewhere where they say they
8   can't go, that's relevant.  Or if
9   somebody's constantly talking about
10  thinking about suicide in their social
11  media posts, that's important.  So I did
12  request those.
13       Also I requested -- and I
14  understand it's a very sensitive issue, but
15  it's unfortunately a relevant one -- and
16  that is Mr. Steininger's first child has a
17  developmental problem.  And obviously, for
18  a parent, that's an important issue.  Every
19  parent, you know, adapts and copes
20  differently.
21       But Mr. Steininger had told me
22  that he had his son formally evaluated at
23  the Child Center at Yale University, where
24  they formally diagnosed the problem that
25  the son had.  And I wasn't interested, per

35

Kleinman - Direct

1
2   se, in learning all about his son's
3   problems, I wanted to learn about how Mr.
4   Steininger and his wife and his family as a
5   whole were dealing with his son's problems.
6   And I did ask for that report.  But that
7   was not made available to me.
8        And then finally, I believe, you
9   know, I've learned that, you know, of
10  course money problems can cause a lot of
11  stress.  Some people it causes more stress
12  for than others.  And Mr. Steininger had
13  mentioned to me that after Covid started,
14  he had missed, for the first time ever, two
15  mortgage payments.  But he also told me
16  that -- and he told me that he was going to
17  be selling his house sometime in the
18  future.  And so of course I wondered
19  whether he had financial problems and, if
20  so, you know, what was the timing of them
21  and what was the extent of them.  There
22  could be a lot of reasons for that.  But
23  I've met enough people who have bought
24  houses that maybe were more than they
25  really could afford, and then it causes

36

Kleinman - Direct

1
2   stress afterwards.
3        So those are the kinds of records
4   that I look for.
5        Q.   Now, if you look at your report
6   on pages 27 through 28.  The title of that
7   is Forensic Psychiatric Conclusion.
8        A.   Yes.
9        Q.   Is that a summary of your -- the
10  conclusion or opinion that you have
11  provided in this case?
12       A.   Yes.
13       Q.   And as I see from point number 2,
14  it appears that you have said that there's
15  some support for Mr. Steininger having an
16  Unspecified Depressive Disorder, with
17  Anxiety, which is of overall mild severity?
18       A.   Yes.  That was my diagnosis.
19       Q.   And what does that mean?
20       A.   It means that there was
21  essentially a sufficient severity magnitude
22  of depression that was present, more than
23  just everyday sadness, was present that I
24  thought it warranted a diagnosis of a
25  disorder of depression.

37

Kleinman - Direct

1   I called it, first of all,
2   unspecified disorder, which doesn't mean
3   it's not a disorder; it means that the
4   symptoms of depression that were identified
5   and verified by me didn't fit any
6   particular specific pattern that would have
7   a more specific name.  So it has nothing to
8   do with whether someone's depressed or not,
9   it just is the type of depression.  So
10  unspecified and disorder of depression.
11        The depression was mixed with
12  some degree of anxiety.  And very commonly,
13  depression and anxiety go together.  In
14  this case, I thought the depression was
15  more than the anxiety.  Matter of fact, I
16  asked that question.  Mr. Steininger said
17  yes, percentage wise, it's more depression
18  than anxiety.  So that was the diagnosis.
19        And then, of course, to really
20  understand someone's mental state, it's not
21  just a diagnosis, but the severity of the
22  diagnosis; how much is it affecting them in
23  their lives.  And I looked at all kinds of
24  data, all kinds of information from

38

Kleinman - Direct

1   different aspects of his life and from
2   records that I reviewed describing how he
3   was doing.  And it was my conclusion, is my
4   conclusion, that overall, the severity of
5   that disorder is mild.
6        Q.    Is there a distinction between
7   distress and a disorder?
8        A.    Yes, absolutely.
9        Q.    And what's that distinction?
10       A.    It's actually very important.
11  Sometimes people, if you read the
12  newspapers, for example, it may not be so
13  obvious.  It's an unfortunate part of life
14  that, in the course of a lifetime, most
15  people will be exposed to at least one very
16  severe stressor; matter of fact, the kind
17  of stressor that can, in theory, cause a
18  posttraumatic stress disorder.
19       Fortunately, most people don't go
20  on to develop a posttraumatic stress
21  disorder.  In other words, the event is
22  upsetting, it produces distress, of course
23  it would.  But the person has enough
24  ability to adapt, to cope in a constructive

39

Kleinman - Direct

1   way, that the distress really doesn't get
2   out of hand and rise to the level of a
3   disorder.  So we all experience, obviously,
4   distress in our lives and we all
5   unfortunately get exposed to distressing
6   circumstances.  In most instances, the
7   distress doesn't transform into a disorder.
8   And that's really the distinction.  And
9   that's an important area in psychiatry and
10  psychology these days, trying to understand
11  resilience and trying to understand what
12  differentiates between those people who go
13  on to develop a disorder and those who
14  don't.  That's essentially the difference.
15       Q.    And then on your report, page 27,
16  just under where I read, the sentence says,
17  "Mr. Steininger did not develop PTSD as a
18  result of any aspect of his employment at
19  WPIX."  Is that your conclusion?
20       A.    Absolutely.
21       Q.    And why did you reach that
22  conclusion, or how?
23       A.    Well, again, this is something
24  that -- it isn't maybe as well understood,

40

Kleinman - Direct

1   and we read about it in the media.  First
2   of all, just because you're exposed to a
3   trau -- a truly traumatic event, you're a
4   war veteran, you're the victim of a
5   terrible violent crime, you're in a
6   terrible car accident, you see something
7   terrible, violent happen to somebody;
8   because you're exposed to that kind of
9   event doesn't mean you necessarily develop
10  a mental disorder.
11       But to develop a PTSD,
12  posttraumatic stress disorder, by
13  definition, according to the diagnostic
14  textbook, which is published by the
15  American Psychiatric Association, it's
16  called the Diagnostic and Statistical
17  Manual of Mental Disorders, Fifth Edition,
18  that's what we're up to now, it very
19  specifically, or reasonably specifically I
20  should say, lays out the kind of life
21  events that an individual must be exposed
22  to if you could even consider whether
23  whatever problems they have afterwards are
24  posttraumatic stress disorder.

41

Kleinman - Direct

1
2       In other words, saying that an
3  event is traumatic, and maybe for you it
4  really was, isn't enough to pass the
5  threshold, the line that determines whether
6  an event may cause PTSD.  Essentially, to
7  develop PTSD, in one way or another, you
8  basically have to be exposed to an event
9  which threatens to death or which, in a
10  reasonably likely way, threatens some type
11  of serious injury.
12       So, you know, people use the
13  word, oh, it was traumatic.  And maybe it
14  was, again, genuinely traumatic for them.
15  But it's not just your perception and how
16  you experience an event that's required for
17  the development of PTSD, you actually have
18  to objectively be exposed to a certain kind
19  of event.  And if you're not, you just, by
20  definition, can't be correctly diagnosed
21  with posttraumatic stress disorder.
22  Q.    Are you able to opine, or were
23  you able to opine as to causation of any
24  disorder that Mr. Steininger may have
25  suffered?

42

Kleinman - Direct

1
2  A.    No.  The data that -- and I had
3  substantial data.  But looking at all of
4  the information, all of the data that I
5  had, it doesn't allow, in my opinion, any
6  forensic mental health evaluator or eval --
7  mental health evaluator to form a reliable
8  opinion about causation of whatever
9  disorder is diagnosed.
10  Q.    And is that reflected in point
11  number 3 on page 27 of your report?
12  A.    Yes.  That's exactly what it
13  says, with some of the reasons for that.
14  Q.    Now, is there any data in
15  particular that was important to your
16  conclusion?
17  A.    Well, in a sense, there are three
18  kinds of information that are particularly
19  important.  So the first is, at least in
20  terms of the role of the alleged
21  discrimination -- and I use the word
22  alleged only because, you know, I'm here as
23  a mental health professional, I'm not here
24  to make a factual opinion about whether the
25  claim of dis -- whether Mr. Steininger was

43

Kleinman - Direct

1
2  discriminated against or not, I don't know.
3       But if -- so the first thing is a
4  mental health professional, under the
5  circumstances, would be inhibited from
6  saying that discrimination caused or
7  significantly contributed to a mental
8  disorder if the mental health professional
9  doesn't reliably know whether
10  discrimination, in fact, occurred.  So
11  that's number one.
12       Number two is Mr. Steininger has
13  reported experiencing certain symptoms
14  which could be related to aspects of the
15  alleged discrimination.  What I mean is Mr.
16  Steininger has said that the alleged verbal
17  harassment specifically has caused him to
18  have regular distressing thoughts, and
19  memories of it has caused him to have
20  nightmares that continued to bother him
21  about it.  And that he was beating himself
22  up specifically about the alleged verbal
23  harassment and why he didn't speak up about
24  it at the time that he alleges it occurred.
25       And the difficulty is that I have

44

Kleinman - Direct

1
2  no way of reliably knowing whether Mr.
3  Steininger, in fact, has nightmares that --
4  of the content that he said.  He might.
5  But no -- based on the data that I have, no
6  mental health evaluator can really know
7  that.
8       We don't, for example, have a
9  diary in which he was writing about his
10  nightmares.  I don't have contemporaneous
11  treatment notes, especially soon after the
12  time of the loss of his position or while
13  he was working there and he says that he
14  was being exposed to the discrimination in
15  which he's reporting having these
16  nightmares or thoughts.  I don't have
17  medical -- well, I should say I have
18  medical records, which is important, but
19  the medical records don't describe him as
20  having terrible nightmares and terrible
21  insomnia, particularly not during the first
22  couple of years afterwards.
23       So I can't know, often, whether
24  someone's telling the truth or not.  I only
25  can know whether there are -- is enough

45

Kleinman - Direct

1 information to reliably determine whether
2 certain symptoms are present. So since I
3 can't do that, based upon what the records
4 show, because the records are, in important
5 ways, different than what Mr. Steininger
6 has reported, there's enough question about
7 either whether he has those nightmares,
8 those thoughts, that beating himself up, or
9 he might have those. But, you know, it
10 really makes a difference if you have a
11 nightmare once every three months or if you
12 have it three times a week. It really
13 makes a difference if you're being flooded
14 with terrible memories of an event that
15 make it hard to focus, that distracts you,
16 versus every once in a while when you see
17 something that reminds you of it, you have
18 a bad thought.
19 So even if he has those
20 experiences, the records don't really
21 reliably let you know does he have these in
22 a way that are sufficiently intense and
23 frequent that would say this is a
24 reflection of what he alleges happened at

46

Kleinman - Direct

1 the workplace.
2 And then the third, which I kind
3 of said already, is that there are
4 discrepancies, differences in important
5 ways between some of what Mr. Steininger
6 has said about either the presence or the
7 severity of symptoms and other sources of
8 information. And I mentioned a little
9 while ago that part of what a forensic
10 psychiatrist, but really any forensic
11 evaluator does in a forensic evaluation and
12 litigation, for example, is to try to
13 independently corroborate someone's reports
14 about either the presence of symptoms or
15 the severity.
16 And so, for example, without
17 going into detail, there are medical
18 records which don't reflect aspects of what
19 Mr. Steininger has said. Mr. Steininger's
20 functioning at the workplace, you know,
21 very importantly, isn't supportive of the
22 level of symptoms that he said. And even
23 how he answered questions on one of the
24 psychological instruments that another

47

Kleinman - Direct

1 mental health professional gave him, to me,
2 altogether, creates an issue of whether --
3 well, it suggests that he has, at times,
4 and to different degrees, exaggerated the
5 severity of his symptoms.
6 So when you put that issue
7 together with not knowing, in fact, whether
8 he was discriminated against, and not being
9 able to verify the content of his thoughts,
10 any nightmares that he has, negative
11 thoughts he has, I don't believe that it
12 would be responsible to come to a
13 conclusion, with a reasonable degree of
14 medical or psychiatric or psychological
15 certainty, regarding causation.
16 Q.   You mentioned his functioning in
17 the workplace. With respect to Mr.
18 Steininger, did you gather information both
19 about his function at his current job in
20 Connecticut after he left WPIX, as well as
21 look at the records with respect to his
22 employment at WPIX?
23 A.   I did.
24 Q.   And your report, from page 21

48

Kleinman - Direct

1 through 24, lists, under the heading Other
2 Stressors.
3 A.   Yes.
4 Q.   And I know we talked about, as
5 part of your evaluation, you looked at any
6 -- and as you always do -- any other
7 stressors or independent stressors that
8 might come into play. In here, you've
9 identified, by number, seven.
10 A.   Yes. That's correct.
11 Q.   And you've already testified to
12 some of them. You talked about his oldest
13 son's developmental difficulty, which is
14 number 2.
15 Number 1 says, "Brain abscess and
16 associated surgery," which I know you've
17 alluded to. It says, "These created
18 physical and cognitive difficulty." What
19 does that mean?
20 A.   I'll answer that in a moment.
21 The one thing, without going into detail,
22 unless you want me to later, about Mr.
23 Steininger's son's developmental difficulty
24 is the timing of it. Because of course, in

49

Kleinman - Direct

1  terms of its role in affecting his mental
2  state, it matters when his son started to
3  show problems and when he started to be
4  concerned about those problems.  And then
5  whether the problems have gotten better or
6  worse or stayed the same over time, and how
7  Mr. Steininger sees those problems and
8  perceives those problems.  And his wife of
9  course, because when a child has a problem,
10  obviously it's a family issue.  So that's
11  number one.
12           In terms of the brain abscess,
13  that was a very unfortunate situation that
14  Mr. Steininger had.  It's relevant in
15  several ways.  First of all, you asked me
16  about PTSD.  Potentially being informed
17  that you have a brain abscess might
18  constitute the kind of event, medical
19  event, that maybe could cause a
20  posttraumatic stress disorder.  Mr.
21  Steininger characterized it as a near-death
22  experience.
23           Initially there was a concern
24  that he had a tumor.  He was fortunate

50

Kleinman - Direct

1  that, instead, it was an infection.  But he
2  did have to have brain surgery.  And the
3  relevance of it is several -- in several
4  ways.  First, he did have physical problems
5  afterwards; and obviously that's stressful.
6  Secondly, as you might think could happen,
7  he had some thinking difficulties
8  afterwards, and those -- it's frustrating
9  and frightening, often, to have your mind
10  and your abilities altered, because of
11  course you worry are they ever going to
12  come back and what's my future going to be.
13           Mr. Steininger's been fortunate
14  because he recovered, largely or fully, his
15  cognitive abilities.  But it's relevant for
16  the time period that he didn't.  And of
17  course it's relevant to family stress
18  because the spec -- there's indication from
19  the records that I read that this was
20  stressful of course for his wife as well.
21           So there is the physical
22  consequence of the ab -- really the surgery
23  for the abscess, which means limitations
24  physically, which eventually got better;

51

Kleinman - Direct

1  thinking difficulties, which eventually got
2  better; and then the worry about your
3  physical and thinking difficulties.  So for
4  that time period, that was significant.
5           And I could identify the others
6  or I leave it up to you in terms of the --
7       Q.   Let's talk about you mentioned
8  one thing that we didn't cover with respect
9  to his oldest son's developmental
10  difficulties, you mentioned some things
11  about the timing associated with --
12       A.   Yes.
13       Q.   -- his knowledge of those issues.
14  And what did you mean by that?
15       A.   Well, in late 2019, I mentioned
16  Mr. Steininger -- Mr. Steininger told me, I
17  should say, that, you know, he and his wife
18  brought their son to Yale Psychiatry, Child
19  Psychiatry, a very good department.  And a
20  formal diagnosis of the kind of
21  developmental difficulty was given.
22           But when someone is diagnosed
23  isn't necessarily the same as when a
24  problem begins or when someone becomes

52

Kleinman - Direct

1  worried about the problem.  And, again,
2  because psychiatrists can't read people's
3  minds, I can't tell you -- no one can
4  really, other than Mr. Steininger -- when
5  he started to worry about his son.  And,
6  but I did investigate that as best I could.
7           And so of course he had brought
8  his son to the pediatrician, he talked
9  about what the pediatrician said.  And
10  also, you know, his son, by the age of
11  around two, was not developing in a way
12  that his son really should have been, that
13  any parent would understand should have
14  been.  And then the social worker's notes,
15  the social worker who came to Mr.
16  Steininger to help him after his surgery,
17  reported clearly a description of very
18  significant problem.
19           So there's reason to believe that
20  Mr. Steininger's son's problem was
21  evidenced to him by around the time his son
22  was two.  And then when his son's problem
23  didn't get better, of course you try to be
24  optimistic as a parent and hope maybe my

53

Kleinman - Direct

1
2 son will be a late bloomer and things will
3 work out. But obviously as time goes by,
4 and this significant problem doesn't get
5 better, you tend to lose hope. So the
6 timing of it is relevant to understanding
7 the timing of Mr. Steininger's distress
8 that he's reported, and therefore the cause
9 of it.
10      Q.    And you say, on page 22, where he
11 noticed that his prior hope that his son
12 would eventually acquire reasonable
13 language ability seemed to have been
14 abandoned. And you write here, "Loss of
15 "hope" commonly induces sadness, the depth
16 and duration typically shaped by the
17 importance of the hoped for outcome." What
18 does that mean?
19      A.    Well, I'll just make --
20 differentiate between genuine acceptance of
21 a problem versus being depressed because
22 you're hope -- you have been hoping for
23 something and it's not going to happen and
24 you haven't really accepted it. So when
25 you, you lose hope for something getting

54

Kleinman - Direct

1
2 better, but you can't accept how it is in
3 the present, that's depressing.
4      And part of what I was trying to
5 do with my examination of Mr. Steininger is
6 to determine whether he -- whether or to
7 what degree he had accepted his son's
8 difficulties versus was depressed about it.
9 So Mr. Steininger told me that he had lost
10 hope by about the time that I had seen him,
11 maybe a bit before, that these problems
12 would largely improve.
13      He did indicate to me that --
14 well, it was -- I should say it this way.
15 It wasn't clear to me, I think this is the
16 most accurate way of saying, whether his
17 giving up hope meant that he had accepted
18 it or whether this was making him sad now
19 that he didn't have optimism that he had
20 before. And I don't have a definite answer
21 to that. I just know that it's a very
22 important consideration.
23      Q.    And then, in fact, one of the
24 other stressors you identify is his
25 brother's substance abuse, point 3 on page

55

Kleinman - Direct

1
2 22.
3      A.    Yes.
4      Q.    And other -- go ahead.
5      A.    The real relevance of this, you
6 know, just in brief, you know, Mr.
7 Steininger described his brother as having
8 a longtime substance abuse problem. So
9 from a perspective, which was my job to
10 determine causation, if there's a problem
11 that's been there for years and that
12 problem hasn't gotten worse or something
13 about it is substantially different, it
14 would be reasonably unlikely that it was
15 now an important cause of distress in
16 someone's life. And that's what I tried to
17 assess.
18      And what I learned, and therefore
19 why I think it's a stressor, not the most
20 important stressor but a relevant stressor,
21 is that what was really bothering Mr.
22 Steininger was the extent to which his
23 brother, Mr. Steininger's mother's son, was
24 really taking advantage of Mr. Steininger's
25 mother. Of course, as a parent, you don't

56

Kleinman - Direct

1
2 want to see your son or daughter living on
3 the street or in unsafe circumstances. So
4 what Mr. Steininger told me, that his
5 mother really has still not been able to
6 say no. And that all together, he
7 estimated that, over time, his son has
8 manipulated maybe 100,000 dollars from his
9 mother. And of course his mother isn't a
10 young woman anymore, and the concern is,
11 you know, what's my mother's well-being
12 going to be if she keeps on giving away her
13 money to her son, and her ability to take
14 care of herself. So that's why it becomes
15 a relevant stressor as time goes by.
16      Q.    And then you note in here, in
17 number 4, two known and potential medical
18 conditions, one being sleep apnea, and the
19 other one for a potential additional
20 hormonal disturbance.
21      And with respect to the sleep
22 apnea, what did you conclude as to why it
23 was a stressor in his life?
24      A.    Right. Well, I don't know to
25 what extent. I do know this -- in part

57

Kleinman - Direct

2 from the medical records that I reviewed --
3 Mr. Steininger has been diagnosed with
4 sleep apnea. Sleep apnea, of course, which
5 means that there are pauses in breathing
6 during someone's sleep. It can be
7 frightening if you're next to someone and
8 you see that. And it's associated with
9 snoring commonly.
10        People who have sleep apnea
11 commonly have what's called nonrestorative
12 sleep. Sleep helps us be refreshed in the
13 morning. People who have sleep apnea,
14 depending on the severity, don't have
15 restorative sleep. So it would tend to
16 produce disruptive sleep, insomnia. It
17 would tend to cause fatigue, which is
18 relevant. Can elevate blood pressure. And
19 even contribute to depression or a look
20 like depression, because your sleep and
21 your energy is disturbed.
22        So I would really need to know
23 the extent of Mr. Steininger's sleep apnea
24 to get a sense of the role it's playing in
25 his mental state, even if he's not fully

58

Kleinman - Direct

2 aware of it. What makes it relevant, and
3 not just hypothetical, is that Mr.
4 Steininger was prescribed a common
5 treatment for sleep apnea, which is a
6 particular mask that you have to wear. He
7 hadn't been wearing the mask for the year
8 before I saw him, which was approximately
9 the time when he got diagnosed. And
10 unfortunately that's common because it's
11 hard to sleep with the mask, so it's a bit
12 ironic that the treatment also makes it
13 hard to sleep.
14        But the point being his sleep
15 apnea wasn't being treated. And I would
16 have to know more about the extent of it to
17 give a more specific opinion, but it's
18 medically relevant.
19        The other medical problem, I
20 won't go into detail, I don't -- I can just
21 say this, that in 2015, a blood test was
22 done. It demonstrated the low level of a
23 certain hormone in the body which can
24 contribute to what appears to be certain
25 symptoms of depression. Now, I don't have

59

Kleinman - Direct

2 any blood work for that particular hormone
3 in the records that I reviewed. I don't --
4 can't see that it was repeated. So I don't
5 want to overstate this. Maybe that
6 hormonal level is perfectly normal. But if
7 I were treating someone who had had that
8 lab test, and then they came to my office,
9 I would send them to get the blood work
10 because I would need to know the answer to
11 fully accurately diagnose their depression.
12        So that's part of -- that's the
13 reason why I list it as a potential
14 biological stressor. But we don't really
15 know because we don't have the lab results.
16 Q.    I'm going to have you flip to
17 page 24, which says Participation in
18 adversarial litigation, and explain why
19 that is a stressor that you've identified?
20 A.    Unfortunately, it's a classic
21 stressor. It's hard to be in a lawsuit.
22 For some people it's harder than others.
23 It's hard to be in a lawsuit when two sides
24 see things very differently, so it's more
25 contentious.

60

Kleinman - Direct

2        And Mr. Steininger said to me
3 what is pretty typical, that when he's
4 involved -- you know, that it's basically
5 pretty terrible, and that when he has to be
6 involved in litigation activities, it
7 increases his level of distress. This is
8 relevant really in terms of prognosis,
9 thinking about, well, to the extent that
10 there's a disorder, if Mr. Steininger were,
11 in fact, discrim -- had been, in fact,
12 discriminated against, what's the future,
13 to the extent that that contributed to his
14 mental state.
15        And, you know, the good news is
16 litigation won't go on forever. And so
17 that stress will get resolved. And that's
18 relevant to assessing prognosis.
19 Q.    With respect to, on page 4, I
20 talked about your Sources of Data. But you
21 referred to -- numbers 3 and 4 were
22 psychological evaluation of July 16, 2020
23 from Dr. N.G. Berrill, and then records
24 from Vicki Boudin who's a psychologist as
25 well. So I'm just going to have you look,

61

Kleinman - Direct

1   what you have in front of you as
2   Plaintiff's Exhibit 821.
3       A.    Bear with me a moment, please.
4       Q.    Sure.
5       A.    Can -- maybe it would make it a
6   little faster, can you just tell me the
7   identity of the document?
8       Q.    Yeah, 821 is Vicki Boudin's --
9       A.    Summary.
10      Q.    It's entitled Treatment Summary
11  for Mr. Brett Steininger.
12      A.    Okay.
13      Q.    It's two pages.
14      A.    Yes, of course that's the very
15  last thing that I'm going to find.
16      Q.    Right.
17      A.    Okay.
18      Q.    And then there's a PTSD Checklist
19  - Civilian Version.  And then a, I guess
20  what I would call a kind of a matrix.  And
21  then the last thing is a Burn's Depression
22  Checklist.
23      A.    Right.
24      Q.    And that's what you referred to

62

Kleinman - Direct

1   on page 4 under number 4, right, of your
2   report?
3       A.    Correct, yes.
4       Q.    Okay.  And then with respect to
5   Dr. Berrill, his psychological evaluation
6   report is Plaintiff Exhibit 822.
7       A.    Right.
8       Q.    And the attachments B and C would
9   be Defendant Exhibit YY -
10      A.    Yes.
11      Q.    -- which is the MCMI-V --
12      A.    Yeah.
13      Q.    -- document.  And then the,
14  what's referred to as the DAPS, D-A-P-S,
15  Profile Form.
16      A.    Yes.
17      Q.    And those are what you reviewed
18  as well, correct?
19      A.    Correct.
20      Q.    And are you aware that Dr.
21  Boudin, or Boudin, provided -- or, excuse
22  me, administered the PTSD Checklist to Mr.
23  Steininger?
24      A.    Yes.

63

Kleinman - Direct

1       Q.    What impact could that have had?
2       A.    I'm sorry, can you rephrase your
3   question?
4       Q.    Yeah, sure.  So she administers
5   this checklist to him from what you
6   understand and what you read.  Is that
7   something that's valid in a forensic
8   setting?
9           MR. CABECEIRAS:  Objection.
10  Leading.
11      A.    I'll tell you my assessment of
12  its use.
13      Q.    Let me rephrase the question.
14          So can you tell me what your
15  assessment is of her administration of the
16  PTSD Checklist to Mr. Steininger?
17      A.    Sure.  Highly problematic.  And
18  what I mean is that that particular
19  instrument has no utility, no usefulness,
20  in a forensic litigation setting.  It's
21  what's called a self-report instrument,
22  which suggests the answers by the nature of
23  the questions.  So anyone with a high
24  school education would easily understand

64

Kleinman - Direct

1   how to answer the questions in a way that
2   would create an image of the presence of
3   PTSD symptoms or of severe symptoms that
4   weren't, in fact, present.
5           Technically speaking, it doesn't
6   have what's called any internal validity
7   scales.  So it has no measure built into it
8   to help check how accurately someone is
9   presenting their mental state.
10          So it's a fine measure to use if
11  you're doing a research study.  It's a fine
12  measure to use if you're evaluating for
13  some -- someone for the purpose of
14  treatment.  But it's just not a reliable
15  measure at all to use in a forensic
16  litigation setting, including if you're
17  treating someone who is in the midst of
18  bringing a lawsuit.  And in my teaching
19  that I do, it's an example of the kind of
20  test which I strongly warn against using.
21      Q.    Let's talk about the DAPS test.
22  Are you familiar with the DAPS test?
23      A.    Yes.  I'm familiar with it.  It's
24  less commonly used than certain other

Kleinman - Direct

1  measures, but I'm familiar with it.
2  
3      Q.   Do you consider that to be
4  reliable in a forensic litigation setting?
5      A.   I would say that it's highly
6  problematic at best.  It's not as bad as
7  the PTSD Checklist.  Because the DAPS does
8  have two, what I referenced a moment ago,
9  what are called internal validity scales.
10 One is called NB, which means negative
11 bias, which means is somebody biased in the
12 way they're representing their mental state
13 by making it seem more severe than it
14 really is.  Or positive bias.  Let's say
15 someone wants to get a certain -- say
16 they're in a psychiatric hospital, let's
17 say they're in a prison psychiatric
18 hospital and they want to get out, so they
19 might minimize the severity of their
20 symptoms.  That's called positive bias.  So
21 those are good things.
22          The problem is, and I have, at
23 least as best as I can, researched whether
24 the usefulness, or whether those scales
25 have been shown to, in the real world, be

Kleinman - Direct

1  useful in being able to separate out, in a
2  reliable way, people who are exaggerating
3  or faking from those who are not, because
4  that's their purpose.  And the research
5  indicates that they're not useful.  Even
6  since I wrote my report, I did additional
7  research.  And I read an article yesterday
8  in which one of the, in a way, great
9  psychological test researchers, simply said
10 that the NB, negative bias, shouldn't be --
11 you know, not useful in a forensic setting.
12         So DAPS is fine for, again,
13 treatment.  It's fine or good for research.
14 It's not an advisable or reliable measure
15 to use in a forensic litigation setting.
16 Plus it's problematic to use a measure that
17 really was designed to help assess PTSD,
18 posttraumatic stress disorder, when you
19 know that someone hasn't been exposed to
20 the kind of life event which, by
21 definition, can produce or cannot produce
22 PTSD.  You wouldn't -- want to use a
23 different kind of test.
24         MR. CABECEIRAS:  I'll move to

Kleinman - Direct

1  strike the portions of the witness's
2  answers that involved hearsay
3  testimony.  I think he made reference
4  to an article.  But we can deal with
5  that after, Ed, okay?
6      Q.   Now, referring to the MCMI-IV
7  test that was administered to Mr.
8  Steininger by Dr. Berrill, are you familiar
9  with that testing?
10     A.   Yes.  I'm more familiar, because
11 it's been around longer, with the earlier
12 version.  The IV is not used as much.  But
13 I have administered the MCMI many times
14 myself, so I'm certainly familiar with it.
15     Q.   And are you familiar with its
16 utility in assessing personality?
17     A.   Yes.
18     Q.   And is it useful in assessing
19 personality?
20     A.   Certainly -- well, the short
21 answer is yes.  The earlier version had a
22 lot more supporting data because it had
23 been around longer, in terms of the utility
24 of its scales.  There is very -- is very

Kleinman - Direct

1  limited data about the MCMI-IV and its
2  utility.  But to the extent that it is
3  useful, the MCMI really is best, its
4  greatest use is looking at personality and
5  someone's overall psychological makeup.
6      Q.   And did you evaluate it with
7  respect to the answers and results of this
8  testing for Mr. Steininger on --
9      A.   I did, very carefully.
10     Q.   And what is it that you
11 concluded?
12     A.   Well, again, to the extent that
13 its measures related to personality are
14 reliable -- because there, again, are very
15 limited data, you know, that support it --
16 but to the extent it's reliable, it really
17 shows that Mr. Steininger has long
18 struggled with problematic self-esteem.
19 And that's consistent with the clinical
20 picture; in other words, what I learned
21 from him and what I read that he stated, in
22 terms of his growing up and his
23 relationship with his mother.  So he's long
24 struggled with problematic self-esteem.

69

Kleinman - Direct

1   And he described that to me, and even in
2   certain surgeries that he's had to help him
3   feel better about himself.
4            And the MCMI really describes
5   certain psychological dynamics that tend to
6   cause chronic fluctuating levels of
7   depression.  So not acute depression, but
8   just almost depression as part of who you
9   are, sometimes worse, sometimes better.
10  And just a tendency because, again, of your
11  -- who you are and how you're made up, a
12  tendency to depressively beat up on
13  yourself and to be angry and disappointed
14  in yourself and disappointed in others.
15           And the second part is relevant
16  because it really describes a dynamic that
17  sets somebody up for problems in
18  relationships.  If you are dependent on
19  somebody who you feel isn't meeting your
20  needs and you become resentful, and you go
21  back and forth between expressing your
22  resentment in a way that tends to
23  antagonize or you hold your resentment in,
24  it tends to not be good for an intimate

70

Kleinman - Direct

1   relationship.
2   Q.    In reviewing the MCMI that Dr.
3   Berrill provided, was there anything that
4   you saw in here with respect to what you
5   testified earlier about exaggeration of the
6   degree of any distress?
7   A.    Yes, there was.  May I look at
8   the test just for a moment?
9   Q.    Absolutely.  And you're looking
10  at, just to be clear, Defendant Exhibit YY,
11  right?
12  A.    That is correct.
13  Q.    Okay.
14  A.    So please just bear with me a
15  moment.
16           Well, there are really three
17  basic points.  First I'll mention, the
18  MCMI, generally speaking, is much more
19  helpful in describing personality
20  characteristics and personality makeup than
21  it is in assisting in the diagnosis of
22  someone's acute mental state.  In other
23  words, it's better at looking at
24  longstanding patterns of relating,

71

Kleinman - Direct

1   perceiving, and feeling than it is at
2   certain acute or recent changes in
3   someone's mental state.  That's number one.
4            The MCMI is pretty terrible at
5   assisting in diagnosing PTSD.  And I'll
6   note that the narrative report that I'm
7   looking at includes a diagnosis of PTSD.
8   Yet PTSD is impossible, because Mr.
9   Steininger was not exposed to an event
10  which threatened his life or serious
11  physical injury or an event of similar
12  objective magnitude.  Problem is that a
13  psychological test is not an investigator,
14  so if someone simply checks off that they
15  were exposed to a certain kind of life
16  event, the test doesn't know what that life
17  event or, objectively, what the nature of
18  the event was.
19           And then in terms of
20  exaggeration, what are called the validity
21  scales -- I used that term before -- to
22  determine, to help assess how someone has
23  approached taking the test and whether it's
24  suggestive of they're exaggerating or

72

Kleinman - Direct

1   minimizing, or sometimes people do both,
2   regarding certain kinds of problems.  MCMI
3   is not very good at that.  There are much
4   better tests.
5            Nonetheless, the MCMI really does
6   suggest symptom exaggeration on Mr.
7   Steininger's part.  I'll find -- I won't
8   read from the test but I'll just reference
9   one thing in the test.  The test notes that
10  the severity of the presentation, which is
11  different than how somebody really is, it
12  means the way the test questions were
13  answered, that, simply based on those
14  answers -- because a test doesn't meet
15  somebody and conduct an exam -- but if you
16  had those answers, you would think that
17  professional observation was necessary up
18  to the point of suggesting that this person
19  maybe should be in a psychiatric hospital.
20  It doesn't say the test taker should be in
21  a psychiatric hospital, it says it may be
22  appropriate.
23           Now, I can tell you there is just
24  no reason to believe that Mr. Steininger is

73

Kleinman - Direct

1  needed to be in a psychiatric hospital.  So
2  if the test is suggesting that is something
3  that is reasonable to consider -- again,
4  I'm not saying he should be -- but
5  reasonable to consider, it means that
6  either the test is very flawed or the way
7  Mr. Steininger presented his mental state
8  was exaggerated, or some combination of
9  both.
10        Q.    So if you look at page 16 to 17
11  of your report.
12        A.    Give me one second, please.
13        Q.    Yes.  Which is Exhibit --
14  Defendant Exhibit VV.
15        A.    Okay.  I'm at page 16.
16        Q.    Is that the -- so from 16 to 19,
17  is that the data that supports your
18  findings and opinion in this case, or a
19  summary of them?
20        A.    It's a summary of the data which
21  is my assessment of the severity or lack of
22  severity of the distress that Mr.
23  Steininger presented.  In other words, part
24  of an evaluation is to first determine all

74

Kleinman - Direct

1  of the symptoms or reported symptoms and
2  difficulties that somebody has, and then to
3  assess what is the meaning of that.  In
4  other words, how severe or not severe is
5  it, as well as to find out about other
6  symptoms and whether they're present or
7  not.  If they're present, that's relevant;
8  if they're not, it's relevant.
9        Q.    Item 2 there says, "Observations
10  of and Mr. Steininger's reporting to his
11  primary care physician subsequent to his
12  hospital discharge."  That refers to the
13  hospital discharge from the brain surgery?
14        A.    Yes, that wasn't clear.  But yes,
15  Mr. Steininger was admitted to Yale
16  Hospital in July of 2019 after a minor car
17  accident related to the effect of his brain
18  abscess and he had surgery.  And as a
19  forensic psychiatrist, I am interested in
20  reading hospital records to see the
21  observations of an individual's mental
22  state.  And in this particular case, those
23  observations were particularly important.
24        Q.    And why is that?

75

Kleinman - Direct

1        A.    Well, one, I look for, as I said,
2  both the presence and absence of symptoms.
3  Anxiety symptoms that might reflect panic
4  attacks or significant anxiety were not
5  endorsed.  In other words, especially with
6  panic attacks, things such as shortness of
7  breath, chest pain, rapid heartbeat were
8  denied.
9        Mr. Steininger's mood was
10  assessed.  And he wasn't described as being
11  clinically significantly depressed, he was
12  described as being appropriately worried
13  about his condition.  And particularly a
14  screening measure, not test, measure that
15  is commonly used in primary care, sometimes
16  used at hospitals, just to screen and
17  determine is there a level of depression
18  here that is of concern and maybe warrants
19  psychiatric evaluation or careful
20  observation, this measure is called the
21  PHQ-2.  It's a screening measure for
22  depression.  And Mr. Steininger scored a 0
23  on that, meaning that there wasn't a
24  suggestion on this measure of the presence

76

Kleinman - Direct

1  of concern -- a concerning level of
2  depression.
3        So this is an example of, outside
4  of a litigation setting, but during the
5  relevant -- a relevant time period,
6  observations of disinterested parties and a
7  screening measure that was given, don't
8  support the level of depression and anxiety
9  that Mr. Steininger either has reported to
10  some people or, for example, that -- the
11  test that we measured -- mentioned a moment
12  ago, the MCMI, suggest to be present.
13        Q.    And then number 3, on the bottom
14  of page 16, says his report to you "that he
15  sought to return to work as soon as he was
16  able following his surgery.  He did not
17  attempt to avoidantly extend his disability
18  leave."  What did that suggest to you?
19        A.    Well, of course the reported
20  source of -- primary reported source that
21  Mr. Steininger says of his distress is what
22  he alleges happened at his workplace.  So
23  typically when people have been exposed to
24  bad things at their workplace, exposure to

77

Kleinman - Direct

1  work, even when it's a different workplace,
2  tends to trigger bad memories, bad
3  feelings, and even what's called avoidance
4  anxiety, even phobias in some instances.
5      So it was notable to me that the
6  records that I reviewed -- and I think this
7  is the social worker's records -- indicate
8  that Mr. Steininger was being told
9  medically he could stay out for up to about
10  two more months to recover from his
11  surgery, it was a significant surgery. But
12  he was pushing, despite that, to get back
13  as soon as possible.
14      Now, there are two possible
15  explanations, and both may be true. But
16  first of all, his pushing to get back, even
17  though he could have still gotten,
18  suggestively, disability financial
19  payments, suggested he was not phobically
20  anxious or pathologically anxious about the
21  prospect of going to work, that it wasn't
22  triggering overwhelming distress, certainly
23  not that of a mental disorder.
24      Now, he may have wanted to go
25

78

Kleinman - Direct

1  back earlier too because perhaps he was
2  earning more money than disability was
3  paying. And I don't know the answer to
4  that, but I certainly considered that
5  because obviously it's my job to consider
6  all possibilities.
7      But it's psychologically relevant
8  that he wasn't avoiding going back to
9  something that would expectedly remind him,
10  in the sense that it's work, of his alleged
11  prior experience.
12  Q.   And how about the fact that's
13  noted in number 5, his description of his
14  mental abilities to perform his sales job
15  well and that he excelled at it, what
16  impact did that have on your evaluation and
17  opinion?
18  A.   Yeah, I would say that that was,
19  you know, more important, maybe
20  significantly more important than the prior
21  point. Here are the facts that are
22  relevant. Mr. Steininger returned to work
23  or had a new job within approximately a
24  month after losing his job. So I'm
25

79

Kleinman - Direct

1  interested in, when conducting an
2  evaluation, if the signs and symptoms of
3  depression and anxiety reveal themselves or
4  manifest in someone's real life, as I
5  mentioned earlier. So I was interested in
6  knowing what it takes to do Mr.
7  Steininger's job well and what his
8  activities are.
9      So, and he reported functioning
10  in a way that didn't support the presence
11  of the level of depression and anxiety that
12  he -- that's, for example, indicated on the
13  MCMI-III psychological test or,
14  objectively, of a moderate or severe level
15  of a depressive disorder.
16      He specifically indicated that,
17  pre-Covid, when he was physically working,
18  he was working 50 hours a week. Now, I
19  don't know if that was more difficult than
20  it was before for him, but it means that he
21  had -- you could say reasonably, that he
22  had enough energy to work 50 hours a week.
23  And very severe depression tends to
24  diminish your energy.
25

80

Kleinman - Direct

1      A large component, and I
2  discussed this with Mr. Steininger, of his
3  work involves sales type of activities.
4  And to be a good salesperson, you have to
5  come across enthusiastically, you have to
6  be engaging. No one wants to do business
7  with a depressed, withdrawn person. So
8  even if one were to say Mr. Steininger was,
9  you know, quote, faking it to do well at
10  work, it means he was able to, at the very
11  least, fake it as opposed to most or many
12  severely depressed people who can't fake it
13  because they're just too depressed. There
14  are always exceptions, but it's relevant
15  information.
16      And then clinically significant
17  depression, generally the worse the more
18  affect attention and concentration. It's
19  hard to focus when you're very depressed
20  and anxious. It's hard to focus if you're
21  constantly being bombarded with distressing
22  thoughts about a bad life experience that
23  keep replaying in your mind. Now, the
24  workplace, again, is a place where if Mr.
25

Kleinman - Direct

Steininger were having such kinds of
thoughts, he would expectedly have them at
work, at least at work because, again,
it's, at least superficially, reminiscent
of where the alleged discrimination
occurred.

And so we discussed certain
aspects of his job. And one of them
related to numbers. And as part of his
job, and determining how his company could
make profit, he had to be on top of certain
numerical monetary considerations. And he
described being able to concentrate and
attend to that well.

So his -- how he was functioning
at work is quite important, and even how
Mr. Steininger described it. You know,
self-esteem is a very complex thing. And,
you know, your self-esteem can vary, you
can have more self-esteem in one setting
than in another, maybe it in part depends
on who you're actually sitting with. So
it's not simple. But Mr. Steininger did
say that he -- to me -- that he was

Kleinman - Direct

functioning very well at the job that he
had then. And also told me that he
performed his job very well at his prior
job at WPIX.

I can't assess objectively either
of those. But psychologically, people who
are severely depressed commonly berate
themselves and have trouble finding
anything good. Or -- they can, you know,
depends on the level of depression. But
that's not how Mr. Steininger was reporting
it.

And of course, people can feel
badly and still think good things of
themselves, so I don't want to be
simplistic. But when you put the whole
picture together, he was concentrating on
the numbers, he was engaged and
enthusiastic, he was actually able to get
new clients, which isn't such a simple
thing, as well as still work with the old
clients, which is important, because
whatever embarrassment he felt, it wasn't
causing him to avoid seeing people who --

Kleinman - Direct

with whom he had done business. He may not
have told them why he wasn't working there,
which is understandable. But he wasn't
irrationally and self-defeatingly avoiding
them. And, again, he was working hard.

So these are all very important
things when assessing how severe or not
someone's depression and anxiety are.

Q.    In number 4 on page 18, you refer
to the "intentional weight loss, and
subsequent weight stability." And what
significance did that have in reaching your
opinion?

A.    I think this is a good example
of, you know, when I said, in forensic
evaluation, you want to try to match
someone's activities with their mental
state. You know, Mr. Steininger's had
weight problems. It's hard to lose weight.
And Mr. Steininger, the Yale record
indicated, had lost, intentionally -- so
not because of depression or anxiety -- but
the report was intentionally lost
approximately 30 pounds. That must have

Kleinman - Direct

taken a lot of willpower to lose that
amount of weight. And I don't know how he
did it. I don't know to what extent he was
doing it with exercise, which is relevant
because exercise takes motivation and
energy. And that's part of what you look
at when assessing depression.

But a very severely depressed
person, a commonly -- not always, you know,
everybody's different -- but commonly
attends less well to their welfare, because
they're depressed, it doesn't matter as
much to them, they don't take care of
themselves as well, they don't necessarily
even take their medicines as they should.

But Mr. Steininger cared enough
about himself to lose 30 pounds and had the
motivation and will, in a sense, to do it.
So that's, again, you know, a real world
objective fact that is important in
assessing the severity of depression and
anxiety.

Q.    If you can look on page 26 of
your report. Title there says Mode of

85

Kleinman - Direct

1  Relating Data, which I think you've
2  testified to about whether he has, as it
3  says here, "varyingly exaggerated the
4  magnitude of psychiatric difficulties that
5  he has reported suffering." I think you've
6  gone through that.
7      A.   There are two parts I didn't
8  really --
9      MR. CABECEIRAS:  Objection.
10  There's no question.
11      Q.   You've gone through the first
12  part dealing with MCMI. I think you've
13  testified to the discrepancy between the
14  severity of his symptoms that he reported
15  and the way he's functioned in various
16  domains. Have you reviewed with us today
17  points 3 and 4?
18      A.   No.
19      Q.   And what does 3, which says, "The
20  absence of reported or observed significant
21  mental state disturbance in the medical
22  records that the evaluator has reviewed,"
23  what does that mean?
24      A.   Right. I should modify my
25

86

Kleinman - Direct

1  answer. I partially reviewed point 3,
2  which is about the medical records.
3  Because I testified a moment ago about what
4  the Yale records from July of 2019
5  indicate. But those weren't the only
6  medical records that I reviewed.
7      The medical records, during the
8  next year and four months or so, so until
9  about November of 2019, these were the
10  primary care doctor records, also don't
11  describe the presence of severe depression
12  or anxiety. And also the primary care
13  doctor utilized the same screening measure
14  of depression that was used at Yale. So
15  the PHQ-2 was, again, administered to Mr.
16  Steininger, in this instance in September
17  of 2019. And, again, on the screening
18  measure of depression, he didn't -- he
19  scored in a way that didn't support or
20  suggest that substantial depression was
21  present.
22      So that's point number 3, the
23  discrepancy between the observations,
24  descriptions, and reports of disinterested
25

87

Kleinman - Direct

1  parties, but including of Mr. Steininger's,
2  in a sense, own words when he answered the
3  questions on the PHQ when he was in Yale in
4  July of 2019 and then subsequently.
5      I requested, but apparently they
6  weren't available -- maybe there weren't
7  visits, I don't know -- but also records
8  prior to Yale and after Mr. Steininger lost
9  his position. But I don't have that.
10      And then point 4 is also very
11  important. I mentioned that Mr. Steininger
12  saw -- that a social worker would visit Mr.
13  Steininger periodically after his surgery,
14  and he got home from the hospital, after
15  the brain abscess was removed. And those
16  records really -- well, first in terms of
17  symptom reporting, they real -- you know,
18  they indicate that there was anxiety about
19  Mr. Steininger's condition, I mean Mr.
20  Steininger being anxious about his
21  condition, as was his wife, post surgery.
22  But they really don't describe the presence
23  of a disorder of severe depression or a
24  disorder of severe anxiety.
25

88

Kleinman - Direct

1      And, you know, these were
2  seemingly private conversations with
3  someone that Mr. Steininger felt
4  comfortable with. As a matter of fact, the
5  very last social worker note says that Mr.
6  Steininger, I'm paraphrasing, expressed
7  disappointment, that I think it had to do
8  with insurance or reimbursement, that the
9  social worker couldn't continue to speak
10  with him.
11      So when someone has a
12  relationship with someone whom they like
13  and seemingly are reasonably open with, it
14  makes those records and the person's
15  reports that much more important. And so
16  the social worker notes weren't consistent
17  with the presence of certainly not a severe
18  disorder of depression or anxiety, or even
19  suggestively of a moderately severe
20  disorder of such.
21      Q.   A little bit ago, you testified
22  about what Mr. Steininger told you with
23  respect to his performance at WPIX. And on
24  page 18 at the bottom, which is 5B, it says
25

89

Kleinman - Direct

1 that he reported his work "at the highest
2 level" at WPIX. Do you remember that?
3      A.   I do.
4      Q.   Are you aware, from reading the
5 deposition transcripts and looking at the
6 litigation papers here, that WPIX has taken
7 the position that Mr. Steininger's
8 employment ended for performance related
9 reasons?
10            MR. CABECEIRAS:  Objection.
11     Leading.  Objection to form.
12            MR. CERASIA:  Okay.  I'll
13     withdraw it.
14     Q.   In reading the depositions, the
15 litigation papers, did you have an
16 understanding as to why Mr. Steininger was
17 terminated?
18     A.   Yes.  As of course a layperson,
19 yes.
20     Q.   Right.  And what was your
21 understanding in a very general sense?
22     A.   That there was a performance
23 issue which wasn't satisfactorily, as
24 judged by WPIX, satisfactorily rectified.

90

Kleinman - Direct

1 So that was their basis.
2      Q.   So you've got Mr. Steininger
3 reporting to you that he performed at the
4 highest level, you have the company's
5 position, from what you read, that there
6 were performance related issues.  Is there
7 anything, in making your evaluation, that
8 you look at whether or not that shows any
9 lack of insight or clouding of his
10 understanding as to why he was fired?
11     A.   Well, yes, as a general --
12            MR. CABECEIRAS:  I'll object to
13     it was not only compound, but it was
14     also leading.
15     Q.   Did you have any opinion, in
16 evaluating Mr. Steininger, about his view
17 of his performance versus WPIX's view of
18 his performance?
19     A.   I did assess that.  Because
20 obviously how someone perceives
21 circumstances, if their perception is not
22 accurate, it can cause them to come to
23 inaccurate conclusions which can be
24 painful.  I can't, and I haven't made a

91

Kleinman - Direct

1 determination objectively about the quality
2 of Mr. Steininger's performance, and that's
3 not my area of expertise.
4      So I think it's an important
5 psychological question.  It can only really
6 be ultimately answered by objectively
7 reliably knowing what, in fact, was his
8 performance and comparing his perception of
9 it and seeing whether it matches that.  So
10 it's a relevant issue.  I considered it.  I
11 can't give a definitive answer about it.
12     But, again, the fact that,
13 whether accurate or not, the perception
14 that he did perform at the highest level is
15 relevant to my assessment of at least the
16 severity of a depressive disorder.
17     Q.   And did you --
18            THE VIDEOGRAPHER:  Excuse me,
19     counsel.  This is David Chroniger, the
20     videographer.  I just wanted to let you
21     know we have to take a break within the
22     next 10 minutes, so the file can't be
23     too long, okay?
24            MR. CERASIA:  Okay.  Alex, why

92

Kleinman - Direct

1 don't we take a break now because I
2 think I literally maybe only have 10
3 more minutes.
4            MR. CABECEIRAS:  Okay.  Sure.
5            THE VIDEOGRAPHER:  We are off the
6     record 15:46.
7            (Recess)
8            THE VIDEOGRAPHER:  We are back on
9     the record 15:55.
10            MR. CABECEIRAS:  Before we begin,
11     Plaintiff will move to strike issues of
12     credibility that the witness just
13     testified to.  As we are all aware,
14     issues of credibility are for the jury,
15     not for an expert witness.  So
16     Plaintiff will again move to strike
17     portions of the witness's testimony
18     that have to do with credibility of
19     Plaintiff.
20            MR. CERASIA:  We'll deal with
21     that with the Judge, yeah.
22            MR. CABECEIRAS:  Okay.
23            MR. CERASIA:  All right.  I've
24     got just a little bit more.

---

**93**

Kleinman - Direct

1  DIRECT EXAMINATION CONTINUED
2  BY MR. CERASIA:
3  Q.    Dr. Kleinman, did you reach any
4  conclusion about a prognosis for Mr.
5  Steininger?
6  A.    My answer unfortunately is a
7  little -- going to seem, at least on the
8  surface, a little unclear.  Yes and no.
9  Q.    And can you explain what you mean
10  by that?
11  A.    Well, the prognosis, of course,
12  depends on the severity of the disorder.
13  So my opinion is that Mr. Steininger has an
14  Unspecified Depressive Disorder, with
15  Anxiety, that's of mild severity.  The fact
16  it's of mild severity would indicate that
17  medication is not necessary or required.
18  And the type of disorder, as Mr. Steininger
19  reports the symptoms, would be typically
20  especially responsive, do well with,
21  respond positively to, systematically
22  applied, cognitive therapy.
23        There are many different types of
24  psychotherapy, not all psychotherapy is the

---

**94**

Kleinman - Direct

1  same.  Cognitive therapy is a very specific
2  type of cognitive therapy -- of
3  psychotherapy, and demonstrated to be very
4  effective for mildly to moderately severe
5  depression.  Matter of fact, there is a lot
6  of reason to believe that, generally
7  speaking, it's as effective as
8  antidepressant medicine for mildly to
9  moderately severe depression, and for
10  anxiety.
11        So my understanding of the
12  treatment that Mr. Steininger has received,
13  psychological treatment that he's received
14  to date, is that he has not received,
15  systematically applied, cognitive therapy;
16  in other words, the type of therapy that is
17  likely to be quite effective for a mildly
18  severe disorder of depression.  And if he
19  were to receive that therapy, especially
20  once litigation resolved, I can't give you
21  an exact date, an exact time, no one can,
22  but it probably would resolve the disorder
23  of depression, which, again, is different
24  than feeling upset or distressed for

---

**95**

Kleinman - Direct

1  whatever the reasons may be.
2        MR. CABECEIRAS:  Ed, you're
3  muted.
4  Q.    When you say that you didn't have
5  information that he had received cognitive
6  behavioral therapy, is that the therapy
7  that he was receiving by Dr. Boudin that
8  you're referring to?
9  A.    I am.  And what I mean --
10        MR. CABECEIRAS:  Objection.
11  Leading question.  I'll object.
12        MR. CERASIA:  I'll rephrase it.
13  Q.    You referred to the fact that you
14  had information that led you to believe he
15  was not receiving cognitive behavioral
16  therapy, right?
17  A.    Correct.
18  Q.    You understood from -- did you
19  understand from reading the records that he
20  was receiving therapy?
21  A.    Yes.
22  Q.    And his treating therapist was
23  Dr. Boudin, right?
24  A.    Correct.

---

**96**

Kleinman - Direct

1  Q.    Is it fair then to say that your
2  conclusion was that Dr. Boudin was not
3  using cognitive behavioral therapy?
4  A.    Based upon the information I
5  have, which is Dr. Boudin's deposition
6  testimony, her two summaries, and probably,
7  most importantly, the way Mr. Steininger
8  described his therapy to me -- I spent time
9  intentionally, during our evaluation,
10  talking about whether he does the kinds of
11  things which are typical of cognitive
12  therapy -- the answer is no.
13        I -- the reason why I have a
14  slight hesitation is because Dr. Boudin, to
15  my understanding, didn't create progress
16  notes of each of her meetings with Mr.
17  Steininger.  And it's those kind of
18  treatment notes of each session that
19  typically help another professional
20  understand what transpires in the course of
21  treatment.
22  Q.    When you refer to treatment
23  notes, are those notes that are kept of a
24  treatment session?

97

Kleinman - Direct

1
2    A.    Yes, treatment notes, progress
3  notes.  After a mental health professional
4  has a session, a treatment session,
5  typically they write a note of the
6  important aspects of the session.  And if
7  they're doing cognitive therapy, they
8  particularly will describe the kinds of
9  homework assignments that are being given
10 and how somebody did with the prior week's
11 homework assess -- assignments.
12    Q.    And finally, can you reiterate
13 what your conclusion was after evaluating
14 Mr. Steininger for eight hours and
15 reviewing all of the materials that we've
16 identified?
17    A.    My conclusion, which has several
18 parts, is that, first and foremost, Mr.
19 Steininger suffers from an Unspecified
20 Depressive Disorder, with Anxiety, which
21 overall is of mild severity.  So that's
22 number one.
23        In terms of the cause or causes
24 of such, the -- all of the information that
25 I looked at, taken as a whole -- and it's

98

Kleinman - Direct

1
2  substantial information -- does not allow,
3  in my opinion, any mental health evaluator,
4  including specifically a forensic mental
5  health evaluator, to specifically determine
6  the cause of this disorder, particularly
7  whether or to what extent the alleged
8  discrimination contributed to this
9  disorder.
10        And then, finally, Mr. Steininger
11 has been exposed to multiple stressors,
12 life events, difficulties unrelated to the
13 alleged discrimination, which
14 independently, in other words, by
15 themselves, and/or in combination, have
16 likely meaningfully contributed to this
17 disorder.  And that part of the difficulty
18 in determining causation, as well as
19 severity, is that all of the information,
20 again, taken as a whole, indicates that, to
21 varying extents, probably sometimes more,
22 probably sometimes less, Mr. Steininger has
23 exaggerated the severity of his
24 presentation of the depression and anxiety
25 that I just referenced and diagnosed.

99

Kleinman - Cross

1
2        MR. CABECEIRAS:  Once again, move
3  to strike portions of the witness's
4  testimony that have to do with
5  credibility of Plaintiff.
6        MR. CERASIA:  I have no other
7  questions at this time.  Thank you, Dr.
8  Kleinman.
9        THE WITNESS:  You're welcome.
10       MR. CABECEIRAS:  Okay.  My turn.
11 CROSS-EXAMINATION
12 BY MR. CABECEIRAS:
13    Q.    How are you doing today, sir?
14    A.    Hi.
15    Q.    Sir, you and I have never met,
16 right?
17    A.    That's right.
18    Q.    Sir, my understanding was you
19 requested to testify remotely today, is
20 that right?
21    A.    Yes.
22    Q.    For medical issues we don't have
23 to get into, but for a medical issue,
24 right?
25    A.    Correct.

100

Kleinman - Cross

1
2    Q.    Does your medical issue impact
3  your cognitive abilities in any way?
4    A.    No.
5    Q.    Okay.  Are you on any medication
6  that could impair your cognition in any
7  way?
8    A.    No.
9    Q.    Okay.  Sir, you've been hired by
10 Defendants' lawyers in this matter, right?
11    A.    Correct.
12    Q.    And you mentioned you requested
13 to speak to Brett's wife, right?
14    A.    Yes.
15    Q.    I can represent to you that
16 Defendants' lawyers never asked the Court
17 to order you to be allowed to speak to his
18 wife.  Do you have any reason to disagree
19 with that?
20    A.    I don't know what communications
21 occurred or what was represented to the
22 Court or not.  I just don't know.
23    Q.    Okay.  So no reason to disagree,
24 right?
25    A.    No reason to agree or disagree.

101

Kleinman - Cross

1  I just don't know.

2      Q.    And you mentioned you requested

3  you wanted to speak with his social worker,

4  right?

5      A.    If that person were available,

6  correct.

7      Q.    I can further represent to you

8  that Defendants' lawyer never asked the

9  Court to order that you speak with a social

10 worker.  Do you disagree with that?

11     A.    I have no reason not to believe

12 you.  But I don't have any independent

13 information one way or another.

14     Q.    And do you know Defendants'

15 lawyers never asked the Court to compel

16 production of Brett's social media?

17     A.    You know, again, I would have to

18 answer the same way.  You know, I have no

19 reason, and I would not do it, I have no

20 reason not to believe you.  I just have no

21 independent information about any of those

22 kinds of communications or relate -- or

23 what transpired with the Court.

24     Q.    Sir, are you aware if Brett even

102

Kleinman - Cross

1  uses social media or not?

2      A.    You know, I would have to look at

3  my examination notes.  I don't think it's

4  necessarily an issue of zero or none.  But

5  I honestly don't -- I don't recall, as I

6  sit here, the extent to which he, at any

7  time, used social media.

8      Q.    Would it change your evaluation

9  if I told you Brett does not engage in any

10 kind of social media activities?

11     A.    If it were reliably established

12 that during the relevant time period, so

13 not just now, but since at least one year

14 prior to the time that he alleges he

15 started to be discriminated against, he did

16 not engage in any social media activity

17 whatsoever, and that was an accurate

18 representation, then of course I wouldn't

19 request social media records.

20     Q.    Okay.  So that's a yes, is that

21 right?

22     A.    I think I -- I think my answer

23 really is probably the most accurate way I

24 can represent it.

103

Kleinman - Cross

1      Q.    By the way, sir, you agree

2  sometimes social media does not reflect how

3  that person is feeling on any given day,

4  right?

5      A.    Social media doesn't always

6  reflect -- accurately reflect a lot of

7  things.  And when I review social media

8  records, I'm acutely aware that people can

9  exaggerate, minimize, misrepresent many

10 things, and that's part of what one needs

11 to consider.

12     Q.    Sir, do you know that Defendants'

13 lawyers never requested the Court compel

14 production of records about Brett's son

15 Alexander?

16     A.    Again, I would answer the same

17 way.  I have no reason, you know, not to

18 believe you and I have no information about

19 what happened or didn't happen otherwise,

20 regarding those records.

21     Q.    But as your report indicates, you

22 don't have an interview with his wife, you

23 don't have his son's records, you don't

24 have these alleged social media posts,

104

Kleinman - Cross

1  right, you don't have any of that

2  information, is that correct?

3      A.    Well, if I understand correctly,

4  there are no social media posts to be had.

5  But I don't have that other -- I didn't

6  conduct collateral interviews of those two

7  individuals or of the other record, that's

8  correct.

9      Q.    And your report, of course, could

10 not rely on those things, right?

11     A.    Of course.  And it hasn't.

12     Q.    And your testimony was that no

13 reasonable person can come to the final

14 conclusion on causation as it relates to

15 Brett's emotional distress, right?

16     A.    Partly that's what I said.

17         MR. CERASIA:  Objection.

18 Misstating his testimony.

19     A.    What I said was that no mental

20 health evaluator, particularly a forensic

21 mental health evaluator, who utilized the

22 database, the information that was

23 available to me, is able to reliably render

24 a -- an opinion regarding the causation of

105

Kleinman - Cross

1    the disorder of depression and anxiety that
2    I diagnosed.
3        Q.    So you, sir, cannot responsibly
4    come to a final conclusion on the causation
5    as well, is that correct?
6        A.    That is my opinion about
7    causation.
8        Q.    Okay.  Including your own report,
9    right, sir?
10       A.    Well, I'm testifying exactly what
11   my report says about causation, with the
12   exception, as I did testify few moments
13   ago, that there are independent stressors
14   which independently, or in combination,
15   have contributed to Mr. Steininger's
16   distress.  But I can't go beyond that in
17   giving an opinion about causation.
18       Q.    Okay.  So, again, you cannot
19   responsibly come to a final conclusion on
20   the causation of his emotional distress, is
21   it a yes or a no, or I don't know?
22            MR. CERASIA:  Objection.
23       A.    Your question includes language
24   that prevents me from answering.

106

Kleinman - Cross

1        Q.    Okay.  Sir, you mentioned a car
2    accident in your testimony just now.  What
3    car accident were you referring to?
4        A.    I'm not sure that I indicated
5    that Mr. Steininger was in a car accident,
6    but I'm happy to have my memory refreshed.
7        Q.    You gave testimony that had
8    something to do with his brain abscess.
9        A.    Oh, thank you.  Yes.  The brain
10   abscess, in retrospect, I, the best of my
11   recollection, I think was affecting his
12   vision.  And he had a minor car accident.
13   And that was the -- that set in action a
14   chain of events which led him to be
15   hospitalized and for the brain abscess to
16   be detected.
17       Q.    Sir, are you aware that he had no
18   idea he was feeling bad until he passed out
19   at a barbecue on July 4th?
20       A.    My memory is that I read
21   something else in the records.
22       Q.    Okay.  Sir, again, you've been
23   retained by Defendants' lawyers, right, on
24   behalf of Defendants in this action, is

107

Kleinman - Cross

1    that correct?
2        A.    Yes.
3        Q.    And, sir, you've been retained by
4    Defendants' lawyers to theorize on Brett's
5    emotional state and the potential causes of
6    said emotional state, right?
7        A.    No.  That doesn't accurately
8    reflect my retention and, more importantly,
9    what I, in fact, did.
10       Q.    Well, sir, you're being -- you
11   were paid money, right, to evaluate Brett
12   Steininger on Defendants --
13       A.    Of course I'm paid for my time,
14   of course.
15       Q.    And you were paid by Defendants'
16   lawyers to write a report, right?
17       A.    I was paid for the time I spent
18   writing the report, of course.
19       Q.    And likewise, you're going to be
20   paid for the testimony you're giving here
21   today, right?
22       A.    No, I'm not paid for my
23   testimony.  I'm paid for my time appearing
24   in court.

108

Kleinman - Cross

1        Q.    Okay.  And there's a fundamental
2    difference between being paid to be here
3    today and being paid to be here in court?
4    What's the distinction, sir?
5        A.    Well, I believe your question was
6    I'm being paid for my testimony; and that
7    of course is not true, if the inference is
8    that somehow money is being given to
9    influence an opinion or what I say when I
10   testify, as opposed to being paid for me
11   physically appearing here, and the
12   testimony is my own.
13       Q.    Sir, that wasn't the question,
14   right.  The question was are you being paid
15   to give testimony here today, yes or no?
16       A.    I will rely on my answer.  I'm
17   being paid for the time that I am here
18   today.  If I were here and -- if we were in
19   a physical courtroom and I sat on a bench
20   for four hours and didn't testify at all, I
21   would still be paid the same amount of
22   money because I'm being paid for my time.
23       Q.    Sir, I can assure you the
24   majority of my questions are going to be

109

Kleinman - Cross

1  yes or no like the former.  I'd rather not
2  waste the jury's time, and if you could
3  just work with me on those yes or no
4  answers, that will go a long way.
5  Sir --
6  MR. CERASIA:  I'm just going to
7  object that you're badgering him, Alex.
8  MR. CABECEIRAS:  Sure.
9  Q.   You of course talked to
10  Defendants' lawyers before today, right?
11  A.   Yes.
12  Q.   And I assume you were paid for
13  your time in speaking with them, right?
14  A.   Correct.
15  Q.   And you testified you evaluated
16  Brett, correct?
17  A.   Yes.
18  Q.   And I assume you were paid by
19  Defendants' lawyers for that evaluation,
20  correct?
21  A.   For the amount of time that I
22  spent, correct.
23  Q.   And you reviewed his medical
24  documents on behalf of Defendants' lawyers,
25

110

Kleinman - Cross

1  right?
2  A.   Yes.
3  Q.   And I think you might have said
4  this, but you're billing Defendants'
5  lawyers for your time here today, correct?
6  A.   Correct.
7  Q.   How many hours have you worked on
8  this case to date?
9  A.   I don't know because I haven't
10  reviewed invoices.  I can, if you give me a
11  moment, give you the best guesstimate I
12  can.  And that's the best that I can do, if
13  you'll allow me to think about it.
14  Q.   Absolutely.  Take your time.
15  A.   Again, I truly have not looked at
16  invoices.  But I'll give you best
17  guesstimate based on spending eight hours
18  plus breaks with Mr. Steininger, so I'll
19  say 10 hours.  I reviewed obviously a
20  substantial amount of records, probably
21  well over a thousand pages of deposition
22  testimony.  And I wrote a moderate length
23  report which takes substantial time.  So a
24  rough guesstimate --
25

111

Kleinman - Cross

1  Q.   Sir, respectfully, I'm just
2  asking how many hours.  I don't need you to
3  --
4  A.   Right.
5  Q.   -- walk us through.  Just how
6  many hours have you worked to date?
7  A.   Well, I'm doing that as, in a
8  way, a mental device so that I can add it
9  up.
10  A rough guesstimate, separate and
11  apart from preparing to testify here today,
12  would be maybe about 60 hours.
13  Q.   And how much do you charge per
14  hour?
15  A.   I think, at the time I was
16  retained a year ago, my fee was 825 or 830
17  dollars an hour.
18  Q.   And, sir, you've testified in
19  court cases before, right?
20  A.   Yes.
21  Q.   And, sir, you've been retained by
22  a corporate defendant before, correct?
23  A.   Yes.
24  Q.   And, sir, you've written reports
25

112

Kleinman - Cross

1  on behalf of corporate defendants before,
2  right?
3  A.   Correct.
4  Q.   Sir, you agree with me that the
5  majority of your time, when you give expert
6  opinions in employment matters, you are
7  giving them on behalf of corporate
8  defendants, right?
9  A.   I have been retained by the
10  defendant in most of the employment cases
11  in which I have worked.
12  Q.   And before this case, you were
13  hired by Thomson Reuter to evaluate a woman
14  named Priscilla Serath (phonetic), right?
15  A.   I think, technically, I was hired
16  by the law firm representing Thomson
17  Reuters.  But, yes, I was involved in a
18  case by that name.
19  Q.   Fair enough.  And similar to
20  Brett, do you recall Ms. Serath bringing a
21  claim against her employer?
22  A.   Correct.
23  Q.   Okay.  And you were hired to
24  examine Ms. Serath and prepare a report for
25

113

Kleinman - Cross

1  litigation purposes by those lawyers,
2  right?
3
4      A.    Yes.
5          MR. CERASIA:  I'm going to object
6  to this line of questioning.  I tried
7  to object before, I was on mute.
8          MR. CABECEIRAS:  Ed, do you want
9  to just handle it after?  Because I
10  think I'll move to strike some things
11  and sounds like you might move to
12  strike some.
13          MR. CERASIA:  Yeah, I'm going to
14  just have a blanket objection, and
15  we'll deal with it in front of the
16  Judge or you and I after, sure.
17          MR. CABECEIRAS:  Okay.
18      Q.    And going back to that case, sir,
19  that was actually in this court, was it
20  not?
21      A.    When you say this court, which
22  court are you referring to?
23      Q.    Southern District of New York,
24  the federal court we're sitting in today.
25      A.    I actually don't remember.

114

Kleinman - Cross

1
2      Q.    You remember producing a report
3  in that matter, right?
4      A.    Correct.
5      Q.    You recall identifying in that
6  report potential out-of-work stressors of
7  Ms. Serath, right?
8      A.    No, I don't remember the specific
9  content of that report from several years
10  ago.
11      Q.    Okay.  Sir, this report was done
12  within the last four years, was it not?
13      A.    Exactly.
14      Q.    Okay.  And you don't recall
15  sharing potential stressors about her
16  family's finances?
17      A.    Well, now you're refreshing my
18  memory, I have some recollection of that
19  being an issue in the case.  But without
20  the report in front of me, I'm at a great
21  disadvantage.
22      Q.    I understand.  And I'm just
23  asking you what you got, you know,
24  memorized here.
25          Do you recall bringing up her

115

Kleinman - Cross

1  family vacation history as a potential
2  stressor?
3
4      A.    No.  I don't recall one way or
5  another.
6      Q.    Do you recall bringing up her
7  husband's job in the report you made as a
8  potential stressor?
9      A.    Yes.
10      Q.    Do you generally agree that you
11  brought up these potential stressors, on
12  behalf of the corporate defendants, to
13  argue that Ms. Serath's emotional distress
14  was caused by something outside of the
15  workplace?
16      A.    No, I would strenuously disagree.
17  And as I testified to on direct testimony,
18  I teach a seminar weekly on the appropriate
19  method of assessing emotional stress
20  damages.  And, as I learned when I was a
21  fellow in forensic psychiatry, assessing
22  the presence and potential, not necessarily
23  in fact, but potential impact of
24  independent or intervening stressors is a
25  necessary and important part of an

116

Kleinman - Cross

1  evaluation.  And unemployment or a
2  problematic employment, if that's the case,
3  of a spouse can, not always, but it can, in
4  some situations, can be an important source
5  of distress in someone's life.
6      Q.    I appreciate that.  And if I can
7  just remind you, just yes or no just so we
8  can move things along, I'd appreciate it.
9          But you certainly, in Ms.
10  Serath's report, didn't report that any
11  workplace experience caused her emotional
12  distress, did you?
13
14      A.    Again, if you're asking me about
15  conclusions in that report without my
16  seeing the report, which I think was four
17  years ago, or close to four years ago, I
18  just don't remember the specifics.
19      Q.    Do you recall testifying in a
20  case Velasquez v. ATCO Properties?
21      A.    Yes.
22          MR. CERASIA:  Again, I'm going to
23  object to this line of question on the
24  grounds it's irrelevant.  It's also
25  hearsay.

Kleinman - Cross

1  Q.    That's a claim where you
2  testified for the corporate defendant,
3  right?
4  A.    I was retained by the defense in
5  that matter, correct.
6  Q.    And you recall Ms. Velasquez
7  claiming she was sexually assaulted at
8  work?
9  A.    Yes.
10  Q.    You recall sitting down with Ms.
11  Velasquez and doing your evaluation, right?
12  A.    Yes.
13  Q.    And you recall issuing a report
14  on behalf of defendant's lawyers after
15  speaking with her, right?
16  A.    Correct.
17  Q.    And in that report, you
18  identified other stressors outside of the
19  workplace that you testified contributed to
20  her emotional distress, right?
21  A.    I certainly did.
22  Q.    And you gave testimony in Ms.
23  Velasquez's case, right?
24  A.    Correct.

Kleinman - Cross

1  Q.    And likewise, prior to this,
2  you've been retained by UBS Securities to
3  evaluate a gentleman named Mr. Murray.  Do
4  you remember him?
5  A.    I do.
6  Q.    You testified in court that Mr.
7  Murray's symptoms were mild, correct?
8  A.    I don't know if I diagnosed a
9  disorder that was mild or if symptoms were
10  mild, and there is a difference, an
11  important one.  And I just don't remember.
12  Q.    It's fair enough.
13  MR. CERASIA:  Objection, Alex.
14  I'm going to, again, object to the line
15  of questions with respect to the UBS
16  case.
17  Q.    Sir, you were asked to evaluate a
18  report made by Dr. Goldstein in that case,
19  right?
20  A.    Correct.
21  Q.    Similar to how you were asked to
22  evaluate Dr. Berrill's report in this case,
23  right?
24  A.    That's not a correct

Kleinman - Cross

1  characterization of what I did, actually,
2  in either case.
3  Q.    And you reviewed, in that case,
4  Mr. Murray's potential important stressors,
5  right?
6  A.    I'm sorry, couldn't hear that
7  one.  Can you repeat that, please?
8  Q.    Sure.  You reviewed, in Mr.
9  Murray's case, his potential important
10  stressors, right?
11  A.    I hope so.
12  Q.    And in your test -- well, I'll
13  withdraw.
14  Do you recall testifying in that
15  case that there's, quote, one, more than
16  one and different causes of contribution to
17  Mr. Murray's disorder.  Do you recall that?
18  A.    I don't recall my specific
19  testimony, but that's conceivable.
20  Q.    Now, in Mr. Murray's case,
21  defendant's attorneys paid you over 50,000
22  dollars for your service, is that right?
23  A.    Again, a case that's three or so
24  years old, I haven't looked at invoices.

Kleinman - Cross

1  But if you represent that that's accurate,
2  I certainly will accept that.
3  MR. CERASIA:  Alex, I'm going to
4  also object.  You keep referring to the
5  defendant's lawyers.  You're not clear.
6  My firm didn't represent any of the
7  defendants that you noted.  So you
8  should make that clear.
9  MR. CABECEIRAS:  I will clear
10  that up moving forward.  Thank you.
11  Q.    Sir, you've also been retained by
12  J.P. Morgan as well, right?
13  MR. CERASIA:  Objection to this
14  line of questions.
15  A.    I've been retained by a law firm
16  representing J.P. Morgan, correct.
17  Q.    And you were retained by a law
18  firm representing J.P. Morgan to give them
19  a psychological assessment of an individual
20  who was suing them, right?
21  A.    To conduct a forensic psychiatric
22  evaluation of that person, correct.
23  Q.    Okay.  You've also been retained
24  by ANZ Securities, right?

121

Kleinman - Cross

2   MR. CERASIA:  Objection.

3   A.   I was retained in a matter by the
4   law firm representing ANZ Securities, that
5   is correct.

6   Q.   And what is ANZ Securities, sir,
7   are they a hedge fund?

8   A.   As I sit here today, I'm not sure
9   myself.  Something in the financial
10   industry.

11   Q.   And that was an employment case
12   just like this case, right?

13   A.   Correct.

14   Q.   Dr. Kleinman, you advertise for
15   your forensic services online, don't you?

16   A.   I don't believe I advertise.
17   You'll have to tell me what you mean by the
18   term advertise.

19   Q.   Sure.  Forensic-psychiatrist.org,
20   isn't that your website?

21   A.   Yes, I have a website.  And if
22   you want to refer to my having a website as
23   advertising, then we can use that term.

24   Q.   Sir, I can represent to you that
25   your website currently states you are

122

Kleinman - Cross

2   available to, quote, help managers safely
3   discipline and terminate employees.  Do you
4   have any reason to doubt my representation?

5   A.   No.  As long as you accurately
6   represent it and allow me to accurately
7   represent it and not take it out of
8   context, of course.

9   Q.   Do you recall that is on your
10   website, to help managers safely discipline
11   or terminate employees?

12   A.   Yes.  I help with workplace
13   safety --

14   Q.   So, sir, part of your business is
15   to help managers terminate employees, is it
16   not?

17   A.   Well, I just said, if you don't
18   take my statements out of context, I can
19   agree with you.

20   Q.   Sir, I can assure you --

21   A.   But if you misrepresent what I do
22   --

23   Q.   Sir --

24   MR. CERASIA:  Alex, you've got to
25   let him answer the questions.

123

Kleinman - Cross

2   MR. CABECEIRAS:  It's
3   nonresponsive.

4   Q.   So I can assure you, sir, that
5   your attorney will, on redirect, maybe ask
6   you about that, okay?  But for now I'd like
7   to move along.

8   Sir, most of your income comes
9   from doing forensic work activities, right?

10   A.   I practice in my specialty and
11   subspecialty, so yes.

12   Q.   And a significant part of that
13   involves testifying in courts like you are
14   doing now, right?

15   A.   If a yes or no is required, the
16   answer is no.

17   Q.   The answer is no?

18   A.   The answer is no, as you've asked
19   the question.

20   Q.   Do you recall giving testimony in
21   the Murray case?

22   A.   We were just talking about it,
23   yes.

24   Q.   Okay.  Do you recall being under
25   oath in that case?

124

Kleinman - Cross

2   A.   Yes.

3   Q.   The same oath you took today
4   before you started talking?

5   A.   Correct.

6   Q.   Do you recall saying, most of the
7   time and income comes from doing forensic
8   work activities which, to a significant
9   extent, does not involve testifying at a
10   deposition or in court but, in some
11   instances, it does.  Do you recall giving
12   that testimony?

13   A.   Exactly.  That's why the answer
14   was no.  But if you'd like to ask me to
15   elaborate, I'm happy to do that.

16   Q.   Well, sir, you said in some
17   instances it does, right?

18   A.   Well, I can't answer a question
19   about a phrase in a sentence.  But the
20   sentence, as stated and as you read, was
21   correct.

22   Q.   Okay.  We can move along, sir.
23   Focusing your attention to the report you
24   made at -- sir, your own report, you
25   yourself admit Brett has anxiety, don't

125

1    Kleinman - Cross
2  you?
3    A.    I'm not admitting anything.  I
4  made a diagnosis of a mental disorder,
5  which is a depressive disorder intermingled
6  with anxiety.
7    Q.    And when you met with Brett, you
8  didn't administer any kind of psychiatric
9  test, did you?
10   A.    Well, I didn't administer any
11  psychological test, that is correct.
12   Q.    To help support your report, you
13  reviewed a number of what you refer to as
14  Sources of Data to reach your conclusion,
15  right?
16   A.    To help me arrive at an opinion,
17  I reviewed various sources of information,
18  correct.
19   Q.    Okay.  And one of these sources
20  of data is from Brett's family doctor, Dr.
21  Yaffe Ruden, right?
22   A.    Correct.
23   Q.    You didn't speak to Dr. Ruden
24  directly, right?
25   A.    Correct, and there was no reason

126

1    Kleinman - Cross
2  to.
3    Q.    Okay.  You just reviewed Dr.
4  Ruden's offices's notes?
5    A.    Just reviewed -- I reviewed the
6  notes that were available, correct.
7    Q.    And in those notes, do you recall
8  them clearly indicating Brett denying any
9  anxiety or depression in 2016?
10   A.    Actually not.  Those notes, at
11  least some of the notes from 2015, 2016,
12  indicate that there was high stress, and
13  there were several notes indicating
14  anxiety.  And I believe one note from 2016
15  referenced the presence of insomnia.  So
16  that's what they say.
17   Q.    Okay.  Sir, if I may, I'm going
18  to share my screen and share with you
19  what's been premarked as Plaintiff's 815,
20  Plaintiff's 815.
21       Sir, I will start at the top of
22  the page.  As you can see, the header's
23  marked.  This is his doctor, right, Ruden
24  Yaffe, right?  Is that the doctor whose
25  medical records you reviewed, sir?

127

1    A.    One of the doctors, correct.
2    Q.    Okay.  And what's the date right
3  there, sir?
4    A.    May 31st, 2016.
5    Q.    Okay.  And you see, under Review
6  of Symptoms here, can you see that okay,
7  sir?
8    A.    I do.
9    Q.    Okay.  And do you see, where it
10  says under Psych, "Denies anxiety and
11  depression"?
12   A.    I do.
13   Q.    Now, you reviewed these
14  documents, right?
15   A.    Yes.
16   Q.    But you don't mention that in
17  your report, do you, sir?
18   A.    I'm not sure I understand your
19  question.  I didn't identify what every
20  single treatment note states.  That one
21  treatment note indicates, if you read -- if
22  you'll allow me to see the bottom of it, I
23  saw -- there it is.  "Denies anxiety and
24  depression."

128

1       What I do say in my report was --
2  well, I don't diagnose the presence of a
3  disorder of anxiety or a disorder of
4  depression in 2016.  So I reviewed those
5  notes.  In fact, there was substantial
6  depression and anxiety on a fluctuating
7  basis.  I inquired about that with Mr.
8  Steininger.
9       But the relevant part of the
10  answer, the most relevant part is my report
11  does not indicate the presence of a
12  disorder of depression or anxiety, based
13  upon the material I had, in 2015 or 2016.
14       MR. CABECEIRAS:  Move to strike
15  as nonresponsive.
16   Q.    Sir, did you add in your report
17  that on March 21st, 2016, Plaintiff
18  reported denying anxiety and depression, is
19  that in your report, yes or no, sir?
20   A.    No.
21   Q.    Thank you.  And do you know that
22  Defendant Tzianabos became Brett's manager
23  in 2017?
24   A.    Correct.  I mean that's my

129

Kleinman - Cross

1
2 understanding.
3     Q.    Okay.  Sir, you understand that
4 Brett lost his job at WPIX, right?
5     A.    Correct.
6     Q.    You don't dispute that happened,
7 do you?
8     A.    No.
9     Q.    You didn't need to consult any
10 other sources of data for that fact, right?
11    A.    I don't think I have suggested I
12 would need to.
13    Q.    Would you generally put losing a
14 job in the positive category of life events
15 or negative category of --
16    A.    Well, of course it's a difficult
17 life experience, there's no question.
18    Q.    Do you dispute that Brett is now
19 making significantly less money than he did
20 at WPIX?
21         MR. CERASIA:  Objection.
22    A.    It's my understanding that he is
23 making less money than at WPIX.
24    Q.    And do you think that's generally
25 a good thing or a bad thing for somebody to

130

Kleinman - Cross

1
2 have their salary slashed?
3     A.    I won't characterize as good or
4 bad.  I think it's an upsetting thing.
5     Q.    And you didn't need to consult
6 any additional data to evaluate whether it
7 was an upsetting thing or not, right?
8     A.    I, again, haven't suggested I
9 would need to do so.
10    Q.    Do you think having moved out of
11 his home because he could not afford to
12 make mortgage payments was a positive thing
13 or an upsetting thing for Brett?
14         MR. CERASIA:  Objection.  No
15 foundation.
16    A.    Yeah, I'm not aware -- at least
17 at the time when I met Mr. Steininger, he
18 hadn't moved out of his home.  So I'm not
19 sure what you're referring to.
20    Q.    You're not aware of a lot of
21 things that happened with Brett, right, to
22 date?
23    A.    I'm not sure that that's a
24 question that is meant to really be
25 answered.  I can't know everything about

131

Kleinman - Cross

1
2 anything.
3     Q.    Well, sir, you only met with him
4 once, correct?
5     A.    Well, I met with him eight hours
6 and conducted an in --
7     Q.    Sir, you only met with him one
8 day, yes or no?
9     A.    I met with him, as I testified,
10 for eight hours of interview on one day in
11 January of 2021.
12    Q.    Do you think having to liquidate
13 his 401(k) and incur penalties was a
14 positive thing or a negative thing for
15 Brett?
16    A.    If you inform me that he incurred
17 penalties, I'll include that in my answer,
18 I wasn't necessarily aware of that.  But
19 you don't need -- obviously this isn't a
20 question for a forensic expert because of
21 course a decline in the value of someone's
22 retirement monies or having less of them is
23 an upsetting, unhappy event.
24    Q.    Okay.  And sir, you admit that
25 Brett being called a Jew boy is a hurtful

132

Kleinman - Cross

1
2 thing to say to a Jewish person, right?
3         MR. CERASIA:  Objection.
4     A.    Well, a Jew being called a Jew
5 boy in a derogatory way of course is
6 hurtful.
7     Q.    Right.  Yeah, you'd agree that
8 comments can be degrading to a Jewish
9 person, right, like Jew boy?
10    A.    Comments based on race,
11 ethnicity, et cetera, can be upsetting and
12 hurtful to any recipient of such.
13    Q.    Likewise, you agree being called
14 a fat Jew in earnest can be a hurtful
15 comment to hear if you're a Jewish person,
16 right?
17    A.    Of course.
18    Q.    Or referred to as a fucking Jew
19 in an angry tone, you could see how that
20 could be hurtful to a Jewish person, right?
21    A.    Of course.
22    Q.    Of course being referred to as a
23 cheap Jew, you'd agree, can be hurtful to a
24 Jewish person, right?
25    A.    Yes.

133

Kleinman - Cross

1
2    Q.    Sir, are you Jewish?
3    A.    Yes.
4    Q.    Would your feelings be hurt being
5    called in earnest a cheap Jew?
6          MR. CERASIA:  Objection.
7    A.    Right, that's not a question for
8    me to opine about in terms of Mr.
9    Steininger.  But I'll answer it anyway.
10         I might be more angry than hurt,
11   but it would depend upon the circumstance.
12   Q.    Okay.  But you wouldn't have to
13   consult any additional sources to
14   understand that you might be hurt by that,
15   right?
16   A.    I haven't represented that
17   understanding people's feelings in
18   particular situations is something, as a
19   psychiatrist, I require additional sources
20   of understanding to appreciate.
21   Q.    So that answer is no, you
22   wouldn't need to?
23   A.    I think it's obvious the answer
24   is no.
25         MR. CABECEIRAS:  Move to strike

134

Kleinman - Cross

1
2    as unresponsive.
3    Q.    Is the answer no, sir?
4    A.    Again, the answer is no.
5    Q.    Now, to support your opinions,
6    you met with Brett one day, right?
7    A.    I think that mischaracterizes the
8    way the assessment was done.
9    Q.    Sir, I'm not asking you to grade
10   my questions on a scale here, I'm asking
11   you to answer.  Did you meet with Brett for
12   one day, yes or no?
13   A.    That's a different question.
14   Yes.
15   Q.    Okay.  Before meeting with Brett,
16   you had never spoken to him in your life,
17   right?
18   A.    That is correct.
19   Q.    If you passed him on the street a
20   month before you talked with him, you'd
21   have no idea who he was, right?
22   A.    Of course.
23   Q.    He was a stranger, correct?
24   A.    Of course.
25   Q.    Sir, did you audio record Mr.

135

Kleinman - Cross

1
2    Steininger when you met him?
3    A.    No.
4    Q.    Are you sure about that?
5    A.    Well, I could be -- I could
6    misremember.
7    Q.    I'd like you to open up your
8    report to page 6, paragraph 4.
9    A.    Right.  And this is why it's
10   helpful to have a report.
11         I'm sorry, which page?
12   Q.    Page 6, paragraph 4.  Says you,
13   "Informed Mr. Steininger that the
14   examination would be audio recorded."
15   A.    Thank you for reminding me.  Then
16   the answer is yes.
17   Q.    Do you think someone can really
18   open up to a stranger while they're being
19   recorded?
20   A.    Absolutely.  I've done it many,
21   many times.  I have no doubt about it.
22   Q.    Sir, you asked some things about
23   his sex life, right?
24   A.    To an extent.
25   Q.    And you asked him questions about

136

Kleinman - Cross

1
2    his gastrointestinal system, did you not?
3    A.    Of course.
4    Q.    And Mr. Steininger never met you
5    before that day, right?
6    A.    That is correct.
7    Q.    Sir, you'd agree, generally, your
8    evaluation of the information Brett gave
9    you on that day would be more reliable if
10   you had multiple sessions with him, right?
11   A.    I disagree.
12   Q.    Would you be able to better
13   challenge some of the things Brett said to
14   you if you had multiple sessions with him?
15   A.    Well, first, I'm not sure that I
16   challenged things with him, number one.
17         Number two, that's a hypothetical
18   question, so I don't know the answer to it.
19         But number three, I do not
20   believe that it would have been necessarily
21   a better or worse evaluation if I had met
22   with him several times.  There are
23   disadvantages which can contaminate the
24   examination if conducted over several
25   sessions.  But I'm well aware that there

137

Kleinman - Cross

1  are arguments of advantages as well. It's
2  not a simple yes or no answer or a
3  definitive answer to that question.
4      Q.   So it's accurate to say you don't
5  know, is that true?
6      A.   It's a hypothetical question.
7  And if the answer is would it have been a
8  better examination because I could have
9  challenged him better, my answer is the
10  same. I don't know that I was challenging
11  him in any way but -- so I don't know, from
12  the point of view of challenging, it would
13  be better, and it would potentially be a
14  more problematic and less reliable
15  examination, from that specific
16  perspective.
17     Q.   It would be a less reliable
18  examination to meet with him more than
19  once, is that what you just said?
20     A.   I'll repeat what I just said.
21  From the perspective of, quote, challenging
22  him, it potentially would be a less
23  effective evaluation if I saw him on
24  multiple sessions.

138

Kleinman - Cross

1      Q.   Sir, you know who Dr. Vicki
2  Boudin is, right?
3      A.   Well, I have never met Dr.
4  Boudin. I have read her two treatment
5  summaries and her deposition testimony in
6  this case.
7      Q.   Are you aware that Dr. Boudin has
8  treated Brett for over two years?
9      A.   Yes.
10     Q.   Are you further aware she's been
11  seeing Brett twice a week for over two
12  years?
13     A.   I know the approximate number of
14  treatment sessions up through the time of
15  her second report. The exact frequency
16  over time, that I don't know; in other
17  words, exact frequency of those sessions.
18     Q.   Are you aware that Dr. Boudin and
19  Brett, in these sessions, have discussed
20  Brett's personal relationships?
21     A.   I would assume so.
22     Q.   Are you aware that Dr. Boudin and
23  Brett, over the course of these sessions,
24  have discussed other potentially traumatic

139

Kleinman - Cross

1  things that have happened in Brett's life?
2      A.   Again, with the lack of treatment
3  notes, I have limited knowledge of the
4  content of their sessions. But I would
5  expect, in the course of psychotherapy,
6  that would be part of the content of the
7  treatment.
8      Q.   Absolutely. As you would expect.
9  So you would agree and expect that Dr.
10  Boudin and Brett have discussed far more
11  aspects of Brett's life than you ever could
12  in your one day session with him, right?
13         MR. CERASIA:  Objection.
14     Speculation.
15     A.   I'm sure there are some things
16  that Dr. Boudin knows that I don't know,
17  and vice a versa.
18     Q.   Are you saying that you think you
19  know more about Brett in your one day
20  session with him than Dr. Boudin knows
21  about Brett after two years twice a week
22  with him?
23     A.   That mischaracterizes the basis
24  of my knowledge. My knowledge of Mr.

140

Kleinman - Cross

1  Steininger is, first of all, not solely
2  based upon my meeting with him. Secondly,
3  it's based upon forensic -- use of forensic
4  methodology. And, yes, there is certain
5  information that I had access to that, to
6  the best of my knowledge, Dr. Boudin has
7  not reviewed. Just as, again, I'm sure
8  that in the course of Mr. Steininger's
9  meetings with Dr. Boudin, certain things
10  have been discussed that weren't discussed
11  with me.
12     Q.   Sir, you're aware that Dr.
13  Boudin, having treated Brett for two years,
14  arrived at an almost identical conclusion
15  as Dr. Berrill?
16     A.   Yes.
17     Q.   Are you also aware --
18     A.   Well, I'm sorry, I'm sorry. My
19  answer wasn't quite fully correct. And I'm
20  not sure, as I think about it --
21     Q.   Sir, it calls for a yes or no.
22  So I appreciate it. We can move on. Are
23  you aware of --
24     A.   There's doubting yes or no.

Case 1:19-cv-03644-PAE   Document 90   Filed 09/29/21   Page 86 of 225

141

Kleinman - Cross

Q.   Are you aware Dr. Boudin is not a forensic psychologist hired in this matter?

A.   Well, Dr. Boudin, as I understand it, is not a forensic psychologist.

Q.   Right. Are you aware she has never testified on behalf of a plaintiff or defendant in any litigation ever?

A.   I don't know one way -- I don't know one way or another as I sit here.

Q.   Okay. And do you know that Dr. Boudin's administrating of tests on Brett were not intended for this litigation but her own office's use?

A.   I assume that.

Q.   Sir, you've never spoken to Dr. Boudin about Brett's mental health, have you?

A.   Correct.

Q.   You certainly knew her name before you wrote the report, right?

A.   I read her deposition testimony and her treatment summaries before I read the -- wrote my report, and looked at the two instruments that she administered, yes.

142

Kleinman - Cross

Q.   And, in fact, on those treatment summaries is her contact information, right?

A.   I could look at the summary, but if you represent that as yes, I assume that's true. And it obviously is not hard to find mental health professionals, generally speaking.

MR. CABECEIRAS:  Move to strike the answer as nonresponsive, that last part.

Q.   You could have called her before you wrote that report, right?

A.   Of course.

Q.   You could have talked to her about her experience in treating Brett's emotional state, right?

A.   Yes.

Q.   Likewise, you could have called Brett's primary doctor, Dr. Yaffe Ruden, right?

A.   Former primary care doctor, correct.

Q.   And you could have speak about

143

Kleinman - Cross

some of those things that were written in the notes, right?

A.   Sure.

Q.   But you did not, is that correct?

A.   That is correct.

Q.   Sir, can you treat sleep apnea?

A.   Can you rephrase your question?

Q.   Sure. You discussed sleep apnea. Is it treatable or is it an incurable disease?

A.   Treatment and cure are very different things. Is sleep apnea regularly treated? Yes, it is regularly treated. Can it be cured? That depends. There are some instances of sleep apnea in which, for example, surgical procedure is done to remove the source of the obstruction, and the sleep apnea either is, quote, cured or significantly improved. In other instances of nonsurgical treatment, CPAP device, if tolerated, is very helpful; in other instances, it's not.

Q.   Have you ever prescribed somebody treatment for sleep apnea?

144

Kleinman - Cross

A.   I don't prescribe treatment for it. I make referrals to other physicians who specialize in sleep medicine.

Q.   So the answer is no, right?

A.   Correct.

Q.   Sir, you mentioned Brett's brain abscess as well. And you said someone told him he had it. Is that correct reflection of your testimony?

A.   Well, no, not some generic person. If -- I can't recall my exact words, but of course I was referring to the fact that he was hospitalized. And while hospitalized, he was diagnosed as having a brain abscess.

Q.   Sir, you understand that the first time he heard about the abscess, it had already been removed, right?

A.   Yes. Because, as I testified, it was unclear before surgery what it was, and there was a thought that it was a tumor. And the good fortune was that it turned out not to be the tumor.

Q.   Okay. So the answer's yes, thank

PIROZZI & HILLMAN
212-213-5858

145

Kleinman - Cross

1  you.

3  Now, you, I believe, testified he
4  was appropriately worried about his brain
5  abscess, right, is that your testimony?

6  A.  Correct.

7  Q.  Okay.  Sir, I'm sure some of your
8  clients in your years of practice have had
9  special needs children, right?

10  A.  Of course.

11  Q.  Not all those people are
12  depressed because they have a kid with
13  special needs, right?

14  A.  Not all, or even most, have a
15  mental disorder.  Of course that's
16  different than feeling sad, anxious, or
17  having other feelings.  But yes, and it
18  depends --

19  Q.  In fact --

20  A.  -- on obviously many different
21  things.

22  Q.  You'd agree, sir, that people
23  with special needs children can derive a
24  great amount of joy and love from those
25  kids, right?

146

Kleinman - Cross

2  A.  One hopes so.  And it depends on
3  when in the course of acceptance and the
4  progression of their child's life they are.
5  So it's not one mental state throughout the
6  entirety of a child's life whether the
7  child has special needs or doesn't have
8  special needs.

9  Q.  If I represent to you that
10  Brett's son Alexander has always brought
11  him great amounts of joy and love, would
12  you disagree with that?

13  A.  No, I would never do that.

14  Q.  Sir, you talked about how a civil
15  litigant can potentially exaggerate claims
16  of emotional distress.  Do you recall that?

17  A.  Yes.

18  Q.  Would you agree that, in your
19  theory, because of the economic incentive
20  in civil litigation cases?

21  A.  I'm sorry.  Can you repeat that
22  question?  I missed a word, I think.

23  Q.  Would you agree because of the
24  economic incentive, is that why you believe
25  civil litigants can exaggerate?

147

Kleinman - Cross

2  A.  Well, this is not a belief that I
3  personally have.  Civil litigants sometimes
4  exaggerate the presence or severity of a
5  condition they have.  Economic gain is one
6  of the reasons that that is done.

7  Q.  Okay.  And you, sir, have your
8  own economic gain in testifying today,
9  right?

10  A.  I don't have an economic gain
11  from my testimony, but I have economic gain
12  from my time being here in court.  So in
13  that sense, yes.

14  Q.  Sir, you went through with the
15  attorney that hired you all the things you
16  did not have, right, to do your report?  Do
17  you remember that?

18  A.  Yes.

19  Q.  So you'd agree, sir, that your
20  report is, on its face, inconclusive, agree
21  or not?

22  A.  No, I don't agree.  And I think
23  that's a mischaracterization of what the
24  lack of those sources means.

25  Q.  Sir, the question didn't ask for

148

Kleinman - Cross

2  your opinion, sir.  I appreciate your
3  answer.  Is your answer no?

4  A.  Can you repeat your question so
5  that I remember it --

6  Q.  Sure.

7  A.  -- correctly?

8  Q.  Sure.  So, sir, you go through
9  all the things you did not have to evaluate
10  Brett, right, do you recall that?

11  A.  Correct.

12  Q.  The interviews with his wife,
13  right?

14  A.  Yes.

15  Q.  Records from his son Alexander's
16  development, right?

17  A.  Well, the report from Yale,
18  correct.

19  Q.  Okay.  You wanted medical records
20  that go even further back than the ones you
21  had, right?  You said you didn't have
22  those?

23  A.  Correct.

24  Q.  So is it accurate that because
25  you do not, you do not have any of those

149

Kleinman - Redirect

1  things, your report is, at best,
2  inconclusive?
3
4      A.    No.  That is --
5      Q.    About the causation of Brett's
6  emotional distress?
7      A.    No, that's an incorrect
8  representation.
9          MR. CABECEIRAS:  Okay.  No
10  further questions.  Thank you, Doctor.
11          MR. CERASIA:  I have a few.
12  REDIRECT EXAMINATION
13  BY MR. CERASIA:
14      Q.    All right.  On cross-examination,
15  Mr. Cabeceiras asked you about the times
16  that you've been retained by other law
17  firms as defense counsel in a case.  Do you
18  remember that?
19      A.    Yes.
20      Q.    In your times having been de --
21  excuse me, retained by defense counsel, had
22  you ever concluded that a plaintiff did, in
23  fact, suffer emotional distress because of
24  employment discrimination or harassment?
25      A.    The answer is yes, many times to

150

Kleinman - Redirect

1
2  -- in varying kinds of ways, whether it's
3  -- well, yes.
4      Q.    So just because you're retained
5  by a defense counsel doesn't mean that
6  you're going to give an answer that's
7  favorable to the defense?
8      A.    That's true of defense counsel
9  and, when I've been retained by plaintiff's
10  counsel, equally true.
11      Q.    You talked about things that you
12  said that you didn't think Dr. Boudin knew,
13  and that you may have known some things
14  that she didn't know.  Are you aware of
15  whether or not you learned from Mr.
16  Steininger that he had seen a mental health
17  professional prior to seeing Dr. Boudin?
18      A.    Yes.  He had, for approximately
19  two years, for what he described as a
20  mental disorder, certain features of which
21  never fully resolved.
22      Q.    And what was the circumstances
23  under which he told you why he saw that
24  mental health professional for a few years?
25      A.    It was very tragic.  As best as I

151

Kleinman - Redirect

1  can recall, a very close friend of his was
2  killed and another was seriously injured.
3  And, again, to the best of my recollection,
4  he wasn't able or didn't protect or attempt
5  to protect his best friend.  And he felt
6  horribly guilty, which is not to mean that
7  he should have been horribly guilty or that
8  he, in fact, should have acted differently.
9  But he was tormented by guilt, and it had
10  to do with certain events that led up to
11  this incident that Mr. Steininger was aware
12  of that, at least in retrospect, predicted
13  that there was potentially this rising
14  level of tension that led to violence.
15          And as a result of this, and I
16  think Mr. Steininger was about age 17 or
17  so, he received mental health counseling.
18      Q.    In questions in response, in
19  cross-examination, about whether Mr.
20  Steininger was upset about losing his job
21  at WPIX, did you ever opine that he was not
22  upset about that?
23      A.    No.  I think I opined in the
24  report that he was, in fact, upset about

152

Kleinman - Redirect

1
2  it, and even provided some of the reasons
3  why he was upset about it.
4      Q.    You were asked questions on
5  cross-examination about your website and
6  the fact that there is a category there of
7  your services with respect to workplace
8  violence.
9      A.    Correct.
10      Q.    Do you remember that?
11      A.    I do.
12      Q.    What are the services that you
13  provide in the context of workplace
14  violence within employment?
15      A.    I attempt to diminish the risk of
16  there being workplace violence.  And, in
17  some instances, as relates to the specific
18  question I was asked, employers have
19  contacted me when they've decided that they
20  are going to terminate an employee, and the
21  employee has made threats or what they
22  perceived as threats of violence, or has
23  acted in certain concerning ways, and they
24  are seeking counsel how to safely inform
25  the employee that the employee is losing

153

Kleinman - Redirect

1   his or her job without there being violence
2   either during that meeting or in the
3   aftermath of such.
4   
5       Q.   And there was a question to you
6   about whether or not Dr. Boudin reached the
7   same conclusions as Dr. Berrill.  And you
8   weren't permitted to answer.  What was the
9   answer that you were going to give?
10      A.   I believe --
11      Q.   Or I should accurately say you
12  weren't permitted to expand on your answer,
13  sorry.
14      A.   I believe Dr. Boudin diagnosed
15  posttraumatic stress disorder, and Dr.
16  Berrill did not diagnose posttraumatic
17  stress disorder, nor have I.  And that's a
18  fundamental difference.
19      Q.   You were asked questions about
20  whether or not you ever picked up the phone
21  and called Dr. Boudin or any of Mr.
22  Steininger's health care professionals.  Do
23  you remember that?
24      A.   Correct.
25      Q.   That have made a difference in

154

Kleinman - Redirect

1   you rendering an opinion in this case?
2       A.   Well, of course one never knows
3   unless one does something.  But I can say
4   this, there are times in which I have
5   information that leads me to call someone's
6   treating mental health professional.
7   Sometimes I will be given permission to
8   speak with that person, sometimes not.
9       But I didn't have any information
10  that would suggest there were specific
11  questions for me to ask that would be
12  helpful.  In other words, I didn't have any
13  actual session treatment notes or progress
14  notes about which to inquire.  And I read
15  Dr. Boudin's deposition testimony; and I
16  didn't think it was clearly valuable, if I
17  had been given the opportunity, to ask
18  broad general questions.
19      Q.   And did you give the opinion that
20  you gave in this case only because you were
21  paid for your time by the defendant?
22      A.   Well, of course not.  As you
23  asked me a moment ago, I've been retained
24  by defendants and many times have given

155

Kleinman - Recross

1   opinions which, in part or full, were not
2   opinions that supported their emotional
3   distress damages claim, or something
4   related to that.  And I've certainly been
5   retained by plaintiff's attorneys in which
6   I've done the same.  And also clearly a
7   number of times in criminal cases in which
8   my opinion hasn't supported either the
9   prosecution or defense theory.
10      MR. CERASIA:  Thank you.  I have
11  no other questions.
12      MR. CABECEIRAS:  I have a few
13  more for follow-up here.
14  RECROSS-EXAMINATION
15  BY MR. CABECEIRAS:
16      Q.   Sir, going back to Brett's
17  friend.  You know his friend died in 1991,
18  right?
19      A.   I don't know which friend we're
20  talking about.  But I believe that if you
21  tell me a friend of his died in 1991, I
22  believe it.
23      Q.   You don't know the friend I'm
24  talking about, although you just testified

156

Kleinman - Recross

1   that a friend died and it was tragic.  Do
2   you recall that?
3       A.   Yes.  But I assume that Mr.
4   Steininger's had more than one friend.  But
5   from your question, if you're telling me
6   that I misrecalled, without my notes, that
7   his friend was severely injured, now that
8   you're asking me about it, I think I did
9   make a mistake.  His friend -- I said one
10  friend was killed and one was seriously
11  injured.  I think his best friend, or best
12  friend at the time, was very seriously
13  injured.
14      Q.   Okay.
15      A.   And that's what caused him to go
16  for mental health treatment for two years.
17      Q.   That was about 30 years ago,
18  right?
19      A.   That's correct.  And as I
20  testified, Mr. Steininger's words to me
21  were there were certain aspects of his
22  response to that or feelings about it that
23  he, you know, you never get over.  I'm
24  almost quoting him exactly.

157

Kleinman - Recross

1    Q.   He wasn't present for that tragic
2    event, right?
3    A.   To the best of my knowledge or
4    recollection, no.
5    Q.   Okay.  Prior to being terminated,
6    he hadn't spoken to a mental health
7    professional since that time about 30 years
8    ago, right?
9    A.   That's correct.
10   Q.   In employment law cases, sir,
11   when you testify, you've never testified on
12   behalf of a defendant and found the
13   employee's distress was linked to something
14   that happened in the workplace, right?
15   A.   I'm sorry, can you repeat that
16   question, please?
17   Q.   Sure, sure.  You do work in
18   employment law cases, right?  I believe you
19   testified to that earlier.
20   A.   Correct.
21   Q.   You've given testimony multiple
22   times, correct?
23   A.   In employment cases, only
24   actually a limited number of times over the

159

Kleinman - Recross

1    that -- that anti-Jewish feelings were the
2    basis for the loss of his job.  And of
3    course I know that he's upset and angry as
4    I -- you know -- I've indicated in my
5    report.
6    MR. CABECEIRAS:  All right.  No
7    further questions.  Thank you, sir.
8    MR. CERASIA:  All right.  Dr.
9    Kleinman, thank you.
10   THE WITNESS:  Thank you.
11   THE VIDEOGRAPHER:  All right.  We
12   are off the record 17:02.
13   (Time noted:  5:02 p.m.)

158

Kleinman - Recross

1    years.  But I've been retained certainly in
2    multiple cases.
3    Q.   Okay.  And when you testified,
4    you've never testified on behalf of a
5    defendant and found the employee's distress
6    was linked to the workplace, right?
7    A.   Sorry.  I'm still not sure that I
8    understand your question.  Can you ask one
9    more time?
10   MR. CABECEIRAS:  Julia, could you
11   read my question back, please.
12   (Question read)
13   A.   No, I've never been called to
14   testify in cases in which that was my
15   opinion.
16   Q.   Thank you.  Sir, do you
17   understand Brett is upset about losing his
18   job because he is Jewish?
19   A.   I think Mr. Steininger is upset
20   about losing his job for a number of
21   reasons, some of which you yourself cited.
22   But he's reported that a significant part
23   of why he's upset has to do with the
24   alleged verbal harassment and his belief

160

1    CERTIFICATE
2
3    STATE OF NEW YORK )
4                     ) ss.
5    COUNTY OF NEW YORK)
6
7    I, Julia Liu, a Shorthand Reporter and
8    Notary Public within and for the State of
9    New York, do hereby certify:
10   That STUART B. KLEINMAN, M.D., the
11   witness whose deposition is hereinbefore set
12   forth, was duly sworn by me and that such
13   deposition is a true record of the testimony
14   given by such witness.
15   I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage and that I am in no way
18   interested in the outcome of this matter.
19
20
21   _____
22   JULIA LIU

181

1
2  September 17, 2021

3
                  INDEX
4

5  WITNESS              DX CX   ReDX  ReCX

6  Stuart B.       4  99   149    155
   Kleinman, M.D.
7

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 0

**0** [1] - 75:23

## 1

**1** [3] - 3:3, 29:14, 48:16
**10** [5] - 10:15, 11:2, 91:23, 92:3, 110:20
**100,000** [1] - 56:8
**10038** [1] - 2:13
**10119** [1] - 2:7
**14-hour-a-day** [1] - 23:10
**149** [1] - 161:6
**14:02** [1] - 3:15
**150** [1] - 2:12
**1517** [1] - 2:12
**155** [1] - 161:6
**15:46** [1] - 92:7
**15:55** [1] - 92:10
**16** [6] - 30:5, 60:22, 73:11, 73:16, 73:17, 76:15
**17** [4] - 1:11, 73:11, 151:17, 161:2
**17:02** [1] - 159:13
**17th** [1] - 3:14
**18** [2] - 83:10, 88:25
**19** [1] - 73:17
**19-CV-3644** [1] - 3:12
**1991** [2] - 155:18, 155:22
**1:19-cv-3644** [1] - 1:6

## 2

**2** [4] - 29:17, 36:13, 48:15, 74:10
**20** [1] - 15:9
**2015** [3] - 58:21, 126:11, 128:14
**2016** [7] - 126:9, 126:11, 126:14, 127:5, 128:5, 128:14, 128:18
**2017** [1] - 128:24
**2019** [5] - 51:16, 74:17, 86:5, 86:10, 86:18, 87:5
**2020** [1] - 60:22
**2021** [4] - 1:11, 3:15, 131:11, 161:2
**21** [1] - 47:25
**21st** [1] - 128:18
**22** [2] - 53:10, 55:2
**24** [2] - 48:2, 59:17
**26** [1] - 84:24
**27** [3] - 36:6, 39:16, 42:11
**28** [1] - 36:6
**29** [1] - 29:25
**2:02** [1] - 1:11

## 3

**3** [9] - 29:17, 42:11, 54:25, 60:21, 76:14, 85:18, 85:20, 86:2, 86:23
**30** [9] - 7:12, 8:17, 12:24, 29:8, 30:4, 83:25, 84:18, 156:18, 157:8
**31st** [1] - 127:5

## 4

**4** [13] - 29:11, 29:17, 56:17, 60:19, 60:21, 62:2, 83:10, 85:18, 87:11, 135:8, 135:12, 161:6
**40** [1] - 11:10
**401(k** [1] - 131:13
**4905** [1] - 2:6
**4th** [1] - 106:20

## 5

**5** [1] - 78:14
**50** [3] - 11:10, 79:19, 79:23
**50,000** [1] - 119:22
**5:02** [1] - 159:14
**5B** [1] - 88:25

## 6

**6** [2] - 135:8, 135:12
**60** [1] - 111:13

## 8

**815** [2] - 126:19, 126:20
**821** [2] - 61:3, 61:9
**822** [1] - 62:7
**825** [1] - 111:17
**830** [1] - 111:17

## 9

**99** [1] - 161:6

## A

**ab** [1] - 50:23
**abandoned** [1] - 53:14
**abilities** [4] - 50:11, 50:16, 78:15, 100:3
**ability** [6] - 6:4, 15:14, 27:5, 38:25, 53:13, 56:13
**able** [15] - 16:24, 18:18, 27:20, 41:22, 41:23, 47:10,

56:5, 66:2, 76:17, 80:11, 81:14, 82:20, 104:24, 136:12, 151:5
**about** [133] - 7:19, 9:9, 13:6, 13:19, 14:15, 14:18, 14:20, 17:13, 18:3, 18:23, 19:3, 22:11, 22:14, 22:20, 22:25, 24:16, 26:4, 27:2, 27:3, 27:20, 28:7, 28:12, 28:15, 28:16, 32:12, 32:20, 33:10, 34:9, 34:10, 35:2, 35:3, 40:2, 42:8, 42:24, 43:21, 43:22, 43:23, 44:9, 45:7, 46:7, 46:15, 47:20, 48:5, 48:13, 48:23, 49:5, 49:17, 51:3, 51:8, 51:12, 52:2, 52:6, 52:10, 54:8, 54:10, 55:13, 58:16, 60:9, 60:20, 64:22, 68:2, 69:4, 70:6, 74:6, 75:14, 77:10, 77:21, 78:13, 80:23, 84:18, 85:3, 86:3, 86:4, 86:10, 87:19, 87:21, 88:23, 90:17, 91:2, 91:12, 93:5, 96:11, 101:22, 103:15, 103:19, 105:7, 105:12, 105:18, 110:14, 111:13, 114:15, 116:14, 123:6, 123:22, 124:19, 128:8, 130:25, 133:8, 135:4, 135:21, 135:22, 135:25, 139:20, 139:22, 140:21, 141:17, 142:17, 142:25, 144:18, 145:4, 146:14, 149:5, 149:15, 150:11, 151:17, 151:20, 151:21, 151:23, 151:25, 152:3, 152:5, 153:6, 153:19, 154:15, 155:21, 155:25, 156:9, 156:18, 156:23, 157:8, 158:18, 158:21
**abscess** [13] - 48:16, 49:13, 49:18, 50:24, 74:19, 87:16, 106:9, 106:11, 106:16, 144:8, 144:16, 144:18, 145:5
**absence** [2] - 75:3, 85:21
**absolutely** [6] - 38:9, 39:21, 70:10, 110:15, 135:20, 139:9
**abuse** [2] - 54:25, 55:8
**abused** [1] - 6:19
**Academy** [2] - 9:16, 19:2
**accelerated** [1] - 5:15
**accept** [2] - 25:10, 54:2, 120:3
**acceptance** [2] - 53:20, 146:3
**accepted** [3] - 53:24, 54:7, 54:17
**access** [1] - 140:6
**accident** [6] - 40:7, 74:18, 106:3, 106:4, 106:6, 106:13
**according** [1] - 40:14

**accredited** [1] - 10:13
**accurate** [10] - 6:5, 21:19, 54:16, 90:23, 91:14, 102:18, 102:24, 120:2, 137:5, 148:24
**accurately** [8] - 20:25, 59:11, 64:9, 103:7, 107:8, 122:5, 122:6, 153:11
**acquire** [1] - 53:12
**across** [1] - 80:6
**acted** [2] - 151:9, 152:23
**action** [3] - 106:14, 106:25, 160:17
**activities** [8] - 34:3, 60:6, 79:9, 80:4, 83:18, 102:11, 123:9, 124:8
**activity** [1] - 102:17
**actual** [1] - 154:14
**actually** [17] - 6:11, 9:23, 10:15, 13:21, 16:2, 16:11, 23:5, 33:19, 38:11, 41:17, 81:23, 82:20, 113:19, 113:25, 119:2, 126:10, 157:25
**acute** [3] - 69:8, 70:23, 71:3
**acutely** [1] - 103:9
**adapt** [1] - 38:25
**adapts** [1] - 34:19
**add** [2] - 111:9, 128:17
**additional** [6] - 4:17, 56:19, 66:7, 130:6, 133:13, 133:19
**address** [2] - 8:25, 9:21
**addressing** [1] - 9:23
**adequate** [2] - 11:25, 12:2
**administer** [2] - 125:8, 125:10
**administered** [5] - 62:23, 67:8, 67:14, 86:16, 141:25
**administers** [1] - 63:5
**administrating** [1] - 141:12
**administration** [1] - 63:16
**admit** [2] - 124:25, 131:24
**admitted** [1] - 74:16
**admitting** [1] - 125:3
**adults** [1] - 6:17
**advanced** [3] - 5:3, 5:7, 10:22
**advantage** [1] - 55:24
**advantages** [1] - 137:2
**adversarial** [1] - 59:18
**advertise** [3] - 121:14, 121:16, 121:18
**advertising** [1] - 121:23
**advisable** [1] - 66:15
**affect** [2] - 33:18, 80:19
**affected** [1] - 27:17
**affecting** [5] - 27:25, 28:4, 37:23, 49:2, 106:12
**afford** [2] - 35:25, 130:11
**after** [22] - 4:18, 5:18, 7:20, 15:23, 16:14, 32:16, 35:13, 44:11, 47:21, 52:17, 67:6,

163

74:17, 78:25, 87:9, 87:14,
87:15, 97:3, 97:13, 113:9,
113:16, 117:15, 139:22
**aftermath** [1] - 153:4
**afternoon** [1] - 4:11
**afterwards** [6] - 30:12,
36:2, 40:24, 44:22, 50:6,
50:9
**again** [33] - 39:24, 41:14,
52:2, 66:13, 68:13, 68:15,
69:11, 73:4, 80:25, 81:4,
83:6, 84:20, 86:16, 86:18,
91:13, 92:17, 94:24, 98:20,
99:2, 101:18, 103:17,
105:19, 106:23, 110:16,
116:14, 116:22, 118:15,
119:24, 130:8, 134:4, 139:3,
140:8, 151:4
**against** [7] - 1:6, 43:2, 47:9,
60:12, 64:21, 102:16, 112:22
**age** [2] - 52:11, 151:17
**ago** [14] - 27:13, 46:10,
65:8, 76:13, 86:4, 88:22,
105:14, 111:17, 114:10,
116:17, 154:24, 156:18,
157:9
**agree** [16] - 100:25, 103:2,
112:5, 115:10, 122:19,
132:7, 132:13, 132:23,
136:7, 139:10, 145:22,
146:18, 146:23, 147:19,
147:20, 147:22
**ahead** [1] - 55:4
**aided** [1] - 30:22
**Alex** [5] - 91:25, 109:8,
118:14, 120:4, 122:24
**Alexander** [3] - 4:2, 103:16,
146:10
**ALEXANDER** [1] - 2:8
**Alexander's** [1] - 148:15
**ALISON** [1] - 2:15
**all** [46] - 4:8, 7:13, 10:4,
13:11, 14:12, 14:13, 16:4,
20:17, 24:22, 27:15, 28:10,
30:14, 31:19, 33:23, 35:2,
37:2, 37:24, 37:25, 39:4,
39:5, 40:3, 42:3, 42:4, 49:16,
56:6, 64:16, 73:25, 77:17,
78:7, 83:7, 92:14, 92:24,
93:25, 97:15, 97:24, 98:19,
108:21, 140:2, 145:11,
145:14, 147:15, 148:9,
149:14, 159:7, 159:9, 159:12
**alleged** [12] - 32:23, 42:20,
42:22, 43:15, 43:16, 43:22,
78:11, 81:6, 98:7, 98:13,
103:25, 158:25
**allegedly** [1] - 11:25
**alleges** [5] - 32:11, 43:24,
45:25, 76:23, 102:15
**alleging** [1] - 11:16

**allow** [6] - 8:5, 42:5, 98:2,
110:14, 122:6, 127:23
**allowed** [1] - 100:17
**allows** [1] - 21:5
**alluded** [1] - 48:18
**almost** [3] - 69:9, 140:15,
156:25
**along** [3] - 116:9, 123:7,
124:22
**already** [4] - 10:21, 46:4,
48:12, 144:19
**also** [32] - 5:6, 6:22, 7:11,
8:9, 13:14, 14:9, 14:19, 17:7,
22:9, 22:13, 23:20, 30:7,
31:4, 31:5, 32:7, 32:13,
34:13, 35:15, 52:11, 58:12,
82:3, 86:11, 86:13, 87:8,
87:11, 90:15, 116:24, 120:5,
120:12, 120:24, 140:18,
155:7
**altered** [1] - 50:11
**although** [1] - 155:25
**altogether** [1] - 47:3
**always** [10] - 24:17, 25:2,
31:23, 33:21, 48:7, 80:15,
84:10, 103:6, 116:4, 146:10
**am** [7] - 4:14, 4:25, 74:20,
95:10, 108:18, 160:16,
160:18
**American** [7] - 9:16, 14:23,
15:3, 15:6, 16:4, 19:2, 40:16
**amount** [6] - 26:17, 84:3,
108:22, 109:22, 110:21,
145:24
**amounts** [1] - 146:11
**and/or** [2] - 23:21, 98:15
**angry** [4] - 69:14, 132:19,
133:10, 159:4
**Annual** [1] - 18:25
**another** [10] - 12:18, 22:6,
41:7, 46:25, 81:22, 96:20,
101:14, 115:5, 141:10, 151:3
**answer** [46] - 21:6, 21:7,
48:21, 54:20, 59:10, 64:2,
67:22, 78:4, 86:2, 91:12,
93:7, 96:13, 101:19, 102:23,
103:17, 108:17, 122:25,
123:16, 123:17, 123:18,
124:13, 124:18, 128:11,
131:17, 133:9, 133:21,
133:23, 134:3, 134:4,
134:11, 135:16, 136:18,
137:3, 137:4, 137:8, 137:10,
140:20, 142:11, 144:5,
148:3, 149:25, 150:6, 153:8,
153:9, 153:12
**answer's** [1] - 144:25
**answered** [5] - 46:24,
72:14, 87:3, 91:7, 130:25
**answering** [1] - 105:25
**answers** [6] - 63:23, 67:3,

68:8, 72:15, 72:17, 109:5
**antagonize** [1] - 69:24
**anti** [1] - 159:2
**anti-Jewish** [1] - 159:2
**antidepressant** [2] - 33:20,
94:9
**Anxiety** [3] - 36:17, 93:16,
97:20
**anxiety** [31] - 33:17, 37:13,
37:14, 37:16, 37:19, 75:4,
75:5, 76:9, 77:5, 79:4, 79:12,
83:9, 83:23, 84:23, 86:13,
87:19, 87:25, 88:19, 94:11,
98:24, 105:2, 124:25, 125:6,
126:9, 126:14, 127:11,
127:24, 128:4, 128:7,
128:13, 128:19
**anxious** [5] - 77:21, 80:21,
87:21, 145:16
**any** [49] - 15:4, 22:24,
30:11, 30:20, 37:6, 39:19,
41:23, 42:5, 42:14, 46:11,
47:11, 48:6, 48:7, 52:14,
59:2, 64:7, 70:7, 90:9, 90:16,
93:4, 98:3, 100:3, 100:5,
100:6, 100:18, 101:13,
101:22, 102:7, 102:10,
102:17, 103:4, 104:2,
116:11, 120:7, 122:4, 125:8,
125:10, 126:8, 129:9, 130:6,
132:12, 133:13, 137:12,
141:8, 148:25, 153:21,
154:10, 154:13, 160:17
**anymore** [1] - 56:10
**anyone** [1] - 63:24
**anything** [5] - 70:4, 82:10,
90:8, 125:3, 131:2
**anyway** [1] - 133:9
**ANZ** [3] - 120:25, 121:4,
121:6
**apart** [2] - 26:22, 111:12
**apnea** [15] - 56:18, 56:22,
57:4, 57:10, 57:13, 57:23,
58:5, 58:15, 143:7, 143:9,
143:13, 143:16, 143:19,
143:25
**apparently** [1] - 87:6
**APPEARANCES** [1] - 2:2
**appearing** [2] - 107:24,
108:12
**appears** [2] - 36:14, 58:24
**Appendix** [1] - 29:25
**applied** [2] - 93:23, 94:16
**appointed** [2] - 12:8, 12:16
**appreciate** [6] - 25:3,
116:7, 116:9, 133:20,
140:23, 148:2
**approached** [1] - 71:24
**appropriate** [6] - 11:3, 14:6,
17:4, 19:7, 72:23, 115:18
**appropriately** [3] - 13:4,

75:13, 145:4
**approximate** [1] - 138:14
**approximately** [7] - 3:15,
26:21, 29:15, 58:8, 78:24,
83:25, 150:18
**area** [4] - 4:16, 18:8, 39:10,
91:4
**argue** [1] - 115:13
**arguments** [1] - 137:2
**arrange** [1] - 32:14
**arrive** [1] - 125:16
**arrived** [1] - 140:15
**article** [4] - 18:11, 18:15,
66:8, 67:5
**arts** [1] - 5:15
**aside** [1] - 29:14
**aspect** [1] - 39:19
**aspects** [8] - 27:22, 38:2,
43:14, 46:19, 81:9, 97:6,
139:12, 156:22
**assaulted** [2] - 12:3, 117:8
**assess** [9] - 14:16, 18:14,
55:17, 66:18, 71:23, 74:4,
82:6, 90:20, 97:11
**assessed** [1] - 75:11
**assessing** [9] - 11:3, 60:18,
67:17, 67:19, 83:8, 84:8,
84:22, 115:19, 115:21
**assessment** [11] - 6:5,
9:11, 14:7, 20:10, 25:12,
63:12, 63:16, 73:22, 91:16,
120:20, 134:8
**assessments** [1] - 15:15
**assignments** [2] - 97:9,
97:11
**assist** [2] - 5:24, 12:18
**assisting** [3] - 9:25, 70:22,
71:6
**associated** [3] - 48:17,
51:12, 57:8
**association** [1] - 3:19
**Association** [4] - 14:24,
15:3, 15:6, 40:16
**assume** [6] - 109:13,
109:19, 138:22, 141:15,
146:2, 156:4
**assure** [3] - 108:24, 122:20,
123:4
**ATCO** [1] - 116:20
**attachments** [1] - 62:9
**attacked** [2] - 7:22, 12:3
**attacks** [2] - 75:5, 75:7
**attempt** [3] - 76:18, 151:5,
152:15
**attempted** [1] - 26:2
**attend** [1] - 81:15
**attended** [4] - 5:14, 5:16,
5:20, 16:10
**attends** [1] - 84:12
**attention** [3] - 27:6, 80:19,
124:23

attorney [2] - 123:5, 147:15
Attorney's [1] - 12:12
Attorneys [2] - 2:5, 2:11
attorneys [4] - 12:13,
12:14, 119:22, 155:6
attuned [1] - 16:21
audio [2] - 134:25, 135:14
author [1] - 18:12
available [7] - 33:12, 35:7,
87:7, 101:6, 104:24, 122:2,
126:6
avoid [1] - 82:25
avoidance [1] - 77:4
avoidantly [1] - 76:18
avoiding [2] - 78:9, 83:5
award [1] - 15:5
awards [1] - 15:4
aware [23] - 14:22, 58:2,
62:21, 89:5, 92:14, 101:25,
103:9, 106:18, 130:16,
130:20, 131:18, 136:25,
138:8, 138:11, 138:19,
138:23, 140:13, 140:18,
140:24, 141:2, 141:6,
150:14, 151:12

**B**

bachelor [1] - 5:15
background [1] - 11:19
bad [8] - 8:16, 45:19, 65:6,
76:25, 77:3, 80:23, 106:19,
129:25, 130:4
badgering [1] - 109:8
badly [1] - 82:15
barbecue [1] - 106:20
barely [1] - 23:7
based [10] - 28:13, 44:5,
45:4, 72:14, 96:5, 110:18,
128:13, 132:10, 140:3, 140:4
basic [1] - 70:18
basically [3] - 21:20, 41:8,
60:4
basis [4] - 90:2, 128:8,
139:24, 159:3
bear [2] - 61:4, 70:15
beat [1] - 69:13
beating [2] - 43:21, 45:9
became [1] - 128:23
because [68] - 7:14, 9:3,
11:18, 16:5, 17:14, 18:20,
20:7, 22:24, 24:17, 26:11,
28:9, 28:18, 32:7, 32:17,
33:15, 33:17, 33:25, 40:3,
40:9, 42:22, 45:5, 48:25,
49:10, 50:11, 50:15, 50:19,
52:3, 53:21, 57:20, 58:10,
59:10, 59:15, 65:7, 66:4,
67:11, 67:23, 68:15, 69:11,
69:17, 71:9, 72:15, 78:2,
78:6, 80:14, 81:4, 82:23,

83:23, 84:6, 84:12, 86:4,
90:20, 92:2, 96:15, 108:23,
110:10, 113:9, 130:11,
131:20, 137:9, 144:20,
145:12, 146:19, 146:23,
148:24, 149:23, 150:4,
154:21, 158:19
become [3] - 4:24, 10:23,
69:21
becomes [2] - 51:25, 56:14
bed [1] - 23:7
been [53] - 4:6, 7:2, 8:16,
10:25, 12:8, 12:16, 12:22,
12:24, 14:2, 14:9, 15:2,
16:15, 24:11, 50:14, 52:13,
52:15, 53:13, 53:22, 55:11,
56:5, 57:3, 58:7, 60:11,
65:25, 66:20, 67:12, 67:24,
76:24, 98:11, 100:9, 106:23,
107:4, 111:22, 112:10,
118:3, 120:12, 120:16,
120:24, 126:19, 136:20,
137:8, 138:11, 140:11,
144:19, 149:16, 149:20,
150:9, 151:8, 154:18,
154:24, 155:5, 158:2, 158:14
before [31] - 8:19, 22:15,
22:17, 22:19, 25:25, 26:10,
26:17, 29:21, 30:8, 30:14,
30:16, 54:11, 54:20, 58:8,
71:22, 79:21, 92:11, 109:11,
111:20, 111:23, 112:2,
112:13, 113:7, 124:4,
134:15, 134:20, 136:5,
141:21, 141:23, 142:13,
144:21
begin [1] - 92:11
begins [1] - 51:25
begun [1] - 22:17
behalf [9] - 106:25, 109:25,
112:2, 112:8, 115:12,
117:15, 141:7, 157:13, 158:5
behaving [1] - 22:5
behavioral [3] - 95:7,
95:16, 96:4
being [4] - 3:13, 6:16, 7:8,
9:13, 11:15, 18:18, 44:14,
45:14, 47:9, 49:17, 53:21,
56:11, 56:18, 58:14, 58:15,
66:2, 75:11, 75:13, 77:9,
80:22, 81:14, 87:21, 97:9,
107:11, 108:3, 108:4, 108:7,
108:9, 108:11, 108:15,
108:18, 108:23, 114:19,
123:24, 131:25, 132:4,
132:13, 132:22, 133:4,
135:18, 147:12, 152:16,
153:2, 157:6
beings [1] - 28:10
belief [2] - 147:2, 158:25
believe [22] - 7:22, 25:11,
35:8, 47:12, 52:20, 72:25,

94:7, 95:15, 101:12, 101:21,
103:19, 108:6, 121:16,
126:14, 136:20, 145:3,
146:24, 153:10, 153:14,
155:21, 155:23, 157:19
Bellevue [1] - 5:5
bench [1] - 108:20
berate [1] - 82:8
Berrill [7] - 60:23, 62:6,
67:9, 70:4, 140:16, 153:7,
153:16
Berrill's [1] - 118:23
besides [1] - 15:25
best [18] - 21:10, 30:13,
52:7, 65:6, 65:23, 68:4,
106:11, 110:12, 110:13,
110:17, 140:7, 149:2,
150:25, 151:4, 151:6,
156:12, 157:4
better [15] - 49:6, 50:25,
51:3, 52:24, 53:5, 54:2, 69:4,
69:10, 70:24, 72:5, 136:12,
136:21, 137:9, 137:10,
137:14
between [10] - 8:21, 15:10,
38:7, 39:13, 46:6, 53:20,
69:22, 85:14, 86:24, 108:3
beyond [1] - 105:17
bias [4] - 65:11, 65:14,
65:20, 66:11
biased [1] - 65:11
billing [1] - 110:5
biological [2] - 16:22,
59:14
bit [4] - 54:11, 58:11, 88:22,
92:25
blanket [1] - 113:14
blood [5] - 57:18, 58:21,
59:2, 59:9, 160:18
bloomer [1] - 53:2
board [7] - 4:24, 8:19, 10:8,
10:10, 10:11, 16:2, 16:3
Board [2] - 6:24, 16:5
boats [1] - 7:21
body [1] - 58:23
bombarded [1] - 80:22
both [9] - 11:7, 12:18,
13:10, 15:13, 47:19, 72:2,
73:10, 75:3, 77:16
bother [1] - 43:20
bothering [1] - 55:21
bottom [3] - 76:14, 88:25,
127:23
Boudin [26] - 60:24, 62:22,
95:8, 95:24, 96:3, 96:15,
138:3, 138:5, 138:8, 138:19,
138:23, 139:11, 139:17,
139:21, 140:7, 140:10,
140:14, 141:2, 141:4,
141:17, 150:12, 150:17,
153:6, 153:14, 153:21

Boudin's [4] - 61:9, 96:6,
141:12, 154:16
bought [1] - 35:23
boy [3] - 131:25, 132:5,
132:9
brain [16] - 16:6, 16:16,
32:17, 48:16, 49:13, 49:18,
50:3, 74:14, 74:18, 87:16,
106:9, 106:10, 106:16,
144:7, 144:16, 145:4
break [2] - 91:22, 92:2
breaks [3] - 26:23, 29:16,
110:19
breath [1] - 75:8
breathing [1] - 57:5
Brett [33] - 3:5, 5:25, 61:12,
101:25, 102:10, 107:12,
109:17, 112:21, 124:25,
125:7, 126:8, 129:4, 129:18,
130:13, 130:21, 131:15,
131:25, 134:6, 134:11,
134:15, 136:8, 136:13,
138:9, 138:12, 138:20,
138:24, 139:11, 139:20,
139:22, 140:14, 141:12,
148:10, 158:18
BRETT [1] - 1:4
Brett's [17] - 100:13,
101:17, 103:15, 104:16,
107:5, 125:20, 128:23,
138:21, 139:2, 139:12,
141:17, 142:17, 142:21,
144:7, 146:10, 149:5, 155:17
brief [2] - 4:17, 55:6
briefly [1] - 21:8
bringing [4] - 64:19,
112:21, 114:25, 115:6
broad [1] - 154:19
Broadcasting [2] - 3:6, 3:9
BROADCASTING [2] - 1:7,
1:8
Broadway [1] - 2:12
Brooklyn [2] - 6:13, 13:17
brother [2] - 55:7, 55:23
brother's [1] - 54:25
brought [4] - 51:19, 52:8,
115:11, 146:10
building [1] - 11:24
built [1] - 64:8
Burn's [1] - 61:22
business [3] - 80:7, 83:2,
122:14
BY [7] - 2:8, 2:14, 4:10,
93:3, 99:12, 149:13, 155:16

**C**

Cabeceiras [2] - 4:3,
149:15
CABECEIRAS [29] - 2:8,
4:2, 31:9, 63:10, 66:25,

85:10, 89:11, 90:13, 92:5, 92:11, 92:23, 95:3, 95:11, 99:2, 99:10, 99:12, 109:9, 113:8, 113:17, 120:10, 123:2, 128:15, 133:25, 142:10, 149:9, 155:13, 155:16, 158:11, 159:7

**call** [3] - 16:12, 61:21, 154:6

**called** [24] - 4:6, 5:14, 11:22, 17:10, 32:2, 37:2, 40:17, 57:11, 63:22, 64:7, 65:9, 65:10, 65:20, 71:21, 75:21, 77:4, 131:25, 132:4, 132:13, 133:5, 142:13, 142:20, 153:21, 158:14

**calls** [1] - 140:22

**came** [2] - 52:16, 59:8

**can** [82] - 5:23, 9:12, 21:10, 21:21, 22:22, 23:7, 31:3, 31:4, 31:5, 31:7, 33:17, 35:10, 38:18, 44:6, 44:25, 52:4, 57:6, 57:18, 58:20, 58:23, 61:6, 61:7, 63:3, 63:15, 65:23, 66:22, 67:5, 72:24, 81:20, 81:21, 82:10, 82:14, 84:24, 90:23, 90:24, 91:6, 93:10, 94:22, 97:12, 100:15, 101:8, 102:25, 103:9, 104:14, 108:24, 110:11, 110:13, 111:9, 116:4, 116:5, 116:7, 116:9, 119:8, 121:23, 121:24, 122:18, 122:20, 123:4, 124:22, 126:22, 127:7, 132:8, 132:11, 132:14, 132:23, 135:17, 136:23, 140:23, 143:7, 143:8, 143:15, 145:23, 146:15, 146:21, 146:25, 148:4, 151:2, 154:4, 157:16, 158:9

**can't** [20] - 21:7, 34:5, 34:8, 41:20, 44:23, 45:4, 52:3, 52:4, 54:2, 59:4, 80:13, 82:6, 90:25, 91:12, 91:23, 94:21, 105:17, 124:18, 130:25, 144:12

**cannot** [3] - 66:22, 105:4, 105:19

**car** [6] - 40:7, 74:17, 106:2, 106:4, 106:6, 106:13

**care** [12] - 16:19, 33:13, 33:15, 33:19, 56:14, 74:12, 75:16, 84:14, 86:11, 86:13, 142:23, 153:22

**cared** [1] - 84:17

**careful** [1] - 75:20

**carefully** [2] - 27:14, 68:10

**case** [35] - 3:11, 10:18, 20:9, 29:4, 30:23, 31:24, 36:11, 37:15, 73:19, 74:23, 110:9, 112:13, 112:19,

113:18, 114:19, 116:3, 116:20, 117:24, 118:17, 118:19, 118:23, 119:3, 119:4, 119:10, 119:16, 119:21, 119:24, 121:11, 121:12, 123:21, 123:25, 138:7, 149:17, 154:2, 154:21

**Case** [1] - 1:5

**cases** [16] - 11:15, 11:21, 11:22, 12:6, 19:25, 20:6, 31:24, 111:20, 112:11, 146:20, 155:8, 157:11, 157:19, 157:24, 158:3, 158:15

**category** [3] - 129:14, 129:15, 152:6

**causation** [3] - 41:23, 42:8, 47:16, 55:10, 98:18, 104:15, 104:25, 105:5, 105:8, 105:12, 105:18, 105:21, 149:5

**cause** [13] - 21:2, 25:3, 35:10, 38:18, 41:6, 49:20, 53:8, 55:15, 57:17, 69:7, 90:23, 97:23, 98:6

**caused** [7] - 28:20, 43:6, 43:17, 43:19, 115:14, 116:12, 156:16

**causes** [6] - 21:12, 35:11, 35:25, 97:23, 107:6, 119:17

**causing** [2] - 32:21, 82:25

**Center** [2] - 13:18, 34:23

**center** [1] - 6:13

**central** [2] - 8:16, 16:6

**Cerasia** [2] - 3:24

**CERASIA** [33] - 2:10, 2:14, 3:23, 4:8, 4:10, 31:16, 89:13, 91:25, 92:21, 92:24, 93:3, 95:13, 99:6, 104:18, 105:23, 109:7, 113:5, 113:13, 116:22, 118:14, 120:4, 120:14, 121:2, 122:24, 129:21, 130:14, 132:3, 133:6, 139:14, 149:11, 149:13, 155:11, 159:9

**certain** [28] - 15:18, 18:5, 19:22, 26:5, 26:12, 27:7, 33:25, 34:5, 41:18, 43:13, 45:3, 58:23, 58:24, 64:25, 65:15, 69:3, 69:6, 71:3, 71:16, 72:3, 81:8, 81:12, 140:5, 140:10, 150:20, 151:11, 152:23, 156:22

**certainly** [12] - 17:24, 67:15, 67:21, 77:23, 78:5, 88:18, 116:10, 117:22, 120:3, 141:20, 155:5, 158:2

**certainty** [1] - 47:16

**CERTIFICATE** [1] - 160:2

**certification** [2] - 16:3

**certified** [5] - 4:24, 8:19, 10:8, 10:10, 10:12

**certify** [2] - 160:10, 160:16

**cetera** [1] - 132:11

**chain** [1] - 106:15

**chair** [1] - 9:19

**chairperson** [1] - 9:17

**challenge** [1] - 136:13

**challenged** [2] - 136:16, 137:10

**challenging** [3] - 137:11, 137:13, 137:22

**change** [1] - 102:9

**changes** [1] - 71:3

**chapter** [1] - 8:10

**characteristics** [1] - 70:21

**characterization** [1] - 119:2

**characterize** [1] - 130:3

**characterized** [1] - 49:22

**charge** [1] - 111:14

**cheap** [2] - 132:23, 133:5

**check** [2] - 30:10, 64:9

**Checklist** [5] - 61:19, 61:23, 62:23, 63:17, 65:7

**checklist** [1] - 63:6

**checks** [1] - 71:15

**chest** [1] - 75:8

**child** [3] - 34:16, 49:10, 146:7

**Child** [2] - 34:23, 51:19

**child's** [2] - 146:4, 146:6

**children** [3] - 6:17, 145:9, 145:23

**Christopher** [1] - 3:7

**CHRISTOPHER** [1] - 1:7

**chronic** [1] - 69:7

**Chroniger** [2] - 3:16, 91:20

**CHRONIGER** [1] - 2:18

**circumstance** [1] - 133:11

**circumstances** [5] - 39:7, 43:5, 56:3, 90:22, 150:22

**cited** [1] - 158:22

**City** [1] - 14:13

**civil** [14] - 9:5, 11:7, 11:13, 11:14, 11:21, 12:6, 18:22, 20:5, 20:9, 20:21, 146:14, 146:20, 146:25, 147:3

**Civilian** [1] - 61:20

**claim** [5] - 22:17, 42:25, 112:22, 117:2, 155:4

**claiming** [1] - 117:8

**claims** [3] - 11:4, 27:18, 146:15

**classic** [3] - 19:20, 19:21, 59:20

**clear** [7] - 31:13, 54:15, 70:11, 74:15, 120:6, 120:9, 120:10

**clearly** [4] - 52:18, 126:8, 154:17, 155:7

**clients** [3] - 82:21, 82:23, 145:8

**clinical** [2] - 17:13, 68:20

**clinically** [2] - 75:12, 80:17

**close** [3] - 11:2, 116:17, 151:2

**cloth** [1] - 19:15

**clouding** [1] - 90:10

**co** [2] - 9:19, 18:12

**co-author** [1] - 18:12

**co-chair** [1] - 9:19

**cognition** [1] - 100:6

**cognitive** [12] - 48:19, 50:16, 93:23, 94:2, 94:3, 94:16, 95:6, 95:16, 96:4, 96:12, 97:7, 100:3

**collar** [1] - 14:21

**collateral** [2] - 32:3, 104:7

**College** [1] - 5:21

**college** [2] - 4:20, 5:17

**Columbia** [3] - 12:23, 13:22

**combination** [2] - 73:9, 98:15, 105:15

**come** [11] - 13:17, 24:6, 25:6, 47:13, 48:9, 50:13, 80:6, 90:23, 104:14, 105:5, 105:20

**comes** [3] - 25:4, 123:8, 124:7

**comfortable** [1] - 88:5

**comment** [1] - 132:15

**comments** [2] - 132:8, 132:10

**Committee** [2] - 9:15, 9:21

**common** [4] - 28:12, 58:4, 58:10

**commonly** [11] - 8:24, 31:23, 37:13, 53:15, 57:9, 57:11, 64:25, 75:16, 82:8, 84:10, 84:11

**communications** [2] - 100:20, 101:23

**Company** [1] - 3:6

**company** [1] - 81:11

**COMPANY** [1] - 1:7

**company's** [1] - 90:5

**comparing** [1] - 91:9

**compel** [2] - 101:16, 103:14

**Compensation** [1] - 6:24

**complete** [2] - 5:2, 26:14

**completed** [2] - 5:7, 10:13

**completion** [1] - 5:18

**complex** [1] - 81:19

**component** [1] - 80:2

**compound** [1] - 90:14

**conceivable** [1] - 119:20

**concentrate** [2] - 27:6, 81:14

**concentrating** [1] - 82:18

**concentration** [1] - 80:19

**concern** [4] - 49:24, 56:10, 75:19, 76:2

**concerned** [1] - 49:5

**concerning** [2] - 76:2,

152:23
**conclude** [1] - 56:22
**concluded** [2] - 68:12, 149:22
**conclusion** [17] - 9:12, 36:10, 38:4, 38:5, 39:20, 39:23, 42:16, 47:14, 93:5, 96:3, 97:13, 97:17, 104:15, 105:5, 105:20, 125:14, 140:15
**Conclusion** [1] - 36:7
**conclusions** [3] - 90:24, 116:15, 153:7
**condition** [5] - 33:18, 75:14, 87:20, 87:22, 147:5
**conditions** [1] - 56:18
**conduct** [7] - 9:7, 13:7, 15:14, 32:4, 72:16, 104:7, 120:22
**conducted** [4] - 26:19, 30:14, 131:6, 136:24
**conducting** [2] - 14:7, 79:2
**CONE** [1] - 2:10
**Cone** [1] - 3:24
**Connecticut** [1] - 47:21
**connection** [1] - 1:15
**consequence** [1] - 50:23
**consequences** [4] - 6:16, 7:18, 8:15, 12:4
**consider** [8] - 20:17, 20:24, 40:23, 65:3, 73:4, 73:6, 78:6, 103:12
**consideration** [1] - 54:22
**considerations** [1] - 81:13
**considered** [2] - 78:5, 91:11
**consistent** [2] - 68:20, 88:17
**constantly** [2] - 34:9, 80:22
**constitute** [1] - 49:19
**constructive** [1] - 38:25
**consult** [3] - 129:9, 130:5, 133:13
**consultant** [1] - 6:23
**contact** [1] - 142:3
**contacted** [1] - 152:19
**contaminate** [1] - 136:23
**contaminated** [1] - 22:23
**contemporaneous** [1] - 44:10
**content** [5] - 44:4, 47:10, 114:9, 139:5, 139:7
**contentious** [1] - 59:25
**context** [3] - 122:8, 122:18, 152:13
**continue** [1] - 88:10
**continued** [1] - 43:20
**CONTINUED** [1] - 93:2
**contribute** [2] - 57:19, 58:24
**contributed** [6] - 43:7,

60:13, 98:8, 98:16, 105:16, 117:20
**contribution** [1] - 119:17
**contributions** [1] - 16:22
**conversation** [1] - 33:7
**conversations** [3] - 32:18, 32:19, 88:3
**cope** [2] - 8:6, 38:25
**coped** [3] - 8:4, 28:21, 28:23
**copes** [1] - 34:19
**core** [1] - 14:3
**Cornell** [2] - 13:22, 13:23
**corporate** [5] - 111:23, 112:2, 112:8, 115:12, 117:3
**correct** [65] - 48:11, 62:4, 62:19, 62:20, 70:13, 95:18, 95:25, 99:25, 100:11, 101:7, 104:3, 104:9, 105:6, 107:2, 109:15, 109:17, 109:21, 109:23, 110:6, 110:7, 111:23, 112:4, 112:23, 114:4, 117:6, 117:17, 117:25, 118:8, 118:21, 118:25, 120:17, 120:23, 121:5, 121:13, 124:5, 124:21, 125:11, 125:18, 125:22, 125:25, 126:6, 127:2, 128:25, 129:5, 131:4, 134:18, 134:23, 136:6, 140:20, 141:19, 142:24, 143:5, 143:6, 144:6, 144:9, 145:6, 148:11, 148:18, 148:23, 152:9, 153:24, 156:20, 157:10, 157:21, 157:23
**correctly** [3] - 41:20, 104:4, 148:7
**corroborate** [2] - 21:11, 46:14
**could** [34] - 4:12, 22:8, 24:25, 31:25, 35:22, 35:25, 40:23, 43:14, 49:20, 50:7, 51:6, 52:7, 63:2, 77:10, 77:18, 79:22, 81:11, 100:6, 104:10, 109:3, 130:11, 132:19, 132:20, 135:5, 137:9, 139:12, 142:5, 142:13, 142:16, 142:20, 142:25, 158:11
**couldn't** [2] - 88:10, 119:7
**counsel** [8] - 3:21, 91:20, 149:17, 149:21, 150:5, 150:8, 150:10, 152:24
**counseling** [1] - 151:18
**COUNTY** [1] - 160:6
**couple** [1] - 44:22
**course** [72] - 7:11, 7:12, 8:3, 10:5, 10:25, 13:8, 14:25, 16:6, 16:17, 16:20, 16:23, 17:2, 17:18, 19:5, 19:7,

19:11, 19:25, 20:5, 24:3, 26:18, 26:22, 30:19, 35:10, 35:18, 37:20, 38:15, 38:23, 48:25, 49:10, 50:12, 50:18, 50:21, 52:8, 52:24, 55:25, 56:9, 57:4, 61:15, 76:20, 82:14, 89:19, 93:12, 96:21, 102:19, 104:10, 104:12, 107:14, 107:15, 107:19, 108:8, 109:10, 122:8, 129:16, 131:21, 132:5, 132:17, 132:21, 132:22, 134:22, 134:24, 136:3, 138:24, 139:6, 140:9, 142:15, 144:13, 145:10, 145:15, 146:3, 154:3, 154:23, 159:4
**COURT** [1] - 1:2
**Court** [8] - 3:10, 31:14, 100:16, 100:22, 101:10, 101:16, 101:24, 103:14
**court** [13] - 3:18, 11:4, 12:9, 107:25, 108:4, 111:20, 113:19, 113:21, 113:22, 113:24, 118:7, 124:10, 147:12
**courtroom** [1] - 108:20
**courts** [1] - 123:13
**cover** [1] - 51:9
**Covid** [2] - 35:13, 79:18
**CPAP** [1] - 143:21
**create** [2] - 64:3, 96:16
**created** [1] - 48:18
**creates** [1] - 47:3
**credibility** [4] - 92:13, 92:15, 92:19, 99:5
**crime** [4] - 6:17, 7:2, 14:21, 40:6
**Crime** [1] - 6:24, 13:17
**criminal** [12] - 7:5, 9:5, 11:7, 11:11, 11:12, 12:7, 12:14, 14:20, 18:21, 19:25, 20:21, 155:8
**criminally** [1] - 7:9
**CROSS** [1] - 99:11
**cross** [3] - 149:14, 151:20, 152:5
**CROSS-EXAMINATION** [1] - 99:11
**cross-examination** [3] - 149:14, 151:20, 152:5
**crucial** [1] - 23:23
**cup** [1] - 34:7
**cure** [1] - 143:12
**cured** [2] - 143:15, 143:19
**current** [1] - 47:20
**currently** [2] - 9:19, 121:25
**CX** [1] - 161:5

**D**

**damage** [1] - 22:17
**damages** [5] - 11:4, 14:8, 14:17, 115:20, 155:4
**DAPS** [6] - 62:15, 64:22, 64:23, 65:7, 66:13
**data** [14] - 37:25, 42:2, 42:3, 42:4, 42:14, 44:5, 67:23, 68:2, 68:16, 73:18, 73:21, 125:20, 129:10, 130:6
**Data** [5] - 29:12, 30:2, 60:20, 85:2, 125:14
**database** [1] - 104:23
**date** [6] - 94:15, 94:22, 110:9, 111:7, 127:3, 130:22
**daughter** [1] - 56:2
**David** [2] - 3:16, 91:20
**DAVID** [1] - 2:18
**day** [13] - 23:9, 26:22, 26:24, 26:25, 103:4, 131:8, 131:10, 134:6, 134:12, 136:5, 136:9, 139:13, 139:20
**days** [1] - 39:11
**de** [1] - 149:20
**deal** [4] - 6:10, 67:5, 92:21, 113:15
**dealing** [2] - 35:5, 85:13
**death** [2] - 41:9, 49:22
**decided** [1] - 152:19
**decline** [1] - 131:21
**decrease** [1] - 10:2
**defeatingly** [1] - 83:5
**defendant** [7] - 111:23, 112:11, 117:3, 141:8, 154:22, 157:13, 158:6
**Defendant** [4] - 62:10, 70:11, 73:15, 128:23
**defendant's** [3] - 117:15, 119:22, 120:6
**defendants** [7] - 2:11, 3:25, 112:2, 112:9, 115:12, 120:8, 154:25
**Defendants** [3] - 1:9, 106:25, 107:13
**Defendants'** [3] - 28:25, 100:10, 100:16, 101:9, 101:15, 103:13, 106:24, 107:5, 107:16, 109:11, 109:20, 109:25, 110:5
**defense** [9] - 12:14, 20:3, 117:5, 149:17, 149:21, 150:5, 150:7, 150:8, 155:10
**definite** [1] - 54:20
**definition** [3] - 40:14, 41:20, 66:22
**definitive** [2] - 91:12, 137:4
**degrading** [1] - 132:8
**degree** [5] - 5:16, 37:13, 47:14, 54:7, 70:7

**degrees** [1] - 47:5
**Del** [1] - 3:24
**DEL** [1] - 2:10
**demonstrated** [2] - 58:22, 94:4
**denied** [1] - 75:9
**denies** [2] - 127:11, 127:24
**denying** [2] - 126:8, 128:19
**department** [1] - 51:20
**depend** [1] - 133:11
**dependent** [1] - 69:19
**depending** [2] - 21:15, 57:14
**depends** [8] - 15:16, 31:23, 81:22, 82:11, 93:13, 143:15, 145:18, 146:2
**deposition** [11] - 3:4, 3:13, 89:6, 96:6, 110:22, 124:10, 138:6, 141:22, 154:16, 160:12, 160:14
**depositions** [1] - 89:15
**depressed** [12] - 37:9, 53:21, 54:8, 75:12, 80:8, 80:13, 80:14, 80:20, 82:8, 84:9, 84:13, 145:12
**depressing** [1] - 54:3
**Depression** [1] - 61:22
**depression** [49] - 33:17, 36:22, 36:25, 37:5, 37:10, 37:11, 37:12, 37:14, 37:15, 37:18, 57:19, 57:20, 58:25, 59:11, 69:8, 69:9, 75:18, 75:23, 76:3, 76:9, 79:4, 79:12, 79:24, 80:18, 82:11, 83:9, 83:23, 84:8, 84:22, 86:12, 86:15, 86:19, 86:21, 87:24, 88:19, 94:6, 94:10, 94:19, 94:24, 98:24, 105:2, 126:9, 127:12, 127:25, 128:5, 128:7, 128:13, 128:19
**Depressive** [3] - 36:16, 93:15, 97:20
**depressive** [3] - 79:16, 91:17, 125:5
**depressively** [1] - 69:13
**depth** [1] - 53:15
**DEREK** [1] - 2:4
**Derek** [1] - 4:3
**derive** [1] - 145:23
**derogatory** [1] - 132:5
**describe** [4] - 44:19, 86:12, 87:23, 97:8
**described** [8] - 55:7, 69:2, 75:11, 75:13, 81:14, 81:18, 96:9, 150:19
**describes** [2] - 69:5, 69:17
**describing** [2] - 38:3, 70:20
**description** [2] - 52:18, 78:14
**descriptions** [1] - 86:25
**designed** [1] - 66:18

**despite** [1] - 77:13
**detail** [3] - 46:18, 48:22, 58:20
**detected** [1] - 106:17
**determination** [1] - 91:2
**determine** [12] - 7:3, 18:19, 21:17, 21:18, 24:21, 45:2, 54:6, 55:10, 71:23, 73:25, 75:18, 98:5
**determined** [1] - 7:10
**determines** [1] - 41:5
**determining** [2] - 81:11, 98:18
**develop** [7] - 8:7, 38:21, 39:14, 39:18, 40:10, 40:12, 41:7
**developing** [1] - 52:12
**development** [2] - 41:17, 148:16
**developmental** [5] - 34:17, 48:14, 48:24, 51:10, 51:22
**device** [2] - 111:9, 143:21
**diagnose** [4] - 13:4, 59:11, 128:3, 153:16
**diagnosed** [11] - 34:24, 41:20, 42:9, 51:23, 57:3, 58:9, 98:25, 105:3, 118:9, 144:15, 153:14
**diagnosing** [1] - 71:6
**diagnosis** [9] - 36:18, 36:24, 37:19, 37:22, 37:23, 51:21, 70:22, 71:8, 125:4
**diagnostic** [1] - 40:14
**Diagnostic** [1] - 40:17
**diary** [1] - 44:9
**did** [63] - 5:2, 5:12, 7:24, 14:10, 15:9, 15:22, 27:13, 28:6, 29:19, 29:20, 29:23, 30:7, 31:17, 31:22, 34:11, 35:6, 39:18, 39:22, 47:19, 47:24, 50:3, 50:5, 51:15, 52:7, 54:13, 56:22, 66:7, 68:7, 68:10, 76:17, 76:19, 78:17, 81:24, 83:13, 84:4, 89:16, 90:16, 90:20, 91:15, 91:18, 93:4, 95:19, 97:10, 102:16, 105:13, 107:10, 116:13, 117:22, 119:2, 125:9, 128:17, 129:19, 134:11, 134:25, 136:2, 143:5, 147:16, 148:9, 149:22, 151:22, 153:16, 154:20, 156:9
**didn't** [37] - 11:25, 33:4, 33:5, 33:9, 37:6, 43:23, 50:17, 51:9, 52:24, 54:19, 79:11, 85:8, 86:19, 86:20, 95:5, 96:16, 103:20, 104:6, 108:21, 116:11, 120:7, 125:8, 125:10, 125:23, 127:20, 129:9, 130:5,

147:25, 148:21, 150:12, 150:14, 151:5, 154:10, 154:13, 154:17
**died** [3] - 155:18, 155:22, 156:2
**difference** [8] - 15:10, 39:15, 45:11, 45:14, 108:3, 118:11, 153:18, 153:25
**differences** [1] - 46:5
**different** [21] - 9:6, 15:16, 17:6, 17:14, 17:16, 27:22, 38:2, 45:6, 47:5, 55:13, 66:24, 72:12, 77:2, 84:11, 93:24, 94:24, 119:17, 134:13, 143:13, 145:16, 145:20
**differentiate** [1] - 53:20
**differentiates** [2] - 25:16, 39:13
**differently** [3] - 34:20, 59:24, 151:9
**differs** [1] - 15:18
**difficult** [4] - 6:8, 8:6, 79:20, 129:16
**difficulties** [8] - 50:8, 51:2, 51:4, 51:11, 54:8, 74:3, 85:5, 98:12
**difficulty** [6] - 43:25, 48:14, 48:19, 48:24, 51:22, 98:17
**diminish** [3] - 10:3, 79:25, 152:15
**DIRECT** [2] - 4:9, 93:2
**direct** [1] - 115:17
**directly** [3] - 6:4, 31:20, 125:24
**director** [2] - 6:11, 6:12
**dis** [1] - 42:25
**disability** [3] - 76:18, 77:19, 78:3
**disadvantage** [1] - 114:21
**disadvantages** [1] - 136:23
**disagree** [7] - 100:18, 100:23, 100:25, 101:11, 115:16, 136:11, 146:12
**disappointed** [2] - 69:14, 69:15
**disappointment** [1] - 88:8
**discharge** [2] - 74:13, 74:14
**discipline** [2] - 122:3, 122:10
**discrepancies** [1] - 46:5
**discrepancy** [2] - 85:14, 86:24
**discrim** [1] - 60:11
**discriminated** [4] - 43:2, 47:9, 60:12, 102:16
**discrimination** [14] - 11:16, 14:16, 27:17, 32:11, 32:23, 42:21, 43:6, 43:10, 43:15, 44:14, 81:6, 98:8, 98:13,

149:24
**discuss** [2] - 13:9, 19:6
**discussed** [8] - 80:3, 81:8, 138:20, 138:25, 139:11, 140:11, 143:9
**disease** [1] - 143:11
**disinterested** [2] - 76:7, 86:25
**disorder** [52] - 8:8, 14:19, 18:10, 18:14, 24:2, 36:25, 37:3, 37:4, 37:11, 38:6, 38:8, 38:19, 38:22, 39:4, 39:8, 39:14, 40:11, 40:13, 40:25, 41:21, 41:24, 42:9, 43:8, 49:21, 60:10, 66:19, 77:24, 79:16, 87:24, 87:25, 88:19, 88:21, 91:17, 93:13, 93:19, 94:19, 94:23, 98:6, 98:9, 98:17, 105:2, 118:10, 119:18, 125:4, 125:5, 128:4, 128:13, 145:15, 150:20, 153:15, 153:17
**Disorder** [3] - 36:16, 93:15, 97:20
**Disorders** [1] - 40:18
**disorders** [1] - 8:8
**dispute** [2] - 129:6, 129:18
**disruptive** [1] - 57:16
**distinction** [4] - 38:7, 38:10, 39:9, 108:5
**distracts** [1] - 45:16
**distress** [29] - 11:4, 14:8, 14:17, 22:16, 38:8, 38:23, 39:2, 39:5, 39:8, 53:7, 55:15, 60:7, 70:7, 73:23, 76:22, 77:23, 104:16, 105:17, 105:21, 115:13, 116:6, 116:13, 117:21, 146:16, 149:6, 149:23, 155:4, 157:14, 158:6
**distressed** [1] - 94:25
**distressing** [3] - 39:6, 43:18, 80:22
**District** [3] - 3:10, 3:11, 113:23
**DISTRICT** [2] - 1:2, 1:2
**disturbance** [2] - 56:20, 85:22
**disturbed** [1] - 57:21
**do** [97] - 6:4, 9:3, 10:5, 10:6, 13:3, 17:20, 21:10, 21:21, 23:4, 23:10, 23:12, 23:20, 24:19, 25:12, 28:6, 29:6, 29:7, 30:25, 31:23, 33:21, 37:9, 45:4, 48:7, 54:5, 56:25, 64:20, 65:3, 72:2, 79:7, 80:7, 80:10, 84:19, 88:8, 89:3, 89:4, 92:19, 93:21, 99:4, 100:18, 101:11, 101:15, 101:20, 103:13, 106:9, 110:13, 111:14,

112:21, 113:8, 114:25,
115:6, 115:10, 116:19,
118:4, 118:6, 119:15,
119:18, 122:3, 122:9,
122:21, 123:20, 123:24,
124:6, 124:11, 124:15,
126:7, 127:9, 127:10,
127:13, 127:18, 128:2,
128:22, 129:7, 129:18,
129:24, 130:9, 130:10,
131:12, 135:17, 136:19,
141:11, 146:13, 146:16,
147:16, 148:10, 148:25,
149:17, 151:11, 152:10,
152:11, 153:22, 156:2,
157:18, 158:17, 158:24,
160:10

**doctor** [10] - 4:15, 15:21,
22:21, 86:11, 86:14, 125:20,
126:23, 126:24, 142:21,
142:23

**Doctor** [1] - 149:10

**doctors** [4] - 15:7, 33:16,
33:19, 127:2

**doctors'** [1] - 33:13

**document** [2] - 61:8, 62:14

**documents** [5] - 29:21,
30:8, 30:20, 109:25, 127:15

**does** [22] - 11:14, 19:12,
24:2, 36:19, 45:22, 46:12,
48:20, 53:18, 65:7, 72:6,
85:20, 85:24, 96:11, 98:2,
100:2, 102:10, 103:3, 124:9,
124:11, 124:17, 128:12,
154:4

**doesn't** [18] - 20:19, 28:19,
37:3, 39:2, 39:8, 40:10, 42:5,
43:9, 53:4, 64:6, 71:17,
72:15, 72:21, 84:13, 103:6,
107:8, 146:7, 150:5

**doing** [16] - 6:21, 9:11,
10:25, 15:17, 20:20, 34:3,
38:4, 64:12, 84:5, 97:7,
99:13, 111:8, 117:12, 123:9,
123:14, 124:7

**dollars** [3] - 56:8, 111:18,
119:23

**domains** [1] - 85:17

**don't** [89] - 18:5, 20:13,
21:6, 24:16, 24:17, 25:2,
26:12, 26:13, 31:3, 31:5,
38:20, 39:15, 43:2, 44:8,
44:10, 44:16, 44:19, 45:21,
46:19, 47:12, 54:20, 55:25,
56:24, 57:14, 58:20, 58:25,
59:3, 59:4, 59:14, 59:15,
76:8, 78:4, 79:20, 82:16,
84:3, 84:4, 84:14, 84:15,
86:11, 87:8, 87:10, 87:23,
92:2, 99:22, 100:20, 100:22,
101:2, 101:13, 102:4, 102:6,
103:23, 103:24, 104:2,

104:6, 105:22, 110:10,
111:3, 113:25, 114:8,
114:14, 115:4, 116:18,
118:9, 118:12, 119:19,
121:15, 121:16, 122:17,
124:25, 127:17, 128:3,
129:6, 129:11, 131:19,
136:18, 137:5, 137:11,
137:12, 138:17, 139:17,
141:9, 144:2, 147:10,
147:22, 155:20, 155:24

**done** [10] - 7:18, 25:19,
58:22, 83:2, 114:11, 134:8,
135:20, 143:17, 147:6, 155:7

**double** [1] - 23:10

**doubt** [2] - 122:4, 135:21

**doubting** [1] - 140:25

**down** [1] - 117:11

**Dr** [46] - 3:4, 4:11, 60:23,
62:6, 62:21, 67:9, 70:3, 93:4,
95:8, 95:24, 96:3, 96:6,
96:15, 99:7, 118:19, 118:23,
121:14, 125:20, 125:23,
126:3, 138:2, 138:4, 138:8,
138:19, 138:23, 139:10,
139:17, 139:21, 140:7,
140:10, 140:13, 140:16,
141:2, 141:4, 141:11,
141:16, 142:21, 150:12,
150:17, 153:6, 153:7,
153:14, 153:15, 153:21,
154:16, 159:9

**duly** [2] - 4:6, 160:13

**duration** [1] - 53:16

**during** [8] - 32:19, 44:21,
57:6, 76:5, 86:8, 96:10,
102:13, 153:3

**DX** [1] - 161:5

**dynamic** [1] - 69:17

**dynamics** [1] - 69:6

---

# E

**earnest** [2] - 132:14, 133:5

**earning** [1] - 78:3

**easily** [1] - 63:25

**economic** [6] - 146:19,
146:24, 147:5, 147:8,
147:10, 147:11

**Ed** [3] - 67:6, 95:3, 113:8

**Edition** [1] - 40:18

**education** [1] - 63:25

**Edward** [1] - 3:23

**EDWARD** [1] - 2:14

**effect** [1] - 74:18

**effective** [4] - 94:5, 94:8,
94:18, 137:24

**effects** [1] - 13:20

**effort** [2] - 21:10, 21:17

**eight** [7] - 4:19, 26:21,
29:15, 97:14, 110:18, 131:5,

131:10

**either** [15] - 9:4, 19:14,
20:25, 23:16, 23:21, 45:8,
46:7, 46:15, 73:7, 76:10,
82:6, 119:3, 143:19, 153:3,
155:9

**elaborate** [1] - 124:15

**elective** [1] - 13:14

**elevate** [1] - 57:18

**else** [1] - 106:22

**embarrassment** [1] - 82:24

**emotional** [17] - 11:3, 14:7,
14:16, 22:16, 104:16,
105:21, 107:6, 107:7,
115:13, 115:19, 116:12,
117:21, 142:18, 146:16,
149:6, 149:23, 155:3

**emotionally** [1] - 27:16

**emphasis** [1] - 17:16

**employee** [4] - 152:20,
152:21, 152:25

**employee's** [2] - 157:14,
158:6

**employees** [3] - 122:3,
122:11, 122:15

**employer** [1] - 112:22

**employers** [1] - 152:18

**employment** [14] - 11:16,
14:15, 39:19, 47:23, 89:9,
112:7, 112:11, 116:3,
121:11, 149:24, 152:14,
157:11, 157:19, 157:24

**end** [1] - 7:20

**ended** [1] - 89:9

**endedly** [1] - 27:18

**endorsed** [1] - 75:6

**energy** [4] - 57:21, 79:23,
79:25, 84:7

**enforcement** [1] - 9:25

**engage** [2] - 102:10, 102:17

**engaged** [1] - 82:19

**engaging** [1] - 80:7

**enough** [9] - 35:23, 38:24,
41:4, 44:25, 45:7, 79:23,
84:17, 112:20, 118:13

**enthusiastic** [1] - 82:20

**enthusiastically** [1] - 80:6

**entirely** [1] - 24:9

**entirety** [1] - 146:6

**entitled** [1] - 61:11

**environment** [1] - 11:17

**equally** [1] - 150:10

**especially** [5] - 22:18,
44:11, 75:6, 93:21, 94:20

**essentially** [4] - 7:5, 36:21,
39:15, 41:6

**established** [1] - 102:12

**esteem** [5] - 68:19, 68:25,
81:19, 81:20, 81:21

**estimated** [1] - 56:7

**et** [1] - 132:11

**ethnicity** [1] - 132:11

**eval** [1] - 42:6

**evaluate** [10] - 6:25, 23:20,
68:7, 107:12, 112:14, 118:4,
118:18, 118:23, 130:6, 148:9

**evaluated** [2] - 34:22,
109:16

**evaluating** [5] - 8:13, 25:15,
64:13, 90:17, 97:13

**evaluation** [31] - 9:4, 9:7,
20:20, 23:25, 25:17, 25:18,
25:19, 25:21, 26:7, 26:15,
26:20, 27:12, 46:12, 48:6,
60:22, 62:6, 73:25, 75:20,
78:17, 79:3, 83:17, 90:8,
96:10, 102:9, 109:20, 116:2,
117:12, 120:23, 136:8,
136:21, 137:24

**evaluator** [11] - 12:9, 12:17,
42:6, 42:7, 44:6, 46:12,
85:23, 98:3, 98:5, 104:21,
104:22

**evaluators** [1] - 24:5

**even** [24] - 9:13, 22:19,
25:11, 33:4, 33:5, 40:23,
45:20, 46:23, 57:19, 57:25,
66:6, 69:2, 77:2, 77:4, 77:5,
77:17, 80:9, 81:17, 84:16,
88:19, 101:25, 145:14,
148:20, 152:2

**event** [20] - 24:12, 38:22,
40:4, 40:10, 41:3, 41:6, 41:8,
41:16, 41:19, 45:15, 49:19,
49:20, 66:21, 71:10, 71:12,
71:17, 71:18, 71:19, 131:23,
157:3

**events** [10] - 6:9, 7:14, 8:6,
8:16, 24:10, 40:22, 98:12,
106:15, 129:14, 151:11

**eventually** [3] - 50:25, 51:2,
53:12

**ever** [12] - 12:8, 15:2, 26:2,
26:10, 35:14, 50:12, 139:12,
141:8, 143:24, 149:22,
151:22, 153:20

**every** [13] - 10:15, 10:24,
13:5, 14:5, 14:11, 14:20,
19:6, 20:16, 26:6, 34:18,
45:12, 45:17, 127:20

**everybody's** [1] - 84:11

**everyday** [2] - 23:19, 36:23

**everything** [1] - 130:25

**evidenced** [1] - 52:22

**ex** [1] - 22:13

**exact** [5] - 94:22, 138:16,
138:18, 144:12

**exactly** [6] - 25:24, 42:12,
105:11, 114:13, 124:13,
156:25

**exaggerate** [7] - 18:19,
20:4, 20:6, 103:10, 146:15,

146:25, 147:4
**exaggerated** [4] - 47:5, 73:9, 85:4, 98:23
**exaggerating** [4] - 19:17, 19:22, 66:3, 71:25
**exaggeration** [3] - 70:6, 71:21, 72:7
**exam** [1] - 72:16
**examination** [14] - 10:16, 29:16, 30:15, 32:5, 54:5, 102:4, 135:14, 136:24, 137:9, 137:16, 137:19, 149:14, 151:20, 152:5
**EXAMINATION** [5] - 4:9, 93:2, 99:11, 149:12, 155:15
**examine** [1] - 112:25
**example** [16] - 7:19, 9:14, 11:22, 19:20, 19:21, 34:4, 38:13, 44:8, 46:13, 46:17, 64:20, 76:4, 76:11, 79:13, 83:15, 143:17
**excelled** [1] - 78:16
**excellence** [1] - 15:7
**exception** [2] - 17:21, 105:13
**exceptions** [1] - 80:15
**excuse** [3] - 62:22, 91:19, 149:21
**exercise** [2] - 84:5, 84:6
**exhausted** [1] - 23:6
**Exhibit** [7] - 28:25, 61:3, 62:7, 62:10, 70:11, 73:14, 73:15
**exist** [1] - 24:15
**expand** [1] - 153:12
**expect** [5] - 23:18, 28:5, 139:6, 139:9, 139:10
**expectedly** [2] - 78:10, 81:3
**experience** [12] - 6:10, 12:20, 13:3, 16:14, 39:4, 41:16, 49:23, 78:12, 80:23, 116:12, 129:17, 142:17
**experiences** [1] - 45:21
**experiencing** [1] - 43:13
**expert** [4] - 17:6, 92:16, 112:6, 131:20
**expertise** [4] - 5:7, 8:23, 9:9, 91:4
**explain** [2] - 59:18, 93:10
**explanations** [1] - 77:16
**exposed** [13] - 38:16, 39:6, 40:3, 40:9, 40:22, 41:8, 41:18, 44:14, 66:20, 71:10, 71:16, 76:24, 98:11
**exposure** [1] - 76:25
**expressed** [1] - 88:7
**expressing** [1] - 69:22
**extend** [1] - 76:18
**extent** [10] - 20:7, 35:21, 55:22, 56:25, 57:23, 58:16, 60:9, 60:13, 68:3, 68:13,

68:17, 84:4, 98:7, 102:7, 124:9, 135:24
**extents** [1] - 98:21

**F**

**fabrication** [1] - 19:14
**face** [1] - 147:20
**facilitated** [1] - 30:22
**facility** [1] - 11:24
**fact** [32] - 5:2, 19:18, 28:22, 33:8, 37:16, 38:17, 43:10, 44:3, 47:8, 54:23, 60:11, 64:5, 78:13, 84:21, 88:5, 91:8, 91:13, 93:16, 94:6, 95:14, 107:10, 115:23, 128:6, 129:10, 142:2, 144:14, 145:19, 149:23, 151:9, 151:25, 152:6
**factors** [1] - 24:22
**facts** [1] - 78:22
**factual** [1] - 42:24
**faculty** [3] - 12:22, 14:3, 14:10
**fair** [3] - 96:2, 112:20, 118:13
**fake** [3] - 18:20, 80:12, 80:13
**faking** [1] - 19:21, 66:4, 80:10
**familiar** [8] - 19:9, 64:23, 64:24, 65:2, 67:9, 67:11, 67:15, 67:16
**families** [1] - 6:18
**family** [5] - 35:4, 49:11, 50:18, 115:2, 125:20
**family's** [1] - 114:16
**far** [1] - 139:11
**faster** [1] - 61:7
**fat** [1] - 132:14
**fatigue** [3] - 23:13, 27:5, 57:17
**favorable** [1] - 150:7
**features** [1] - 150:20
**federal** [3] - 12:9, 12:15, 113:24
**fee** [1] - 111:17
**feel** [3] - 69:4, 69:20, 82:14
**feeling** [5] - 71:2, 94:25, 103:4, 106:19, 145:16
**feelings** [6] - 77:4, 133:4, 133:17, 145:17, 156:23, 159:2
**feels** [1] - 27:16
**fellow** [1] - 115:21
**fellows** [2] - 14:5, 14:12
**fellowship** [4] - 5:3, 10:22, 13:24, 14:11
**felt** [3] - 82:24, 88:4, 151:6
**few** [5] - 27:13, 105:13,

149:11, 150:24, 155:13
**field** [2] - 5:7, 16:2
**fields** [1] - 15:25
**Fifth** [1] - 40:18
**file** [1] - 91:23
**final** [3] - 104:14, 105:5, 105:20
**finally** [4] - 23:3, 35:8, 97:12, 98:10
**finances** [1] - 114:16
**financial** [3] - 35:19, 77:19, 121:9
**find** [7] - 22:18, 23:8, 32:14, 61:16, 72:8, 74:6, 142:8
**finding** [1] - 82:9
**findings** [1] - 73:19
**fine** [4] - 64:11, 64:12, 66:13, 66:14
**fired** [1] - 90:11
**firm** [3] - 31:18, 31:21, 112:17, 120:7, 120:16, 120:19, 121:4
**firms** [1] - 149:17
**first** [26] - 4:25, 6:12, 10:19, 12:25, 15:12, 20:17, 24:14, 25:5, 34:16, 35:14, 37:2, 40:2, 42:19, 43:3, 44:21, 49:16, 50:5, 70:18, 73:25, 77:17, 85:12, 87:17, 97:18, 136:15, 140:2, 144:18
**fit** [1] - 37:6
**five** [2] - 13:8, 23:9
**flawed** [1] - 73:7
**fled** [2] - 7:20, 7:21
**flip** [1] - 59:16
**flooded** [1] - 45:14
**fluctuating** [2] - 69:7, 128:7
**focus** [4] - 8:3, 45:16, 80:20, 80:21
**focusing** [1] - 124:23
**follow** [1] - 155:14
**follow-up** [1] - 155:14
**following** [1] - 76:17
**follows** [1] - 4:7
**foremost** [1] - 97:18
**forensic** [53] - 4:23, 4:25, 5:4, 8:20, 9:22, 10:9, 10:12, 10:14, 10:17, 10:23, 11:6, 13:24, 14:14, 17:22, 18:2, 18:17, 19:4, 20:11, 20:20, 23:24, 24:4, 25:16, 25:17, 26:19, 29:3, 32:3, 42:6, 46:10, 46:11, 46:12, 63:8, 63:21, 64:16, 65:4, 66:12, 66:16, 74:20, 83:16, 98:4, 104:21, 115:21, 120:22, 121:15, 121:19, 123:9, 124:7, 131:20, 140:4, 141:3, 141:5
**Forensic** [2] - 9:21, 36:7
**forensic-psychiatrist.org**

[1] - 121:19
**forever** [1] - 60:16
**forget** [1] - 31:5
**form** [3] - 9:12, 42:7, 89:12
**Form** [1] - 62:16
**formal** [1] - 51:21
**formally** [2] - 34:22, 34:24
**formed** [1] - 13:23
**former** [2] - 109:2, 142:23
**forth** [3] - 20:2, 69:22, 160:13
**fortunate** [2] - 49:25, 50:14
**fortunately** [1] - 38:20
**fortune** [1] - 144:23
**forward** [1] - 120:11
**found** [2] - 157:13, 158:6
**foundation** [1] - 130:15
**founded** [1] - 9:15
**founders** [1] - 8:10
**four** [9] - 4:17, 4:18, 13:8, 15:21, 86:9, 108:21, 114:12, 116:16, 116:17
**fourth** [1] - 13:15
**frequency** [2] - 138:16, 138:18
**frequent** [1] - 45:24
**friend** [14] - 151:2, 151:6, 155:18, 155:20, 155:22, 155:24, 156:2, 156:5, 156:8, 156:10, 156:11, 156:12, 156:13
**frightening** [2] - 50:10, 57:7
**from** [53] - 3:17, 3:24, 7:8, 12:12, 15:5, 25:18, 26:22, 28:14, 29:14, 36:13, 37:25, 38:2, 43:5, 47:25, 50:19, 55:9, 56:8, 57:2, 60:23, 60:24, 63:6, 66:4, 68:22, 72:9, 73:17, 74:14, 77:11, 86:5, 87:15, 89:5, 90:6, 95:19, 95:20, 97:19, 105:25, 111:12, 114:9, 123:9, 124:7, 125:20, 126:11, 126:14, 137:12, 137:16, 137:22, 145:24, 147:11, 147:12, 148:15, 148:17, 150:15, 156:6
**front** [5] - 28:24, 29:6, 61:2, 113:15, 114:20
**frustrating** [1] - 50:9
**fucking** [1] - 132:18
**full** [1] - 155:2
**fully** [7] - 20:25, 25:9, 50:15, 57:25, 59:11, 140:20, 150:21
**function** [1] - 47:20
**functioned** [2] - 27:23, 85:16
**functioning** [5] - 46:21, 47:17, 79:10, 81:16, 82:2

170

**fund** [1] - 121:7
**fundamental** [2] - 108:2, 153:18
**further** [7] - 33:14, 101:8, 138:11, 148:20, 149:10, 159:8, 160:16
**future** [3] - 35:18, 50:13, 60:12

## G

**gain** [6] - 5:6, 19:19, 147:5, 147:8, 147:10, 147:11
**gastrointestinal** [1] - 136:2
**gather** [1] - 47:19
**gave** [7] - 16:13, 27:19, 47:2, 106:8, 117:23, 136:8, 154:21
**general** [5] - 10:6, 10:11, 89:22, 90:12, 154:19
**generally** [10] - 17:19, 21:21, 70:19, 80:18, 94:7, 115:10, 129:13, 129:24, 136:7, 142:9
**generic** [1] - 144:11
**gentleman** [1] - 118:4
**genuine** [1] - 53:20
**genuinely** [1] - 41:14
**get** [25] - 11:20, 12:11, 12:13, 17:16, 19:23, 21:5, 21:7, 21:22, 23:7, 26:9, 26:14, 39:2, 39:6, 52:24, 53:4, 57:24, 59:9, 60:17, 65:15, 65:18, 77:13, 77:17, 82:20, 99:23, 156:24
**gets** [1] - 12:2
**getting** [1] - 53:25
**give** [16] - 14:11, 18:5, 18:6, 58:17, 73:13, 91:12, 94:21, 108:16, 110:11, 110:12, 110:17, 112:6, 120:19, 150:6, 153:9, 154:20
**given** [12] - 15:7, 18:7, 51:22, 76:8, 97:9, 103:4, 108:9, 154:8, 154:18, 154:25, 157:22, 160:15
**giving** [7] - 54:17, 56:12, 105:18, 107:21, 112:8, 123:20, 124:11
**go** [17] - 5:12, 23:8, 34:5, 34:8, 37:14, 38:20, 39:13, 55:4, 58:20, 60:16, 69:21, 77:25, 105:17, 109:5, 148:8, 148:20, 156:16
**goes** [3] - 30:4, 53:3, 56:15
**going** [31] - 16:21, 24:6, 30:10, 33:14, 35:16, 46:18, 48:22, 50:12, 50:13, 53:23, 56:12, 59:16, 60:25, 61:16, 77:22, 78:9, 93:8, 107:20, 108:25, 109:7, 113:5,

113:13, 113:18, 116:22, 118:15, 120:4, 126:17, 150:6, 152:20, 153:9, 155:17
**Goldstein** [1] - 118:19
**gone** [3] - 22:20, 85:7, 85:12
**good** [17] - 4:11, 6:21, 15:15, 18:18, 51:20, 60:15, 65:21, 66:14, 69:25, 72:4, 80:5, 82:10, 82:15, 83:15, 129:25, 130:3, 144:23
**got** [9] - 13:23, 50:25, 51:2, 58:9, 87:15, 90:3, 92:25, 114:23, 122:24
**gotten** [3] - 49:6, 55:12, 77:18
**grade** [1] - 134:9
**great** [5] - 6:10, 66:9, 114:20, 145:24, 146:11
**greater** [1] - 5:6
**greatest** [1] - 68:5
**grounds** [1] - 116:24
**GROUP** [2] - 1:8, 2:4
**Group** [2] - 3:8, 4:3
**growing** [1] - 68:23
**guess** [1] - 61:20
**guesstimate** [4] - 110:12, 110:18, 110:25, 111:11
**guilt** [1] - 151:10
**guilty** [2] - 151:7, 151:8

## H

**had** [68] - 7:2, 7:7, 16:14, 16:16, 27:25, 28:3, 28:5, 32:16, 32:18, 33:2, 34:21, 34:22, 34:25, 35:12, 35:14, 35:19, 42:2, 42:5, 49:15, 49:25, 50:8, 52:8, 54:7, 54:9, 54:10, 54:17, 54:19, 59:7, 60:11, 63:2, 67:22, 67:23, 69:3, 72:17, 74:19, 78:24, 79:22, 79:23, 81:12, 82:3, 83:2, 83:19, 83:22, 84:18, 88:8, 95:6, 95:15, 104:5, 106:8, 106:13, 106:18, 128:14, 134:16, 136:10, 136:14, 136:21, 140:6, 144:9, 144:19, 145:8, 148:21, 149:21, 150:16, 150:18, 151:10, 154:18, 156:5
**hadn't** [3] - 58:7, 130:18, 157:7
**hand** [1] - 39:3
**handle** [1] - 113:9
**happen** [5] - 28:11, 40:8, 50:7, 53:23, 103:20
**happened** [7] - 45:25, 76:23, 103:20, 129:6, 130:21, 139:2, 157:15

**happy** [2] - 106:7, 124:15
**harassment** [4] - 43:17, 43:23, 149:24, 158:25
**hard** [10] - 45:16, 58:11, 58:13, 59:21, 59:23, 80:20, 80:21, 83:6, 83:20, 142:7
**harder** [1] - 59:22
**harmed** [1] - 27:16
**has** [54] - 8:16, 22:13, 22:17, 23:16, 27:10, 28:20, 34:16, 37:8, 38:24, 43:12, 43:16, 43:17, 43:19, 44:3, 45:7, 45:8, 45:20, 46:7, 46:20, 47:4, 47:11, 47:12, 49:10, 56:5, 56:7, 57:3, 60:5, 63:20, 64:8, 68:18, 71:23, 74:3, 76:10, 85:3, 85:6, 85:23, 88:12, 89:7, 93:14, 94:13, 94:15, 97:4, 97:17, 98:11, 98:22, 124:25, 138:8, 140:7, 141:6, 146:7, 146:10, 152:21, 152:22, 158:24
**hasn't** [4] - 55:12, 66:20, 104:12, 155:9
**hat** [1] - 8:18
**header's** [1] - 126:22
**heading** [1] - 48:2
**health** [26] - 6:13, 7:7, 9:24, 15:15, 24:5, 42:6, 42:7, 42:23, 43:4, 43:8, 44:6, 47:2, 97:3, 98:3, 98:5, 104:21, 104:22, 141:17, 142:8, 150:16, 150:24, 151:18, 153:22, 154:7, 156:17, 157:7
**hear** [2] - 119:7, 132:15
**heard** [1] - 144:18
**hearsay** [2] - 67:3, 116:25
**heartbeat** [1] - 75:8
**hedge** [1] - 121:7
**held** [1] - 3:13
**help** [18] - 10:3, 11:20, 14:5, 18:13, 20:8, 26:11, 52:17, 64:9, 66:18, 69:3, 71:23, 96:20, 122:2, 122:10, 122:12, 122:15, 125:12, 125:16
**helpful** [4] - 70:20, 135:10, 143:22, 154:13
**helping** [2] - 8:13, 16:19
**helps** [3] - 18:22, 18:23, 57:12
**hereby** [1] - 160:10
**hereinbefore** [1] - 160:12
**herself** [1] - 56:14
**hesitation** [1] - 96:15
**hi** [1] - 99:14
**high** [2] - 63:24, 126:12
**highest** [3] - 89:2, 90:5, 91:15
**highly** [2] - 63:18, 65:5
**Hillman** [2] - 3:18, 3:20

**himself** [4] - 43:21, 45:9, 69:4, 84:18
**hired** [6] - 100:9, 112:14, 112:16, 112:24, 141:3, 147:15
**history** [1] - 115:2
**hold** [1] - 69:24
**holding** [1] - 34:7
**home** [3] - 87:15, 130:11, 130:18
**homework** [2] - 97:9, 97:11
**honestly** [1] - 102:6
**hope** [9] - 52:25, 53:5, 53:11, 53:15, 53:22, 53:25, 54:10, 54:17, 119:12
**hoped** [1] - 53:17
**hopes** [1] - 146:2
**hoping** [1] - 53:22
**hormonal** [2] - 56:20, 59:6
**hormone** [2] - 58:23, 59:2
**horribly** [2] - 151:7, 151:8
**Hospital** [2] - 5:6, 74:17
**hospital** [9] - 65:16, 65:18, 72:20, 72:22, 73:2, 74:13, 74:14, 74:21, 87:15
**hospitalized** [3] - 106:16, 144:14, 144:15
**hospitals** [1] - 75:17
**hostile** [1] - 11:17
**hotel** [1] - 11:24
**hour** [2] - 111:15, 111:18
**hours** [15] - 13:6, 26:21, 29:15, 79:19, 79:23, 97:14, 108:21, 110:8, 110:18, 110:20, 111:3, 111:7, 111:13, 131:5, 131:10
**house** [1] - 35:17
**houses** [1] - 35:24
**how** [51] - 8:3, 8:4, 13:3, 13:11, 14:16, 15:15, 18:18, 21:16, 21:17, 21:18, 22:3, 22:4, 22:9, 23:18, 24:21, 27:3, 27:23, 28:23, 35:3, 37:23, 38:3, 39:23, 41:15, 46:24, 49:7, 54:2, 64:2, 64:9, 69:12, 71:23, 72:12, 74:5, 78:13, 81:11, 81:16, 81:17, 82:12, 83:8, 84:3, 90:21, 97:10, 99:13, 103:3, 110:8, 111:3, 111:6, 111:14, 118:22, 132:19, 146:14, 152:24
**human** [1] - 28:10
**hurt** [3] - 133:4, 133:10, 133:14
**hurtful** [6] - 131:25, 132:6, 132:12, 132:14, 132:20, 132:23
**husband's** [1] - 115:7
**hypothetical** [3] - 58:3, 136:17, 137:7

# I

**idea** [2] - 106:19, 134:21
**identical** [1] - 140:15
**identified** [5] - 37:5, 48:10, 59:19, 97:16, 117:19
**identify** [3] - 51:6, 54:24, 127:20
**identifying** [1] - 114:5
**identity** [1] - 61:8
**II** [2] - 2:14, 3:24
**III** [1] - 79:14
**ill** [1] - 10:2
**illness** [1] - 20:4
**image** [1] - 64:3
**impact** [7] - 23:21, 28:17, 28:18, 63:2, 78:17, 100:2, 115:23
**impair** [1] - 100:6
**importance** [1] - 53:17
**important** [30] - 10:5, 15:19, 20:17, 32:24, 33:6, 34:11, 34:18, 38:11, 39:10, 42:15, 42:19, 44:18, 45:5, 46:5, 54:22, 55:15, 55:20, 74:24, 78:20, 78:21, 81:17, 82:23, 83:7, 84:21, 87:12, 88:16, 91:5, 97:6, 115:25, 116:5, 118:12, 119:5, 119:10
**importantly** [4] - 26:4, 46:22, 96:8, 107:9
**impossible** [1] - 71:9
**improve** [1] - 54:12
**improved** [1] - 143:20
**inaccurate** [1] - 90:24
**Inc** [2] - 3:8, 3:9
**INC** [1] - 1:8, 1:8
**incentive** [2] - 146:19, 146:24
**incident** [1] - 151:12
**include** [3] - 11:15, 11:22, 131:17
**included** [1] - 15:24
**includes** [2] - 71:8, 105:24
**including** [4] - 64:17, 87:2, 98:4, 105:9
**income** [2] - 123:8, 124:7
**inconclusive** [2] - 147:20, 149:3
**incorrect** [1] - 149:7
**increases** [1] - 60:7
**incur** [1] - 131:13
**incurable** [1] - 143:10
**incurred** [1] - 131:16
**independent** [13] - 6:23, 12:8, 12:16, 23:22, 24:9, 24:13, 25:14, 32:10, 48:8, 101:13, 101:22, 105:14, 115:24
**independently** [4] - 21:11,

46:14, 98:14, 105:15
**INDEX** [1] - 161:3
**indicate** [7] - 54:13, 77:8, 86:6, 87:19, 93:17, 126:12, 128:12
**indicated** [5] - 79:13, 79:17, 83:22, 106:5, 159:5
**indicates** [4] - 66:6, 98:20, 103:22, 127:22
**indicating** [2] - 126:8, 126:13
**indication** [1] - 50:19
**individual** [4] - 13:4, 26:8, 40:22, 120:20
**individual's** [1] - 74:22
**individuals** [3] - 9:4, 10:20, 104:8
**induces** [1] - 53:15
**industry** [1] - 121:10
**infection** [1] - 50:2
**inference** [1] - 108:8
**influence** [1] - 108:10
**inform** [3] - 26:11, 131:16, 152:24
**information** [26] - 26:13, 26:17, 37:25, 42:4, 42:18, 45:2, 46:9, 47:19, 80:16, 95:6, 95:15, 96:5, 97:24, 98:2, 98:19, 101:14, 101:22, 103:19, 104:3, 104:23, 125:17, 136:8, 140:6, 142:3, 154:6, 154:10
**informed** [3] - 33:11, 49:17, 135:13
**inhibited** [1] - 43:5
**initially** [1] - 49:24
**injured** [4] - 151:3, 156:8, 156:12, 156:14
**injury** [2] - 41:11, 71:12
**inquire** [1] - 154:15
**inquired** [1] - 128:8
**insight** [1] - 90:10
**insomnia** [3] - 44:21, 57:16, 126:15
**instance** [2] - 8:24, 86:17
**instances** [8] - 39:7, 77:5, 124:11, 124:17, 143:16, 143:20, 143:23, 152:17
**instead** [1] - 50:2
**institutions** [1] - 12:21
**instrument** [2] - 63:20, 63:22
**instruments** [2] - 46:25, 141:25
**insurance** [1] - 88:9
**intended** [1] - 141:13
**intense** [1] - 45:23
**intentional** [2] - 19:13, 83:11
**intentionally** [4] - 19:17, 83:22, 83:24, 96:10

**interact** [1] - 27:4
**interest** [2] - 16:8, 22:23
**interested** [6] - 7:25, 34:25, 74:20, 79:2, 79:6, 160:19
**interface** [1] - 8:21
**intermingled** [1] - 125:5
**internal** [2] - 64:7, 65:9
**International** [1] - 8:11
**intervening** [2] - 25:14, 115:24
**interview** [6] - 13:7, 32:3, 32:4, 32:14, 103:23, 131:10
**interviews** [2] - 104:7, 148:12
**intimate** [1] - 69:25
**introduce** [1] - 3:21
**investigate** [2] - 24:8, 52:7
**investigation** [2] - 24:20, 24:21
**investigator** [1] - 71:14
**invoices** [3] - 110:11, 110:17, 119:25
**involve** [2] - 9:2, 124:9
**involved** [14] - 10:4, 11:7, 11:11, 11:15, 12:25, 18:21, 20:21, 21:23, 22:7, 22:12, 60:4, 60:6, 67:3, 112:18
**involvement** [1] - 9:24
**involves** [2] - 80:4, 123:13
**ironic** [1] - 58:12
**irrationally** [1] - 83:5
**irrelevant** [1] - 116:24
**issue** [22] - 6:6, 20:22, 34:14, 34:18, 47:3, 47:7, 49:11, 89:24, 91:11, 99:23, 100:2, 102:5, 114:19
**issues** [7] - 9:22, 20:23, 51:14, 90:7, 92:12, 92:15, 99:22
**issuing** [1] - 117:14
**item** [1] - 74:10
**items** [1] - 30:5
**IV** [3] - 67:7, 67:13, 68:2

# J

**J.P** [3] - 120:13, 120:17, 120:19
**January** [1] - 131:11
**Jersey** [1] - 14:13
**Jew** [8] - 131:25, 132:4, 132:9, 132:14, 132:18, 132:23, 133:5
**Jewish** [8] - 132:2, 132:8, 132:15, 132:20, 132:24, 133:2, 158:19, 159:2
**job** [26] - 6:19, 6:21, 6:25, 15:17, 23:11, 25:9, 47:20, 55:9, 78:6, 78:15, 78:24, 78:25, 79:8, 81:9, 81:11,

82:2, 82:4, 82:5, 115:7, 129:4, 129:14, 151:21, 153:2, 158:19, 158:21, 159:3
**jobs** [1] - 23:10
**joy** [2] - 145:24, 146:11
**Judge** [2] - 92:22, 113:16
**judged** [1] - 89:25
**judges** [2] - 12:9, 12:17
**JULIA** [1] - 160:22
**Julia** [4] - 1:17, 3:18, 160:8, 160:8
**July** [5] - 60:22, 74:17, 86:5, 87:5, 106:20
**jury** [1] - 92:15
**jury's** [1] - 109:3
**justice** [3] - 9:5, 9:6, 13:19

# K

**keep** [2] - 80:24, 120:5
**keeps** [1] - 56:12
**kept** [1] - 96:24
**key** [1] - 21:8
**kid** [1] - 145:12
**kids** [1] - 145:25
**killed** [2] - 151:3, 156:11
**kind** [19] - 17:15, 19:19, 23:11, 31:14, 38:17, 40:9, 40:21, 41:18, 46:3, 49:19, 51:21, 61:21, 64:20, 66:21, 66:24, 71:16, 96:18, 102:11, 125:8
**kinds** [20] - 7:14, 8:15, 11:20, 11:21, 12:5, 17:14, 19:22, 26:5, 26:7, 27:7, 36:3, 37:24, 37:25, 42:18, 72:3, 81:2, 96:11, 97:8, 101:23, 150:2
**Kleinman** [7] - 3:5, 4:11, 93:4, 99:8, 121:14, 159:10, 161:6
**KLEINMAN** [3] - 1:16, 4:5, 160:11
**knew** [2] - 141:20, 150:12
**know** [93] - 11:9, 18:3, 21:20, 24:23, 26:12, 26:13, 28:16, 28:24, 34:19, 35:9, 35:20, 41:12, 42:22, 43:2, 43:9, 44:6, 44:23, 44:25, 45:10, 45:22, 46:21, 48:5, 48:17, 51:18, 52:11, 54:21, 55:6, 56:11, 56:24, 56:25, 57:22, 58:16, 59:10, 59:15, 60:4, 60:15, 66:12, 66:20, 68:16, 71:17, 78:4, 78:20, 79:20, 80:10, 81:18, 81:20, 82:10, 83:16, 83:19, 84:3, 84:4, 84:10, 84:20, 87:8, 87:18, 88:2, 91:22, 100:20, 100:22, 101:2, 101:15, 101:18, 101:19, 102:3,

103:13, 103:18, 105:22,
110:10, 114:23, 118:9,
128:22, 130:25, 136:18,
137:6, 137:11, 137:12,
138:2, 138:14, 138:17,
139:17, 139:20, 141:9,
141:10, 141:11, 150:14,
155:18, 155:20, 155:24,
156:24, 159:4, 159:5
**knowing** [6] - 9:9, 19:14,
44:2, 47:8, 79:7, 91:8
**knowledge** [6] - 51:14,
139:4, 139:25, 140:7, 157:4
**known** [3] - 14:23, 56:17,
150:13
**knows** [3] - 139:17, 139:21,
154:3

## L

**lab** [2] - 59:8, 59:15
**labeled** [1] - 3:3
**labor** [1] - 23:12
**lack** [4] - 73:22, 90:10,
139:3, 147:24
**language** [2] - 53:13,
105:24
**large** [2] - 7:12, 80:2
**largely** [2] - 50:15, 54:12
**last** [5] - 61:16, 61:22, 88:6,
114:12, 142:11
**late** [2] - 51:16, 53:2
**later** [1] - 48:23
**Law** [3] - 4:3, 9:17, 19:3
**law** [13] - 5:8, 8:22, 9:25,
31:17, 31:20, 112:17,
120:16, 120:18, 121:4,
149:16, 157:11, 157:19
**LAW** [1] - 2:4
**lawsuit** [4] - 21:24, 59:21,
59:23, 64:19
**lawyer** [1] - 101:9
**lawyers** [14] - 100:10,
100:16, 101:16, 103:14,
106:24, 107:5, 107:17,
109:11, 109:20, 109:25,
110:6, 113:2, 117:15, 120:6
**layperson** [1] - 89:19
**lays** [1] - 40:21
**leading** [4] - 63:11, 89:12,
90:15, 95:12
**leads** [1] - 154:6
**learn** [8] - 13:18, 24:14,
26:25, 27:2, 27:3, 28:14,
32:6, 35:3
**learned** [5] - 35:9, 55:18,
68:21, 115:20, 150:15
**learning** [2] - 13:3, 35:2
**least** [15] - 19:20, 20:24,
21:10, 38:16, 42:19, 65:23,
80:12, 81:4, 81:5, 91:16,

93:8, 102:14, 126:11,
130:16, 151:13
**leave** [2] - 51:7, 76:19
**lectures** [1] - 14:12
**led** [4] - 95:15, 106:15,
151:11, 151:15
**left** [1] - 47:21
**legal** [2] - 3:17, 8:25
**Lehigh** [1] - 5:17
**length** [1] - 110:23
**less** [10] - 22:22, 64:25,
84:12, 98:22, 129:19,
129:23, 131:22, 137:15,
137:18, 137:23
**level** [17] - 23:13, 27:4,
39:3, 46:23, 58:22, 59:6,
60:7, 75:18, 76:2, 76:9,
79:12, 79:15, 81:11, 89:3,
90:5, 91:15, 151:15
**levels** [1] - 69:7
**licensed** [1] - 16:25
**life** [31] - 8:16, 23:22, 27:23,
27:24, 28:2, 28:4, 28:8,
28:11, 28:19, 32:20, 38:2,
38:14, 40:21, 55:16, 56:23,
66:21, 71:11, 71:16, 71:17,
79:5, 80:23, 98:12, 116:6,
129:14, 129:17, 134:16,
135:23, 139:2, 139:12,
146:4, 146:6
**lifetime** [1] - 38:15
**likely** [4] - 22:22, 41:10,
94:18, 98:16
**likewise** [4] - 107:20, 118:2,
132:13, 142:20
**limitations** [1] - 50:24
**limited** [4] - 68:2, 68:16,
139:4, 157:25
**line** [5] - 41:5, 113:6,
116:23, 118:15, 120:15
**linked** [2] - 157:14, 158:7
**liquidate** [1] - 131:12
**list** [2] - 29:16, 59:13
**listen** [2] - 21:14, 25:10
**listened** [1] - 27:14
**lists** [1] - 48:2
**literally** [2] - 13:5, 92:3
**litigant** [1] - 146:15
**litigants** [2] - 146:25, 147:3
**litigating** [1] - 24:10
**litigation** [27] - 11:8, 20:21,
22:3, 22:6, 22:7, 22:12,
22:15, 22:18, 22:24, 22:25,
23:2, 46:13, 59:18, 60:6,
60:16, 63:21, 64:17, 65:4,
66:16, 76:5, 89:7, 89:16,
94:21, 113:2, 141:8, 141:13,
146:20
**little** [6] - 46:9, 61:7, 88:22,
92:25, 93:8, 93:9
**LIU** [1] - 160:22

**Liu** [3] - 1:17, 3:19, 160:8
**live** [1] - 23:5
**lives** [4] - 23:19, 32:5,
37:24, 39:5
**living** [1] - 56:2
**LLC** [4] - 1:7, 1:7, 3:6, 3:7
**LLP** [1] - 2:10
**logical** [1] - 19:19
**long** [9] - 9:18, 26:24,
68:18, 68:24, 91:24, 109:5,
122:5
**longer** [2] - 67:12, 67:24
**longstanding** [1] - 70:25
**longtime** [1] - 55:8
**look** [18] - 24:18, 29:11,
29:24, 31:5, 31:6, 36:4, 36:5,
47:22, 57:19, 60:25, 70:8,
73:11, 75:2, 84:7, 84:24,
90:9, 102:3, 142:5
**looked** [7] - 27:14, 37:24,
48:6, 97:25, 110:16, 119:25,
141:24
**looking** [9] - 18:15, 25:14,
27:22, 42:3, 68:5, 70:10,
70:24, 71:8, 89:6
**lose** [5] - 53:5, 53:25,
83:20, 84:2, 84:18
**losing** [6] - 78:25, 129:13,
151:21, 152:25, 158:18,
158:21
**loss** [4] - 44:12, 53:14,
83:11, 159:3
**lost** [5] - 54:9, 83:22, 83:24,
87:9, 129:4
**love** [2] - 145:24, 146:11
**low** [1] - 58:22

## M

**M.D** [4] - 1:16, 4:5, 160:11,
161:6
**made** [12] - 21:23, 31:20,
35:7, 67:4, 69:12, 90:25,
115:7, 118:19, 124:24,
125:4, 152:21, 153:25
**magnitude** [3] - 36:21,
71:13, 85:5
**main** [1] - 15:25
**majority** [2] - 108:25, 112:6
**make** [17] - 6:21, 19:15,
20:5, 21:9, 30:11, 31:12,
31:17, 33:7, 42:24, 45:16,
53:19, 61:6, 81:12, 120:9,
130:12, 144:3, 156:10
**makes** [5] - 45:11, 45:14,
58:2, 58:12, 88:15
**makeup** [2] - 68:6, 70:21
**making** [5] - 54:18, 65:13,
90:8, 129:19, 129:23
**malingering** [4] - 19:10,
19:12, 19:13, 20:18

**manager** [1] - 128:23
**managers** [3] - 122:2,
122:10, 122:15
**manifest** [1] - 79:5
**manipulated** [1] - 56:8
**Manual** [1] - 40:18
**many** [20] - 6:22, 7:21,
12:25, 13:21, 15:16, 17:14,
26:3, 32:16, 67:14, 80:12,
93:24, 103:10, 110:8, 111:3,
111:7, 135:20, 135:21,
145:20, 149:25, 154:25
**March** [1] - 128:18
**marked** [1] - 126:23
**marriage** [1] - 160:18
**mask** [3] - 58:6, 58:7, 58:11
**match** [1] - 83:17
**matches** [1] - 91:10
**material** [1] - 128:14
**materials** [1] - 97:15
**matrix** [1] - 61:21
**matter** [16] - 3:5, 6:2, 18:21,
18:22, 24:24, 37:16, 38:17,
84:13, 88:5, 94:6, 100:10,
114:3, 117:6, 121:3, 141:3,
160:19
**matters** [5] - 11:12, 11:13,
11:14, 49:3, 112:7
**may** [15] - 20:3, 20:7, 25:6,
31:6, 38:13, 41:6, 41:24,
70:8, 72:22, 77:16, 77:25,
83:2, 95:2, 126:17, 150:13
**May** [1] - 127:5
**maybe** [26] - 11:2, 20:24,
25:8, 28:14, 28:17, 28:18,
28:21, 35:24, 39:25, 41:3,
41:13, 49:20, 52:25, 54:11,
56:8, 59:5, 61:6, 72:20,
75:19, 78:20, 81:22, 87:7,
92:3, 111:13, 123:5
**MCMI** [14] - 62:12, 67:7,
67:14, 68:2, 68:4, 69:5, 70:3,
70:19, 71:5, 72:3, 72:6,
76:13, 79:14, 85:13
**MCMI-III** [1] - 79:14
**MCMI-IV** [2] - 67:7, 68:2
**MCMI-V** [1] - 62:12
**me** [64] - 4:12, 7:15, 16:13,
20:15, 25:7, 27:15, 27:20,
27:22, 34:21, 35:7, 35:13,
35:15, 35:16, 37:6, 47:2,
48:23, 49:16, 51:17, 54:9,
54:13, 54:15, 56:4, 60:2,
61:4, 61:7, 62:23, 63:14,
63:15, 69:2, 70:15, 73:13,
77:6, 81:25, 82:3, 91:19,
96:9, 104:24, 105:25,
108:11, 109:4, 110:11,
110:14, 112:5, 114:20,
116:14, 121:17, 122:6,
124:14, 125:16, 127:23,

131:16, 133:8, 135:15,
140:12, 149:21, 152:19,
154:6, 154:12, 154:24,
155:22, 156:6, 156:9,
156:21, 160:13
**mean** [21] - 19:12, 20:19,
28:19, 31:11, 33:9, 36:19,
37:3, 40:10, 43:15, 48:20,
51:15, 53:18, 63:19, 85:24,
87:20, 93:10, 95:10, 121:17,
128:25, 150:5, 151:7
  **meaning** [5] - 10:22, 19:14,
27:19, 74:4, 75:24
  **meaningfully** [1] - 98:16
**means** [14] - 6:7, 10:13,
13:15, 36:20, 37:4, 50:24,
57:5, 65:10, 65:11, 72:13,
73:6, 79:21, 80:11, 147:24
  **meant** [2] - 54:17, 130:24
**measure** [14] - 64:8, 64:11,
64:13, 64:16, 66:15, 66:17,
75:15, 75:21, 75:22, 75:25,
76:8, 86:14, 86:19
  **measured** [1] - 76:12
**measures** [2] - 65:2, 68:14
**MEDIA** [1] - 1:8
**media** [16] - 3:3, 33:24,
34:2, 34:11, 40:2, 101:17,
102:2, 102:8, 102:11,
102:17, 102:20, 103:3,
103:6, 103:8, 103:25, 104:5
  **Media** [1] - 3:8
  **Medical** [2] - 5:21, 12:23
**medical** [34] - 4:15, 4:18,
5:12, 5:16, 5:19, 5:20, 6:11,
6:12, 13:2, 13:13, 13:15,
15:8, 15:20, 15:21, 15:23,
44:17, 44:18, 44:19, 46:18,
47:15, 49:19, 56:17, 57:2,
58:19, 85:22, 86:3, 86:7,
86:8, 99:22, 99:23, 100:2,
109:24, 126:25, 148:19
  **medically** [2] - 58:18, 77:10
  **medication** [4] - 16:25,
17:3, 93:18, 100:5
  **medicine** [3] - 33:20, 94:9,
144:4
  **Medicine** [1] - 5:5
  **medicines** [1] - 84:16
  **meet** [4] - 26:10, 72:15,
134:11, 137:19
  **Meeting** [1] - 18:25
  **meeting** [5] - 29:21, 69:20,
134:15, 140:3, 153:3
  **meetings** [3] - 13:9, 96:17,
140:10
  **member** [1] - 14:9
  **members** [1] - 14:3
  **memories** [3] - 43:19,
45:15, 77:3
  **memorized** [1] - 114:24

**memory** [3] - 106:7,
106:21, 114:18
**mental** [61] - 6:2, 6:13, 7:7,
8:7, 8:8, 9:2, 9:24, 15:14,
16:7, 16:23, 18:20, 19:16,
20:2, 20:4, 20:23, 22:10,
22:14, 24:2, 24:4, 26:5,
37:21, 40:11, 42:6, 42:7,
42:23, 43:4, 43:7, 43:8, 44:6,
47:2, 49:2, 57:25, 60:14,
64:10, 65:12, 70:23, 71:4,
73:8, 74:22, 77:24, 78:15,
83:18, 85:22, 97:3, 98:3,
98:4, 104:20, 104:22, 111:9,
125:4, 141:17, 142:8,
145:15, 146:5, 150:16,
150:20, 150:24, 151:18,
154:7, 156:17, 157:7
  **Mental** [1] - 40:18
  **mentally** [1] - 10:2
  **mention** [2] - 70:18, 127:17
  **mentioned** [20] - 8:19, 11:6,
12:19, 14:4, 15:9, 15:20,
27:13, 35:13, 46:9, 47:17,
51:8, 51:11, 51:16, 76:12,
79:6, 87:12, 100:12, 101:3,
106:2, 144:7
  **met** [17] - 26:2, 26:18, 30:8,
32:16, 35:23, 99:15, 125:7,
130:17, 131:3, 131:5, 131:7,
131:9, 134:6, 135:2, 136:4,
136:21, 138:4
  **method** [6] - 9:11, 11:3,
20:14, 21:5, 21:7, 115:19
  **methodology** [5] - 9:10,
20:10, 25:22, 25:25, 140:5
  **midst** [1] - 64:18
  **might** [14] - 20:18, 30:11,
32:9, 44:4, 45:10, 48:9,
49:18, 50:7, 65:19, 75:4,
110:4, 113:11, 133:10,
133:14
  **mild** [8] - 36:17, 38:6,
93:16, 93:17, 97:21, 118:8,
118:10, 118:11
  **mildly** [2] - 94:5, 94:9,
94:18
  **miles** [1] - 23:9
  **military** [1] - 19:24
  **mind** [2] - 50:10, 80:24
  **minds** [1] - 52:4
  **minimize** [2] - 65:19,
103:10
  **minimizing** [1] - 72:2
  **minimum** [1] - 4:19
  **minor** [2] - 74:17, 106:13
  **minutes** [2] - 91:23, 92:4
  **mischaracterization** [1] -
147:23
  **mischaracterizes** [2] -
134:7, 139:24

**misrecalled** [1] - 156:7
**misremember** [1] - 135:6
**misrepresent** [2] - 103:10,
122:21
  **missed** [2] - 35:14, 146:22
  **mission** [2] - 6:14
  **misstating** [1] - 104:19
  **mistake** [1] - 156:10
  **mixed** [1] - 37:12
  **Mode** [1] - 84:25
  **moderate** [2] - 79:15,
110:23
  **moderately** [3] - 88:20,
94:5, 94:10
  **modify** [1] - 85:25
  **moment** [9] - 48:21, 61:4,
65:8, 70:9, 70:16, 76:12,
86:4, 110:12, 154:24
  **moments** [2] - 27:13,
105:13
  **monetary** [1] - 81:13
  **money** [8] - 35:10, 56:13,
78:3, 107:12, 108:9, 108:23,
129:19, 129:23
  **monies** [1] - 131:22
  **month** [2] - 78:25, 134:20
  **months** [3] - 45:12, 77:11,
86:9
  **mood** [1] - 75:10
  **Morgan** [3] - 120:13,
120:17, 120:19
  **morning** [2] - 23:8, 57:13
  **mortgage** [2] - 35:15,
130:12
  **most** [16] - 8:24, 9:22, 18:3,
38:15, 38:20, 39:7, 54:16,
55:19, 80:12, 96:8, 102:24,
112:11, 123:8, 124:6,
128:11, 145:14
  **mother** [5] - 55:25, 56:5,
56:9, 68:24
  **mother's** [2] - 55:23, 56:11
  **motivation** [2] - 84:6, 84:19
  **motivations** [1] - 17:11
  **move** [13] - 66:25, 92:12,
92:17, 99:2, 113:10, 113:11,
116:9, 123:7, 124:22,
128:15, 133:25, 140:23,
142:10
  **moved** [2] - 130:10, 130:18
  **moving** [1] - 120:11
  **MR** [59] - 3:23, 4:2, 4:8,
4:10, 31:9, 31:16, 63:10,
66:25, 85:10, 89:11, 89:13,
90:13, 91:25, 92:5, 92:11,
92:21, 92:23, 92:24, 93:3,
95:3, 95:11, 95:13, 99:2,
99:6, 99:10, 99:12, 104:18,
105:23, 109:7, 109:9, 113:5,
113:8, 113:13, 113:17,
116:22, 118:14, 120:4,

**misrecalled** [1] - 156:7
120:10, 120:14, 121:2,
122:24, 123:2, 128:15,
129:21, 130:14, 132:3,
133:6, 133:25, 139:14,
142:10, 149:9, 149:11,
149:13, 155:11, 155:13,
155:16, 158:11, 159:7, 159:9
  **multiple** [6] - 98:11, 136:10,
136:14, 137:25, 157:22,
158:3
  **Murray** [2] - 118:4, 123:21
  **Murray's** [5] - 118:8, 119:5,
119:10, 119:18, 119:21
  **must** [2] - 40:22, 83:25
  **mute** [1] - 113:7
  **muted** [1] - 95:4
  **myself** [2] - 67:15, 121:9

## N

  **N.G** [1] - 60:23
  **name** [4] - 3:16, 37:8,
112:19, 141:20
  **named** [2] - 112:15, 118:4
  **narrative** [1] - 71:7
  **nature** [3] - 21:2, 63:23,
71:18
  **NB** [2] - 65:10, 66:11
  **near** [1] - 49:22
  **near-death** [1] - 49:22
  **necessarily** [9] - 8:7, 25:10,
40:10, 51:24, 84:15, 102:5,
115:22, 131:18, 136:20
  **necessary** [4] - 21:17,
72:18, 93:18, 115:25
  **need** [9] - 57:22, 59:10,
111:3, 129:9, 129:12, 130:5,
130:9, 131:19, 133:22
  **needed** [2] - 7:9, 73:2
  **needs** [7] - 69:21, 103:11,
145:9, 145:13, 145:23,
146:7, 146:8
  **negative** [5] - 47:11, 65:10,
66:11, 129:15, 131:14
  **negatively** [1] - 27:17
  **negligent** [1] - 11:23
  **neurology** [1] - 16:2
  **Neurology** [1] - 16:5
  **neurosurgical** [1] - 16:12
  **never** [17] - 99:15, 100:16,
101:9, 101:16, 103:14,
134:16, 136:4, 138:4, 141:7,
141:16, 146:13, 150:21,
154:3, 156:24, 157:12,
158:5, 158:14
  **NEW** [3] - 1:2, 160:4, 160:6
  **new** [3] - 24:11, 78:24,
82:21
  **New** [14] - 1:18, 2:7, 2:13,
3:11, 5:4, 6:23, 7:6, 8:10,
9:20, 14:13, 113:23, 160:10

**news** [1] - 60:15
**newspapers** [1] - 38:13
**NEXSTAR** [2] - 1:8, 1:8
**Nexstar** [2] - 3:8
**next** [3] - 57:7, 86:9, 91:23
**nightmare** [1] - 45:12
**nightmares** [7] - 43:20, 44:3, 44:10, 44:16, 44:20, 45:8, 47:11
**No** [1] - 1:5
**no** [81] - 28:17, 31:25, 42:2, 44:2, 44:5, 52:4, 56:6, 63:20, 64:8, 72:25, 80:7, 85:11, 85:19, 93:9, 94:22, 96:13, 99:6, 100:4, 100:8, 100:23, 100:25, 101:12, 101:19, 101:20, 101:21, 103:18, 103:19, 104:5, 104:13, 104:20, 105:22, 106:18, 107:8, 107:23, 108:16, 109:2, 109:4, 114:8, 115:4, 115:16, 116:8, 122:5, 123:15, 123:16, 123:17, 123:18, 124:14, 125:25, 128:20, 128:21, 129:8, 129:17, 130:14, 131:8, 133:21, 133:24, 134:3, 134:4, 134:12, 134:21, 135:3, 135:21, 137:3, 140:22, 140:25, 144:5, 144:11, 146:13, 147:22, 148:3, 149:4, 149:7, 149:9, 151:24, 155:12, 157:5, 158:14, 159:7, 160:18
**none** [2] - 32:21, 102:5
**nonetheless** [1] - 72:6
**nonresponsive** [3] - 123:3, 128:16, 142:11
**nonrestorative** [1] - 57:11
**nonsurgical** [1] - 143:21
**normal** [1] - 59:6
**not-for-profit** [1] - 6:12
**notable** [1] - 77:6
**Notary** [2] - 1:18, 160:9
**note** [7] - 56:16, 71:7, 88:6, 97:5, 126:14, 127:21, 127:22
**noted** [3] - 78:14, 120:8, 159:14
**notes** [26] - 32:22, 33:5, 33:8, 44:11, 52:15, 72:10, 88:17, 96:17, 96:19, 96:24, 97:2, 97:3, 102:4, 126:4, 126:6, 126:7, 126:10, 126:11, 126:13, 128:6, 139:4, 143:3, 154:14, 154:15, 156:7
**nothing** [1] - 37:8
**noticed** [1] - 53:11
**November** [1] - 86:10
**number** [29] - 3:3, 3:11, 7:13, 14:12, 29:14, 36:13,

42:11, 43:11, 43:12, 48:10, 48:15, 48:16, 49:12, 56:17, 62:2, 71:4, 76:14, 78:14, 83:10, 86:23, 97:22, 125:13, 136:16, 136:17, 136:19, 138:14, 155:8, 157:25, 158:21
**numbers** [4] - 29:17, 60:21, 81:10, 82:19
**numerical** [1] - 81:13
**NY** [1] - 2:7
**NYU** [1] - 14:10

## O

**oath** [2] - 123:25, 124:3
**object** [8] - 90:13, 95:12, 109:8, 113:5, 113:7, 116:23, 118:15, 120:5
**objection** [17] - 31:10, 63:10, 85:10, 89:11, 89:12, 95:11, 104:18, 105:23, 113:14, 118:14, 120:14, 121:2, 129:21, 130:14, 132:3, 133:6, 139:14
**objective** [2] - 71:13, 84:21
**objectively** [6] - 41:18, 71:18, 79:15, 82:6, 91:2, 91:7
**obligation** [1] - 24:6
**observation** [2] - 72:18, 75:21
**observations** [8] - 21:22, 21:25, 32:7, 74:10, 74:22, 74:24, 76:7, 86:24
**observed** [1] - 85:21
**obstruction** [1] - 143:18
**obtain** [1] - 26:3
**obvious** [2] - 38:14, 133:23
**obviously** [14] - 15:15, 30:16, 32:5, 34:17, 39:4, 49:11, 50:6, 53:3, 78:6, 90:21, 110:20, 131:19, 142:7, 145:20
**occurred** [4] - 43:10, 43:24, 81:7, 100:21
**OF** [3] - 1:2, 160:4, 160:6
**off** [3] - 71:15, 92:6, 159:13
**office** [5] - 11:24, 12:13, 25:5, 25:6, 59:8
**office's** [1] - 141:14
**offices's** [1] - 126:4
**often** [4] - 10:18, 12:16, 44:23, 50:10
**oftentimes** [1] - 33:16
**old** [2] - 82:22, 119:25
**oldest** [2] - 48:13, 51:10
**once** [6] - 45:12, 45:17, 94:21, 99:2, 131:4, 137:20
**One** [1] - 2:6
**one** [64] - 4:22, 8:10, 9:23,

12:17, 14:2, 20:22, 23:24, 25:13, 32:24, 34:15, 38:16, 41:7, 43:11, 46:24, 48:22, 49:12, 51:9, 52:4, 54:23, 56:18, 56:19, 65:10, 66:9, 71:4, 72:10, 73:13, 75:2, 80:7, 80:9, 81:9, 81:21, 94:22, 97:22, 101:14, 102:14, 103:11, 115:4, 118:12, 119:8, 119:16, 119:17, 125:19, 126:14, 127:2, 127:21, 131:7, 131:10, 134:6, 134:12, 136:16, 139:13, 139:20, 141:9, 141:10, 146:2, 146:5, 147:5, 154:3, 154:4, 156:5, 156:10, 156:11, 158:9
**ones** [1] - 148:20
**online** [1] - 121:15
**only** [13] - 6:14, 6:25, 27:2, 42:22, 44:24, 86:6, 90:14, 91:6, 92:3, 131:3, 131:7, 154:21, 157:24
**open** [4] - 27:18, 88:14, 135:7, 135:18
**open-endedly** [1] - 27:18
**operated** [1] - 16:15
**opine** [4] - 41:22, 41:23, 133:8, 151:22
**opined** [1] - 151:24
**opinion** [23] - 24:7, 30:22, 36:10, 42:5, 42:8, 42:24, 58:17, 73:19, 78:18, 83:14, 90:16, 93:14, 98:3, 104:25, 105:7, 105:18, 108:10, 125:16, 148:2, 154:2, 154:20, 155:9, 158:16
**opinions** [4] - 112:7, 134:5, 155:2, 155:3
**opportunity** [3] - 27:19, 33:2, 154:18
**opposed** [2] - 80:12, 108:11
**optimism** [1] - 54:19
**optimistic** [1] - 52:25
**optional** [1] - 13:16
**order** [2] - 100:17, 101:10
**organization** [1] - 14:22
**otherwise** [1] - 103:20
**out-of-work** [1] - 114:6
**outcome** [2] - 20:8, 53:17, 160:19
**outcomes** [1] - 10:3
**outline** [1] - 10:7
**outright** [1] - 6:9
**outside** [5] - 22:5, 22:14, 76:4, 115:14, 117:19
**overall** [6] - 11:10, 19:7, 36:17, 38:5, 68:6, 97:21
**overstate** [1] - 59:5
**overwhelming** [1] - 77:23

**own** [8] - 17:3, 25:12, 87:3, 105:9, 108:13, 124:24, 141:14, 147:8

## P

**p.m** [2] - 1:11, 159:14
**page** [22] - 29:11, 29:17, 29:25, 30:4, 39:16, 42:11, 47:25, 53:10, 54:25, 59:17, 60:19, 62:2, 73:11, 73:16, 76:15, 83:10, 84:24, 88:25, 126:22, 135:8, 135:11, 135:12
**pages** [4] - 29:8, 36:6, 61:14, 110:22
**paid** [19] - 107:12, 107:14, 107:16, 107:18, 107:21, 107:23, 107:24, 108:3, 108:4, 108:7, 108:11, 108:15, 108:18, 108:22, 108:23, 109:13, 109:19, 119:22, 154:22
**pain** [1] - 75:8
**painful** [1] - 90:25
**panic** [2] - 75:4, 75:7
**papers** [2] - 89:7, 89:16
**paragraph** [2] - 135:8, 135:12
**paraphrasing** [1] - 88:7
**parent** [5] - 34:18, 34:19, 52:14, 52:25, 55:25
**part** [40] - 9:8, 10:5, 13:2, 15:23, 16:10, 16:25, 19:5, 19:7, 20:3, 20:15, 23:15, 25:16, 27:12, 27:21, 28:2, 38:14, 46:10, 48:6, 54:4, 56:25, 59:12, 69:9, 69:16, 72:8, 73:24, 81:10, 81:22, 84:7, 85:13, 98:17, 103:11, 115:25, 122:14, 123:12, 128:10, 128:11, 139:7, 142:12, 155:2, 158:23
**partially** [1] - 86:2
**Participation** [1] - 59:17
**particular** [12] - 16:8, 16:13, 19:15, 26:8, 30:25, 37:7, 42:15, 58:6, 59:2, 63:19, 74:23, 133:18
**particularly** [9] - 17:5, 17:9, 42:18, 44:21, 74:24, 75:14, 97:8, 98:6, 104:21
**parties** [4] - 10:4, 76:7, 87:2, 160:17
**partly** [1] - 104:17
**parts** [5] - 23:24, 27:24, 28:4, 85:8, 97:18
**pass** [1] - 41:4
**passed** [3] - 10:15, 106:19, 134:19
**pathologically** [1] - 77:21

**patients** [3] - 7:15, 16:13, 17:3
**pattern** [1] - 37:7
**patterns** [1] - 70:25
**pauses** [1] - 57:5
**pay** [2] - 7:6, 27:5
**paying** [1] - 78:4
**payments** [3] - 35:15, 77:20, 130:12
**pediatrician** [2] - 52:9, 52:10
**penalties** [2] - 131:13, 131:17
**Penn** [1] - 2:6
**Pennsylvania** [3] - 5:9, 5:18, 5:21
**people** [47] - 6:8, 6:15, 6:20, 7:2, 7:7, 7:13, 7:25, 8:2, 8:4, 8:5, 16:14, 16:15, 16:18, 16:19, 18:19, 19:21, 20:2, 20:3, 20:6, 21:23, 21:24, 24:15, 24:23, 24:24, 24:25, 25:2, 35:11, 35:23, 38:12, 38:16, 38:20, 39:13, 41:12, 57:10, 57:13, 59:22, 66:3, 72:2, 76:11, 76:24, 80:13, 82:7, 82:14, 82:25, 103:9, 145:11, 145:22
**people's** [3] - 16:6, 52:3, 133:17
**per** [2] - 34:25, 111:14
**perceived** [1] - 152:22
**perceives** [2] - 49:9, 90:21
**perceiving** [1] - 71:2
**percent** [1] - 11:10
**percentage** [2] - 7:3, 37:18
**perception** [4] - 41:15, 90:22, 91:9, 91:14
**perfectly** [1] - 59:6
**perform** [2] - 78:15, 91:15
**performance** [8] - 88:24, 89:9, 89:23, 90:7, 90:18, 90:19, 91:3, 91:9
**performed** [2] - 82:4, 90:4
**perhaps** [1] - 78:2
**period** [5] - 33:25, 50:17, 51:5, 76:6, 102:13
**periodically** [1] - 87:14
**permission** [1] - 154:8
**permitted** [2] - 153:8, 153:12
**person** [16] - 22:6, 38:24, 72:19, 80:8, 84:10, 101:6, 103:4, 104:14, 120:23, 132:2, 132:9, 132:15, 132:20, 132:24, 144:12, 154:9
**person's** [2] - 23:22, 88:15
**personal** [1] - 138:21
**personality** [6] - 67:17, 67:20, 68:5, 68:14, 70:20,
70:21
**personally** [2] - 29:20, 147:3
**perspective** [3] - 55:9, 137:17, 137:22
**Philadelphia** [3] - 5:9, 5:22, 16:10
**phobia** [1] - 34:5
**phobias** [1] - 77:5
**phobically** [1] - 77:20
**phone** [1] - 153:20
**phonetic** [1] - 112:15
**PHQ** [1] - 87:4
**PHQ-2** [2] - 75:22, 86:16
**phrase** [1] - 124:19
**physical** [9] - 19:16, 19:22, 33:18, 48:19, 50:5, 50:22, 51:4, 71:12, 108:20
**physically** [3] - 50:25, 79:18, 108:12
**physician** [2] - 4:14, 74:12
**physicians** [2] - 16:24, 144:3
**picked** [1] - 153:20
**picture** [3] - 34:6, 68:21, 82:18
**pirates** [2] - 7:23
**Pirozzi** [2] - 3:17, 3:19
**place** [1] - 80:25
**places** [1] - 34:5
**Plaintiff** [7] - 1:5, 62:7, 92:12, 92:17, 92:20, 99:5, 128:18
**plaintiff** [5] - 2:5, 4:4, 5:25, 141:7, 149:22
**plaintiff's** [2] - 150:9, 155:6
**Plaintiff's** [3] - 61:3, 126:19, 126:20
**play** [1] - 48:9
**playing** [1] - 57:24
**Plaza** [1] - 2:6
**PLLC** [1] - 2:4
**plus** [2] - 66:17, 110:19
**point** [10] - 36:13, 42:10, 54:25, 58:14, 72:19, 78:22, 86:2, 86:23, 87:11, 137:13
**points** [2] - 70:18, 85:18
**portions** [3] - 67:2, 92:18, 99:3
**position** [4] - 44:12, 87:10, 89:8, 90:6
**positive** [5] - 65:14, 65:20, 129:14, 130:12, 131:14
**positively** [1] - 93:22
**possibilities** [1] - 78:7
**possible** [4] - 26:3, 32:14, 77:14, 77:15
**post** [2] - 4:19, 87:22
**postings** [2] - 33:24, 34:2
**posts** [3] - 34:11, 103:25, 104:5

**posttraumatic** [12] - 14:18, 18:10, 18:14, 38:19, 38:21, 40:13, 40:25, 41:21, 49:21, 66:19, 153:15, 153:16
**potential** [14] - 28:8, 56:17, 56:19, 59:13, 107:6, 114:6, 114:15, 115:2, 115:8, 115:11, 115:22, 115:23, 119:5, 119:10
**potentially** [7] - 22:23, 49:17, 137:14, 137:23, 138:25, 146:15, 151:14
**pounds** [2] - 83:25, 84:18
**practice** [6] - 4:15, 4:21, 8:17, 20:13, 123:10, 145:8
**pre** [1] - 79:18
**pre-Covid** [1] - 79:18
**predicted** [1] - 151:13
**premarked** [1] - 126:19
**prepare** [1] - 112:25
**prepared** [1] - 29:9
**preparing** [1] - 111:12
**prescribe** [3] - 16:25, 33:20, 144:2
**prescribed** [2] - 58:4, 143:24
**presence** [17] - 20:4, 21:12, 23:20, 46:7, 46:15, 64:3, 75:3, 75:25, 79:11, 86:12, 87:23, 88:18, 115:22, 126:15, 128:3, 128:12, 147:4
**PRESENT** [1] - 2:17
**present** [12] - 20:18, 20:19, 36:22, 36:23, 45:3, 54:3, 64:5, 74:7, 74:8, 76:13, 86:22, 157:2
**presentation** [3] - 19:16, 72:11, 98:24
**presented** [4] - 21:19, 22:14, 73:8, 73:24
**presenting** [2] - 22:4, 64:10
**presents** [2] - 22:2, 22:10
**pressure** [1] - 57:18
**pretty** [4] - 10:16, 60:3, 60:5, 71:5
**prevents** [1] - 105:25
**primary** [10] - 33:13, 33:15, 33:19, 74:12, 75:16, 76:21, 86:11, 86:13, 142:21, 142:23
**Priscilla** [1] - 112:15
**prison** [1] - 65:17
**private** [2] - 22:12, 88:3
**probably** [8] - 11:10, 22:22, 94:23, 96:7, 98:21, 98:22, 102:24, 110:21
**problem** [20] - 19:18, 21:2, 21:3, 25:7, 34:17, 34:24, 49:10, 51:25, 52:2, 52:19, 52:21, 52:23, 53:4, 53:21, 55:8, 55:10, 55:12, 58:19, 65:22, 71:13

**problematic** [7] - 63:18, 65:6, 66:17, 68:19, 68:25, 116:3, 137:15
**problems** [25] - 7:4, 7:8, 8:2, 19:23, 20:7, 21:12, 21:13, 25:3, 28:21, 32:10, 35:3, 35:5, 35:10, 35:19, 40:24, 49:4, 49:5, 49:6, 49:8, 49:9, 50:5, 54:11, 69:18, 72:3, 83:20
**procedure** [1] - 143:17
**produce** [2] - 57:16, 66:22
**produces** [1] - 38:23
**producing** [1] - 114:2
**production** [2] - 101:17, 103:15
**professional** [13] - 4:12, 5:11, 42:23, 43:4, 43:8, 47:2, 72:18, 96:20, 97:3, 150:17, 150:24, 154:7, 157:8
**professionally** [2] - 7:17, 8:9
**professionals** [3] - 9:24, 142:8, 153:22
**Profile** [1] - 62:16
**profit** [2] - 6:12, 81:12
**prognosis** [4] - 60:8, 60:18, 93:5, 93:12
**program** [8] - 5:3, 5:4, 5:16, 10:14, 13:25, 15:23, 15:24
**programs** [1] - 14:14
**progress** [3] - 96:16, 97:2, 154:14
**progression** [1] - 146:4
**proper** [2] - 9:10
**Properties** [1] - 116:20
**prosecution** [1] - 155:10
**prosecutors** [1] - 12:12
**prospect** [1] - 77:22
**protect** [2] - 151:5, 151:6
**provide** [1] - 152:13
**provided** [4] - 36:11, 62:22, 70:4, 152:2
**Psych** [1] - 127:11
**psychiatric** [17] - 6:15, 7:4, 7:8, 25:17, 26:19, 29:3, 32:4, 47:15, 65:16, 65:17, 72:20, 72:22, 73:2, 75:20, 85:5, 120:22, 125:8
**Psychiatric** [6] - 9:20, 14:23, 15:3, 15:6, 36:7, 40:16
**psychiatrist** [6] - 4:25, 8:20, 25:4, 46:11, 74:20, 133:19
**psychiatrist.org** [1] - 121:19
**psychiatrists** [8] - 8:21, 10:21, 10:23, 14:6, 15:12, 16:4, 16:20, 16:24, 17:5, 17:7, 17:21, 17:22, 18:2,

18:3, 18:5, 24:4, 33:21, 52:3
**Psychiatry** [5] - 9:16, 16:5, 19:2, 51:19, 51:20
**psychiatry** [19] - 4:16, 4:22, 4:23, 5:4, 5:8, 8:22, 8:24, 10:9, 10:11, 10:12, 10:14, 10:17, 13:24, 14:15, 15:11, 15:25, 20:11, 39:10, 115:21
**psychodynamics** [1] - 17:10
**psychological** [26] - 8:14, 12:4, 13:20, 17:11, 17:20, 17:23, 17:25, 18:4, 18:13, 19:8, 24:20, 25:18, 28:20, 46:25, 47:15, 60:22, 62:6, 66:10, 68:6, 69:6, 71:14, 79:14, 91:6, 94:14, 120:20, 125:11
**psychologically** [2] - 78:8, 82:7
**psychologist** [3] - 60:24, 141:3, 141:5
**psychologists** [8] - 15:13, 17:6, 17:12, 17:13, 17:17, 17:24, 18:7, 19:3
**psychology** [6] - 8:22, 15:11, 17:8, 17:17, 17:18, 39:11
**psychotherapy** [4] - 93:25, 94:4, 139:6
**PTSD** [16] - 39:18, 40:12, 41:6, 41:7, 41:17, 49:17, 61:19, 62:23, 63:17, 64:4, 65:7, 66:18, 66:23, 71:6, 71:8, 71:9
**Public** [2] - 1:18, 160:9
**published** [3] - 18:11, 18:23, 40:15
**purpose** [3] - 25:19, 64:14, 66:5
**purposely** [1] - 18:20
**purposes** [2] - 9:8, 113:2
**pushing** [2] - 77:13, 77:17
**put** [6] - 13:11, 31:10, 33:5, 47:7, 82:17, 129:13
**putting** [1] - 20:2

## Q

**qualifications** [2] - 4:13, 5:11
**qualified** [1] - 5:24
**quality** [1] - 91:2
**question** [37] - 12:3, 23:14, 24:3, 37:17, 45:7, 63:4, 63:14, 85:11, 91:6, 95:12, 105:24, 108:6, 108:14, 108:15, 116:23, 123:19, 124:18, 127:20, 129:17, 130:24, 131:20, 133:7, 134:13, 136:18, 137:4,

137:7, 143:8, 146:22, 147:25, 148:4, 152:18, 153:5, 156:6, 157:17, 158:9, 158:12, 158:13
**questioning** [1] - 113:6
**questions** [26] - 9:2, 13:10, 13:11, 23:12, 26:12, 26:14, 46:24, 63:24, 64:2, 72:13, 87:4, 99:7, 108:25, 118:16, 120:15, 122:25, 134:10, 135:25, 149:10, 151:19, 152:4, 153:19, 154:12, 154:19, 155:12, 159:8
**quite** [3] - 81:17, 94:18, 140:20
**quote** [5] - 80:10, 119:16, 122:2, 137:22, 143:19
**quoting** [1] - 156:25

## R

**race** [1] - 132:10
**raises** [1] - 23:12
**range** [1] - 9:22
**rapid** [1] - 75:8
**rather** [1] - 109:2
**rational** [1] - 19:19
**Ray** [1] - 3:24
**Ray-Cone** [1] - 3:24
**reach** [3] - 39:22, 93:4, 125:14
**reached** [1] - 153:6
**reaching** [1] - 83:13
**read** [22] - 26:9, 28:15, 32:17, 38:12, 39:17, 40:2, 50:20, 52:3, 63:7, 66:8, 68:22, 72:9, 90:6, 106:21, 124:20, 127:22, 138:5, 141:22, 141:23, 154:15, 158:12, 158:13
**reading** [4] - 74:21, 89:5, 89:15, 95:20
**real** [5] - 55:5, 65:25, 79:5, 84:20, 87:18
**really** [50] - 6:20, 12:18, 14:3, 20:12, 21:9, 23:3, 23:13, 23:16, 24:2, 24:5, 24:7, 27:10, 28:5, 31:24, 35:25, 37:20, 39:2, 39:9, 41:4, 44:6, 45:11, 45:13, 45:21, 46:11, 50:23, 52:5, 52:13, 53:24, 55:21, 55:24, 56:5, 57:22, 59:14, 60:8, 65:14, 66:18, 68:4, 68:17, 69:5, 69:17, 70:17, 72:6, 72:12, 85:9, 87:17, 87:23, 91:6, 102:24, 130:24, 135:17
**reason** [15] - 33:15, 52:20, 59:13, 72:25, 94:7, 96:14, 100:18, 100:23, 100:25, 101:12, 101:20, 101:21,

103:18, 122:4, 125:25
**reasonable** [5] - 47:14, 53:12, 73:4, 73:6, 104:14
**reasonably** [7] - 12:15, 28:12, 40:20, 41:10, 55:14, 79:22, 88:14
**reasons** [7] - 35:22, 42:13, 89:10, 95:2, 147:6, 152:2, 158:22
**recall** [28] - 30:21, 31:2, 31:4, 102:6, 112:21, 114:5, 114:14, 114:25, 115:4, 115:6, 116:19, 117:7, 117:11, 117:14, 119:15, 119:18, 119:19, 122:9, 123:20, 123:24, 124:6, 124:11, 126:7, 144:12, 146:16, 148:10, 151:2, 156:3
**receive** [1] - 94:20
**received** [7] - 15:5, 30:12, 94:13, 94:14, 94:15, 95:6, 151:18
**receiving** [3] - 95:8, 95:16, 95:21
**recent** [2] - 9:22, 71:3
**recess** [1] - 92:8
**recipient** [1] - 132:12
**recognize** [1] - 33:16
**recognized** [1] - 15:2
**recollection** [5] - 30:13, 106:12, 114:18, 151:4, 157:5
**record** [8] - 31:10, 83:21, 92:7, 92:10, 104:8, 134:25, 159:13, 160:14
**recorded** [3] - 3:4, 135:14, 135:19
**records** [48] - 26:3, 26:6, 26:7, 26:10, 26:11, 26:17, 28:15, 29:18, 31:20, 32:8, 32:18, 33:14, 36:3, 38:3, 44:18, 44:19, 45:4, 45:5, 45:21, 46:19, 47:22, 50:20, 57:2, 59:3, 60:23, 74:21, 77:7, 77:8, 85:23, 86:3, 86:5, 86:7, 86:8, 86:11, 87:8, 87:17, 88:15, 95:20, 102:20, 103:9, 103:15, 103:21, 103:24, 106:22, 110:21, 126:25, 148:15, 148:19
**recover** [1] - 77:11
**recovered** [1] - 50:15
**RECROSS** [1] - 155:15
**RECROSS-EXAMINATION** [1] - 155:15
**rectified** [1] - 89:25
**ReCX** [1] - 161:5
**redirect** [1] - 123:5
**REDIRECT** [1] - 149:12
**ReDX** [1] - 161:5
**refer** [4] - 83:10, 96:23, 121:22, 125:13

**reference** [2] - 67:4, 72:9
**referenced** [5] - 30:17, 32:23, 65:8, 98:25, 126:15
**referrals** [1] - 144:3
**referred** [7] - 7:15, 60:21, 61:25, 62:15, 95:14, 132:18, 132:22
**referring** [7] - 67:7, 95:9, 106:4, 113:22, 120:5, 130:19, 144:13
**refers** [1] - 74:13
**reflect** [9] - 26:4, 33:9, 34:2, 46:19, 75:4, 103:3, 103:7, 107:9
**reflected** [1] - 42:10
**reflection** [2] - 45:25, 144:9
**refreshed** [2] - 57:12, 106:7
**refreshing** [1] - 114:17
**regard** [1] - 6:6
**regarding** [9] - 7:18, 8:14, 16:21, 17:25, 18:12, 47:16, 72:3, 103:21, 104:25
**regions'** [1] - 14:14
**regular** [1] - 43:18
**regularly** [2] - 143:13, 143:14
**reimbursement** [1] - 88:9
**reiterate** [1] - 97:12
**relate** [1] - 101:23
**related** [9] - 15:4, 43:14, 68:14, 74:18, 81:10, 89:9, 90:7, 155:5, 160:17
**relatedly** [1] - 22:8
**relates** [2] - 104:15, 152:17
**Relating** [1] - 85:2
**relating** [1] - 70:25
**relationship** [3] - 68:24, 70:2, 88:13
**relationships** [2] - 69:19, 138:21
**relevance** [2] - 50:4, 55:5
**relevant** [29] - 6:4, 9:14, 34:8, 34:15, 49:15, 50:16, 50:18, 53:6, 55:20, 56:15, 57:18, 58:2, 58:18, 60:8, 60:18, 69:16, 74:8, 74:9, 76:6, 78:8, 78:23, 80:15, 84:5, 91:11, 91:16, 102:13, 128:10, 128:11
**reliable** [17] - 6:5, 9:12, 21:5, 21:6, 21:7, 21:24, 24:7, 42:7, 64:15, 65:4, 66:3, 66:15, 68:15, 68:17, 136:9, 137:15, 137:18
**reliably** [8] - 25:15, 43:9, 44:2, 45:2, 45:22, 91:8, 102:12, 104:24
**rely** [2] - 104:11, 108:17
**remember** [12] - 89:3, 113:25, 114:2, 114:8, 116:18, 118:5, 118:12,

177

147:17, 148:5, 149:18,
152:10, 153:23

**remind** [2] - 78:10, 116:8
**reminding** [1] - 135:15
**reminds** [1] - 45:18
**reminiscent** [1] - 81:5
**REMOTE** [1] - 2:2
**remotely** [3] - 1:17, 3:14,
99:19
**remove** [1] - 143:18
**removed** [2] - 87:16,
144:19
**render** [1] - 104:24
**rendering** [1] - 154:2
**repeat** [5] - 119:8, 137:21,
146:21, 148:4, 157:16
**repeated** [1] - 59:4
**rephrase** [4] - 63:3, 63:14,
95:13, 143:8
**replaying** [1] - 80:24
**report** [61] - 29:2, 29:3,
29:9, 30:17, 31:6, 35:6, 36:5,
39:16, 42:11, 47:25, 62:3,
62:7, 63:22, 66:7, 71:7,
73:12, 76:15, 83:24, 84:25,
103:22, 104:10, 105:9,
105:12, 107:17, 107:19,
110:24, 112:25, 114:2,
114:6, 114:9, 114:11,
114:20, 115:7, 116:11,
116:15, 116:16, 117:14,
117:18, 118:19, 118:23,
124:23, 124:24, 125:12,
127:18, 128:2, 128:11,
128:17, 128:20, 135:8,
135:10, 138:16, 141:21,
141:24, 142:14, 147:16,
147:20, 148:17, 149:2,
151:25, 159:6
**reported** [16] - 1:16, 43:13,
45:7, 52:18, 53:8, 74:2,
76:10, 76:20, 76:21, 79:10,
85:6, 85:15, 85:21, 89:2,
128:19, 158:23
**reporter** [1] - 3:18
**Reporter** [2] - 1:17, 160:8
**reporting** [5] - 44:15, 74:11,
82:12, 87:18, 90:4
**reports** [7] - 21:11, 21:22,
46:14, 86:25, 88:16, 93:20,
111:25
**represent** [10] - 100:15,
101:8, 102:25, 120:2, 120:7,
121:24, 122:6, 122:7, 142:6,
146:9
**representation** [3] -
102:19, 122:4, 149:8
**represented** [2] - 100:21,
133:16
**representing** [9] - 3:25, 4:4,
20:25, 27:7, 65:12, 112:17,

120:17, 120:19, 121:4
**request** [6] - 31:11, 31:12,
31:14, 31:17, 34:12, 102:20
**requested** [6] - 34:13, 87:6,
99:19, 100:12, 101:3, 103:14
**requesting** [2] - 30:21,
31:13
**requests** [1] - 31:19
**require** [1] - 133:19
**required** [4] - 5:2, 41:16,
93:18, 123:15
**requires** [2] - 4:17, 23:11
**research** [5] - 7:18, 64:12,
66:5, 66:8, 66:14
**researched** [1] - 65:23
**researchers** [1] - 66:10
**researching** [1] - 8:14
**resentful** [1] - 69:21
**resentment** [2] - 69:23,
69:24
**residence** [1] - 16:9
**residency** [2] - 15:22, 16:9
**resilience** [1] - 39:12
**resolve** [1] - 94:23
**resolved** [3] - 60:17, 94:21,
150:21
**respect** [14] - 11:5, 18:9,
25:22, 47:18, 47:22, 51:9,
56:21, 60:19, 62:5, 68:8,
70:5, 88:24, 118:16, 152:7
**respectfully** [1] - 111:2
**respond** [2] - 6:8, 93:22
**response** [2] - 151:19,
156:23
**responsibilities** [1] - 16:11
**responsibility** [3] - 10:24,
14:4, 16:17
**responsible** [3] - 16:12,
24:22, 47:13
**responsibly** [2] - 105:4,
105:20
**responsive** [1] - 93:21
**rest** [1] - 11:12
**restorative** [1] - 57:15
**result** [3] - 7:4, 39:19,
151:16
**results** [2] - 59:15, 68:8
**retained** [12] - 11:20, 12:11,
12:14, 106:24, 107:4,
111:17, 111:22, 112:10,
117:5, 118:3, 120:12,
120:16, 120:18, 120:24,
121:3, 149:16, 149:21,
150:4, 150:9, 154:24, 155:6,
158:2
**retention** [1] - 107:9
**retirement** [1] - 131:22
**retrospect** [1] - 106:11,
151:13
**return** [1] - 76:16
**returned** [1] - 78:23

**Reuter** [1] - 112:14
**Reuters** [1] - 112:18
**reveal** [1] - 79:4
**review** [3] - 29:21, 30:7,
103:8
**Review** [1] - 127:6
**reviewed** [27] - 26:16,
29:18, 30:14, 32:8, 38:3,
57:2, 59:3, 62:18, 77:7,
85:17, 85:23, 86:2, 86:7,
109:24, 110:11, 110:20,
119:4, 119:9, 125:13,
125:17, 126:3, 126:5,
126:25, 127:14, 128:5, 140:8
**reviewing** [2] - 70:3, 97:15
**REY** [1] - 2:10
**REY-CONE** [1] - 2:10
**right** [123] - 13:10, 25:8,
25:9, 26:14, 30:18, 56:24,
61:17, 61:24, 62:2, 62:8,
70:12, 85:25, 89:21, 92:24,
95:17, 95:24, 99:16, 99:17,
99:20, 99:24, 100:10,
100:13, 100:24, 101:5,
102:22, 103:5, 104:2,
104:11, 104:16, 105:10,
106:24, 107:7, 107:12,
107:17, 107:22, 108:15,
109:11, 109:14, 110:2,
111:5, 111:20, 112:3, 112:9,
112:15, 113:3, 114:3, 114:7,
117:4, 117:12, 117:16,
117:21, 117:24, 118:20,
118:24, 119:6, 119:11,
119:23, 120:13, 120:21,
120:25, 121:12, 123:9,
123:14, 124:17, 125:15,
125:21, 125:24, 126:23,
126:24, 127:3, 127:15,
129:4, 129:10, 130:7,
130:21, 132:2, 132:7, 132:9,
132:16, 132:20, 132:24,
133:7, 133:15, 134:6,
134:17, 134:21, 135:9,
135:23, 136:5, 136:10,
138:3, 139:13, 141:6,
141:21, 142:4, 142:14,
142:18, 142:22, 143:3,
144:5, 144:19, 144:5, 145:9,
145:13, 145:25, 147:9,
147:16, 148:10, 148:13,
148:16, 148:21, 149:14,
155:19, 156:19, 157:3,
157:9, 157:15, 157:19,
158:7, 159:7, 159:9, 159:12
**rise** [1] - 39:3
**rising** [1] - 151:14
**risk** [1] - 152:15
**role** [3] - 42:20, 49:2, 57:24
**rotating** [1] - 15:24
**rough** [2] - 110:25, 111:11
**routinely** [2] - 28:6, 28:13

**Ruden** [4] - 125:21, 125:23,
126:23, 142:21
**Ruden's** [1] - 126:4
**running** [1] - 23:9

**S**

**sad** [2] - 54:18, 145:16
**sadness** [2] - 36:23, 53:15
**safely** [3] - 122:2, 122:10,
152:24
**safety** [1] - 122:13
**said** [28] - 21:18, 27:25,
36:14, 37:17, 43:16, 44:4,
46:4, 46:7, 46:20, 46:23,
52:10, 60:2, 66:10, 75:2,
83:16, 104:17, 104:20,
107:7, 110:4, 122:17,
124:16, 136:13, 137:20,
137:21, 144:8, 148:21,
150:12, 156:10
**salary** [1] - 130:2
**sales** [2] - 78:15, 80:4
**salesperson** [1] - 80:5
**same** [11] - 49:7, 51:24,
86:14, 94:2, 101:19, 103:17,
108:22, 124:3, 137:11,
153:7, 155:7
**sat** [1] - 108:20
**satisfactorily** [2] - 89:24,
89:25
**saw** [6] - 58:8, 70:5, 87:13,
127:24, 137:24, 150:23
**say** [39] - 16:9, 21:15,
21:16, 22:11, 23:10, 23:13,
23:17, 25:11, 31:11, 34:7,
40:21, 44:17, 45:24, 51:18,
53:10, 54:14, 56:6, 58:21,
65:5, 65:14, 65:15, 65:17,
72:21, 78:19, 79:22, 80:9,
81:25, 95:5, 96:2, 108:10,
110:20, 113:21, 126:16,
128:2, 132:2, 137:5, 153:11,
154:4
**saying** [8] - 22:5, 22:21,
41:2, 43:6, 54:16, 73:5,
124:6, 139:19
**scale** [1] - 134:10
**scales** [5] - 64:8, 65:9,
65:24, 67:25, 71:22
**school** [8] - 4:19, 5:13,
5:20, 13:16, 15:21, 15:23,
63:25
**School** [2] - 5:5, 12:23
**scored** [2] - 75:23, 86:20
**screen** [2] - 75:17, 126:18
**screening** [3] - 75:15,
75:22, 76:8, 86:14, 86:18
**se** [1] - 35:2
**second** [4] - 21:4, 69:16,
73:13, 138:16

178

**secondly** [2] - 50:7, 140:3
**Securities** [4] - 118:3, 120:25, 121:4, 121:6
**security** [2] - 11:23, 12:2
**see** [19] - 21:24, 23:4, 27:23, 27:24, 34:6, 36:13, 40:7, 45:17, 56:2, 57:8, 59:4, 59:24, 74:21, 126:22, 127:6, 127:7, 127:10, 127:23, 132:19
**seeing** [6] - 16:14, 82:25, 91:10, 116:16, 138:12, 150:17
**seeking** [1] - 152:24
**seem** [2] - 65:13, 93:8
**seemed** [1] - 53:13
**seemingly** [2] - 88:3, 88:14
**seen** [2] - 54:10, 150:16
**sees** [1] - 49:8
**self** [7] - 63:22, 68:19, 68:25, 81:19, 81:20, 81:21, 83:5
**self-defeatingly** [1] - 83:5
**self-esteem** [2] - 68:19, 68:25, 81:19, 81:20, 81:21
**self-report** [1] - 63:22
**selling** [1] - 35:17
**seminar** [2] - 19:5, 115:18
**send** [1] - 59:9
**senior** [1] - 16:18
**sense** [7] - 42:17, 57:24, 78:11, 84:19, 87:3, 89:22, 147:13
**sensitive** [1] - 34:14
**sentence** [3] - 39:17, 124:19, 124:20
**separate** [3] - 26:22, 66:2, 111:11
**September** [4] - 1:11, 3:14, 86:17, 161:2
**Serath** [4] - 112:15, 112:21, 112:25, 114:7
**Serath's** [2] - 115:13, 116:11
**serious** [3] - 9:25, 41:11, 71:11
**seriously** [5] - 21:14, 22:19, 151:3, 156:11, 156:13
**serve** [1] - 9:19
**service** [1] - 119:23
**services** [3] - 121:15, 152:7, 152:12
**serving** [1] - 19:23
**session** [8] - 96:19, 96:25, 97:4, 97:6, 139:13, 139:21, 154:14
**sessions** [9] - 136:10, 136:14, 136:25, 137:25, 138:15, 138:18, 138:20, 138:24, 139:5
**set** [4] - 4:8, 13:14, 106:14,

160:12
**sets** [1] - 69:18
**setting** [10] - 22:3, 22:11, 63:9, 63:21, 64:17, 65:4, 66:12, 66:16, 76:5, 81:21
**settings** [1] - 18:17
**seven** [1] - 48:10
**several** [8] - 49:16, 50:4, 97:17, 114:9, 126:13, 136:22, 136:24
**severe** [6] - 38:17, 64:4, 65:13, 74:5, 79:15, 79:24, 83:8, 86:12, 87:24, 87:25, 88:18, 88:20, 94:5, 94:10, 94:19
**severely** [5] - 28:3, 80:13, 82:8, 84:9, 156:8
**severity** [25] - 19:17, 23:17, 28:2, 36:17, 36:21, 37:22, 38:5, 46:8, 46:16, 47:6, 57:14, 65:19, 72:11, 73:22, 73:23, 84:22, 85:15, 91:17, 93:13, 93:16, 93:17, 97:21, 98:19, 98:23, 147:4
**sex** [1] - 135:23
**sexually** [1] - 117:8
**shaped** [1] - 53:16
**share** [2] - 126:18
**sharing** [1] - 114:15
**she** [8] - 32:5, 32:18, 56:12, 63:5, 117:8, 141:6, 141:25, 150:14
**she's** [1] - 138:11
**shifts** [1] - 23:11
**short** [1] - 67:21
**Shorthand** [2] - 1:17, 160:8
**shortness** [1] - 75:7
**should** [16] - 16:9, 40:21, 44:17, 51:18, 52:13, 52:14, 54:14, 72:20, 72:21, 73:5, 84:16, 85:25, 120:9, 151:8, 151:9, 153:11
**shouldn't** [1] - 66:11
**show** [4] - 23:18, 27:11, 45:5, 49:4
**showing** [2] - 27:8, 27:9
**shown** [1] - 65:25
**shows** [2] - 68:18, 90:9
**side** [4] - 11:8, 12:7, 12:17, 14:20
**sides** [2] - 12:18, 59:23
**significance** [1] - 83:13
**significant** [11] - 26:16, 51:5, 52:19, 53:4, 75:5, 77:12, 80:17, 85:21, 123:12, 124:8, 158:23
**significantly** [5] - 43:7, 75:12, 78:21, 129:19, 143:20
**signs** [1] - 79:3
**similar** [3] - 71:12, 112:20, 118:22

**simple** [3] - 81:24, 82:21, 137:3
**simplistic** [1] - 82:17
**simply** [4] - 6:7, 66:10, 71:15, 72:14
**since** [7] - 13:22, 13:25, 24:12, 45:3, 66:7, 102:14, 157:8
**single** [1] - 127:21
**sit** [4] - 13:5, 102:7, 121:8, 141:10
**sitting** [3] - 81:23, 113:24, 117:11
**situation** [1] - 49:14
**situations** [2] - 116:5, 133:18
**six** [1] - 5:15
**six-year** [1] - 5:15
**slashed** [1] - 130:2
**sleep** [24] - 56:18, 56:21, 57:4, 57:6, 57:10, 57:12, 57:13, 57:15, 57:16, 57:20, 57:23, 58:5, 58:11, 58:13, 58:14, 143:7, 143:9, 143:13, 143:16, 143:19, 143:25, 144:4
**slight** [1] - 96:15
**smiling** [1] - 34:6
**SMITH** [1] - 2:4
**Smith** [1] - 4:3
**snoring** [1] - 57:9
**social** [26] - 32:15, 32:22, 33:11, 33:24, 33:25, 34:10, 52:15, 52:16, 77:8, 87:13, 88:6, 88:10, 88:17, 101:4, 101:10, 101:17, 102:2, 102:8, 102:11, 102:17, 102:20, 103:3, 103:6, 103:8, 103:25, 104:5
**Society** [1] - 8:11
**Society's** [1] - 9:20
**sole** [1] - 6:13
**solely** [1] - 140:2
**some** [43] - 11:24, 12:19, 19:18, 22:9, 23:11, 26:7, 28:11, 31:5, 31:24, 32:9, 35:11, 36:15, 37:13, 41:10, 42:13, 46:6, 48:13, 50:8, 51:11, 59:22, 64:14, 73:9, 76:11, 77:5, 113:10, 113:12, 114:18, 116:5, 124:10, 124:16, 126:11, 135:22, 136:13, 139:16, 143:2, 143:16, 144:11, 145:7, 150:13, 152:2, 152:17, 158:22
**somebody** [18] - 12:2, 15:16, 22:9, 23:4, 26:10, 27:2, 27:3, 40:8, 65:11, 69:18, 69:20, 72:12, 72:16, 74:3, 97:10, 129:25, 143:24

**somebody's** [2] - 34:3, 34:9
**somehow** [1] - 108:9
**someone** [30] - 20:20, 21:14, 22:2, 22:13, 22:17, 23:6, 23:15, 24:2, 25:4, 27:10, 28:5, 28:14, 34:4, 51:23, 51:25, 57:7, 59:7, 64:9, 64:14, 64:18, 65:15, 66:20, 71:15, 71:23, 88:4, 88:12, 88:13, 90:21, 135:17, 144:8
**someone's** [18] - 16:22, 21:11, 33:18, 37:9, 37:21, 44:24, 46:14, 55:16, 57:6, 68:6, 70:23, 71:4, 79:5, 83:9, 83:18, 116:6, 131:21, 154:6
**something** [21] - 13:16, 31:22, 33:8, 33:10, 39:24, 40:7, 45:18, 53:23, 53:25, 55:12, 63:8, 73:3, 78:10, 106:9, 106:22, 115:14, 121:9, 133:18, 154:4, 155:4, 157:14
**sometime** [1] - 35:17
**sometimes** [20] - 12:13, 13:8, 14:17, 17:24, 20:6, 24:15, 24:16, 32:2, 34:2, 38:12, 69:10, 72:2, 75:16, 98:21, 98:22, 103:3, 147:3, 154:8, 154:9
**somewhere** [1] - 34:7
**son** [18] - 34:22, 34:25, 49:3, 51:19, 52:6, 52:9, 52:11, 52:13, 52:22, 53:2, 53:11, 55:23, 56:2, 56:7, 56:13, 103:15, 146:10, 148:15
**son's** [9] - 35:2, 35:5, 48:14, 48:24, 51:10, 52:21, 52:23, 54:7, 103:24
**soon** [3] - 44:11, 76:16, 77:14
**sophisticated** [1] - 15:13
**sorry** [9] - 63:3, 119:7, 135:11, 140:19, 146:21, 153:13, 157:16, 158:8
**sought** [1] - 76:16
**sounds** [1] - 113:11
**source** [4] - 76:21, 116:5, 143:18
**Sources** [4] - 29:12, 30:2, 60:20, 125:14
**sources** [9] - 29:17, 32:24, 46:8, 125:17, 125:19, 129:10, 133:13, 133:19, 147:24
**Southern** [2] - 3:10, 113:23
**SOUTHERN** [1] - 1:2
**speaking** [7] - 17:19, 64:6, 70:19, 94:8, 109:14, 117:16, 142:9

**spec** [1] - 50:19
**special** [5] - 145:9, 145:13, 145:23, 146:7, 146:8
**specialist** [1] - 3:17
**specialize** [1] - 144:4
**specialty** [2] - 4:16, 123:10
**specific** [11] - 20:14, 26:8, 37:7, 37:8, 58:17, 94:2, 114:8, 119:19, 137:16, 152:17, 154:11
**specifically** [14] - 5:24, 7:15, 9:14, 14:18, 18:2, 18:7, 18:12, 40:20, 43:17, 43:22, 79:17, 98:4, 98:5
**specifics** [1] - 116:18
**speculation** [1] - 139:15
**spend** [1] - 26:25
**spending** [1] - 110:18
**spent** [4] - 26:20, 96:9, 107:18, 109:23
**spoken** [3] - 134:16, 141:16, 157:7
**spouse** [1] - 116:4
**ss** [1] - 160:5
**stability** [1] - 83:12
**staff** [1] - 6:20
**standard** [2] - 20:13, 23:24
**start** [2] - 3:3, 126:21
**started** [9] - 11:19, 13:25, 22:15, 35:13, 49:3, 49:4, 52:6, 102:16, 124:4
**STATE** [1] - 160:4
**State** [4] - 1:18, 6:24, 7:6, 160:9
**state** [26] - 6:2, 9:2, 12:13, 16:23, 18:20, 20:3, 20:23, 22:10, 22:14, 26:5, 37:21, 49:3, 57:25, 60:14, 64:10, 65:12, 70:23, 71:4, 73:8, 74:23, 83:19, 85:22, 107:6, 107:7, 142:18, 146:5
**statements** [1] - 122:18
**states** [3] - 16:7, 121:25, 127:21
**States** [1] - 3:10
**STATES** [1] - 1:2
**Statistical** [1] - 40:17
**stay** [1] - 77:10
**stayed** [1] - 49:7
**STEININGER** [1] - 1:4
**Steininger** [100] - 3:5, 25:23, 26:2, 26:18, 29:22, 30:9, 32:6, 32:8, 32:16, 34:21, 35:4, 35:12, 36:15, 37:17, 39:18, 41:24, 42:25, 43:12, 43:16, 44:3, 45:6, 46:6, 46:20, 47:19, 49:8, 49:15, 49:22, 51:17, 52:5, 52:17, 54:5, 54:9, 55:7, 55:22, 56:4, 57:3, 58:4, 60:2, 60:10, 61:12, 62:24, 63:17,

67:9, 68:9, 68:18, 71:10, 72:25, 73:8, 73:24, 74:16, 75:23, 76:10, 76:22, 77:9, 78:23, 80:3, 80:9, 81:2, 81:18, 81:24, 82:12, 83:21, 84:17, 86:17, 87:9, 87:12, 87:14, 87:21, 88:4, 88:7, 88:23, 89:17, 90:3, 90:17, 93:6, 93:14, 93:19, 94:13, 96:8, 96:18, 97:14, 97:19, 98:10, 98:22, 106:6, 107:13, 110:19, 128:9, 130:17, 133:9, 135:2, 135:13, 136:4, 140:2, 150:16, 151:12, 151:17, 151:21, 158:20
**Steininger's** [6] - 6:2, 32:2, 33:23, 34:16, 46:20, 48:24, 50:14, 52:21, 53:7, 55:23, 55:24, 57:23, 72:8, 74:11, 75:10, 79:8, 83:19, 87:2, 87:20, 89:8, 91:3, 105:16, 140:9, 153:22, 156:5, 156:21
**still** [8] - 7:23, 24:25, 56:5, 77:18, 82:15, 82:22, 108:22, 158:8
**straight** [1] - 5:19
**stranger** [2] - 134:23, 135:18
**street** [2] - 56:3, 134:19
**strenuously** [1] - 115:16
**stress** [25] - 4:22, 6:6, 8:25, 11:19, 14:19, 18:10, 18:14, 32:21, 32:25, 35:11, 36:2, 38:19, 38:21, 40:13, 40:25, 41:21, 49:21, 50:18, 60:17, 66:19, 115:19, 126:12, 153:15, 153:17
**Stress** [2] - 8:12, 9:15
**stressful** [2] - 50:6, 50:21
**stressor** [15] - 28:19, 28:20, 28:22, 38:17, 38:18, 55:19, 55:20, 56:15, 56:23, 59:14, 59:19, 59:21, 115:3, 115:8
**stressors** [21] - 23:22, 24:9, 24:11, 24:12, 25:15, 28:7, 28:8, 28:16, 32:10, 48:8, 54:24, 98:11, 105:14, 114:6, 114:15, 115:11, 115:24, 117:19, 119:5, 119:11
**Stressors** [1] - 48:3
**strike** [9] - 67:2, 92:12, 92:17, 99:3, 113:10, 113:12, 128:15, 133:25, 142:10
**strongly** [1] - 64:21
**struggled** [2] - 68:19, 68:25
**Stuart** [2] - 3:4, 161:6
**STUART** [3] - 1:16, 4:5, 160:11
**student** [1] - 10:19
**students** [4] - 13:2, 13:5, 13:14, 15:8

**Studies** [1] - 8:12
**study** [2] - 8:3, 64:12
**subjects** [1] - 18:9
**subsequent** [2] - 74:12, 83:12
**subsequently** [1] - 87:5
**subspecialties** [2] - 4:21, 6:3
**subspecialty** [1] - 123:11
**substance** [2] - 54:25, 55:8
**substantial** [6] - 42:3, 86:21, 98:2, 110:21, 110:24, 128:6
**substantially** [1] - 55:13
**suffer** [1] - 149:23
**suffered** [6] - 6:15, 7:8, 7:13, 8:2, 41:25
**suffering** [1] - 85:6
**suffers** [1] - 97:19
**sufficient** [1] - 36:21
**sufficiently** [1] - 45:23
**suggest** [5] - 72:7, 76:13, 76:19, 86:21, 154:11
**suggested** [4] - 32:9, 77:20, 129:11, 130:8
**suggesting** [2] - 72:19, 73:3
**suggestion** [1] - 75:25
**suggestive** [1] - 71:25
**suggestively** [2] - 77:19, 88:20
**suggests** [2] - 47:4, 63:23
**suicide** [1] - 34:10
**suing** [1] - 120:21
**Suite** [2] - 2:6, 2:12
**summaries** [4] - 96:7, 138:6, 141:23, 142:3
**summary** [6] - 5:10, 36:9, 61:10, 73:20, 73:21, 142:5
**Summary** [1] - 61:11
**superficially** [1] - 81:5
**support** [7] - 36:15, 68:16, 76:9, 79:11, 86:20, 125:12, 134:5
**supported** [2] - 155:3, 155:9
**supporting** [1] - 67:23
**supportive** [1] - 46:22
**supports** [1] - 73:18
**surface** [1] - 93:9
**surgeries** [1] - 69:3
**surgery** [14] - 16:16, 32:17, 48:17, 50:3, 50:23, 52:17, 74:14, 74:19, 76:17, 77:12, 87:14, 87:22, 144:21
**surgical** [1] - 143:17
**sworn** [2] - 4:7, 160:13
**symptom** [2] - 72:7, 87:18
**Symptoms** [1] - 127:7
**symptoms** [30] - 23:16, 23:17, 27:8, 27:9, 27:11,

27:24, 28:3, 28:6, 37:5, 43:13, 45:3, 46:8, 46:15, 46:23, 47:6, 58:25, 64:4, 65:20, 74:2, 74:7, 75:3, 75:4, 79:3, 85:15, 93:20, 118:8, 118:10
**system** [6] - 9:5, 9:6, 12:10, 12:15, 13:19, 136:2
**systematically** [2] - 93:22, 94:16

---

## T

**taker** [1] - 72:21
**taught** [3] - 13:2, 18:25, 20:15
**teach** [11] - 9:9, 10:20, 10:24, 12:21, 14:15, 14:18, 14:20, 19:6, 20:16, 23:15, 115:18
**teacher** [1] - 10:20
**teachers** [1] - 14:2
**teaching** [4] - 12:20, 13:13, 15:4, 64:19
**technically** [2] - 64:6, 112:16
**technique** [2] - 20:14, 21:9
**tend** [5] - 18:2, 53:5, 57:15, 57:17, 69:6
**tendency** [2] - 69:11, 69:13
**tends** [5] - 69:23, 69:25, 77:3, 79:24
**tension** [1] - 151:15
**term** [4] - 19:10, 71:22, 121:18, 121:23
**terminate** [4] - 122:3, 122:11, 122:15, 152:20
**terminated** [2] - 89:18, 157:6
**terms** [14] - 9:13, 15:14, 20:8, 42:20, 49:2, 49:13, 51:7, 60:8, 67:24, 68:23, 71:20, 87:17, 97:23, 133:8
**terrible** [10] - 7:14, 7:24, 40:6, 40:7, 40:8, 44:20, 45:15, 60:5, 71:5
**terribly** [1] - 6:9
**test** [26] - 58:21, 59:8, 64:21, 64:22, 64:23, 66:10, 66:24, 67:8, 70:9, 71:14, 71:17, 71:24, 72:9, 72:10, 72:13, 72:15, 72:21, 73:3, 73:7, 75:15, 76:12, 79:14, 119:13, 125:9, 125:11
**tested** [1] - 27:21
**testified** [24] - 4:7, 48:12, 70:6, 85:3, 85:14, 86:4, 88:22, 92:14, 109:16, 111:19, 115:17, 117:3, 117:20, 118:7, 131:9, 141:7, 144:20, 145:3, 155:25,

156:21, 157:12, 157:20, 158:4, 158:5
**testify** [7] - 99:19, 105:13, 108:11, 108:21, 111:12, 157:12, 158:15
**testifying** [6] - 105:11, 116:19, 119:15, 123:13, 124:9, 147:8
**testimony** [28] - 1:15, 67:4, 92:18, 96:7, 99:4, 104:13, 104:19, 106:3, 106:8, 107:21, 107:24, 108:7, 108:13, 108:16, 110:23, 115:17, 117:23, 119:20, 123:20, 124:12, 138:6, 141:22, 144:10, 145:5, 147:11, 154:16, 157:22, 160:14
**testing** [7] - 17:20, 18:4, 18:9, 19:4, 19:8, 67:10, 68:9
**tests** [8] - 17:23, 17:25, 18:5, 18:13, 18:16, 18:18, 72:5, 141:12
**textbook** [1] - 40:15
**THE** [7] - 3:2, 91:19, 92:6, 92:9, 99:9, 159:11, 159:12
**theme** [1] - 18:15
**themselves** [7] - 21:19, 22:4, 79:4, 82:9, 82:16, 84:15, 98:15
**theorize** [1] - 107:5
**theory** [3] - 38:18, 146:19, 155:10
**therapist** [2] - 22:21, 95:23
**therapy** [14] - 93:23, 94:2, 94:3, 94:16, 94:17, 94:20, 95:7, 95:17, 95:21, 96:4, 96:9, 96:13, 97:7
**therefore** [2] - 53:8, 55:18
**they've** [3] - 21:18, 22:20, 152:19
**thinking** [6] - 22:20, 34:10, 50:8, 51:2, 51:4, 60:9
**third** [1] - 46:3
**Thomson** [2] - 112:14, 112:17
**thoughts** [4] - 43:18, 44:16, 45:9, 47:10, 47:12, 80:23, 81:3
**thousand** [1] - 110:22
**threatened** [1] - 71:11
**threatens** [2] - 41:9, 41:10
**threats** [2] - 152:21, 152:22
**three** [7] - 13:8, 42:17, 45:12, 45:13, 70:17, 119:24, 136:19
**threshold** [1] - 41:5
**throughout** [1] - 146:5
**timing** [5] - 35:20, 48:25, 51:12, 53:6, 53:7
**title** [2] - 36:6, 84:25

**today** [14] - 85:17, 99:13, 99:19, 107:22, 108:4, 108:16, 108:19, 109:11, 110:6, 111:12, 113:24, 121:8, 124:3, 147:8
**together** [7] - 13:7, 13:12, 13:23, 37:14, 47:8, 56:6, 82:18
**tolerated** [1] - 143:22
**TOMASCO** [1] - 2:15
**tone** [1] - 132:19
**took** [1] - 124:3
**top** [2] - 81:12, 126:21
**topic** [1] - 33:6
**tormented** [1] - 151:10
**total** [1] - 26:20
**tough** [1] - 10:16
**tragic** [3] - 150:25, 156:2, 157:2
**train** [2] - 6:20, 14:5
**trained** [3] - 17:8, 17:17, 18:6
**training** [16] - 4:18, 5:3, 5:8, 10:14, 10:22, 10:23, 13:24, 14:11, 14:14, 15:8, 15:18, 15:22, 15:24, 17:8, 17:15, 17:20
**transcripts** [1] - 89:6
**transform** [1] - 39:8
**transpired** [1] - 101:24
**transpires** [1] - 96:21
**trau** [1] - 40:4
**Trauma** [1] - 9:15
**trauma** [3] - 7:19, 8:15, 13:20
**traumatic** [12] - 4:22, 6:6, 6:9, 7:14, 8:6, 8:25, 11:19, 40:4, 41:3, 41:13, 41:14, 138:25
**Traumatic** [1] - 8:11
**treat** [3] - 6:14, 6:20, 143:7
**treatable** [1] - 143:10
**treated** [6] - 7:11, 58:15, 138:9, 140:14, 143:14
**treating** [6] - 8:13, 59:7, 64:18, 95:23, 142:17, 154:7
**Treatment** [1] - 61:11
**treatment** [33] - 7:6, 7:7, 9:8, 17:2, 25:5, 25:20, 44:11, 58:5, 58:12, 64:15, 66:14, 94:13, 94:14, 96:19, 96:22, 96:23, 96:25, 97:2, 97:4, 127:21, 127:22, 138:5, 138:15, 139:3, 139:8, 141:23, 142:2, 143:12, 143:21, 143:25, 144:2, 154:14, 156:17
**trial** [1] - 1:16
**Trial** [1] - 28:25
**TRIBUNE** [1] - 1:7
**Tribune** [1] - 3:6

**tried** [2] - 55:16, 113:6
**trigger** [1] - 77:3
**triggering** [1] - 77:23
**trouble** [1] - 82:9
**true** [8] - 25:11, 77:16, 108:8, 137:6, 142:7, 150:8, 150:10, 160:14
**truly** [2] - 40:4, 110:16
**truth** [3] - 24:24, 24:25, 44:24
**try** [6] - 10:2, 26:9, 28:16, 46:13, 52:24, 83:17
**trying** [3] - 39:11, 39:12, 54:4
**tumor** [3] - 49:25, 144:22, 144:24
**turn** [1] - 99:10
**turned** [1] - 144:23
**twice** [2] - 138:12, 139:22
**two** [27] - 4:21, 5:17, 5:19, 6:3, 13:6, 35:14, 43:12, 52:12, 52:23, 56:17, 59:23, 61:14, 65:8, 77:11, 77:15, 85:8, 96:7, 104:7, 136:17, 138:5, 138:9, 138:12, 139:22, 140:14, 141:25, 150:19, 156:17
**type** [7] - 11:12, 37:10, 41:10, 80:4, 93:19, 94:3, 94:17
**types** [1] - 93:24
**typical** [2] - 60:3, 96:12
**typically** [6] - 18:6, 53:16, 76:24, 93:20, 96:20, 97:5
**TZIANABOS** [1] - 1:7
**Tzianabos** [2] - 3:7, 128:23

## U

**U.S** [1] - 12:12
**UBS** [2] - 118:3, 118:16
**ultimately** [1] - 91:7
**unclear** [2] - 93:9, 144:21
**under** [8] - 39:17, 43:4, 48:2, 62:2, 123:24, 127:6, 127:11, 150:23
**understand** [21] - 17:10, 17:18, 28:17, 34:14, 37:21, 39:11, 39:12, 52:14, 63:7, 63:25, 95:20, 96:21, 104:4, 114:22, 127:19, 129:3, 133:14, 141:4, 144:17, 158:9, 158:18
**understandable** [1] - 83:4
**understanding** [14] - 5:25, 6:7, 17:9, 53:6, 89:17, 89:22, 90:11, 94:12, 96:16, 99:18, 129:2, 129:22, 133:17, 133:20
**understood** [2] - 39:25, 95:19

**unemployment** [1] - 116:2
**unfortunate** [3] - 10:2, 38:14, 49:14
**unfortunately** [7] - 6:19, 11:23, 34:15, 39:6, 58:10, 59:20, 93:7
**unhappy** [1] - 131:23
**United** [1] - 3:9
**UNITED** [1] - 1:2
**University** [5] - 5:5, 5:9, 5:17, 12:23, 34:23
**unless** [2] - 48:23, 154:4
**unlikely** [1] - 55:14
**unrelated** [3] - 23:21, 32:10, 98:12
**unresponsive** [1] - 134:2
**unsafe** [1] - 56:3
**Unspecified** [3] - 36:16, 93:15, 97:19
**unspecified** [1] - 37:3, 37:11
**up** [28] - 13:14, 19:15, 20:5, 23:18, 24:6, 40:19, 43:22, 43:23, 45:9, 51:7, 54:17, 68:23, 69:12, 69:13, 69:18, 72:18, 77:10, 111:10, 114:25, 115:6, 115:11, 120:11, 135:7, 135:18, 138:15, 151:11, 153:20, 155:14
**upset** [9] - 94:25, 151:21, 151:23, 151:25, 152:3, 158:18, 158:20, 158:24, 159:4
**upsetting** [6] - 38:23, 130:4, 130:7, 130:13, 131:23, 132:11
**useful** [5] - 66:2, 66:6, 66:12, 67:19, 68:4
**usefulness** [3] - 18:16, 63:20, 65:24
**uses** [1] - 102:2
**utility** [5] - 18:16, 63:20, 67:17, 67:24, 68:3
**utilized** [2] - 86:14, 104:22

## V

**vacation** [1] - 115:2
**valid** [1] - 63:8
**validity** [3] - 64:7, 65:9, 71:21
**valuable** [1] - 154:17
**value** [1] - 131:21
**varies** [1] - 11:9
**various** [2] - 85:16, 125:17
**vary** [2] - 17:15, 81:20
**varying** [1] - 98:21, 150:2
**varyingly** [1] - 85:4
**Velasquez** [3] - 116:20,

181

117:7, 117:12
**Velasquez's** [1] - 117:24
**verbal** [3] - 43:16, 43:22, 158:25
**verified** [1] - 37:6
**verify** [1] - 47:10
**versa** [1] - 139:18
**version** [2] - 67:13, 67:22
**Version** [1] - 61:20
**versus** [4] - 45:17, 53:21, 54:8, 90:18
**veteran** [1] - 40:5
**via** [1] - 3:14
**vice** [1] - 139:18
**Vicki** [3] - 60:24, 61:9, 138:2
**victim** [2] - 6:16, 40:5
**victimization** [1] - 7:5
**victimized** [1] - 7:9
**Victims** [2] - 6:24, 13:18
**victims** [1] - 7:2
**Victor** [1] - 29:2
**video** [2] - 3:4, 3:17
**video-recorded** [1] - 3:4
**videographer** [2] - 2:18, 91:21
**VIDEOGRAPHER** [5] - 3:2, 91:19, 92:6, 92:9, 159:12
**videotaped** [1] - 1:15
**Vietnam** [2] - 7:20, 7:21
**Vietnamese** [1] - 7:20
**view** [3] - 90:17, 90:18, 137:13
**vigorous** [1] - 21:9
**violence** [7] - 10:3, 151:15, 152:8, 152:14, 152:16, 152:22, 153:2
**violent** [2] - 40:6, 40:8
**vision** [1] - 106:13
**visit** [2] - 25:5, 87:13
**visits** [1] - 87:8
**VV** [2] - 28:25, 73:15

## W

**walk** [1] - 111:6
**wants** [2] - 65:15, 80:7
**war** [1] - 40:5
**War** [1] - 7:21
**warn** [1] - 64:21
**warranted** [1] - 36:24
**warrants** [1] - 75:19
**waste** [1] - 109:3
**ways** [11] - 6:7, 15:18, 15:19, 21:20, 27:15, 45:6, 46:6, 49:16, 50:5, 150:2, 152:23
**wear** [2] - 8:18, 58:6
**wearing** [1] - 58:7
**website** [6] - 121:20,

121:21, 121:22, 121:25, 122:10, 152:5
**week** [6] - 13:6, 45:13, 79:19, 79:23, 138:12, 139:22
**week's** [1] - 97:10
**weekly** [2] - 10:25, 115:18
**weight** [5] - 83:11, 83:12, 83:20, 84:3
**welcome** [1] - 99:9
**welfare** [1] - 84:12
**well-being** [1] - 56:11
**what's** [18] - 5:14, 11:22, 15:10, 20:12, 27:4, 27:5, 38:10, 50:13, 56:11, 57:11, 60:12, 62:15, 63:22, 64:7, 77:4, 108:5, 126:19, 127:3
**whatever** [4] - 40:24, 42:8, 82:24, 95:2
**whatsoever** [1] - 102:18
**where** [16] - 5:12, 9:21, 11:23, 12:20, 13:18, 14:10, 18:21, 20:2, 34:7, 34:23, 39:17, 53:10, 80:25, 81:6, 117:2, 127:10
**white** [1] - 14:20
**whole** [5] - 19:15, 35:5, 82:17, 97:25, 98:20
**wife** [10] - 32:2, 35:4, 49:9, 50:21, 51:18, 87:22, 100:13, 100:18, 103:23, 148:12
**willpower** [1] - 84:2
**wise** [1] - 37:18
**withdraw** [2] - 89:14, 119:14
**withdrawn** [1] - 80:8
**witness** [5] - 4:6, 92:13, 92:16, 160:12, 160:15
**WITNESS** [5] - 99:9, 159:11, 161:5
**witness's** [3] - 67:2, 92:18, 99:3
**woman** [2] - 56:10, 112:14
**wondered** [1] - 35:18
**word** [3] - 41:13, 42:21, 146:22
**words** [20] - 18:17, 21:13, 22:2, 22:16, 23:6, 25:2, 38:22, 41:2, 68:21, 70:24, 73:24, 74:5, 75:6, 87:3, 94:17, 98:14, 138:18, 144:13, 154:13, 156:21
**work** [27] - 8:21, 11:6, 11:17, 17:23, 23:9, 53:3, 59:2, 59:9, 76:16, 77:2, 77:22, 78:11, 78:23, 79:23, 80:4, 80:11, 81:4, 81:17, 82:22, 89:2, 109:4, 114:6, 117:9, 123:9, 124:8, 157:18
**worked** [4] - 13:18, 110:8, 111:7, 112:12
**worker** [10] - 32:15, 32:22,

33:11, 52:16, 87:13, 88:6, 88:10, 88:17, 101:4, 101:11
**worker's** [2] - 52:15, 77:8
**working** [5] - 44:13, 79:18, 79:19, 83:3, 83:6
**workplace** [16] - 46:2, 46:21, 47:18, 76:23, 76:25, 77:2, 80:25, 115:15, 116:12, 117:20, 122:12, 152:7, 152:13, 152:16, 157:15, 158:7
**world** [3] - 7:24, 65:25, 84:20
**worried** [3] - 52:2, 75:13, 145:4
**worry** [3] - 50:12, 51:3, 52:6
**worse** [5] - 49:7, 55:12, 69:10, 80:18, 136:21
**worsened** [1] - 24:11
**would've** [1] - 33:4
**WPIX** [14] - 1:7, 3:7, 39:20, 47:21, 47:23, 82:5, 88:24, 89:3, 89:7, 89:25, 129:4, 129:20, 129:23, 151:22
**WPIX's** [1] - 90:18
**write** [3] - 53:14, 97:5, 107:17
**writing** [2] - 44:9, 107:19
**written** [4] - 7:19, 18:8, 111:25, 143:2
**wrote** [7] - 30:16, 32:22, 66:7, 110:23, 141:21, 141:24, 142:14

## Y

**Yaffe** [3] - 125:21, 126:24, 142:21
**Yale** [9] - 34:23, 51:19, 74:16, 83:21, 86:5, 86:15, 87:4, 87:9, 148:17
**year** [12] - 5:15, 10:24, 13:15, 14:5, 14:11, 14:20, 19:6, 20:16, 58:7, 86:9, 102:14, 111:17
**years** [33] - 4:17, 4:18, 4:19, 5:17, 5:19, 6:22, 7:12, 8:17, 10:16, 11:2, 12:24, 12:25, 13:21, 15:9, 15:22, 44:22, 55:11, 114:9, 114:12, 116:17, 119:25, 138:9, 138:13, 139:22, 140:14, 145:8, 150:19, 150:24, 156:17, 156:18, 157:8, 158:2
**yesterday** [1] - 66:8
**YORK** [3] - 1:2, 160:4, 160:6
**York** [13] - 1:18, 2:7, 2:13, 3:11, 5:4, 6:23, 7:6, 8:10, 9:20, 14:13, 113:23, 160:10
**young** [1] - 56:10

**yourself** [6] - 23:14, 29:20, 69:14, 69:15, 124:25, 158:22
**yourselves** [1] - 3:22
**YY** [2] - 62:10, 70:11

## Z

**zero** [1] - 102:5
**Zoom** [1] - 3:14

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

                                                :

BRETT STEININGER,                      :

                                                :

                             Plaintiff,    :           19 Civ. 3644 (PAE)

                                                  :

                       v.                  :

                                                :

TRIBUNE BROADCASTING COMPANY, LLC :
ET AL.,                                 :

                                              :

                         Defendants. :

                                              :

                                              :

------------------------------------------------------------ X

**Jury Charge**
**Draft for Counsel's Review: September 23, 2021**

### TABLE OF CONTENTS

I.   GENERAL INSTRUCTIONS ........................................................................................... 1

   A.   Introductory Remarks ...................................................................................... 1

   B.   Role of the Court............................................................................................ 1

   C.   Role of the Jury .............................................................................................. 2

   D.   Role of Counsel / Objections and Sidebars.................................................... 2

   E.   Sympathy or Bias ........................................................................................... 3

   F.   Burden of Proof.............................................................................................. 3

   G.   What Is and Is Not Evidence .......................................................................... 5

   H.   Direct and Circumstantial Evidence ............................................................... 6

   I.   Witness Credibility ........................................................................................ 7

   J.   Interested Witnesses / Employee Witnesses ................................................... 9

   K.   Expert Witnesses ........................................................................................... 10

   M.   All Available Evidence Need Not Be Produced .............................................. 10

II.   SUBSTANTIVE CHARGES ......................................................................................... 12

   A.   Overview of Plaintiff's Claims ....................................................................... 12

   B.   Claims Under Title VII .................................................................................. 14

      1.   Elements of the Title VII Discriminatory Termination Claim...................... 14

         a.   Summary ................................................................................. 14

         b.   First Element: Member of a Protected Class ............................ 15

         c.   Second Element: Qualified for the Position................................ 15

         d.   Third Element: Adverse Employment Action ........................... 15

         e.   Fourth Element: Religion or Race as Motivating Factor ........... 15

         f.   Defendants' Reasons for the Termination ................................ 17

      2.   Elements of the Title VII Hostile Work Environment Claim ........................... 18

         a.   Summary ................................................................................. 18

         b.   First Element:  Member of a Protected Class ........................... 19

         c.   Second Element:  Unwelcome Harassment That Created a Hostile Work Environment and Altered Work Conditions ........................................ 19

         d.   Third Element: Harassment Based on Race or Religion ............ 20

         e.   Fourth Element: Responsibility of the Defendant ..................... 20

C.    Claims Under Section 1981 ..................................................................... 23

   1.    Elements of a Section 1981 Discriminatory Termination Claim.................................. 23

   2.    Elements of a Section 1981 Hostile Work Environment Claim .................................. 24

   3.    Individual Defendant's Liability Under Section 1981 ................................................. 24

D.    Claims Under the New York State Human Rights Law .................................. 24

   1.    Elements of the NYSHRL Discriminatory Termination Claim.................................... 25

   2.    Elements of the NYSHRL Hostile Work Environment Claim ..................................... 25

   3.    Individual Liability Under the NYSHRL ................................................................... 25

E.    Claims Under the New York City Human Rights Law ................................... 26

   1.    Overview................................................................................................................. 26

   2.    Elements of a NYCHRL Discriminatory Termination Claim..................................... 26

   3.    Elements of a NYCHRL Hostile Work Environment Claim....................................... 27

F.    Damages.................................................................................................. 29

   1.    Overview................................................................................................................. 29

   2.    Categories of Damages ............................................................................................ 29

     a.    Compensatory Damages ................................................................................... 30

      i.    Overview .................................................................................................... 30

      ii.    Back Pay .................................................................................................... 30

      iii.    Front Pay .................................................................................................... 30

      iv.    Back Pay and Front Pay Damages; Plaintiff's Duty to Mitigate........................ 31

     b.    Loss of Unvested Stock Options........................................................................ 32

     c.    401(k) Withdrawal Penalty ............................................................................... 32

     d.    Non-Economic Compensatory Damages.............................................................. 33

     e.    Nominal Damages............................................................................................ 33

     f.    Punitive Damages ........................................................................................... 34

      i.    Punitive Damages Under Section 1981: Defendant Tzianabos **Error! Bookmark not defined.**

      ii.    Punitive Damages Under NYCHRL: Both Defendants ..... **Error! Bookmark not defined.**

      iii.    Calculating and Allocating Punitive Damages.................................................. 35

III.    DELIBERATIONS OF THE JURY ........................................................................... 38

A. Right to See Exhibits and Hear Testimony ........................................................ 38

B. Communication with the Court ...................................................................... 38

C. Notes .......................................................................................................... 39

D. Duty to Deliberate; Unanimous Verdict ......................................................... 39

E. Verdict Form ............................................................................................... 40

F. Duties of Foreperson .................................................................................... 40

G. Return of Verdict ......................................................................................... 40

IV. CONCLUSION.................................................................................................. 41

I.   **General Instructions**

A.   **Introductory Remarks**

Members of the jury, you have now heard all of the evidence in the case, as well as the final arguments of the parties.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in the case.

Now it is time for me to instruct you as to the law that governs the case. There are three parts to these instructions.  First, I'm going to give you some general instructions about your role, and about how you are to decide the facts of the case.  These instructions really would apply to just about any trial.  Second, I'll give you some specific instructions about the legal rules applicable to this particular case.  Third, I'll give you some final instructions about procedure.

Listening to these instructions may not be easy.  It is important, however, that you listen carefully and concentrate.  I ask you for patient cooperation and attention.  You'll notice that I'm reading these instructions from a prepared text.  It would be more lively, no doubt, if I just improvised.  But it's important that I not do that.  The law is made up of words, and those words are very carefully chosen.  So when I tell you the law, it's critical that I use exactly the right words.

You'll have copies of what I'm reading in the jury room to consult, so don't worry if you miss a word or two.  But for now, listen carefully and try to concentrate on what I'm saying.  I will be distributing to you a verdict form in which to record your verdict.  It will list the questions that you must consider, in the order that you should consider them.

B.   **Role of the Court**

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.  With respect to legal

1

matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.  You must not substitute your own notions or opinions of what the law is or ought to be.

### C.   Role of the Jury

As members of the jury, you are the sole and exclusive judges of the facts.  You pass upon the evidence.  You determine the credibility of the witnesses.  You resolve such conflicts as there may be in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Although you are encouraged to use all of your life experiences in analyzing testimony and reaching a fair verdict, you may not communicate any personal professional expertise you might have or other facts not in evidence to the other jurors during deliberations.  You must base your discussions and decisions solely on the evidence presented to you during the trial and that evidence alone.  You may not consider or speculate on matters not in evidence or matters outside the case.

### D.   Role of Counsel / Objections and Sidebars

It is the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible.  It is my job to rule on those objections.  Therefore, why an objection was made or why I ruled on it the way I did is not your concern.  You should draw no inference from the fact that an attorney objected to any evidence.  Nor should you draw any inference from the fact that I might have sustained or overruled an objection.  Simply because I have permitted certain evidence to be introduced does not mean that I have decided on its significance.  That is for you to decide.

From time to time, the lawyers and I had conferences out of your hearing.  These conferences involved procedural and other matters, and none of the events relating to these conferences should enter into your deliberations at all.

Similarly, the personalities and the conduct of counsel in the courtroom are not in any way at issue.  If you formed reactions of any kind to any of the lawyers in the case, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, those reactions should not enter into your deliberations.

### E.     Sympathy or Bias

You are to evaluate the evidence calmly and objectively, without prejudice or sympathy. You are to be completely fair and impartial.  Your verdict must be based solely on the evidence developed at this trial, or the lack of evidence.  The parties in this case are entitled to a trial free from prejudice and bias.  Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

It would be improper for you to consider, in deciding the facts of the case, any personal feelings you may have about the race, national origin, sex or age of any party or any witness, or any other such irrelevant factor.  This case should be decided by you as an action between parties of equal standing in the community, and of equal worth.  Both parties are entitled to the same fair trial at your hands.  Both parties stand equal before the law, and are to be dealt with as equals in this Court.

### F.     Burden of Proof

The plaintiff, Brett Steininger, has the burden of proving all the elements of his claims by a preponderance of the evidence.

What does a "preponderance of the evidence" mean?  To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not the number of witnesses or documents.  In determining whether a claim has been proven by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.

If, after considering all of the testimony, you are satisfied that the plaintiff, the party with the burden of proof, has carried his burden on each essential point of a claim, then you must find in the plaintiff's favor.  If, after such consideration, you find that the evidence produced by the plaintiff is outweighed by the evidence against the plaintiff's position, or that the credible evidence on a given issue is evenly divided between the parties—that it is as equally probable that one side is right as it is that the other side is right—then you must decide that issue against the plaintiff.  That is because the plaintiff, because he bears the burden of proof, must prove more than simple equality of evidence—he must prove the element by a preponderance of the evidence.  On the other hand, the plaintiff need prove no more than a preponderance.  So long as you find that the scales tip, however slightly, in favor of the plaintiff—that what he claims is more likely true than not—then that element will have been proven by a preponderance of the evidence.

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof only in a *criminal* trial. That requirement does not apply to a civil case such as this, and you should put it out of your mind.

### G.     What Is and Is Not Evidence

I want to take a moment to describe to you what is and is not evidence in this case.  As I have said, you may rely only on the evidence in your deliberations.  The evidence in this case is the sworn testimony of the witnesses, and the exhibits received in evidence.  On the other hand, certain things are not evidence.

First, I will describe a list of examples of things that are not evidence:

1.     A question by a lawyer is not to be considered by you as evidence.  It is the witnesses' answers that are evidence, not the questions.  At times, a lawyer may have incorporated into a question a statement which assumed certain facts to be true, and asked the witness if the statement was true.  If the witness denied the truth of a statement, and if there is no direct evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

2.     Similarly, arguments by lawyers are not evidence, because the lawyers are not witnesses.  What they have said in their opening statements was intended, and what they will say to you in their closing statements will be intended, to help you understand the evidence and to reach your verdict.  However, if your recollection of the facts differs from the lawyers' statements, it is your recollection which controls.

3.     Statements that I may have made concerning the evidence do not constitute evidence.  Similarly, at times, I may have admonished a witness or directed a witness to be responsive to questions or to keep his or her voice up.  At times, I may have asked a question myself.  Any questions that I asked, or instructions that I gave, were intended only to clarify the presentation of evidence and to bring out something that I thought might be unclear.  You should draw no inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or any party in the case, by reason of any comment, question, or instruction of mine.  Nor should you infer that I have any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that is before you.  That is entirely your role.

4.     Testimony that has been stricken or excluded is not evidence, and it may not be considered by you in rendering your verdict.

5.     Anything you may have seen or heard outside the courtroom is not evidence.

Now, I will provide you with some things that you may consider as evidence.  As I have said, evidence may come in several forms:

1.   The sworn testimony of witnesses, regardless of who called them, is evidence.  This is true of the witnesses' answers on both direct and cross examination.  However, if certain testimony was received for a limited purpose, you must follow the limiting instructions I have given.

2.   The exhibits that were admitted during the trial are evidence.  Exhibits marked for identification but not admitted are not evidence, nor are materials brought forth only to refresh a witness's recollection.

3.   Prior testimony is evidence.  Such testimony, known as depositions, is produced through a procedure where, prior to trial, the attorneys for one side may question a witness or an adversary under oath.  This is part of what is called pretrial discovery, and each side is entitled to take depositions.  To the extent I admitted excerpts of prior testimony at trial, you may consider the prior testimony of a witness according to the same standards you would use to evaluate the testimony of a witness given at trial.

## H.    Direct and Circumstantial Evidence

Generally, as I told you in my initial instructions, there are two types of evidence that you may consider in reaching your verdict.  One type of evidence is direct evidence.  Direct evidence is testimony by a witness about something she knows by virtue of her own senses—something she has seen, felt, touched, or heard.  For example, if a witness testified that when she left his house this morning, it was raining, that would be direct evidence about the weather.

Circumstantial evidence is evidence from which you may infer the existence of certain facts.  To use the same example I gave you at the start of trial:  Assume that when you came into the courthouse this morning, the sun was shining and it was a nice day.  Assume that the courtroom blinds were drawn and you could not look outside.  As you were sitting here, someone walked in with an umbrella, which was dripping wet.  Then a few minutes later another person entered with a wet raincoat.  Now, you cannot look outside of the courtroom and you cannot see

whether or not it is raining, and no one has testified that it is raining.  So you have no direct

evidence of that fact.  But on the combination of facts that I have asked you to assume, it would

be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence.  You infer on the basis of reason and

experience and common sense from one established fact the existence or non-existence of some

other fact.  Many facts, such as a person's state of mind or intentions, are rarely susceptible of proof

by direct evidence.  Usually, such facts are established by circumstantial evidence.  Where

circumstantial evidence is presented, it is of no less value than direct evidence, for it is a general rule

that the law makes no distinction between direct evidence and circumstantial evidence.

## I.        Witness Credibility

You have had the opportunity to observe the witnesses.  It is now your job to decide how

believable each witness was in his or her testimony.  You are the sole judge of the credibility of

each witness and of the importance of his or her testimony.

In making these judgments, you should carefully scrutinize the testimony of each witness,

the circumstances under which each witness testified, the impression the witness made when

testifying, and any other matter in evidence which may help you decide the truth and the

importance of each witness's testimony.

How do you determine where the truth lies?  You watched each witness testify.

Everything a witness said or did on the witness stand counts in your determination.  How did the

witness impress you?  Did he or she appear to be frank, forthright, and candid?  Or was the

witness evasive and edgy, as if hiding something?  How did the witness appear?  What was his

or her demeanor—that is, his or her carriage, behavior, bearing, manner and appearance while

testifying?  Often it is not what a person says but how he or she says it that moves us.

You should use all the tests for truthfulness that you would use in determining matters of importance to you in your everyday life.  You should consider any bias or hostility the witness may have shown for or against any party as well as any interest the witness has in the outcome of the case.  You should consider the opportunity the witness had to see, hear, and know the things about which he or she testified, the accuracy of his or her memory, his or her candor or lack of candor, his or her intelligence, the reasonableness and probability of his or her testimony and its consistency or lack of consistency and its corroboration or lack of corroboration with other credible testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given, and all of the other evidence in the case.  Always remember that you should use your common sense, your good judgment, and your everyday experiences in life to make your credibility determinations.

If you find that any witness has willfully testified falsely as to any material fact—that is, as to an important matter—the law permits you to disregard the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything.  However, you are not required to consider such a witness as totally "unbelievable."  You may accept so much of the witness's testimony as you deem true and disregard what you feel is false.  By the processes which I have just described, you, as the sole judges of the facts, decide which of the witnesses you will believe, what portion of each witness's testimony you accept, and what weight you will give to it.

On some occasions during this trial, witnesses were asked to explain an apparent inconsistency between testimony offered at this trial and previous statements made by the witness.  It is for you to determine whether a prior statement was inconsistent, and if so, how

much (if any) weight to give to an inconsistent statement in assessing the witness's credibility at trial.

**J.        Interested Witnesses / Employee Witnesses**

In deciding whether to believe a witness, you should take into account any evidence that shows that a witness may benefit in some way from the outcome of the case, such as a financial interest.  Likewise, you should specifically note any evidence of hostility or affection that the witness may have towards one of the parties.  You should also consider any other interest or motive that the witness may have in cooperating with a particular party.

In this case, the plaintiff, Brett Steininger, and a defendant, Christopher Tzianabos, testified before you.  As parties to this action, they are, by definition, interested witnesses.

It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony.  In short, if you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

An interested witness is not necessarily less believable than a disinterested witness.  The mere fact that a witness is interested in the outcome of the case does not mean he or she has not told the truth. It is for you to decide from your observations and applying your common sense and experience and all the other considerations mentioned, whether the possible interest of any witness, or of any party, has intentionally or otherwise colored or distorted his or her testimony. You are not required to believe an interested witness; you may accept as much of his or her testimony as you deem reliable and reject as much as you deem unworthy of acceptance.

Similarly, several witnesses who testified are presently or were previously employed by the corporate defendants, whom I am referring again for short as WPIX.  In the order they have testified, they are Christian Wayland, Michael Schwartz, Nancy Barbosa, and Debbie Presser, via portions of her deposition testimony.  You may consider whether the testimony of these

witnesses was in any way influenced by the fact that they are now, or were previously, employed by WPIX.

**K.      Expert Witnesses**

You will recall that the witnesses Dr. N.G. Berrill, called by the plaintiff, and Dr. Stuart B. Kleinman, called by the defense, testified as experts in the fields of forensic psychology and forensic psychiatry, respectively, and gave their opinions concerning Mr. Steininger's mental state.  When a case involves a matter of science or art, or requires special knowledge or skill not ordinarily possessed by the average person, an expert is permitted to state his or her opinion for the information of the Court and jury.  The opinions stated by each expert who testified before you were based on particular facts, as the expert obtained knowledge of them and testified to them before you, or as the attorney who questioned the expert asked him to assume.  You may reject an expert's opinion if you find the facts to be different from those which formed the basis for the opinion.  You may also reject the opinion if, after careful consideration of all the evidence in the case, expert and other, you disagree with the opinion.  In other words, you are not required to accept an expert's opinion to the exclusion of the facts and circumstances disclosed by other testimony.  Such an opinion is subject to the same rules concerning reliability as the testimony of any other witness.  It is given to assist you in reaching a proper conclusion; it is entitled to such weight as you find the expert's qualifications in the field warrant and must be considered by you, but is not controlling upon your judgment.

**M.      All Available Evidence Need Not Be Produced**

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of

the matters in issue at this trial.  Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in this case.

Each party has had an equal opportunity or lack of opportunity to call any witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what any uncalled witnesses would have testified to had they been called.  The absence of any witnesses should not affect your judgment in any way.

**II.    SUBSTANTIVE CHARGES**

I am now going to instruct you on the substantive law to be applied to Mr. Steininger's

claims in this lawsuit.

**A.    Overview of Plaintiff's Claims**

First, I want to give you an overview of the claims that Mr. Steininger brings in this case.

He brings claims against five defendants.  One of them is Christopher Tzianobos, who was Mr.

Steininger's supervisor at WPIX.  The other are WPIX and three affiliated corporations.  The

parties and I agree that for the purposes of your work, you, the jury, are to treat the corporations

as a single defendant, which I will refer to as WPIX.  You should not concern yourself with

differences or distinctions among these corporations.  So, for your purposes, then, there are two

defendants: Mr. Tzianobos and WPIX.

Mr. Steininger brings claims under four statutes.  Two of them are federal statutes: Title

VII of the Civil Rights Act of 1964, which I will refer to as Title VII, and Section 1981 of Title

42 of the United States Code, which I will refer to as Section 1981.  The third is a state statute,

the New York State Human Rights Law, sometimes called the "NYSHRL."  And the fourth is a

local statute, the New York City Human Rights Law, sometimes called the "NYCHRL."

These statutes all prohibit discrimination in the terms and conditions of employment

based on, among other things, a person's race and/or his religion.  There are similarities among

these laws and I will point out to you where the requirements of certain laws are the same.  But

there are also some differences, as I will draw to your attention.  And so Mr. Steininger's burden

in proving some claims differs from his burden as to others.

I will go through the requirements of the four statutes in the order I have listed them.

Under each statute, Mr. Steininger brings two claims. The first is for discriminatory termination.

He claims that he was terminated based on being Jewish.  I will refer to that as the discriminatory

termination claim.  The second is for harassment, also known as hostile work environment.  He claims that he was subjected to a hostile work environment at WPIX, also based on his being Jewish.  I will refer to that as the hostile work environment claim.  For each statute, I will instruct you first as to the elements of the discriminatory termination claim and then as to the elements of the hostile work environment claim.

As to damages, Mr. Steininger, claims that, as a result of the violations of law that he claims, he was deprived of wages and certain benefits and that he suffered emotional distress. Defendants deny Mr. Steininger's claims.  They assert that Mr. Steininger was not terminated on account of his religion.  And they deny that there was a hostile work environment for Mr. Steininger at WPIX based on his being Jewish.

I'm about to turn to the first of the claims.  I want to emphasize here that, although certain claims are related in ways that I will explain, you must consider each claim and each defendant separately.  With respect to each claim and each defendant, the critical issue is whether Mr. Steininger has proved the elements of the claim you are considering against the defendant you are considering by a preponderance of the evidence.  If you find a defendant liable to Mr. Steininger, you must then decide the amount of damages, if any, for which that defendant is responsible.

.

13

**B.      Claims Under Title VII**

Let's start with Mr. Steininger's claims under Title VII.

Title VII provides, in pertinent part, that it shall be an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or religion." Under Title VII, Judaism is considered both a race and a religion.

A Title VII claim may only be brought against an employer and not against individuals. So, Mr. Steininger's claims under Title VII are brought only against WPIX.  However, you may consider the conduct of the other defendant, Mr. Tzianabos, in determining whether Mr. Steininger has proven his claims under Title VII.

**1.  Elements of the Title VII Discriminatory Termination Claim**

**a.  Summary**

There are four elements that Mr. Steininger is required to prove by a preponderance of the evidence in order to prevail on his Title VII claim for a discriminatory termination based on religion or race.

*First*, that he is a member of a protected class.

*Second*, that he was qualified for the position he held.

*Third*, that he experienced an "adverse employment action," which I'll describe in a moment.

*Fourth*, that his race or religion—here, his being Jewish—was a motivating factor in WPIX's decision to take the adverse employment action.

### b.  First Element: Member of a Protected Class

The parties agree that Mr. Steininger, based on his being Jewish, has satisfied the first

element.  I therefore instruct you that you must find this element satisfied.

### c.  Second Element: Qualified for the Position

The parties agree that Mr. Steininger was qualified for the position from which he was

terminated, that is, as a Sales Manager at WPIX.  I therefore instruct you that you must find this

element satisfied.

### d.  Third Element: Adverse Employment Action

The third element that Mr. Steininger must prove by a preponderance of the evidence is

that he suffered an adverse employment action, one that worked a materially adverse change in

the terms or conditions of employment.  Here, Mr. Steininger claims he suffered one such action:

being terminated.  As a matter of law, a termination is a materially adverse employment action.  I

therefore instruct you that you must find this element satisfied.

### e.  Fourth Element: Religion or Race as Motivating Factor

Finally, Mr. Steininger must prove by a preponderance of the evidence that the adverse

employment action at issue here, his termination, occurred because of discrimination based on

his being Jewish.  When I say "because of," I mean that Mr. Steininger must prove by a

preponderance of the evidence that his Jewish identity was a motivating factor at the time WPIX

undertook the action.  Mr. Steininger need not, however, establish that his Jewish identity was

the sole or principal reason for that decision.

Mr. Steininger may use direct evidence, or indirect or circumstantial evidence, or a

combination of these, to meet his burden.  Again, direct evidence is evidence which, by its very

nature, speaks to the issue sought to be proved.  An example of direct evidence would be a

statement by a person that he intended to make an employment decision on the basis of a person's race or religion.  Mr. Steininger is not required to prove his case by direct evidence, but he may do so.  You should consider any direct evidence along with all of the evidence in the case and determine whether it convinces you, by a preponderance of the evidence, that WPIX was motivated by a race- or religious-based discriminatory purpose.

Mr. Steininger may also prove that WPIX was motivated by discrimination based on Mr. Steininger's Jewish identity by presenting what is called indirect evidence to that effect.  Indirect evidence is evidence which, though it does not speak directly to the issue sought to be proved, provides the basis for an inference with regard to that issue.  Mr. Steininger may use such evidence in attempting to prove to you that WPIX was motivated by a race- or religious-based discriminatory purpose, and, if you believe the evidence establishes that fact, you may use it as the basis for your finding of intent.

Mr. Steininger may also prove that WPIX was motivated by discrimination based on his being Jewish even absent evidence of bias on the part of the ultimate decision maker at WPIX, so long as an individual shown to have the impermissible bias played a meaningful role in the decision-making process.  But just because an individual with an impermissible bias played a role in the decision-making process does not necessarily mean Mr. Steininger's termination was wrongful.  Only if Mr. Steininger has proved that the ultimate decisionmaker *negligently* adopted the bias of another employee with discriminatory animus, and thereby afforded that employee an outsize role in the employment decision, can that biased motivation be imputed to the employer and used to support a claim under Title VII.

16

### f. Defendants' Reasons for the Termination

Defendants contend that WPIX had legitimate reasons for its conduct toward Mr. Steininger.  Specifically, they contend that Mr. Steininger's termination was for reasons independent of bias, specifically, reasons relating to Mr. Steininger's performance in that position.

Mr. Steininger contends that WPIX's explanations for his termination are pretextual, that is, that they are unworthy of belief.  Mr. Steininger further contends that even if those explanations were genuinely held, they were not the only bases on which WPIX made that decision.  Mr. Steininger asserts that a motivating factor for his termination was his Jewish identity.

When you consider these competing claims, you are not to judge the wisdom of WPIX's actions, but instead, to decide whether the reasons it advances were the actual reasons for its actions.  An employer is entitled to make its decisions for good reasons, bad reasons, or for no reason at all, so long as the decision is not motivated by discrimination.

Similarly, absent evidence of bad faith, an employer is entitled to set its own expectations and requirements as to how to organize and staff its workplace and as to the performance expectations for a given position.  You are not to judge WPIX's standards of expected performance or the qualifications it set in good faith.  Rather, you are to examine how it treated Mr. Steininger in light of its legitimate expectations of performance it desired.

If you believe that the reasons WPIX gave for Mr. Steininger's termination are false or incomplete, you may infer, but you are not required to infer, that WPIX acted as it did based on Mr. Steininger's Jewish identity.  Of course, if you find that WPIX's proffered reasons for its assignment decisions were false or incomplete, that does not necessarily mean that its true

motives included the unlawful ones of racial or religious discrimination argued by Mr. Steininger.  You may infer discrimination from the falsity or incompleteness of the employer's explanation, but you are not required to do so.

Ultimately, however, it remains Mr. Steininger's burden to prove that he was a victim of discrimination—that is, that his Jewish identity was a motivating factor in his termination.  If he fails to meet this burden, then you must find in favor of WPIX.

In sum, if you find that Mr. Steininger has established each of the four elements of his employment discrimination claim by a preponderance of the evidence, then you must return a verdict in his favor.  If, however, you find that he has failed to prove one or more of these elements by a preponderance of the evidence, then you must return a verdict for WPIX.

### 2.        Elements of the Title VII Hostile Work Environment Claim

#### a.        Summary

In addition to his discriminatory termination claim, Mr. Steininger has also brought a claim against WPIX under Title VII for hostile work environment.  Title VII prohibits harassment based on race or religion in the form of a hostile work environment.

There are four elements that Mr. Steininger is required to prove by a preponderance of the evidence to prevail on his claim under Title VII for a hostile work environment based on race or religion:

*First*, that he is a member of a protected class;

*Second*, that he was subject to harassment that had the purpose or effect of unreasonably interfering with Mr. Steininger's work performance and creating an intimidating, hostile, or offensive work environment;

*Third*, that the harassment was based on Mr. Steininger's being Jewish;

**Fourth**, that WPIX has responsibility for the acts of harassment in the workplace to which Mr. Steininger was subjected.

I shall now address each of these elements in greater detail.

**b.      First Element:  Member of a Protected Class**

The first element of Mr. Steininger's claim is that he is a member of a protected class.  As discussed earlier, the parties do not dispute that Mr. Steininger has satisfied this element.

**c.      Second Element:  Unwelcome Harassment That Created a Hostile Work Environment and Altered Work Conditions**

The second element that Mr. Steininger must prove by a preponderance of the evidence is that he was subjected to unwelcome harassment that had the purpose or effect of altering his work conditions so as to interfere unreasonably with his work performance and to create an intimidating, hostile, or offensive work environment.  Unwelcome conduct is conduct that Mr. Steininger indicated by his own conduct was unwanted.  Here, Mr. Steininger must prove that he was subjected to harassment that transcended coarse, rude, or boorish behavior.  He must prove more than the existence of isolated or trivial remarks.  A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of Mr. Steininger's employment.

Although Mr. Steininger need not prove that he suffered tangible psychological injury or the loss of a tangible job benefit, he must show that he perceived the work environment to be hostile or abusive, in the way I have described, and also that a reasonable person would have found his work environment to be hostile or abusive.  You must also find that a reasonable person of Mr. Steininger's background would also have found the working conditions to constitute a hostile work environment.  In other words, it is not enough for you to find that Mr. Steininger felt subjectively intimidated.  You must also find that a reasonable person in his

19

position would have felt that his workplace was such an environment. As a consequence, when considering this claim, you may only consider evidence of conduct—either toward himself or others—of which Mr. Steininger was aware.

Mr. Steininger can show that his discriminatory work environment was hostile in two ways: he may show either that a single incident of harassment or intimidation was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of his working environment. I remind you, however, that the offensive conduct must have been severe and pervasive and cannot have consisted of trivial or isolated remarks and incidents. In determining whether the conduct complained of was sufficiently severe and pervasive to have created a hostile work environment at Mr. Steininger's workplace, you should consider the totality of the circumstances. The circumstances may include the frequency of the discriminatory conduct, the severity of the conduct, whether it was physically threatening or humiliating, the effect on Mr. Steininger's psychological well-being, and whether it unreasonably interfered with Mr. Steininger's work performance. No single factor, however, is required.

### d.  Third Element: Harassment Based on Race or Religion

The third element that Mr. Steininger must prove by a preponderance of the evidence is that the harassment was based on his being Jewish. If an environment is equally abusive to all employees, or if the harassment was not directed toward Jewish individuals in a way that permits you to find that it was "based on race or religion," then this element has not been satisfied.

### e.  Fourth Element: Responsibility of the Defendant

The final element that Mr. Steininger must prove by a preponderance of the evidence is that WPIX had responsibility for the acts of harassment in the workplace to which Mr. Steininger

was subjected.  Under Title VII, an employer such as WPIX can be responsible for harassment committed by its employees; whether an employer is liable for such conduct depends on the status of the harasser.  For purposes of this case, in which Mr. Steininger alleges harassing behavior by one person, Mr. Tzianabos, the standards that govern harassment by supervisors are the ones that are relevant.

An employee qualifies as a supervisor within the meaning of Title VII if he or she is empowered to take tangible employment actions against the particular employee who is claiming to be the victim of harassment.  A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  If you find that the harasser was Mr. Steininger's supervisor within the meaning of Title VII, you must then determine whether he or she engaged in harassment that culminated in a tangible employment action.  If you find that there was harassment that culminated in a tangible employment action against Mr. Steininger, then WPIX would be strictly liable for any acts of religious or racial harassment committed by the harasser against Mr. Steininger.  You may consider whether the harasser played an outsized role in the termination, even if he himself was not the ultimate decisionmaker.

If you find, however, that the harasser was Mr. Steininger's supervisor within the meaning of Title VII, but the harassment did not culminate in a tangible employment action, then WPIX may still be liable for such harassment.  But, in this circumstance WPIX can avoid liability by proving a defense.  WPIX would not be liable if it proved, by a preponderance of the evidence, that (i) it exercised reasonable care to prevent and correct any harassing behavior and

(ii) Mr. Steininger unreasonably failed to take advantage of the preventive or corrective opportunities that it provided.

You may consider, as to the first prong of this defense, whether WPIX had promulgated an effective policy against harassment based on race or religion in the workplace; whether that policy was fully communicated to its employees; and whether that policy provided a reasonable avenue for Mr. Steininger to make a complaint to higher management.  You may also consider the level of the employer's demonstrated commitment to adhere to its policy. For example, an employer does not exercise reasonable care when its practice indicates tolerance toward harassment or discrimination, even if it has a policy that states otherwise.  As to the second prong, you may consider whether there was a procedure in place by which Mr. Steininger could have complained about harassment based on his race or religion; whether Mr. Steininger made use of that procedure; and, if not, whether it was unreasonable for him not to have done so.

In sum, if you find that Mr. Steininger has established each of the four elements of a hostile work environment claim by a preponderance of the evidence, then you must return a verdict in his favor.  If, however, you find that he has failed to prove one or more of these elements by a preponderance of the evidence, then you must return a verdict for WPIX.

### C.        Claims Under Section 1981

Let's turn next to Mr. Steininger's claims under Section 1981.  Section 1981 guarantees each person, regardless of race, freedom from discrimination in the making and enforcing of contracts.  Under the statute, "mak[ing] and enforc[ing] contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  Under Section 1981, Judaism is a race.  Unlike under Title VII, under Section 1981, individuals as well as employers can be liable.  And so, Mr. Steininger's claims under Section 1981, which are, again, for discriminatory termination and for a hostile work environment, are brought against both WPIX and Mr. Tzianabos.

### 1.        Elements of a Section 1981 Discriminatory Termination Claim

Generally speaking, the four elements of a claim for discriminatory termination under Section 1981 are the same as the four elements of a claim under Title VII.  You may therefore use the same analysis that you used in analyzing Mr. Steininger's discriminatory termination under Title VII.

There is, however, an important difference between Mr. Steininger's Title VII and Section 1981 claims.  It relates to the fourth element.  Specifically, Section 1981 has a different standard for causation.  Under Title VII, you may find WPIX liable if—in addition to finding first three elements proven—Mr. Steininger's Jewish identity was a *motivating factor* in the decision to terminate him.  Under Section 1981, however, you must find that Mr. Steininger's Jewish identity was the *but-for cause* of the termination.  That means that you must find that, were it not for Mr. Steininger's Jewish identity, the defendants would have acted differently, and he would not have been terminated.

### 2.    Elements of a Section 1981 Hostile Work Environment Claim

Mr. Steininger has also brought a claim for hostile work environment under Section 1981.  Generally speaking, the elements of such a claim track those under Title VII, and you therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII hostile work environment claims.

### 3.    Individual Defendant's Liability Under Section 1981

As I mentioned, unlike under Title VII, both corporations and individuals can be liable for violations of Section 1981.  However, to find an individual defendant, here Mr. Tzianabos, liable for a violation of Section 1981 violation, Mr. Steininger must demonstrate an affirmative link that causally connects Mr. Tzianabos to the discriminatory conduct at issue—the discriminatory termination or the hostile work environment.  In other words, an individual cannot be held liable under Section 1981 solely by virtue of his or her position as a supervisor.  Rather, to find Mr. Tzianabos liable in his individual capacity under Section 1981, you must find that Mr. Tzianabos personally caused the discriminatory conduct.  You may find that that Mr. Tzianabos personally caused the discriminatory action if you find one of the following: (i) he directly participated in the discriminatory act; (ii) he failed to remedy the wrong after learning of it; (iii) he created or maintained a policy under which unconstitutional acts occurred; (iv) he was grossly negligent in managing subordinates who committed the unconstitutional acts; or (v) he was deliberately indifferent by failing to act on information indicating that unconstitutional acts were occurring

### D.    Claims Under the New York State Human Rights Law

Let's turn next to Mr. Steininger's claims under the New York State Human Rights Law, or NYSHRL.  That law provides in relevant part that:

> It shall be an unlawfully discriminatory practice for an employer …
> because of an individual's … race [or] national origin … to
> discriminate against such individual in compensation or in terms,
> conditions, or privileges of employment.

Mr. Steininger brings claims under the NYSHRL against both WPIX and Mr. Tzianabos

### 1.     Elements of the NYSHRL Discriminatory Termination Claim

Generally speaking, the elements of a claim for discriminatory termination under the NYSHRL track the elements of a claim under Title VII, and you may therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII discriminatory termination claim.

### 2.     Elements of the NYSHRL Hostile Work Environment Claim

Generally speaking, the elements of a claim for hostile work environment under the NYHSRL track the elements under Title VII, and you may therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII hostile work environment claim.

### 3.     Individual Defendant's Liability Under the NYSHRL

Like Section 1981, the NYSHRL has more expansive liability than Title VII.  In addition to allowing an employer such as WPIX to be found liable for employment discrimination, there are circumstances in which an individual employee such as Mr. Tzianabos may be found liable. Specifically, if you find either that Mr. Tzianabos had an ownership interest in WPIX, or that he had had the power to do more than carry out personnel decisions made by others, and if you find that Mr. Steininger has proved the other elements of an NYSHRL claim (whether for discriminatory termination or hostile work environment) as to Mr. Tzianabos, then you are to find Mr. Tzianabos individually liable for that claim.

### E.       Claims Under the New York City Human Rights Law

#### 1.       Overview

Let's turn finally to Mr. Steininger's claims under the New York City Human Rights

Law.  It provides that:

> It shall be an unlawful discriminatory practice . . . [f]or an employer
> or employee or agent thereof  … because of the actual or perceived
> … race [or] national origin … or alienage … of any person, to …
> discriminate against such person in compensation or in terms,
> conditions, or privileges of employment.

Mr. Steininger brings two claims under that law.  These claim, respectively, discriminatory

termination and a hostile work environment, again, both based on his being Jewish.

A claim under the NYCHRL has different elements from the federal and state law claims

that I have previously reviewed.  To prevail on an NYCHRL claim of either kind, Mr. Steininger

must prove the following two elements, each by a preponderance of the evidence:

*First*, that he was subjected to differential treatment—*i.e.*, that he was treated less well

than other employees—because of his Jewish identity; and

*Second*, that the defendant you are considering is responsible for that discriminatory

conduct.

#### 2.       Elements of a NYCHRL Discriminatory Termination Claim

Generally speaking, the elements of a claim for discriminatory termination under the

NYCHRL are the same as the elements of a claim under Title VII, including the requirement that

the plaintiff show that race or religion was a motivating factor in his termination.  You may

therefore use the same analysis that you used in analyzing Mr. Steininger's discriminatory

termination under Title VII.  There is, however, one important difference, relating to the

responsibility of the defendant you are considering.

With respect to an individual defendant, like Mr. Tzianabos, the NYCHRL imposes liability where the employee directly participated in the discriminatory conduct.  If Mr. Steininger has proven this by a preponderance of the evidence as to Mr. Tzianabos, this element is established as to Mr. Tzianabos.

With respect to the responsibility of an employer, like WPIX, for the discriminatory acts of an employee, the NYCHRL imposes liability on the employer where (i) the offending employee exercised managerial or supervisory responsibility; (ii) the employer knew of the offending employee's unlawful discriminatory conduct and either acquiesced or failed to take immediate and appropriate corrective action; or (iii) the employer should have known of the conduct yet failed to exercise reasonable diligence to prevent it.  If you find Mr. Steininger has proven his claim of discriminatory termination under the NYCHRL against Mr. Tzianabos, and he has proven one or more of these three situations by a preponderance of the evidence, then this element is established as to WPIX.

### 3.    Elements of a NYCHRL Hostile Work Environment Claim

Generally speaking, the elements of a claim for hostile work environment under the NYCHRL track the elements under Title VII and you must therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII hostile work environment claim.  There are, however, two important differences you must consider.

First, under Title VII, you must find that the harassment the plaintiff suffered was "severe and pervasive" in order to find for him on his hostile work environment claims.  Under the NYCHRL, however, a plaintiff need only prove that he was treated less well than other employees because of his Jewish identity.  If the plaintiff proves this, an affirmative defense is available to the defendant.  The defendant can attempt to establish, by a preponderance of the evidence, that the conduct at issue was nothing more than what a reasonable person would

consider to be petty slights and trivial inconveniences.  That is because the NYCHRL is not a general civility code, and it does not apply in the case of such minor slights and inconveniences. If Mr. Steininger proves that he was treated differently from other employees on account of his Jewish identity, but if the defense then proves that the conduct at issue was nothing more than what a reasonable person would consider to be petty slights and trivial inconveniences, you must return a verdict for the defense.

Second, Mr. Steininger again must prove by a preponderance of the evidence that the defendant you are considering is responsible for his being treated differently on account of his Jewish identity.  The same standards that I reviewed a moment ago apply here as well.  With respect to an individual defendant, like Mr. Tzianabos, the NYCHRL imposes liability where the employee directly participated in the discriminatory conduct.  If Mr. Steininger has proven this by a preponderance of the evidence as to Mr. Tzianabos, this element is established as to Mr. Tzianabos.

With respect to the responsibility of an employer, like WPIX, for the discriminatory acts of an employee, the NYCHRL imposes liability on the employer where (i) the offending employee exercised managerial or supervisory responsibility; (ii) the employer knew of the offending employee's unlawful discriminatory conduct and either acquiesced or failed to take immediate and appropriate corrective action; or (iii) the employer should have known of the conduct yet failed to exercise reasonable diligence to prevent it.  If you find Mr. Steininger has proven his claim of hostile work environment under the NYCHRL against Mr. Tzianabos, and he has proven one or more of these three situations by a preponderance of the evidence, then this element is established as to WPIX.

### F.     Damages

#### 1.     Overview

If you conclude that Mr. Steininger has met his burden of proving liability under one or more of the claims that he asserts, then you must determine the damages, if any, to which he is entitled.  You should not infer that Mr. Steininger is entitled to recover damages merely because I am instructing you on how to calculate damages.  It is exclusively your function to decide upon liability, and I am instructing you on damages only so that you will have guidance should you decide that there is liability and that damages are warranted.

In awarding damages, if you decide to award them, you must be guided by dispassionate common sense.  Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork.  On the other hand, the law does not require a Mr. Steininger to prove the amount of his or her losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.  In all instances, you are to use sound discretion in fixing an award of damages, drawing reasonable inferences where you deem appropriate from the facts and circumstances in evidence.

The verdict form I will give you will assist you in recording the determinations, if any, that you make as to damages.

#### 2.     Categories of Damages

In this case, Mr. Steininger seeks to recover six types of damages: (i) back pay, (ii) front pay, (iii) the loss of his unvested stock options in Tribune Media; (iv) an early withdrawal penalty with respect to his 401(k) account; (v) damages for emotional distress, pain and suffering, humiliation, and mental anguish, and (vi) punitive damages.

### a.  Compensatory Damages

#### i.  Overview

The first five types of damages that Mr. Steininger seeks are known as "compensatory damages," and they are designed to put Mr. Steininger in the same position that he would have been in had there been no violation of his rights.  You may award compensatory damages only for injuries that Mr. Steininger proves were caused by the discriminatory conduct that you have determined was committed by a defendant.  You may not award damages based on speculation. The damages that you award must be fair compensation—no more and no less.

Please note that you may not award compensatory damages more than once to Mr. Steininger for the same injury.  In other words, Mr. Steininger is entitled to be compensated only for injury that he actually suffered—he is entitled only to be made whole, not to recover more than he lost.  Of course, if different injuries are attributed to separate claims, then you must compensate Mr. Steininger fully for all of the injuries.

#### ii.  Back Pay

If you find for Mr. Steininger on any one of his claims for discriminatory termination, then Mr. Steininger is entitled, as compensation, to the back pay that he would have earned had he not been terminated.  This amount consists of the wages, including salary increases and employee benefits, that Mr. Steininger would have obtained from the date of the adverse employment action until the time of trial, and minus any earnings or benefits that Mr. Steininger received from other employment during this time.  Back pay damages, however, are not available on Mr. Steininger's hostile work environment claims.

#### iii.  Front Pay

Additionally, if you find for Mr. Steininger on any of his claims for discriminatory termination, and if you find that Mr. Steininger will be unable to earn in the future what he would have earned at WPIX, then you may award him, as additional compensation, the amount he would have earned from the day of your verdict until either:  (i) the date you believe he would have worked at WPIX absent any discriminatory conduct or (ii) the date you can reasonably predict that he has a reasonable prospect of obtaining comparable employment.  This is called "front pay." You should keep in mind that the goal of back pay and front pay is to make Mr. Steininger "whole"—that is, to put Mr. Steininger in the position he would have been had he not been discriminatorily terminated.

If you find that Mr. Steininger is entitled to an award of front pay, you should state the total dollar amount of that award and indicate the period over which such an award is intended to compensate Mr. Steininger.  In determining the length of time for which front pay will be awarded, if any, you should not unduly speculate as to future events, but are to be guided by the evidence presented at trial, including Mr. Steininger's age, work history, and likelihood of finding comparable employment.  You should not discount this award to its present value.

Again, like back-pay damages, front-pay damages are not available on Mr. Steininger's hostile work environment claims.

### iv.  Back Pay and Front Pay Damages—Plaintiff's Duty to Mitigate

A plaintiff has a duty to mitigate back pay and front pay damages by using reasonable care and diligence in seeking suitable alternative employment.  The burden is on defendants to prove by a preponderance of the evidence that Mr. Steininger has failed in his duty to mitigate. Thus, if you find that Mr. Steininger failed to use reasonable care and diligence and that he could have obtained a job substantially equivalent to the one he left at WPIX, then you should reduce

31

any award of back pay by the amount you find he could have earned from such employment. Similarly, if you find that, in the future, Mr. Steininger will be able to obtain such a job, using reasonable care and diligence, then you should reduce any award of front pay by the amount you find that he will earn through such other employment.

In assessing the reasonableness of Mr. Steininger's efforts to mitigate his damages, you may consider what you have learned about Mr. Steininger's qualifications for employment, the characteristics of the job market, and the quantity and quality of the efforts made by Mr. Steininger to find suitable work. The question whether Mr. Steininger acted reasonably with respect to the mitigation of damages is one for you to decide, as sole judges of the facts. In weighing the evidence, keep in mind that Mr. Steininger was under no obligation to enter another line of work, or to take a demotion or a demeaning job.

Mr. Steininger's failure to make a reasonable effort to minimize damages does not prevent all recovery, but does prevent recovery of such damages as might have been avoided.

### b.    Loss of Unvested Stock Options

If you find for Mr. Steininger on any of his claims for discriminatory termination, you must also consider whether to award him compensatory damages for the loss he claims of unvested stock options valued at $92,565.35. These damages, however, are not available on Mr. Steininger's hostile work environment claims.

### c.    401(k) Withdrawal Penalty

If you find for Mr. Steininger on any of his claims for discriminatory termination, you must also consider whether to award him compensatory damages for the penalties he incurred as a result of having to liquidate a 401(k). The parties agree that these penalties totaled $20,006.87. These damages, however, are not available on Mr. Steininger's hostile work environment claims.

### d.      Non-Economic Compensatory Damages

Mr. Steininger also seeks what I will refer to as "non-economic compensatory damages." These damages are available for both Mr. Steininger's discriminatory termination claims and his hostile work environment claims.  If Mr. Steininger has proved the elements of one or more of his claims, then he may recover, in addition to any back pay or front pay that you award, to compensatory damages for any pain and suffering caused by defendants' unlawful conduct, as well as emotional distress, fear, personal humiliation, and indignation caused by that conduct.

As I noted, compensatory damages may not be based on speculation or sympathy.  They must be based on those injuries that you find Mr. Steininger has proven by a preponderance of the evidence presented at trial, and only on that evidence.  There is no requirement that evidence of the monetary value of such intangible things as pain and suffering be introduced into evidence.  There is no exact standard for fixing the compensation to be awarded for these elements of damages.  Any award you make should be fair in light of the evidence presented at the trial.  In order to recover damages for mental and emotional distress, Mr. Steininger must present credible evidence with respect to the claimed distress.  Psychiatric or other medical treatment is not a precondition to recovery.

That said, you may not simply award damages for *any* injury suffered by Mr. Steininger—you must award damages only for those injuries that were a proximate result of conduct by defendants that violated Mr. Steininger's rights.

### e.      Nominal Damages

If you find, after considering all the evidence presented, that one or more defendants discriminated against Mr. Steininger, but that Mr. Steininger suffered no injury as a result of this violation, you may award Mr. Steininger nominal damages.  Nominal damages are a sum of

money up to $1.  They are awarded as recognition that Mr. Steininger's rights have been violated.  You would award nominal damages if you conclude that the only injury that Mr. Steininger suffered was the deprivation of his rights, without any resulting physical, emotional, or financial damage.

You may also award nominal damages if, upon finding that some injury resulted from a given unlawful act, you find that you are unable to determine monetary damages except by engaging in pure speculation and guessing.

### f.    Punitive Damages

Finally, Mr. Steininger seeks punitive damages.  Punitive damages are available only on Mr. Steininger's claims under the NYCHRL.  Mr. Steininger pursues punitive damages against both WPIX and Mr. Tzianabos on these claims.  If, but only if, you find for Mr. Steininger on such claims, you are permitted but are not required to award punitive damages to him.  You may make an award of punitive damages whether or not you award Mr. Steininger other forms of damages.

### i.    Standard for Awarding Punitive Damages

Punitive damages are awarded, in the discretion of the jury, to punish defendants for wrongful conduct or to deter them and others from similar misconduct in the future.  Punitive damages are intended to protect the community, and to be an expression of the jury's indignation at the misconduct.  Punitive damages may be awarded only after a thoughtful consideration of all of the evidence in the case.  The standard for determining damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

### ii.  Affirmative Defense for Employer

There is an affirmative defense to punitive damages available to an employer such as WPIX under the NYCHRL.  An employer will not be liable for punitive damages if it has made good faith efforts to enforce an antidiscrimination policy.  This defense requires an employer to establish both that it had an antidiscrimination policy and that it made good faith effort to enforce it.  This defense focuses on the employer's state of mind.  It precludes punitive damages unless the employer discriminated in the face of a perceived risk that its actions would violate federal law.

### iii.  Calculating and Allocating Punitive Damages

#### a.  General Standards

If you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them.  In making this decision, you should consider the underlying purpose of punitive damages.  Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future.  Thus, in deciding whether to award punitive damages, you should consider whether the defendant may be adequately punished by an award of actual damages only, or whether actual damages are inadequate to punish the wrongful conduct.  You should also consider whether actual damages, standing alone, are likely to deter or prevent the defendant from similar wrongful conduct in the future, or whether punitive damages are necessary to provide deterrence.  Finally, you should consider whether punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those the defendant committed.

In considering a punitive damages award, if any, as to a defendant, you may consider the defendant's financial resources and the financial impact on him or it of paying any award.

Moreover, punitive damages, if any, must bear a reasonable relationship to Mr. Steininger's actual injury. However, no single numerical equation has been made that easily links punitive to compensatory damages. In determining a reasonable relationship to the actual injury, you must consider all relevant factors. These include:

1. The impact or severity of the defendant's conduct;
2. The amount of time the defendant conducted himself in this manner, and whether the defendant has a record of prior incidents of gender discrimination;
3. The effect of the damages award on the defendant's financial condition, as I noted a moment ago, and
4. Any punishment the defendant may receive from other sources.

If you do award punitive damages, you should fix the amount using calm discretion and sound reason. You must not be influenced by sympathy for or dislike of any party in this case.

### b. Responsibility for a Punitive Damages Award Against Mr. Tzianabos Under the NYCHRL

I mentioned a moment ago that under the NYCHRL, an employer will not be liable for punitive damages if it has made a good faith effort to enforce an antidiscrimination policy. However, even if you decide to award punitive damages to Mr. Steininger based on Mr. Tzianabos' conduct and not WPIX's, WPIX may still be liable for Mr. Tzianabos' punitive damages. Under the NYCHRL, an employer is held liable for any award of punitive damages imposed on a managerial or supervisory employee found to have engaged in unlawful discrimination with the necessary state of mind. In effect, the liability for the misconduct of the manager or supervisor is attributed to the employer. Thus, if you assess punitive damages against Mr. Tzianabos, WPIX would be obligated to pay the amount of such damages you impose. That liability would be joint, meaning that the entire award could be collected from either one or from both of these defendants in amounts adding up to the total punitive damages.

However, you may, in your discretion, reduce the amount of the punitive damages award imposed upon Mr. Tzianabos that is imputed to WPIX. In doing so, you may consider whether

WPIX established and complied with policies, programs, and procedures for the prevention and detection of unlawful discriminatory practices by employees, including, but not limited to:

1. A meaningful and responsive procedure for investigation of complaints of discriminatory practices by employees and for taking appropriate action against those persons who are found to have engaged in such practices;
2. A firm policy against such practices, which is effectively communicated to employees;
3. A program to educate employees about unlawful discriminatory practices under the local, state, and federal law; and
4. Procedures for the supervision of employees specifically directed at the prevention and detection of such practices.

You may also consider whether WPIX had a record of no or relatively few prior incidents of discriminatory conduct by Mr. Tzianabos.

You must consider whether WPIX has established any or all of the factors listed above, and, if so, the degree to which the award against WPIX should be reduced relative to the award against Mr. Tzianabos, if any. Further, you may take into account WPIX's financial condition in deciding whether to reduce its responsibility for any punitive damages you may impose against Mr. Tzianabos.

III.   **DELIBERATIONS OF THE JURY**

A.   **Right to See Exhibits and Hear Testimony**

Members of the jury, now that you have heard the closing arguments of the parties, you are about to go into the jury room to begin your deliberations. Before you do that, I will give you a few final instructions.

The exhibits received in evidence will be accessible to you on a monitor in the jury room. If during those deliberations you want to see a hard copy of any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read, you may also request that. Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of the testimony. And please be patient—with respect to requests for testimony, it can sometimes take counsel and the Court some time to identify the portions that are responsive to your request. If you want any further explanation of the law as I have explained it to you, you may also request that.

To assist you in your deliberations, I am providing you with a list of witnesses, in the order in which they testified; a list of exhibits; a verdict form, which I will discuss in a moment; and a copy of these instructions. There is one of each of these for each juror.

B.   **Communication with the Court**

Your requests for exhibits or testimony—in fact any communications with the Court— should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

### C.     Notes

Some of you have taken notes periodically throughout this trial.  I want to emphasize to you, as you are about to begin your deliberations, that notes are simply an aid to memory.  Notes that any of you may have made may not be given any greater weight or influence than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  All jurors' recollections are equal.  If you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

### D.     Duty to Deliberate; Unanimous Verdict

You will now retire to decide the questions I have described to you.  For the plaintiff to prevail on the questions that you must answer, he must sustain his burden of proof as I have explained to you with respect to the questions you are considering.  Your verdict on each question must be unanimous.  Each juror is entitled to his or her opinion, but you are required to exchange views with your fellow jurors.  This is the very essence of jury deliberation.  It is your duty to discuss the evidence.  If you have a point of view and after reasoning with other jurors it appears that your own judgment is open to question, then of course you should not hesitate in yielding your original point of view if you are convinced that the opposite point of view is really one that satisfies your judgment and conscience.  You are not to give up a point of view, however, that you conscientiously believe in simply because you are outnumbered or outweighed.  You should vote with the others only if you are convinced on the evidence, the facts, and the law that it is the correct way to decide the case. You are not to discuss the case until all jurors are present.  Five or six jurors together is only a gathering of individuals. Only when nine jurors are present do you constitute a jury, and only then may you deliberate.

### E.      Verdict Form

I have prepared a verdict form for you to use in recording your decision.  Please use that form to report your verdict.

### F.      Duties of Foreperson

Finally, I referred a moment ago to a foreperson.  The first thing you should do when you retire to deliberate is take a vote to select one of you to sit as your foreperson, and then send out a note indicating whom you have chosen.

The foreperson doesn't have any more power or authority than any other juror, and his or her vote or opinion doesn't count for any more than any other juror's vote or opinion.  The foreperson is merely your spokesperson to the court.  He or she will send out any notes, and when the jury has reached a verdict, he or she will notify the marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

### G.      Return of Verdict

After you have reached a verdict, your foreperson will fill in and date the form that has been given to you.  All jurors must sign the form reflecting each juror's agreement with the verdict.  The foreperson should then advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you must be in agreement with the verdict which is announced in court.  Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

In conclusion, ladies and gentlemen, I am sure that if you listen to the views of your fellow jurors and if you apply your own common sense, you will reach a fair verdict here.

**IV.    CONCLUSION**

Members of the jury, that concludes my instructions to you.  I will ask you to remain seated while I confer with the attorneys to see if there are any additional instructions that they would like me to give to you or anything I may not have covered in my previous statement.

* * * * *

Members of the jury, you may now retire.  The marshal will be sworn before we retire.

(Marshal sworn)

**EXHIBIT 4**

COURT EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                               :

BRETT STEININGER,                          :

                                  :

                          Plaintiff,   :        19 Civ. 3644 (PAE)

                                  :

                  v.                 :

                                  :

TRIBUNE BROADCASTING COMPANY, LLC :
ET AL.,                                :

                                  :

                        Defendants. :

                                  :
-------------------------------------------------------- X

PAUL A. ENGELMAYER, District Judge:

PLEASE CHECK (√) YOUR ANSWERS
All jurors must agree on the answers to all of the questions:

<u>Claims Under Title VII of the Civil Rights Act of 1964</u>

    1.  Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to
        a discriminatory termination based on race or religion in violation of Title VII of the
        Civil Rights Act of 1964:

        a.      by WPIX?

                  Yes _____      No _____

    2.  Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to
        a hostile work environment based on race or religion in violation of Title VII of the Civil
        Rights Act of 1964:

        a.      by WPIX?

                  Yes _____      No _____

<u>Claims Under Section 1981 of Title 42 of the United States Code</u>

    3.  Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to
        a discriminatory termination based on race or religion in violation of Section 1981 of
        Title 42 of the United States Code:

      a.      by WPIX?

            Yes _____      No _____

      b.      by Christopher Tzianabos?

            Yes _____      No _____

4.   Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a hostile work environment based on race or religion in violation of Section 1981 of Title 42 of the United States Code:

      a.      by WPIX?

            Yes _____      No _____

      b.      by Christopher Tzianabos?

            Yes _____      No _____

## Claims Under the New York State Human Rights Law

5.   Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a discriminatory termination based on race or religion in violation of the New York State Human Rights Law:

      a.      by WPIX?

            Yes _____      No _____

      b.      by Christopher Tzianabos?

            Yes _____      No _____

6.   Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a hostile work environment based on race or religion in violation of the New York State Human Rights Law:

      a.      by WPIX?

            Yes _____      No _____

b.      by Christopher Tzianabos?

Yes _____      No _____

Claim Under the New York City Human Rights Law

7.  Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a discriminatory termination based on race or religion in violation of the New York City Human Rights Law:

a.      by WPIX?

Yes _____      No _____

b.      by Christopher Tzianabos?

Yes _____      No _____

8.  Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a hostile work environment based on race or religion in violation of the New York City Human Rights Law:

a.      by WPIX?

Yes _____      No _____

b.      by Christopher Tzianabos?

Yes _____      No _____

*If you have answered "Yes" to any part of any of the above questions 1-8, continue on to questions 9-14.  If not, please continue to the last page and sign the verdict form.*

Damages

*If you have answered "Yes" to any part of the above questions 1, 3, 5, or 7, relating to Mr. Steininger's claims of discriminatory termination, continue to questions 9, 10, 11, and 12.  If not, please continue to question 13.*

9.  <u>Back Pay</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages in the form of back pay?

Yes _____      No _____

3

If "Yes," in what amount?

$_____

10. <u>Front Pay</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages in the form of front pay?

Yes _____     No _____

If "Yes," in what amount?

$_____

11. <u>Loss of Un-Vested Stock Options</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages for the loss of un-vested stock options?

Yes _____     No _____

If "Yes," in what amount?

$_____

12. <u>Penalty for Early Withdrawal from 401(k) Account</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages based on the early withdrawal of his 401(k) account?

Yes _____     No _____

If "Yes," in what amount?

$_____

13. <u>Non-Economic Damages</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages in the form of damages for emotional distress, pain and suffering, humiliation, and mental anguish?

Yes _____     No _____

If "Yes," in what amount?

$_____

14. <u>Nominal Damages</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to nominal damages:

    a.      from WPIX?

             Yes _____      No _____

               i.    If "Yes," in what amount?

                   $_____

*Only if you have answered "Yes" to questions 3(b) or 4(b), or any part of questions 7 or 8, may you consider questions 15 and 16, which relate to punitive damages.*

15. <u>Punitive Damages Under Section 1981 of Title 42 of the United States Code</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to punitive damages under Section 1981 of Title 42 of the United States Code:

    a.      from Christopher Tzianabos?

             Yes _____      No _____

               i.  If "Yes," in what amount?

                   $_____

16. <u>Punitive Damages Under the New York City Human Rights Law</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to punitive damages under the New York City Human Rights Law:

    a.      from Christopher Tzianabos?

             Yes _____      No _____

               i.    If "Yes," in what amount?

                   $_____

    b.      from WPIX?

             Yes _____      No _____

               i.    If "Yes," in what amount?

                   $_____

After the Jury has reached unanimous agreement on all the questions and completed the form,
each juror must sign below:


_____                    _____

Foreperson


_____                    _____



_____                    _____



_____                    _____



_____                    Dated: _____

6

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
BRETT STEININGER,                                            :
                                                             :
                              Plaintiff,      :              19 Civ. 3644 (PAE)
                                              :
                v.                            :              <u>Jury Charge</u>
                                              :
TRIBUNE BROADCASTING COMPANY, LLC :
ET AL.,                                       :
                                              :
                          Defendants.  :
                                              :
                                              :
------------------------------------------------------------ X

**Jury Charge**
**September 24, 2021**

## TABLE OF CONTENTS

I.   GENERAL INSTRUCTIONS ...................................................................................... 1

   A.   Introductory Remarks ................................................................................... 1

   B.   Role of the Court.......................................................................................... 1

   C.   Role of the Jury ........................................................................................... 2

   D.   Role of Counsel / Objections and Sidebars................................................. 2

   E.   Sympathy or Bias ......................................................................................... 3

   F.   Burden of Proof............................................................................................ 3

   G.   What Is and Is Not Evidence ....................................................................... 5

   H.   Direct and Circumstantial Evidence ........................................................... 6

   I.   Witness Credibility ...................................................................................... 7

   J.   Interested Witnesses / Employee Witnesses ............................................... 9

   K.   Expert Witnesses........................................................................................ 10

   L.   Preparation of Witnesses............................................................................ 10

   M.   All Available Evidence Need Not Be Produced ....................................... 11

II.   SUBSTANTIVE CHARGES ................................................................................... 12

   A.   Overview of Plaintiff's Claims ................................................................. 12

   B.   Claims Under Title VII ............................................................................. 14

      1.   Elements of the Title VII Discriminatory Termination Claim.................... 14

         a.   Summary.................................................................................... 14

         b.   First Element: Member of a Protected Class ........................... 15

         c.   Second Element: Qualified for the Position.............................. 15

         d.   Third Element: Adverse Employment Action .......................... 15

         e.   Fourth Element: Race or Religion as Motivating Factor ......... 15

         f.   Defendants' Reasons for the Termination ................................ 17

      2.   Elements of the Title VII Hostile Work Environment Claim ..................... 18

         a.   Summary.................................................................................... 18

         b.   First Element:  Member of a Protected Class ........................... 19

         c.   Second Element:  Unwelcome Harassment That Created a Hostile Work Environment and Altered Work Conditions ................................................................... 19

         d.   Third Element: Harassment Based on Race or Religion ......... 20

       e.      Fourth Element: Responsibility of the Defendant ................................................ 20

  C.   Claims Under Section 1981 ......................................................................................... 23

      1.   Elements of a Section 1981 Discriminatory Termination Claim................................ 23

      2.   Elements of a Section 1981 Hostile Work Environment Claim ................................. 24

      3.   Individual Defendant's Liability Under Section 1981 ............................................... 24

  D.   Claims Under the New York State Human Rights Law ................................................ 24

      1.   Elements of a NYSHRL Discriminatory Termination Claim..................................... 25

      2.   Elements of a NYSHRL Hostile Work Environment Claim ...................................... 25

      3.   Individual Defendant's Liability Under the NYSHRL................................................ 25

  E.   Claims Under the New York City Human Rights Law ................................................ 26

      1.   Overview.................................................................................................................... 26

      2.   Elements of a NYCHRL Discriminatory Termination Claim .................................... 26

      3.   Elements of a NYCHRL Hostile Work Environment Claim...................................... 27

  F.   Damages..................................................................................................................... 29

      1.   Overview.................................................................................................................... 29

      2.   Categories of Damages .............................................................................................. 29

         a.      Compensatory Damages ...................................................................................... 30

            i.      Overview ....................................................................................................... 30

            ii.     Back Pay....................................................................................................... 30

            iii.    Front Pay ...................................................................................................... 30

            iv.    Back Pay and Front Pay Damages—Plaintiff's Duty to Mitigate...................... 31

         b.      Loss of Unvested Stock Options........................................................................... 32

         c.      401(k) Withdrawal Penalty.................................................................................. 32

         d.      Non-Economic Compensatory Damages.............................................................. 33

         e.      Nominal Damages................................................................................................ 33

         f.       Punitive Damages ............................................................................................... 34

            i.      Standard for Awarding Punitive Damages..................................................... 34

            ii.     Affirmative Defense for Employer ................................................................ 35

            iii.    Calculating and Allocating Punitive Damages............................................... 35

III.   DELIBERATIONS OF THE JURY ........................................................................................ 38

  A.   Right to See Exhibits and Hear Testimony................................................................... 38

B.   Communication with the Court.......................................................................... 38

C.   Notes ................................................................................................................... 39

D.   Duty to Deliberate; Unanimous Verdict ............................................................ 39

E.   Verdict Form ...................................................................................................... 40

F.   Duties of Foreperson .......................................................................................... 40

G.   Return of Verdict ............................................................................................... 40

IV.   CONCLUSION............................................................................................................. 41

## I.   GENERAL INSTRUCTIONS

### A.   Introductory Remarks

Members of the jury, you have now heard all of the evidence in the case, as well as the final arguments of the parties.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in the case.

Now it is time for me to instruct you as to the law that governs the case. There are three parts to these instructions.  First, I'm going to give you some general instructions about your role, and about how you are to decide the facts of the case.  These instructions really would apply to just about any trial.  Second, I'll give you some specific instructions about the legal rules applicable to this particular case.  Third, I'll give you some final instructions about procedure.

Listening to these instructions may not be easy.  It is important, however, that you listen carefully and concentrate.  I ask you for patient cooperation and attention.  You'll notice that I'm reading these instructions from a prepared text.  It would be more lively, no doubt, if I just improvised.  But it's important that I not do that.  The law is made up of words, and those words are very carefully chosen.  So when I tell you the law, it's critical that I use exactly the right words.

You'll have copies of what I'm reading in the jury room to consult, so don't worry if you miss a word or two.  But for now, listen carefully and try to concentrate on what I'm saying.  I will be distributing to you a verdict form in which to record your verdict.  It will list the questions that you must consider, in the order that you should consider them.

### B.   Role of the Court

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.  With respect to legal

1

matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.  You must not substitute your own notions or opinions of what the law is or ought to be.

### C.     Role of the Jury

As members of the jury, you are the sole and exclusive judges of the facts.  You pass upon the evidence.  You determine the credibility of the witnesses.  You resolve such conflicts as there may be in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Although you are encouraged to use all of your life experiences in analyzing testimony and reaching a fair verdict, you may not communicate any personal professional expertise you might have or other facts not in evidence to the other jurors during deliberations.  You must base your discussions and decisions solely on the evidence presented to you during the trial and that evidence alone.  You may not consider or speculate on matters not in evidence or matters outside the case.

### D.     Role of Counsel / Objections and Sidebars

It is the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible.  It is my job to rule on those objections.  Therefore, why an objection was made or why I ruled on it the way I did is not your concern.  You should draw no inference from the fact that an attorney objected to any evidence.  Nor should you draw any inference from the fact that I might have sustained or overruled an objection.  Simply because I have permitted certain evidence to be introduced does not mean that I have decided on its significance.  That is for you to decide.

From time to time, the lawyers and I had conferences out of your hearing.  These conferences involved procedural and other matters, and none of the events relating to these conferences should enter into your deliberations at all.

Similarly, the personalities and the conduct of counsel in the courtroom are not in any way at issue.  If you formed reactions of any kind to any of the lawyers in the case, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, those reactions should not enter into your deliberations.

### E.   Sympathy or Bias

You are to evaluate the evidence calmly and objectively, without prejudice or sympathy. You are to be completely fair and impartial.  Your verdict must be based solely on the evidence developed at this trial, or the lack of evidence.  The parties in this case are entitled to a trial free from prejudice and bias.  Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

It would be improper for you to consider, in deciding the facts of the case, any personal feelings you may have about the race, national origin, sex or age of any party or any witness, or any other such irrelevant factor.  This case should be decided by you as an action between parties of equal standing in the community, and of equal worth.  Both parties are entitled to the same fair trial at your hands.  Both parties stand equal before the law, and are to be dealt with as equals in this Court.

### F.   Burden of Proof

The plaintiff, Brett Steininger, has the burden of proving all the elements of his claims by a preponderance of the evidence.

What does a "preponderance of the evidence" mean?  To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not the number of witnesses or documents.  In determining whether a claim has been proven by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.

If, after considering all of the testimony, you are satisfied that the plaintiff, the party with the burden of proof, has carried his burden on each essential point of a claim, then you must find in the plaintiff's favor.  If, after such consideration, you find that the evidence produced by the plaintiff is outweighed by the evidence against the plaintiff's position, or that the credible evidence on a given issue is evenly divided between the parties—that it is as equally probable that one side is right as it is that the other side is right—then you must decide that issue against the plaintiff.  That is because the plaintiff, because he bears the burden of proof, must prove more than simple equality of evidence—he must prove the element by a preponderance of the evidence.  On the other hand, the plaintiff need prove no more than a preponderance.  So long as you find that the scales tip, however slightly, in favor of the plaintiff—that what he claims is more likely true than not—then that element will have been proven by a preponderance of the evidence.

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof only in a *criminal* trial. That requirement does not apply to a civil case such as this, and you should put it out of your mind.

### G.      What Is and Is Not Evidence

I want to take a moment to describe to you what is and is not evidence in this case.  As I have said, you may rely only on the evidence in your deliberations.  The evidence in this case is the sworn testimony of the witnesses, and the exhibits received in evidence.  On the other hand, certain things are not evidence.

First, I will describe a list of examples of things that are not evidence:

1.       A question by a lawyer is not to be considered by you as evidence.  It is the witnesses' answers that are evidence, not the questions.  At times, a lawyer may have incorporated into a question a statement which assumed certain facts to be true, and asked the witness if the statement was true.  If the witness denied the truth of a statement, and if there is no direct evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

2.       Similarly, arguments by lawyers are not evidence, because the lawyers are not witnesses.  What they have said in their opening statements was intended, and what they will say to you in their closing statements will be intended, to help you understand the evidence and to reach your verdict.  However, if your recollection of the facts differs from the lawyers' statements, it is your recollection which controls.

3.       Statements that I may have made concerning the evidence do not constitute evidence.  Similarly, at times, I may have admonished a witness or directed a witness to be responsive to questions or to keep his or her voice up.  At times, I may have asked a question myself.  Any questions that I asked, or instructions that I gave, were intended only to clarify the presentation of evidence and to bring out something that I thought might be unclear.  You should draw no inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or any party in the case, by reason of any comment, question, or instruction of mine.  Nor should you infer that I have any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that is before you.  That is entirely your role.

4.       Testimony that has been stricken or excluded is not evidence, and it may not be considered by you in rendering your verdict.

5.       Anything you may have seen or heard outside the courtroom is not evidence.

5

Now, I will provide you with some things that you may consider as evidence.  As I have said, evidence may come in several forms:

1.    The sworn testimony of witnesses, regardless of who called them, is evidence.  This is true of the witnesses' answers on both direct and cross examination.  However, if certain testimony was received for a limited purpose, you must follow the limiting instructions I have given.

2.    The exhibits that were admitted during the trial are evidence.  Exhibits marked for identification but not admitted are not evidence, nor are materials brought forth only to refresh a witness's recollection.

3.    Prior testimony is evidence.  Such testimony, known as depositions, is produced through a procedure where, prior to trial, the attorneys for one side may question a witness or an adversary under oath.  This is part of what is called pretrial discovery, and each side is entitled to take depositions.  To the extent I admitted excerpts of prior testimony at trial, you may consider the prior testimony of a witness according to the same standards you would use to evaluate the testimony of a witness given at trial.

## H.    Direct and Circumstantial Evidence

Generally, as I told you in my initial instructions, there are two types of evidence that you may consider in reaching your verdict.  One type of evidence is direct evidence.  Direct evidence is testimony by a witness about something she knows by virtue of her own senses—something she has seen, felt, touched, or heard.  For example, if a witness testified that when she left his house this morning, it was raining, that would be direct evidence about the weather.

Circumstantial evidence is evidence from which you may infer the existence of certain facts.  To use the same example I gave you at the start of trial:  Assume that when you came into the courthouse this morning, the sun was shining and it was a nice day.  Assume that the courtroom blinds were drawn and you could not look outside.  As you were sitting here, someone walked in with an umbrella, which was dripping wet.  Then a few minutes later another person entered with a wet raincoat.  Now, you cannot look outside of the courtroom and you cannot see

whether or not it is raining, and no one has testified that it is raining.  So you have no direct evidence of that fact.  But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence.  You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of some other fact.  Many facts, such as a person's state of mind or intentions, are rarely susceptible of proof by direct evidence.  Usually, such facts are established by circumstantial evidence.  Where circumstantial evidence is presented, it is of no less value than direct evidence, for it is a general rule that the law makes no distinction between direct evidence and circumstantial evidence.

## I.      Witness Credibility

You have had the opportunity to observe the witnesses.  It is now your job to decide how believable each witness was in his or her testimony.  You are the sole judge of the credibility of each witness and of the importance of his or her testimony.

In making these judgments, you should carefully scrutinize the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, and any other matter in evidence which may help you decide the truth and the importance of each witness's testimony.

How do you determine where the truth lies?  You watched each witness testify. Everything a witness said or did on the witness stand counts in your determination.  How did the witness impress you?  Did he or she appear to be frank, forthright, and candid?  Or was the witness evasive and edgy, as if hiding something?  How did the witness appear?  What was his or her demeanor—that is, his or her carriage, behavior, bearing, manner and appearance while testifying?  Often it is not what a person says but how he or she says it that moves us.

You should use all the tests for truthfulness that you would use in determining matters of importance to you in your everyday life.  You should consider any bias or hostility the witness may have shown for or against any party as well as any interest the witness has in the outcome of the case.  You should consider the opportunity the witness had to see, hear, and know the things about which he or she testified, the accuracy of his or her memory, his or her candor or lack of candor, his or her intelligence, the reasonableness and probability of his or her testimony and its consistency or lack of consistency and its corroboration or lack of corroboration with other credible testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given, and all of the other evidence in the case.  Always remember that you should use your common sense, your good judgment, and your everyday experiences in life to make your credibility determinations.

If you find that any witness has willfully testified falsely as to any material fact—that is, as to an important matter—the law permits you to disregard the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything.  However, you are not required to consider such a witness as totally "unbelievable."  You may accept so much of the witness's testimony as you deem true and disregard what you feel is false.  By the processes which I have just described, you, as the sole judges of the facts, decide which of the witnesses you will believe, what portion of each witness's testimony you accept, and what weight you will give to it.

On some occasions during this trial, witnesses were asked to explain an apparent inconsistency between testimony offered at this trial and previous statements made by the witness.  It is for you to determine whether a prior statement was inconsistent, and if so, how

8

much (if any) weight to give to an inconsistent statement in assessing the witness's credibility at trial.

**J.      Interested Witnesses / Employee Witnesses**

In deciding whether to believe a witness, you should take into account any evidence that shows that a witness may benefit in some way from the outcome of the case, such as a financial interest.  Likewise, you should specifically note any evidence of hostility or affection that the witness may have towards one of the parties.  You should also consider any other interest or motive that the witness may have in cooperating with a particular party.

In this case, the plaintiff, Brett Steininger, and a defendant, Christopher Tzianabos, testified before you.  As parties to this action, they are, by definition, interested witnesses.

It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony.  In short, if you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

An interested witness is not necessarily less believable than a disinterested witness.  The mere fact that a witness is interested in the outcome of the case does not mean he or she has not told the truth. It is for you to decide from your observations and applying your common sense and experience and all the other considerations mentioned, whether the possible interest of any witness, or of any party, has intentionally or otherwise colored or distorted his or her testimony. You are not required to believe an interested witness; you may accept as much of his or her testimony as you deem reliable and reject as much as you deem unworthy of acceptance.

Similarly, several witnesses who testified are presently or were previously employed by the corporate defendants, whom I am referring again for short as WPIX.  In the order they have testified, they are Christian Wayland, Michael Schwartz, Nancy Barbosa, and Debbie Presser, via portions of her deposition testimony.  You may consider whether the testimony of these

9

witnesses was in any way influenced by the fact that they are now, or were previously, employed by WPIX.

### K.      Expert Witnesses

You will recall that the witnesses Dr. N.G. Berrill, called by the plaintiff, and Dr. Stuart B. Kleinman, called by the defense, testified as experts in the fields of forensic psychology and forensic psychiatry, respectively, and gave their opinions concerning Mr. Steininger's mental state.  When a case involves a matter of science or art, or requires special knowledge or skill not ordinarily possessed by the average person, an expert is permitted to state his or her opinion for the information of the Court and jury.  The opinions stated by each expert who testified before you were based on particular facts, as the expert obtained knowledge of them and testified to them before you, or as the attorney who questioned the expert asked him to assume.  You may reject an expert's opinion if you find the facts to be different from those which formed the basis for the opinion.  You may also reject the opinion if, after careful consideration of all the evidence in the case, expert and other, you disagree with the opinion.  In other words, you are not required to accept an expert's opinion to the exclusion of the facts and circumstances disclosed by other testimony.  Such an opinion is subject to the same rules concerning reliability as the testimony of any other witness.  It is given to assist you in reaching a proper conclusion; it is entitled to such weight as you find the expert's qualifications in the field warrant and must be considered by you, but is not controlling upon your judgment.

### L.      Preparation of Witnesses

You have heard evidence during the trial that witnesses had discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.  Although you may consider that fact when you are evaluating a witness's credibility, I should tell you that there

is nothing either unusual or improper about a witness meeting with lawyers before testifying, so that the witness can be made aware of the subjects that he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them.  In fact, it would be unusual for a lawyer to call a witness without such consultation. Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

### M.     All Available Evidence Need Not Be Produced

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial.  Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in this case.

Each party has had an equal opportunity or lack of opportunity to call any witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what any uncalled witnesses would have testified to had they been called.  The absence of any witnesses should not affect your judgment in any way.

**II.**     **SUBSTANTIVE CHARGES**

I am now going to instruct you on the substantive law to be applied to Mr. Steininger's claims in this lawsuit.

**A.**     **Overview of Plaintiff's Claims**

First, I want to give you an overview of the claims that Mr. Steininger brings in this case. He brings claims against five defendants.  One of them is Christopher Tzianobos, who was Mr. Steininger's supervisor at WPIX.  The other are WPIX and three affiliated corporations.  The parties and I agree that for the purposes of your work, you, the jury, are to treat the corporations as a single defendant, which I will refer to as WPIX.  You should not concern yourself with differences or distinctions among these corporations.  So, for your purposes, then, there are two defendants: Mr. Tzianobos and WPIX.

Mr. Steininger brings claims under four statutes.  Two of them are federal statutes: Title VII of the Civil Rights Act of 1964, which I will refer to as Title VII, and Section 1981 of Title 42 of the United States Code, which I will refer to as Section 1981.  The third is a state statute, the New York State Human Rights Law, sometimes called the "NYSHRL."  And the fourth is a local statute, the New York City Human Rights Law, sometimes called the "NYCHRL."

These statutes all prohibit discrimination in the terms and conditions of employment based on, among other things, a person's race and/or his religion.  There are similarities among these laws and I will point out to you where the requirements of certain laws are the same.  But there are also some differences, as I will draw to your attention.  And so Mr. Steininger's burden in proving some claims differs from his burden as to others.

I will go through the requirements of the four statutes in the order I have listed them. Under each statute, Mr. Steininger brings two claims. The first is for discriminatory termination. He claims that he was terminated based on being Jewish.  I will refer to that as the discriminatory

termination claim.  The second is for harassment, also known as hostile work environment.  He claims that he was subjected to a hostile work environment at WPIX, also based on his being Jewish.  I will refer to that as the hostile work environment claim.  For each statute, I will instruct you first as to the elements of the discriminatory termination claim and then as to the elements of the hostile work environment claim.

As to damages, Mr. Steininger, claims that, as a result of the violations of law that he claims, he was deprived of wages and certain benefits and that he suffered emotional distress.  Defendants deny Mr. Steininger's claims.  They assert that Mr. Steininger was not terminated on account of his religion.  And they deny that there was a hostile work environment for Mr. Steininger at WPIX based on his being Jewish.

I'm about to turn to the first of the claims.  I want to emphasize here that, although certain claims are related in ways that I will explain, you must consider each claim and each defendant separately.  With respect to each claim and each defendant, the critical issue is whether Mr. Steininger has proved the elements of the claim you are considering against the defendant you are considering by a preponderance of the evidence.  If you find a defendant liable to Mr. Steininger, you must then decide the amount of damages, if any, for which that defendant is responsible.

.

B. **Claims Under Title VII**

Let's start with Mr. Steininger's claims under Title VII.

Title VII provides, in pertinent part, that it shall be an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or religion." Under Title VII, Judaism is considered both a race and a religion.

A Title VII claim may only be brought against an employer and not against individuals. So, Mr. Steininger's claims under Title VII are brought only against WPIX. However, you may consider the conduct of the other defendant, Mr. Tzianabos, in determining whether Mr. Steininger has proven his claims under Title VII.

### 1. Elements of the Title VII Discriminatory Termination Claim

#### a. Summary

There are four elements that Mr. Steininger is required to prove by a preponderance of the evidence in order to prevail on his Title VII claim for a discriminatory termination based on religion or race.

***First***, that he is a member of a protected class.

***Second***, that he was qualified for the position he held.

***Third***, that he experienced an "adverse employment action," which I'll describe in a moment.

***Fourth***, that his race or religion—here, his being Jewish—was a motivating factor in WPIX's decision to take the adverse employment action.

### b.  First Element: Member of a Protected Class

The parties agree that Mr. Steininger, based on his being Jewish, has satisfied the first element.  I therefore instruct you that you must find this element satisfied.

### c.  Second Element: Qualified for the Position

The parties agree that Mr. Steininger held the necessary qualifications for the position from which he was terminated, that is, as a Sales Manager at WPIX.  I therefore instruct you that you must find this element satisfied.

### d.  Third Element: Adverse Employment Action

The third element that Mr. Steininger must prove by a preponderance of the evidence is that he suffered an adverse employment action, one that worked a materially adverse change in the terms or conditions of employment.  Here, Mr. Steininger claims he suffered one such action: being terminated.  As a matter of law, a termination is a materially adverse employment action.  I therefore instruct you that you must find this element satisfied.

### e.  Fourth Element: Race or Religion as Motivating Factor

Finally, Mr. Steininger must prove by a preponderance of the evidence that the adverse employment action at issue here, his termination, occurred because of discrimination based on his being Jewish.  When I say "because of," I mean that Mr. Steininger must prove by a preponderance of the evidence that his Jewish identity was a motivating factor at the time WPIX undertook the action.  Mr. Steininger need not, however, establish that his Jewish identity was the sole or principal reason for that decision.

Mr. Steininger may use direct evidence, or indirect or circumstantial evidence, or a combination of these, to meet his burden.  Again, direct evidence is evidence which, by its very nature, speaks to the issue sought to be proved.  An example of direct evidence would be a

statement by a person that he intended to make an employment decision on the basis of a person's race or religion.  Mr. Steininger is not required to prove his case by direct evidence, but he may do so.  You should consider any direct evidence along with all of the evidence in the case and determine whether it convinces you, by a preponderance of the evidence, that WPIX was motivated by a race- or religious-based discriminatory purpose.

Mr. Steininger may also prove that WPIX was motivated by discrimination based on Mr. Steininger's Jewish identity by presenting what is called indirect evidence to that effect.  Indirect evidence is evidence which, though it does not speak directly to the issue sought to be proved, provides the basis for an inference with regard to that issue.  Mr. Steininger may use such evidence in attempting to prove to you that WPIX was motivated by a race- or religious-based discriminatory purpose, and, if you believe the evidence establishes that fact, you may use it as the basis for your finding of intent.

Mr. Steininger may also prove that WPIX was motivated by discrimination based on his being Jewish even absent evidence of bias on the part of the ultimate decision maker at WPIX, so long as an individual shown to have the impermissible bias played a meaningful role in the decision-making process.  But just because an individual with an impermissible bias played a role in the decision-making process does not necessarily mean Mr. Steininger's termination was unlawful.  Only if Mr. Steininger has proved that the ultimate decisionmaker *negligently* adopted the bias of another employee with discriminatory animus, and thereby afforded that employee an outsize role in the employment decision, can that biased motivation be imputed to the employer and used to support a claim under Title VII.

16

### f.  Defendants' Reasons for the Termination

Defendants contend that WPIX had legitimate reasons for its conduct toward Mr. Steininger.  Specifically, they contend that Mr. Steininger's termination was for reasons independent of bias, specifically, reasons relating to Mr. Steininger's performance in that position.

Mr. Steininger contends that WPIX's explanations for his termination are pretextual, that is, that they are unworthy of belief.  Mr. Steininger further contends that even if those explanations were genuinely held, they were not the only bases on which WPIX made that decision.  Mr. Steininger asserts that a motivating factor for his termination was his Jewish identity.

 When you consider these competing claims, you are not to judge the wisdom of WPIX's actions, but instead, to decide whether the reasons it advances were the actual reasons for its actions.  An employer is entitled to make its decisions for good reasons, bad reasons, or for no reason at all, so long as the decision is not motivated by discrimination.

Similarly, absent evidence of bad faith, an employer is entitled to set its own expectations and requirements as to how to organize and staff its workplace and as to the performance expectations for a given position.  You are not to judge WPIX's standards of expected performance or the qualifications it set in good faith.  Rather, you are to examine how it treated Mr. Steininger in light of its legitimate expectations of performance it desired.

If you believe that the reasons WPIX gave for Mr. Steininger's termination are false or incomplete, you may infer, but you are not required to infer, that WPIX acted as it did based on Mr. Steininger's Jewish identity.  Of course, if you find that WPIX's proffered reasons for its assignment decisions were false or incomplete, that does not necessarily mean that its true

17

motives included the unlawful ones of racial or religious discrimination argued by Mr. Steininger.  You may infer discrimination from the falsity or incompleteness of the employer's explanation, but you are not required to do so.

Ultimately, however, it remains Mr. Steininger's burden to prove that he was a victim of discrimination—that is, that his Jewish identity was a motivating factor in his termination.  If he fails to meet this burden, then you must find in favor of WPIX.

In sum, if you find that Mr. Steininger has established each of the four elements of his employment discrimination claim by a preponderance of the evidence, then you must return a verdict in his favor.  If, however, you find that he has failed to prove one or more of these elements by a preponderance of the evidence, then you must return a verdict for WPIX.

### 2.    Elements of the Title VII Hostile Work Environment Claim

#### a.    Summary

In addition to his discriminatory termination claim, Mr. Steininger has also brought a claim against WPIX under Title VII for hostile work environment.  Title VII prohibits harassment based on race or religion in the form of a hostile work environment.

There are four elements that Mr. Steininger is required to prove by a preponderance of the evidence to prevail on his claim under Title VII for a hostile work environment based on race or religion:

*First*, that he is a member of a protected class;

*Second*, that he was subject to harassment that had the purpose or effect of unreasonably interfering with Mr. Steininger's work performance and creating an intimidating, hostile, or offensive work environment;

*Third*, that the harassment was based on Mr. Steininger's being Jewish;

*Fourth*, that WPIX has responsibility for the acts of harassment in the workplace to which Mr. Steininger was subjected.

I shall now address each of these elements in greater detail.

### b.      First Element:  Member of a Protected Class

The first element of Mr. Steininger's claim is that he is a member of a protected class.  As discussed earlier, the parties do not dispute that Mr. Steininger has satisfied this element.

### c.      Second Element:  Unwelcome Harassment That Created a Hostile Work Environment and Altered Work Conditions

The second element that Mr. Steininger must prove by a preponderance of the evidence is that he was subjected to unwelcome harassment that had the purpose or effect of altering his work conditions so as to interfere unreasonably with his work performance and to create an intimidating, hostile, or offensive work environment.  Unwelcome conduct is conduct that Mr. Steininger indicated by his own conduct was unwanted.  Here, Mr. Steininger must prove that he was subjected to harassment that transcended coarse, rude, or boorish behavior.  He must prove more than the existence of isolated or trivial remarks.  A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of Mr. Steininger's employment.

Although Mr. Steininger need not prove that he suffered tangible psychological injury or the loss of a tangible job benefit, he must show that he perceived the work environment to be hostile or abusive, in the way I have described, and also that a reasonable person would have found his work environment to be hostile or abusive.  You must also find that a reasonable person of Mr. Steininger's background would also have found the working conditions to constitute a hostile work environment.  In other words, it is not enough for you to find that Mr. Steininger felt subjectively intimidated.  You must also find that a reasonable person in his

position would have felt that his workplace was such an environment.  As a consequence, when considering this claim, you may only consider evidence of conduct—either toward himself or others—of which Mr. Steininger was aware.

Mr. Steininger can show that his discriminatory work environment was hostile in two ways: he may show either that a single incident of harassment or intimidation was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of his working environment.  I remind you, however, that the offensive conduct must have been severe and pervasive and cannot have consisted of trivial or isolated remarks and incidents.  In determining whether the conduct complained of was sufficiently severe and pervasive to have created a hostile work environment at Mr. Steininger's workplace, you should consider the totality of the circumstances.  The circumstances may include the frequency of the discriminatory conduct, the severity of the conduct, whether it was physically threatening or humiliating, the effect on Mr. Steininger's psychological well-being, and whether it unreasonably interfered with Mr. Steininger's work performance.  No single factor, however, is required.

### d.  Third Element: Harassment Based on Race or Religion

The third element that Mr. Steininger must prove by a preponderance of the evidence is that the harassment was based on his being Jewish.  If an environment is equally abusive to all employees, or if the harassment was not directed toward Jewish individuals in a way that permits you to find that it was "based on race or religion," then this element has not been satisfied.

### e.  Fourth Element: Responsibility of the Defendant

The final element that Mr. Steininger must prove by a preponderance of the evidence is that WPIX had responsibility for the acts of harassment in the workplace to which Mr. Steininger

was subjected.  Under Title VII, an employer such as WPIX can be responsible for harassment committed by its employees; whether an employer is liable for such conduct depends on the status of the harasser.  For purposes of this case, in which Mr. Steininger alleges harassing behavior by one person, Mr. Tzianabos, the standards that govern harassment by supervisors are the ones that are relevant.

An employee qualifies as a supervisor within the meaning of Title VII if he is empowered to take tangible employment actions against the particular employee who is claiming to be the victim of harassment.  A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  If you find that the harasser was Mr. Steininger's supervisor within the meaning of Title VII, you must then determine whether he engaged in harassment that culminated in a tangible employment action. If you find that there was harassment that culminated in a tangible employment action against Mr. Steininger, then WPIX would be strictly liable for any acts of religious or racial harassment committed by the harasser against Mr. Steininger.  You may consider whether the harasser played an outsized role in the termination, even if he himself was not the ultimate decisionmaker.

If you find, however, that the harasser was Mr. Steininger's supervisor within the meaning of Title VII, but that the harassment did not culminate in a tangible employment action, then WPIX may still be liable for such harassment.  But, in this circumstance WPIX can avoid liability by proving a defense.  WPIX would not be liable if it proved, by a preponderance of the evidence, that (i) it exercised reasonable care to prevent and correct any harassing behavior and (ii) Mr. Steininger unreasonably failed to take advantage of the preventive or corrective opportunities that it provided.

You may consider, as to the first prong of this defense, whether WPIX had promulgated an effective policy against harassment based on race or religion in the workplace; whether that policy was fully communicated to its employees; and whether that policy provided a reasonable avenue for Mr. Steininger to make a complaint to higher management.  You may also consider the level of the employer's demonstrated commitment to adhere to its policy. For example, an employer does not exercise reasonable care when its practice indicates tolerance toward harassment or discrimination, even if it has a policy that states otherwise.  As to the second prong, you may consider whether there was a procedure in place by which Mr. Steininger could have complained about harassment based on his race or religion; whether Mr. Steininger made use of that procedure; and, if not, whether it was unreasonable for him not to have done so.

In sum, if you find that Mr. Steininger has established each of the four elements of a hostile work environment claim by a preponderance of the evidence, then you must return a verdict in his favor.  If, however, you find that he has failed to prove one or more of these elements by a preponderance of the evidence, then you must return a verdict for WPIX.

### C.      Claims Under Section 1981

Let's turn next to Mr. Steininger's claims under Section 1981.  Section 1981 guarantees each person, regardless of race, freedom from discrimination in the making and enforcing of contracts.  Under the statute, "mak[ing] and enforc[ing] contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  Under Section 1981, Judaism is a race.  Unlike under Title VII, under Section 1981, individuals as well as employers can be liable.  And so, Mr. Steininger's claims under Section 1981, which are, again, for discriminatory termination and for a hostile work environment, are brought against both WPIX and Mr. Tzianabos.

### 1.      Elements of a Section 1981 Discriminatory Termination Claim

Generally speaking, the four elements of a claim for discriminatory termination under Section 1981 are the same as the four elements of a claim under Title VII.  You may therefore use the same analysis that you used in analyzing Mr. Steininger's discriminatory termination under Title VII.

There is, however, an important difference between Mr. Steininger's Title VII and Section 1981 claims.  It relates to the fourth element.  Specifically, Section 1981 has a different standard for causation.  Under Title VII, you may find WPIX liable if—in addition to finding first three elements proven—Mr. Steininger's Jewish identity was a *motivating factor* in the decision to terminate him.  Under Section 1981, however, you must find that Mr. Steininger's Jewish identity was the *but-for cause* of the termination.  That means that you must find that, were it not for Mr. Steininger's Jewish identity, the defendants would have acted differently, and he would not have been terminated.

23

### 2.      Elements of a Section 1981 Hostile Work Environment Claim

Mr. Steininger has also brought a claim for hostile work environment under Section

1981.  Generally speaking, the elements of such a claim track those under Title VII, and you

therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII hostile work

environment claims.

### 3.      Individual Defendant's Liability Under Section 1981

As I mentioned, unlike under Title VII, both corporations and individuals can be liable

for violations of Section 1981.  However, to find an individual defendant, here Mr. Tzianabos,

liable for a violation of Section 1981 violation, Mr. Steininger must demonstrate an affirmative

link that causally connects Mr. Tzianabos to the discriminatory conduct at issue—the

discriminatory termination or the hostile work environment.  In other words, an individual

cannot be held liable under Section 1981 solely by virtue of his or her position as a supervisor.

Rather, to find Mr. Tzianabos liable in his individual capacity under Section 1981, you must find

that Mr. Tzianabos personally caused the discriminatory conduct.  You may find that that Mr.

Tzianabos personally caused the discriminatory action if you find one of the following: (i) he

directly participated in the discriminatory act; (ii) he failed to remedy the wrong after learning of

it; (iii) he created or maintained a policy under which unconstitutional acts occurred; (iv) he was

grossly negligent in managing subordinates who committed the unconstitutional acts; or (v) he

was deliberately indifferent by failing to act on information indicating that unconstitutional acts

were occurring

### D.      Claims Under the New York State Human Rights Law

Let's turn next to Mr. Steininger's claims under the New York State Human Rights Law,

or NYSHRL.  That law provides in relevant part that:

> It shall be an unlawfully discriminatory practice for an employer …
> because of an individual's … race [or] national origin … to
> discriminate against such individual in compensation or in terms,
> conditions, or privileges of employment.

Mr. Steininger brings claims under the NYSHRL against both WPIX and Mr. Tzianabos

### 1.     Elements of a NYSHRL Discriminatory Termination Claim

Generally speaking, the elements of a claim for discriminatory termination under the

NYSHRL track the elements of a claim under Title VII, and you may therefore use the same

analysis that you used in analyzing Mr. Steininger's Title VII discriminatory termination claim.

### 2.     Elements of a NYSHRL Hostile Work Environment Claim

Generally speaking, the elements of a claim for hostile work environment under the

NYHSRL track the elements under Title VII, and you may therefore use the same analysis that

you used in analyzing Mr. Steininger's Title VII hostile work environment claim.

### 3.     Individual Defendant's Liability Under the NYSHRL

Like Section 1981, the NYSHRL has more expansive liability than Title VII.  In addition

to allowing an employer such as WPIX to be found liable for employment discrimination, there

are circumstances in which an individual employee such as Mr. Tzianabos may be found liable.

Specifically, if you find either that Mr. Tzianabos had an ownership interest in WPIX, or that he

had had the power to do more than carry out personnel decisions made by others, and if you find

that Mr. Steininger has proved the other elements of an NYSHRL claim (whether for

discriminatory termination or hostile work environment) as to Mr. Tzianabos, then you are to

find Mr. Tzianabos individually liable for that claim.

### E.   Claims Under the New York City Human Rights Law

#### 1.   Overview

Let's turn finally to Mr. Steininger's claims under the New York City Human Rights Law.  It provides that:

> It shall be an unlawful discriminatory practice . . . [f]or an employer or employee or agent thereof … because of the actual or perceived … race [or] national origin … or alienage … of any person, to … discriminate against such person in compensation or in terms, conditions, or privileges of employment.

Mr. Steininger brings two claims under that law.  These claim, respectively, discriminatory termination and a hostile work environment, again, both based on his being Jewish.

A claim under the NYCHRL has different elements from the federal and state law claims that I have previously reviewed.  To prevail on an NYCHRL claim of either kind, Mr. Steininger must prove the following two elements, each by a preponderance of the evidence:

*First*, that he was subjected to differential treatment—*i.e.*, that he was treated less well than other employees—because of his Jewish identity; and

*Second*, that the defendant you are considering is responsible for that discriminatory conduct.

#### 2.   Elements of a NYCHRL Discriminatory Termination Claim

Generally speaking, the elements of a claim for discriminatory termination under the NYCHRL are the same as the elements of a claim under Title VII, including the requirement that the plaintiff show that race or religion was a motivating factor in his termination.  You may therefore use the same analysis that you used in analyzing Mr. Steininger's discriminatory termination under Title VII.  There is, however, one important difference, relating to the responsibility of the defendant you are considering.

26

With respect to an individual defendant, like Mr. Tzianabos, the NYCHRL imposes liability where the employee directly participated in the discriminatory conduct.  If Mr. Steininger has proven this by a preponderance of the evidence as to Mr. Tzianabos, this element is established as to Mr. Tzianabos.

With respect to the responsibility of an employer, like WPIX, for the discriminatory acts of an employee, the NYCHRL imposes liability on the employer where (i) the offending employee exercised managerial or supervisory responsibility; (ii) the employer knew of the offending employee's unlawful discriminatory conduct and either acquiesced or failed to take immediate and appropriate corrective action; or (iii) the employer should have known of the conduct yet failed to exercise reasonable diligence to prevent it.  If you find Mr. Steininger has proven his claim of discriminatory termination under the NYCHRL against Mr. Tzianabos, and he has proven one or more of these three situations by a preponderance of the evidence, then this element is established as to WPIX.

### 3.    Elements of a NYCHRL Hostile Work Environment Claim

Generally speaking, the elements of a claim for hostile work environment under the NYCHRL track the elements under Title VII and you must therefore use the same analysis that you used in analyzing Mr. Steininger's Title VII hostile work environment claim.  There are, however, two important differences you must consider.

First, under Title VII, you must find that the harassment the plaintiff suffered was "severe and pervasive" in order to find for him on his hostile work environment claims.  Under the NYCHRL, however, a plaintiff need only prove that he was treated less well than other employees because of his Jewish identity.  If the plaintiff proves this, an affirmative defense is available to the defendant.  The defendant can attempt to establish, by a preponderance of the evidence, that the conduct at issue was nothing more than what a reasonable person would

consider to be petty slights and trivial inconveniences.  That is because the NYCHRL is not a general civility code, and it does not apply in the case of such minor slights and inconveniences. If Mr. Steininger proves that he was treated differently from other employees on account of his Jewish identity, but if the defense then proves that the conduct at issue was nothing more than what a reasonable person would consider to be petty slights and trivial inconveniences, you must return a verdict for the defense.

Second, Mr. Steininger again must prove by a preponderance of the evidence that the defendant you are considering is responsible for his being treated differently on account of his Jewish identity.  The same standards that I reviewed a moment ago apply here as well.  With respect to an individual defendant, like Mr. Tzianabos, the NYCHRL imposes liability where the employee directly participated in the discriminatory conduct.  If Mr. Steininger has proven this by a preponderance of the evidence as to Mr. Tzianabos, this element is established as to Mr. Tzianabos.

With respect to the responsibility of an employer, like WPIX, for the discriminatory acts of an employee, the NYCHRL imposes liability on the employer where (i) the offending employee exercised managerial or supervisory responsibility; (ii) the employer knew of the offending employee's unlawful discriminatory conduct and either acquiesced or failed to take immediate and appropriate corrective action; or (iii) the employer should have known of the conduct yet failed to exercise reasonable diligence to prevent it.  If you find Mr. Steininger has proven his claim of hostile work environment under the NYCHRL against Mr. Tzianabos, and he has proven one or more of these three situations by a preponderance of the evidence, then this element is established as to WPIX.

### F.      Damages

#### 1.      Overview

If you conclude that Mr. Steininger has met his burden of proving liability under one or more of the claims that he asserts, then you must determine the damages, if any, to which he is entitled.  You should not infer that Mr. Steininger is entitled to recover damages merely because I am instructing you on how to calculate damages.  It is exclusively your function to decide upon liability, and I am instructing you on damages only so that you will have guidance should you decide that there is liability and that damages are warranted.

In awarding damages, if you decide to award them, you must be guided by dispassionate common sense.  Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork.  On the other hand, the law does not require a Mr. Steininger to prove the amount of his or her losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.  In all instances, you are to use sound discretion in fixing an award of damages, drawing reasonable inferences where you deem appropriate from the facts and circumstances in evidence.

The verdict form I will give you will assist you in recording the determinations, if any, that you make as to damages.

#### 2.      Categories of Damages

In this case, Mr. Steininger seeks to recover six types of damages: (i) back pay, (ii) front pay, (iii) the loss of his unvested stock options in Tribune Media; (iv) an early withdrawal penalty with respect to his 401(k) account; (v) damages for emotional distress, pain and suffering, humiliation, and mental anguish, and (vi) punitive damages.

### a.  Compensatory Damages

#### i.  Overview

The first five types of damages that Mr. Steininger seeks are known as "compensatory damages," and they are designed to put Mr. Steininger in the same position that he would have been in had there been no violation of his rights.  You may award compensatory damages only for injuries that Mr. Steininger proves were caused by the discriminatory conduct that you have determined was committed by a defendant.  You may not award damages based on speculation. The damages that you award must be fair compensation—no more and no less.

Please note that you may not award compensatory damages more than once to Mr. Steininger for the same injury.  In other words, Mr. Steininger is entitled to be compensated only for injury that he actually suffered—he is entitled only to be made whole, not to recover more than he lost.  Of course, if different injuries are attributed to separate claims, then you must compensate Mr. Steininger fully for all of the injuries.

#### ii.  Back Pay

If you find for Mr. Steininger on any one of his claims for discriminatory termination, then Mr. Steininger is entitled, as compensation, to the back pay that he would have earned had he not been terminated.  This amount consists of the wages, including salary increases and employee benefits, that Mr. Steininger would have obtained from the date of the adverse employment action until the time of trial, and minus any earnings or benefits that Mr. Steininger received from other employment during this time.  Back pay damages, however, are not available on Mr. Steininger's hostile work environment claims.

#### iii.  Front Pay

Additionally, if you find for Mr. Steininger on any of his claims for discriminatory termination, and if you find that Mr. Steininger will be unable to earn in the future what he

would have earned at WPIX, then you may award him, as additional compensation, the amount he would have earned from the day of your verdict until either:  (i) the date you believe he would have worked at WPIX absent any discriminatory conduct or (ii) the date you can reasonably predict that he has a reasonable prospect of obtaining comparable employment.  This is called "front pay."  You should keep in mind that the goal of back pay and front pay is to make Mr. Steininger "whole"—that is, to put Mr. Steininger in the position he would have been had he not been discriminatorily terminated.

If you find that Mr. Steininger is entitled to an award of front pay, you should state the total dollar amount of that award and indicate the period over which such an award is intended to compensate Mr. Steininger.  In determining the length of time for which front pay will be awarded, if any, you should not unduly speculate as to future events, but are to be guided by the evidence presented at trial, including Mr. Steininger's age, work history, and likelihood of finding comparable employment.  You should not discount this award to its present value.

Again, like back-pay damages, front-pay damages are not available on Mr. Steininger's hostile work environment claims.

### iv.  Back Pay and Front Pay Damages—Plaintiff's Duty to Mitigate

A plaintiff has a duty to mitigate back pay and front pay damages by using reasonable care and diligence in seeking suitable alternative employment.  The burden is on defendants to prove by a preponderance of the evidence that Mr. Steininger has failed in his duty to mitigate.  Thus, if you find that Mr. Steininger failed to use reasonable care and diligence and that he could have obtained a job substantially equivalent to the one he left at WPIX, then you should reduce any award of back pay by the amount you find he could have earned from such employment.  Similarly, if you find that, after your verdict, Mr. Steininger will be able to obtain such a job,

using reasonable care and diligence, then you should reduce any award of front pay by the amount you find that he will earn through such other employment.

In assessing the reasonableness of Mr. Steininger's efforts to mitigate his damages, you may consider what you have learned about Mr. Steininger's qualifications for employment, the characteristics of the job market, and the quantity and quality of the efforts made by Mr. Steininger to find suitable work. The question whether Mr. Steininger acted reasonably with respect to the mitigation of damages is one for you to decide, as sole judges of the facts. In weighing the evidence, keep in mind that Mr. Steininger was under no obligation to enter another line of work, or to take a demotion or a demeaning job.

Mr. Steininger's failure to make a reasonable effort to minimize damages does not prevent all recovery, but does prevent recovery of such damages as might have been avoided.

### b.      Loss of Unvested Stock Options

If you find for Mr. Steininger on any of his claims for discriminatory termination, you must also consider whether to award him compensatory damages for the loss he claims of unvested stock options valued at $92,565.35. These damages, however, are not available on Mr. Steininger's hostile work environment claims.

### c.      401(k) Withdrawal Penalty

If you find for Mr. Steininger on any of his claims for discriminatory termination, you must also consider whether to award him compensatory damages for the penalties he incurred as a result of having to liquidate a 401(k). These penalties totaled $20,006.87. These damages, however, are not available on Mr. Steininger's hostile work environment claims.

#### d.      Non-Economic Compensatory Damages

Mr. Steininger also seeks what I will refer to as "non-economic compensatory damages." These damages are available for both Mr. Steininger's discriminatory termination claims and his hostile work environment claims.  If Mr. Steininger has proved the elements of one or more of his claims, then he may recover, in addition to any back pay or front pay that you award, to compensatory damages for any pain and suffering caused by defendants' unlawful conduct, as well as emotional distress, fear, personal humiliation, and indignation caused by that conduct.

As I noted, compensatory damages may not be based on speculation or sympathy.  They must be based on those injuries that you find Mr. Steininger has proven by a preponderance of the evidence presented at trial, and only on that evidence.  There is no requirement that evidence of the monetary value of such intangible things as pain and suffering be introduced into evidence.  There is no exact standard for fixing the compensation to be awarded for these elements of damages.  Any award you make should be fair in light of the evidence presented at the trial.  In order to recover damages for mental and emotional distress, Mr. Steininger must present credible evidence with respect to the claimed distress.  Psychiatric or other medical treatment is not a precondition to recovery.

That said, you may not simply award damages for *any* injury suffered by Mr. Steininger—you must award damages only for those injuries that were a proximate result of conduct by defendants that violated Mr. Steininger's rights.

#### e.      Nominal Damages

If you find, after considering all the evidence presented, that one or more defendants discriminated against Mr. Steininger, but that Mr. Steininger suffered no injury as a result of this violation, you may award Mr. Steininger nominal damages.  Nominal damages are a sum of

money up to $1.  They are awarded as recognition that Mr. Steininger's rights have been violated.  You would award nominal damages if you conclude that the only injury that Mr. Steininger suffered was the deprivation of his rights, without any resulting physical, emotional, or financial damage.

You may also award nominal damages if, upon finding that some injury resulted from a given unlawful act, you find that you are unable to determine monetary damages except by engaging in pure speculation and guessing.

### f.    Punitive Damages

Finally, Mr. Steininger seeks punitive damages.  Punitive damages are available only on Mr. Steininger's claims under the NYCHRL.  Mr. Steininger pursues punitive damages against both WPIX and Mr. Tzianabos on these claims.  If, but only if, you find for Mr. Steininger on such claims, you are permitted but are not required to award punitive damages to him.  You may make an award of punitive damages whether or not you award Mr. Steininger other forms of damages.

### i.    Standard for Awarding Punitive Damages

Punitive damages are awarded, in the discretion of the jury, to punish defendants for wrongful conduct or to deter them and others from similar misconduct in the future.  Punitive damages are intended to protect the community, and to be an expression of the jury's indignation at the misconduct.  Punitive damages may be awarded only after a thoughtful consideration of all of the evidence in the case.  The standard for determining damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

### ii.  Affirmative Defense for Employer

There is an affirmative defense to punitive damages available to an employer such as WPIX under the NYCHRL.  An employer will not be liable for punitive damages if it has made good faith efforts to enforce an antidiscrimination policy.  This defense requires an employer to establish both that it had an antidiscrimination policy and that it made good faith effort to enforce it.  This defense focuses on the employer's state of mind.  It precludes punitive damages unless the employer discriminated in the face of a perceived risk that its actions would violate federal law.

### iii.  Calculating and Allocating Punitive Damages

#### (a)   General Standards

If you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them.  In making this decision, you should consider the underlying purpose of punitive damages.  Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future.  Thus, in deciding whether to award punitive damages, you should consider whether the defendant may be adequately punished by an award of actual damages only, or whether actual damages are inadequate to punish the wrongful conduct.  You should also consider whether actual damages, standing alone, are likely to deter or prevent the defendant from similar wrongful conduct in the future, or whether punitive damages are necessary to provide deterrence.  Finally, you should consider whether punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those the defendant committed.

In considering a punitive damages award, if any, as to a defendant, you may consider the defendant's financial resources and the financial impact on him or it of paying any award.

Moreover, punitive damages, if any, must bear a reasonable relationship to Mr. Steininger's actual injury.  However, no single numerical equation has been made that easily links punitive to compensatory damages.  In determining a reasonable relationship to the actual injury, you must consider all relevant factors. These include:

1. The impact or severity of the defendant's conduct;
2. The amount of time the defendant conducted himself in this manner, and whether the defendant has a record of prior incidents of gender discrimination;
3. The effect of the damages award on the defendant's financial condition, as I noted a moment ago, and
4. Any punishment the defendant may receive from other sources.

If you do award punitive damages, you should fix the amount using calm discretion and sound reason. You must not be influenced by sympathy for or dislike of any party in this case.

### (b) Responsibility for a Punitive Damages Award Against Mr. Tzianabos Under the NYCHRL

I mentioned a moment ago that under the NYCHRL, an employer will not be liable for punitive damages if it has made a good faith effort to enforce an antidiscrimination policy. However, even if you decide to award punitive damages to Mr. Steininger based on Mr. Tzianabos' conduct and not WPIX's, WPIX may still be liable for Mr. Tzianabos' punitive damages.  Under the NYCHRL, an employer is held liable for any award of punitive damages imposed on a managerial or supervisory employee found to have engaged in unlawful discrimination with the necessary state of mind.  In effect, the liability for the misconduct of the manager or supervisor is attributed to the employer.  Thus, if you assess punitive damages against Mr. Tzianabos, WPIX would be obligated to pay the amount of such damages you impose.  That liability would be joint, meaning that the entire award could be collected from either one or from both of these defendants in amounts adding up to the total punitive damages.

However, you may, in your discretion, reduce the amount of the punitive damages award imposed upon Mr. Tzianabos that is imputed to WPIX.  In doing so, you may consider whether

WPIX established and complied with policies, programs, and procedures for the prevention and detection of unlawful discriminatory practices by employees, including, but not limited to:

1. A meaningful and responsive procedure for investigation of complaints of discriminatory practices by employees and for taking appropriate action against those persons who are found to have engaged in such practices;
2. A firm policy against such practices, which is effectively communicated to employees;
3. A program to educate employees about unlawful discriminatory practices under the local, state, and federal law; and
4. Procedures for the supervision of employees specifically directed at the prevention and detection of such practices.

You may also consider whether WPIX had a record of no or relatively few prior incidents of discriminatory conduct by Mr. Tzianabos.

You must consider whether WPIX has established any or all of the factors listed above, and, if so, the degree to which the award against WPIX should be reduced relative to the award against Mr. Tzianabos, if any. Further, you may take into account WPIX's financial condition in deciding whether to reduce its responsibility for any punitive damages you may impose against Mr. Tzianabos.

37

### III.   DELIBERATIONS OF THE JURY

#### A.   Right to See Exhibits and Hear Testimony

Members of the jury, now that you have heard the closing arguments of the parties, you are about to go into the jury room to begin your deliberations. Before you do that, I will give you a few final instructions.

The exhibits received in evidence will be accessible to you on a monitor in the jury room. If during those deliberations you want to see a hard copy of any of the exhibits, you may request that they be brought into the jury room.  If you want any of the testimony read, you may also request that.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of the testimony.  And please be patient—with respect to requests for testimony, it can sometimes take counsel and the Court some time to identify the portions that are responsive to your request.  If you want any further explanation of the law as I have explained it to you, you may also request that.

To assist you in your deliberations, I am providing you with a list of witnesses, in the order in which they testified; a list of exhibits; a verdict form, which I will discuss in a moment; and a copy of these instructions.  There is one of each of these for each juror.

#### B.   Communication with the Court

Your requests for exhibits or testimony—in fact any communications with the Court— should be made to me in writing, signed by your foreperson, and given to one of the marshals.  In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

### C.        Notes

Some of you have taken notes periodically throughout this trial.  I want to emphasize to you, as you are about to begin your deliberations, that notes are simply an aid to memory.  Notes that any of you may have made may not be given any greater weight or influence than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  All jurors' recollections are equal.  If you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

### D.        Duty to Deliberate; Unanimous Verdict

You will now retire to decide the questions I have described to you.  For the plaintiff to prevail on the questions that you must answer, he must sustain his burden of proof as I have explained to you with respect to the questions you are considering.  Your verdict on each question must be unanimous.  Each juror is entitled to his or her opinion, but you are required to exchange views with your fellow jurors.  This is the very essence of jury deliberation.  It is your duty to discuss the evidence.  If you have a point of view and after reasoning with other jurors it appears that your own judgment is open to question, then of course you should not hesitate in yielding your original point of view if you are convinced that the opposite point of view is really one that satisfies your judgment and conscience.  You are not to give up a point of view, however, that you conscientiously believe in simply because you are outnumbered or outweighed.  You should vote with the others only if you are convinced on the evidence, the facts, and the law that it is the correct way to decide the case. You are not to discuss the case until all jurors are present.  Five or six jurors together is only a gathering of individuals. Only when nine jurors are present do you constitute a jury, and only then may you deliberate.

### E.      Verdict Form

I have prepared a verdict form for you to use in recording your decision.  Please use that form to report your verdict.

### F.      Duties of Foreperson

Finally, I referred a moment ago to a foreperson.  The first thing you should do when you retire to deliberate is take a vote to select one of you to sit as your foreperson, and then send out a note indicating whom you have chosen.

The foreperson doesn't have any more power or authority than any other juror, and his or her vote or opinion doesn't count for any more than any other juror's vote or opinion.  The foreperson is merely your spokesperson to the court.  He or she will send out any notes, and when the jury has reached a verdict, he or she will notify the marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

### G.      Return of Verdict

After you have reached a verdict, your foreperson will fill in and date the form that has been given to you.  All jurors must sign the form reflecting each juror's agreement with the verdict.  The foreperson should then advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you must be in agreement with the verdict which is announced in court.  Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

In conclusion, ladies and gentlemen, I am sure that if you listen to the views of your fellow jurors and if you apply your own common sense, you will reach a fair verdict here.

**IV.    CONCLUSION**

Members of the jury, that concludes my instructions to you.  I will ask you to remain seated while I confer with the attorneys to see if there are any additional instructions that they would like me to give to you or anything I may not have covered in my previous statement.

* * * * *

Members of the jury, you may now retire.  The marshal will be sworn before we retire.

(Marshal sworn)

**EXHIBIT 6**

**COURT EXHIBIT 6**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                        :
BRETT STEININGER,                                       :
                                                        :
                                    Plaintiff,          :          19 Civ. 3644 (PAE)
                                                        :
                        v.                              :          <u>Verdict Form</u>
                                                        :
TRIBUNE BROADCASTING COMPANY, LLC :
ET AL.,                                                 :
                                                        :
                                    Defendants.  :
                                                        :
------------------------------------------------------- X


PAUL A. ENGELMAYER, District Judge:

PLEASE CHECK (√) YOUR ANSWERS
All jurors must agree on the answers to all of the questions:

<u>Claims Under Title VII of the Civil Rights Act of 1964</u>

1.  Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a discriminatory termination based on race or religion in violation of Title VII of the Civil Rights Act of 1964:

    a.      by WPIX?

                Yes _____        No _____

2.  Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a hostile work environment based on race or religion in violation of Title VII of the Civil Rights Act of 1964:

    a.      by WPIX?

                Yes _____        No _____

<u>Claims Under Section 1981 of Title 42 of the United States Code</u>

3.  Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a discriminatory termination based on race or religion in violation of Section 1981 of Title 42 of the United States Code:

    a.      by WPIX?

           Yes _____      No _____

    b.      by Christopher Tzianabos?

           Yes _____      No _____

4.   Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a hostile work environment based on race or religion in violation of Section 1981 of Title 42 of the United States Code:

    a.      by WPIX?

           Yes _____      No _____

    b.      by Christopher Tzianabos?

           Yes _____      No _____

Claims Under the New York State Human Rights Law

5.   Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a discriminatory termination based on race or religion in violation of the New York State Human Rights Law:

    a.      by WPIX?

           Yes _____      No _____

    b.      by Christopher Tzianabos?

           Yes _____      No _____

6.   Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a hostile work environment based on race or religion in violation of the New York State Human Rights Law:

    a.      by WPIX?

           Yes _____      No _____

    b.    by Christopher Tzianabos?

        Yes _____     No _____

## Claim Under the New York City Human Rights Law

7. Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a discriminatory termination based on race or religion in violation of the New York City Human Rights Law:

    a.    by WPIX?

Yes _____     No _____

    b.    by Christopher Tzianabos?

Yes _____     No _____

8. Has Mr. Steininger proved, by a preponderance of the evidence, that he was subjected to a hostile work environment based on race or religion in violation of the New York City Human Rights Law:

    a.    by WPIX?

Yes _____     No _____

    b.    by Christopher Tzianabos?

Yes _____     No _____

*If you have answered "Yes" to any part of any of the above questions 1-8, continue on to questions 9-14.  If not, please continue to the last page and sign the verdict form.*

## Damages

*If you have answered "Yes" to any part of the above questions 1, 3, 5, or 7, relating to Mr. Steininger's claims of discriminatory termination, continue to questions 9, 10, 11, and 12.  If not, skip to question 13.*

9. Back Pay: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages in the form of back pay?

        Yes _____     No _____

If "Yes," in what amount?

$_____

10. <u>Front Pay</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages in the form of front pay?

Yes _____     No _____

If "Yes," in what amount, and for what time period?

$_____     _____

11. <u>Loss of Un-Vested Stock Options</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages for the loss of un-vested stock options?

Yes _____     No _____

If "Yes," in what amount?

$_____

12. <u>Penalty for Early Withdrawal from 401(k) Account</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages based on the early withdrawal of his 401(k) account?

Yes _____     No _____

If "Yes," in what amount?

$_____

13. <u>Non-Economic Damages</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to compensatory damages in the form of damages for emotional distress, pain and suffering, humiliation, and mental anguish?

Yes _____     No _____

If "Yes," in what amount?

$_____

4

14. <u>Nominal Damages</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to nominal damages:

Yes _____        No _____

If "Yes," in what amount?

$_____

*Only if you have answered "Yes" any part of questions 7 or 8, may you consider question 15 which relates to punitive damages.*

15. <u>Punitive Damages Under the New York City Human Rights Law</u>: Has Mr. Steininger proved, by a preponderance of the evidence, that he is entitled to punitive damages under the New York City Human Rights Law:

a.     from WPIX?

Yes _____        No _____

i.     If "Yes," in what amount?

$_____

b.     from Christopher Tzianabos?

Yes _____        No _____

i.     If "Yes," in what amount?

$_____

ii.     For what amount of this award is WPIX jointly responsible?

$_____

5

After the Jury has reached unanimous agreement on all the questions and completed the form, each juror must sign below:

_____     _____
Foreperson

_____     _____


_____     _____


_____     _____


_____                    Dated: _____

6

**EXHIBIT 7**

COURT EXHIBIT 7

*Steininger v. WPIX, LLC & Christopher Tzianabos*

*19-cv-3644 (PAE)*

**Plaintiff's Exhibits Admitted Into Evidence**

| Exhibit | Description | Date Admitted |
|---------|-------------|---------------|
| 114 | Chris Tzianabos to External | 9/20/2021 |
| 40 | Brett Steininger expense report – Chris Tzianabos to Dan Mandler | 9/20/2021 |
| 44 | Meeting about Brett – CT and Nancy Barbosa | 9/20/2021 |
| 274 | Audit request on Brett STeininger – Chris Tzianabos, Nancy Barbosa, Jessica Singleton | 9/20/2021 |
| 50 | Brett Expense Analysis Review – Chris Tzianabos, Nancy Barbosa, and Jessica Singleton | 9/20/2021 |
| 408 | Chris Tzianabos to external | 9/20/2021 |
| 41 | Presser and Chris Tzianabos email | 9/20/2021 |
| 415 | Barbosa to Chris Tzianabos re sample PIP | 9/20/2021 |
| 526 | Chris Tzianabos to NB re PIP | 9/20/2021 |
| 67 | Brett Steininger text message screenshot | 9/20/2021 |
| 69 | Emailed correspondence between Christopher Tzianabos and Christian Wayland | 9/21/2021 |
| 593 | Wayland to Chris Tzianabos approving | 9/21/2021 |
| 822 | Dr. Berrill Report | 9/21/2021 |
| 821 | Dr. Vicki Boudin Treatment Summary Reports | 9/21/2021 |
| 2 | Defendant offer letter to Plaintiff | 9/22/2021 |
| 3 | Bob Marra yearly review of Steininger 2016 work | 9/22/2021 |
| 92 | Liquidation of Stock | 9/22/2021 |
| 96 | BS liquidating 401(k) | 9/22/2021 |
| 93 | Post-termination employment agreement WTNH | 9/22/2021 |
| 11 | Plaintiff earnings 2017 | 9/22/2021 |
| 99 | 2020 tax return | 9/22/2021 |
| 4 | Chris Wayland Review | 9/22/2021 |
| 242 | Bonus discussion | 9/21/2021 |

*Steininger v. WPIX, LLC and Christopher S. Tzianabos*
*19-cv-3644 (PAE)*

## Defendants' Exhibits Admitted Into Evidence

| Exhibit | Description | Date Admitted |
|---|---|---|
| B | Tzianabos October 9, 2017 Email to Steininger | 9/21/21 |
| F | Barbosa October 30, 2017 Email to Tzianabos | 9/21/21 |
| H | Tzianabos November 3, 2017 Email to Tzianabos | 9/21/21 |
| K | Steininger December 6, 2017 Email to Shockley, Donner | 9/21/21 |
| L | Steininger December 7, 2017 Email to Tzianabos attaching 2017 Accomplishments | 9/22/21 |
| M | Tzianabos December 15, 2017 Email to Steininger | 9/21/21 |
| N | Tzianabos December 18, 2017 Email to Steininger | 9/21/21 |
| Q | Beitler December 19, 2017 Email to Tzianabos | 9/21/21 |
| R | Data from November 2017 Audit | 9/21/21 |
| S | Barbosa December 20, 2017 Email to Tzianabos | 9/21/21 |
| W | Tzianabos January 17, 2018 Email to Barbosa attaching draft PIP | 9/21/21 |
| X | Barbosa January 25, 2018 Emails to and Tzianabos regarding revised PIP | 9/21/21 |
| Z | Performance Improvement Plan dated January 30, 2018 | 9/21/21 |
| AA | Steininger February 6, 2018 Email to Tzianabos | 9/21/21 |
| BB | Tzianabos February 6, 2018 Email to Tzianabos | 9/21/21 |
| CC | Steininger 2018 Weekly Updates to Tzianabos | 9/21/21 |

| GG | Tzianabos February 21, 2018 Email to Tzianabos | 9/21/21 |
|----|-----------------------------------------------|---------|
| JJ | Barbosa March 13, 2018 Email to Tzianabos | 9/21/21 |
| KK | Tzianabos March 27, 2018 Email to Tzianabos | 9/21/21 |
| OO | Tzianabos May 11, 2018 Email to Wayland | 9/21/21 |
| RR | WPIX Budget 2018 | 9/21/21 |
| SS | EEO and Non-Harassment Policy | 9/21/21 |
| VV | February 19, 2021 Forensic Psychiatric Report of Stuart B. Kleinman, M.D. | 9/23/21 |
| XX | PTSD Description from DSM-5 | 9/21/21 |
| YY | MCMI-IV Report and DAPS | 9/21/21 |

***Steininger v. WPIX, LLC and Christopher S. Tzianabos***
***19-cv-3644 (PAE)***

## **Defendants' Exhibits Admitted Into Evidence**

| Exhibit | Description | Date Admitted |
|---|---|---|
| B | Tzianabos October 9, 2017 Email to Steininger | 9/21/21 |
| F | Barbosa October 30, 2017 Email to Tzianabos | 9/21/21 |
| H | Tzianabos November 3, 2017 Email to Tzianabos | 9/21/21 |
| K | Steininger December 6, 2017 Email to Shockley, Donner | 9/21/21 |
| L | Steininger December 7, 2017 Email to Tzianabos attaching 2017 Accomplishments | 9/22/21 |
| M | Tzianabos December 15, 2017 Email to Steininger | 9/21/21 |
| N | Tzianabos December 18, 2017 Email to Steininger | 9/21/21 |
| Q | Beitler December 19, 2017 Email to Tzianabos | 9/21/21 |
| R | Data from November 2017 Audit | 9/21/21 |
| S | Barbosa December 20, 2017 Email to Tzianabos | 9/21/21 |
| W | Tzianabos January 17, 2018 Email to Barbosa attaching draft PIP | 9/21/21 |
| X | Barbosa January 25, 2018 Emails to and Tzianabos regarding revised PIP | 9/21/21 |
| Z | Performance Improvement Plan dated January 30, 2018 | 9/21/21 |
| AA | Steininger February 6, 2018 Email to Tzianabos | 9/21/21 |
| BB | Tzianabos February 6, 2018 Email to Tzianabos | 9/21/21 |
| CC | Steininger 2018 Weekly Updates to Tzianabos | 9/21/21 |

| GG | Tzianabos February 21, 2018 Email to Tzianabos | 9/21/21 |
|----|-----------------------------------------------|---------|
| JJ | Barbosa March 13, 2018 Email to Tzianabos | 9/21/21 |
| KK | Tzianabos March 27, 2018 Email to Tzianabos | 9/21/21 |
| OO | Tzianabos May 11, 2018 Email to Wayland | 9/21/21 |
| RR | WPIX Budget 2018 | 9/21/21 |
| SS | EEO and Non-Harassment Policy | 9/21/21 |
| VV | February 19, 2021 Forensic Psychiatric Report of Stuart B. Kleinman, M.D. | 9/23/21 |
| XX | PTSD Description from DSM-5 | 9/21/21 |
| YY | MCMI-IV Report and DAPS | 9/21/21 |

**EXHIBIT 8**

COURT EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                          :
BRETT STEININGER,                                         :
                                                          :
                                    Plaintiff,      :          19 Civ. 3644 (PAE)
                                                          :
                        v.                                :          <u>Witness List</u>
                                                          :
TRIBUNE BROADCASTING COMPANY, LLC :
ET AL.,                                                   :
                                                          :
                                    Defendants. :
                                                          :
-------------------------------------------------------------X


WITNESS LIST:

1. Christopher Tzianabos
2. Dr. N.G. Berrill
3. Dr. Vicki Boudin
4. Christian Wayland
5. Brett Steininger
6. Michael Schwartz
7. Dr. Stuart B. Kleinman
8. Nancy Barbosa
9. Debbie Presser (via deposition designation)